IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

W.W. MCDONALD LAND CO.,
THE BRUCE MCDONALD HOLDING COMPANY,
THE MILLARD MCDONALD HEIRS,
THE ALICE ROBINSON HEIRS, S.E. MCDONALD, INC.,
C.B. MORRIS, INC., OAKLEY, INC.,
L.O.U. CORPORATION, MCDONALD-ROBINSON, INC.,
GLENN T. YOST, AGENT AND ATTORNEY IN FACT
FOR ZADA PHIPPS AS TRUSTEE OF THE ERNEST M. PHIPPS
SHELTER TRUST, AND WILLIAM MCDONALD CLARK AS
TRUSTEE OF THE VIRGINIA PHIPPS COX FAMILY TRUST,

          Plaintiffs,

v.                    Civil Action No. 2:11-CV-00418

EQT PRODUCTION COMPANY, a Pennsylvania
corporation, and EQT CORPORATION, a
Pennsylvania corporation,

          Defendants.


     The video deposition of RICKY S. CRITES, taken
upon oral examination, pursuant to notice and
pursuant to the Federal Rules of Civil Procedure,
before James D. Nielsen, Court Reporter and Notary
Public in and for the State of West Virginia,
Thursday, April 26, 2012, at 9:30 a.m., at the
offices of Hendrickson & Long, 214 Capitol Street,
Charleston, West Virginia.



JOHNNY JACKSON & ASSOCIATES, INC.
606 Virginia Street, East
Charleston, WV  25301
(304) 346-8340

Page 2

```
 1              APPEARANCES
 2  On behalf of the Plaintiffs:
 3    BOWLES, RICE, MCDAVID, GRAFF & LOVE
      J. Mark Adkins, Esquire
 4    Britt Freund, Esquire
      600 Quarrier Street
 5    Charleston, West Virginia 25301
      (304) 347-1100
 6
    On behalf of the Defendants:
 7
      HENDRICKSON & LONG
 8    David K. Hendrickson, Esquire
      Stephen E. Hastings, Esquire
 9    214 Capitol Street
      Charleston, West Virginia 25339
10    (304) 346-5500
11    EQT CORPORATION
      Jessica Blake Brisendine, Esquire
12    1710 Pennsylvania Avenue
      Charleston, West Virginia 25302
13    (304) 348-3819
14
15
16
17
18  Also Present: Chuck Ritter, Videographer
19
20
21
22
23
24
```

Page 3

```
 1           EXAMINATION INDEX
 2
    RICKY CRITES
 3    BY MR. ADKINS . . . . . . . .  5
 4
 5
 6
             EXHIBIT INDEX
 7
                              PAGE
 8  EXHIBIT
 9  1   Amended Notice            8
10  2   EQT Corp Objections       8
11  3   EQT Ownership Structure    22
12  4   EQT Production Responses   24
13  5   McDonald Land Co. Leases   54
14  6   EQT McDonald Revenues      81
15  7   Disclaimer            81
16  8   Revenue Payment History    81
17  9   EQT McDonald Revenues     111
18  10  Brisendine Letter      115
19  11  Comprehensive DOI Report  118
20  12  Equitable Base Contract   128
21  13  Gas Gathering Agreement     135
22  14  E-mail Chain          147
23
24
```

Page 4

```
 1              PROCEEDING
 2       THE VIDEOGRAPHER:  We are on the record in
 3  the matter of W.W. McDonald Land Company, et al.,
 4  versus EQT Production Company, a Pennsylvania
 5  corporation, and EQT Corporation, a Pennsylvania
 6  corporation.
 7       My name is Chuck Ritter, I'm a video
 8  specialist for Jackson & Associates in Charleston,
 9  West Virginia.  I'm not related to any of the
10  parties to this action or to counsel of record, nor
11  do I have a financial interest in this action.
12       Today's date is the 26th of April, 2012.
13  The time is 9:31 a.m.  This deposition is taking
14  place at the offices of Hendrickson & Long, PLLC,
15  214 Capitol Street in Charleston, West Virginia.
16  The witness today is Rick Crites.
17       Would counsel please identify themselves
18  for the record.
19       MR. ADKINS:  Mark Adkins and Britt Freund
20  on behalf of the Plaintiffs.
21       MR. HENDRICKSON:  David Hendrickson and
22  Steve Hastings on behalf of EQT, along with Jessica
23  Brisendine.
24       THE VIDEOGRAPHER:  And will the court
```

Page 5

```
 1  reporter please swear in the witness.
 2       RICKY S. CRITES, WITNESS, SWORN
 3              EXAMINATION
 4  BY MR. ADKINS:
 5    Q.  Good morning, Mr. Crites.
 6    A.  Good morning.
 7    Q.  As I indicated to you earlier off the
 8  record, my name is Mark Adkins, and sitting beside
 9  me is Britt Freund.  We're here on behalf of the
10  plaintiffs in this civil action.
11       Would you please state your full name for
12  the record.
13    A.  It's Ricky S. Crites.
14    Q.  And Mr. Crites, would you please give your
15  complete business mailing address?
16    A.  625 Liberty Avenue, Pittsburgh,
17  Pennsylvania.
18    Q.  What's the ZIP code?
19    A.  15222.
20    Q.  And what's your business telephone number?
21    A.  (412) 395-2073.
22    Q.  And who is your current employer?
23    A.  EQT Production Company.
24    Q.  And how long have you been with EQT
```

Page 6

1   Production Company?
2       A.   Since 1984.
3       Q.   And who -- I'm sorry, what is your current
4   position at EQT Production?
5       A.   Director of Revenue Accounts.
6       Q.   And how long have you been in that
7   position?
8       A.   Since 1995.
9       Q.   Mr. Crites, have you ever had your
10  deposition taken before?
11      A.   Yes.
12      Q.   How many times?
13      A.   I believe two.
14      Q.   And I'm sure you've been through this
15  process before but I'm going to give you some basic
16  instructions and I assume you've probably heard
17  before as well.
18          I'll be asking you a series of questions.
19  I'd ask you to give full and complete answers to
20  those questions.  Try to avoid going uh-huh or
21  uh-uh or nodding your head because, as you know,
22  the court reporter is taking down everything that
23  you say and non-verbal responses are difficult to
24  take down onto the record.

Page 7

1          If at any time you do not understand my
2   question, please let me know, I'll be happy to
3   rephrase it.  If I ask you a question and you
4   answer it I'm going to assume that you understood
5   the question; is that fair?
6       A.   That's fair.
7       Q.   If at any time you'd like to take a break,
8   please let me know, I'll be happy to accommodate
9   you.  In addition, at various times in the
10  deposition you may anticipate some of the questions
11  that I'm going to be asking and you'll want to go
12  ahead and answer, I'd ask that you wait until I
13  fully complete my question before you answer
14  because it's difficult for the court reporter to
15  take things down when we're both talking at the
16  same time; is that acceptable?
17      A.   Yes.
18      Q.   Thank you.  Now, Mr. Crites, before we get
19  into kind of the meat and potatoes of the
20  deposition, were you provided a copy of the Amended
21  Notice of Rule 30(b)(6) Video Depositions of
22  Defendants EQT Production Company and EQT
23  Corporation that I served in this case?
24      A.   Yes.

Page 8

1       (Exhibit 1 marked for identification.)
2       Q.   And I'll show it to you, it's been marked
3   as Exhibit 1 to your deposition.
4       A.   Yes.
5       (Exhibit 2 marked for identification.)
6       Q.   And have you also been advised that
7   counsel on your behalf filed an objection to the
8   Notice of Rule 30(b)(6) Video Deposition on behalf
9   of EQT Corporation and EQT Production which has
10  been marked as Exhibit 2, and I'd ask if you've
11  seen that document?
12      A.   I don't believe I've seen this one.
13          MR. HENDRICKSON:  We showed it to him
14  briefly yesterday --
15          MR. ADKINS:  Sure.
16          MR. HENDRICKSON:  -- but we didn't have
17  him go through the document because it's our
18  objection.
19          MR. ADKINS:  That's fine.
20      Q.   (By Mr. Adkins) Mr. Crites, it's my
21  understanding, and I'm going to paraphrase here and
22  your counsel can interject if -- interject if I've
23  got anything incorrectly, or state anything
24  incorrectly, but it's my understanding that you are

Page 9

1   essentially here on behalf of EQT Production to
2   answer questions relating to the areas of inquiry
3   set forth in my notice, Exhibit 1, with respect to
4   the business of EQT Production, and that you're not
5   necessarily here on behalf of EQT Corporation; is
6   that correct?
7       A.   That's correct.
8       Q.   But in your position with EQT Production
9   since I believe '84; is that correct?
10      A.   Correct.
11      Q.   You do have some basic knowledge about the
12  role or the structure of EQT Corp?
13      A.   That's correct.
14          MR. ADKINS:  And did I say everything
15  right, Dave --
16          MR. HENDRICKSON:  Yeah.
17          MR. ADKINS:  -- in terms of what he's here
18  for?
19          MR. HENDRICKSON:  Yeah.
20      Q.   (By Mr. Adkins) So in that sense I may be
21  asking you some questions with respect to EQT
22  Corporation, but as I understand you're not here to
23  answer the areas of inquiry set forth in my notice
24  as it particularly relates to EQT Corporation,

Page 10

1 correct?
2    A.  Correct.
3    Q.  Thank you, sir.  Mr. Crites, let's back up
4 a little bit.  Where did you grow up from
5 originally?
6    A.  Buckhannon, West Virginia.
7    Q.  And where did you graduate high school?
8    A.  Buckhannon.
9    Q.  What year did you graduate?
10   A.  1977.
11   Q.  Did you have any further education
12 following high school?
13   A.  Yes.  West Virginia University, a degree
14 in accounting, 1981.
15   Q.  And any further education after college?
16   A.  No.
17   Q.  Where did you go to work after college?
18   A.  To Union Drilling.
19   Q.  And what type of work did you do for Union
20 Drilling?
21   A.  Just staff accounting.
22   Q.  And how long were you there?
23   A.  I was there for three years.  At that
24 point in time Equitable bought Union Drilling.

Page 11

1    Q.  And that was in 1984?
2    A.  Correct.
3    Q.  So after that what was your position when
4 you came -- when Equitable bought Union Drilling?
5    A.  Just a staff accountant.
6    Q.  And can you tell me the position since '84
7 that you've had with Equitable?
8    A.  In 19 -- 1995 I was made director of
9 accounting.  I left the company in 2000 and
10 returned to the company in 2003.
11   Q.  So you said -- was it '85 that you became
12 director of accounting?
13   A.  No, '95.
14   Q.  '95.  Could you give me the rundown of
15 what your job duties and responsibilities were as
16 director of accounting for Equitable?
17   A.  Overseeing the joint interest billing
18 process and the revenue distribution processes.
19   Q.  When you say joint interest billing, could
20 you be a little more specific, or explain that to
21 me?
22   A.  Yeah.  There are -- we have properties
23 that we have other partners in, and we have a joint
24 interest billing process that bills those partners

Page 12

1 for their share of expenses on the wells.
2    Q.  And then I think the other aspect of it
3 was essentially dealing with the payment of
4 royalties?
5    A.  Right.  I mean --
6    Q.  Revenue distribution?
7    A.  Right.  Revenue distribution is -- you
8 know, we have in most cases seven-eighths and the
9 royalty owners have one-eighth and we have the
10 process to pay the royalties and give ourselves
11 revenue for our income statement.
12   Q.  Now, when you came on in '84 what was the
13 actual corporate entity that you were employed by?
14   A.  Wow, it might have been Equitable
15 Resources Energy Company at that point.  The
16 company has changed names a few times over the
17 years.
18   Q.  And that's one thing I wanted to ask you
19 about.  Can you, if you can recall, tell me what
20 the different changes in the corporate entities
21 were over time.  I know right now it's EQT
22 Production Company.  If you remember.
23   A.  Prior to EQT it was Equitable Production
24 Company.

Page 13

1    Q.  When did that change occur, if you
2 recall?  Was that sometime maybe in 2004 or 2005?
3    MR. HENDRICKSON:  I think we've given the
4 documents that reflect all the changes.
5    MR. ADKINS:  I haven't -- I haven't --
6 I've got this, but this doesn't have the change.
7 This is just the organizational chart as it stands
8 now.
9    MR. HASTINGS:  We have documents that has
10 the changed names of all the EQT Companies.
11   MR. ADKINS:  Was that part of this --
12   MR. HENDRICKSON:  We've given you so many
13 documents, but I thought that was in there.
14   But go ahead, you can answer -- I mean, he
15 can answer the best he can.
16   MR. ADKINS:  Yeah, to be honest with you,
17 listen, we've gone through 40,000 pages and I'm
18 sorry if I missed it.
19   MR. HASTINGS:  It's okay.  We'll make sure
20 you get that.
21   MR. ADKINS:  Okay.
22   MR. HENDRICKSON:  Go ahead and just answer
23 the question.
24   A.  Yeah, I don't recall the exact date.

4 (Pages 10 to 13)

Page 14

1    Q.   (By Mr. Adkins) So if it was EQT
2  Production, prior to that it was Equitable
3  Production?
4    A.   Right.
5    Q.   And then possibly before that it would
6  have been -- was it Equitable Resources?
7    A.   I think, yes, it could have been, yes.
8    Q.   So to the best of your recollection since
9  you came on or became an employee of Equitable
10 that's the transformation of the company from then
11 to the present?
12   A.   Right.
13        MR. HASTINGS:  Let me interject, Mark.
14 Dave's defending the deposition but I just want to
15 make sure some things are accurate.  That may not
16 necessarily be accurate but we'll rely upon the
17 documents because he may be mixing companies that
18 he doesn't know.
19        MR. ADKINS:  Okay.
20        MR. HASTINGS:  And just for your --
21        MR. ADKINS:  Oh, I understand, I'm just
22 asking for the best of his recollection.
23        MR. HASTINGS:  Yeah.  It was Equitable
24 through May 31st of '09, so it was Equitable

Page 15

1  Production Company until May 31st of 2009 and that
2  is when it became EQT Production Company.
3        MR. ADKINS:  Okay, got you.
4    Q.   (By Mr. Adkins) Now, back to your job
5  duties, you've described what you did as director
6  of accounting, and that's your current position
7  right now; is it not?
8    A.   Director of revenue accounting.
9    Q.   Director of revenue accounting?
10   A.   Right.
11   Q.   Is that -- how is that different than the
12 position that you had since --
13   A.   It's just a title change.
14   Q.   Same duties?
15   A.   It's the same thing.
16   Q.   Okay.  Now, you indicated that you left in
17 2000 and returned in 2003, where were you in that
18 time period?
19   A.   In 2000 EQT decided to close their
20 Tennessee office, which is where I was located at
21 that time.
22   Q.   Okay.
23   A.   I opted not to come to Pittsburgh at that
24 time.  And I was employed by another company, Evan

Page 16

1  Energy.
2    Q.   Evan?
3    A.   Evan Energy.
4    Q.   E-V-A-N?
5    A.   Right.
6    Q.   And where are they located?
7    A.   I don't think they exist anymore, but they
8  were located in Kingsport, Tennessee, which is
9  where the Equitable offices were.
10   Q.   Was that a gas company?
11   A.   Yes.
12   Q.   And what was your position there?
13   A.   Controller.  It was a very small gas
14 company.
15   Q.   And were you there from 2000 to 2003?
16   A.   Yes.
17   Q.   Why did you decide to return to EQT
18 Production?
19   A.   The company basically called me and said
20 we'd like for you to come back.  So at that point I
21 said okay, because the company I was working for,
22 Evans, was having some problems.  So I relocated to
23 Charleston, West Virginia to the EQT offices
24 there.  And then a year later I was transferred to

Page 17

1  Pittsburgh.
2    Q.   And what was your position upon returning
3  to EQT in 2003?
4    A.   Director of accounting.
5    Q.   And you continue to have that position,
6  although they might have changed the name?
7    A.   They changed it a couple years ago.
8    Q.   But still your duties have been consistent
9  really from '95 to the present?
10   A.   Correct.
11   Q.   Now, Mr. Crites, I understand you're from
12 West Virginia, do you have any relatives or close
13 family members, either you or your wife, or family
14 in southern West Virginia?
15   A.   Not in southern, no.
16   Q.   A couple of quick questions, Mr. Crites,
17 please don't take offense to this, these are
18 questions I ask of every witness I depose, so I'm
19 not trying to be mean or nasty.  Have you ever been
20 arrested, charged or convicted of a crime?
21   A.   Yes.
22   Q.   Can you please tell me what that is?
23   A.   DUI, two years ago.
24   Q.   Is that currently pending or been

Page 18

1  resolved?
2      A.  That's been resolved.
3      Q.  And was that in West Virginia or
4  Pennsylvania?
5      A.  It was in West Virginia.
6      Q.  What county?
7      A.  Upshur.
8      Q.  Anything else?
9      A.  Nope.
10     Q.  Are you currently taking any medications
11 or drugs which would affect your ability to answer
12 questions here today?
13     A.  No.  I do have -- I am on my blood
14 thinner.  I had a blood clot a couple years ago.
15     Q.  Now, you previously indicated that you
16 have been deposed before, and you believe twice.
17 Could you tell me what those cases were about and
18 when those depositions occurred?
19     A.  The most recent one was two or three years
20 ago, it was a tax case for the state of Virginia.
21     Q.  Were you being deposed on behalf -- as a
22 representative of Equitable?
23     A.  Yes.
24     Q.  So it was a tax case?

Page 19

1      A.  Yes, severance tax.
2      Q.  Severance tax.  Was it an issue with a
3  lessor or just a problem that Equitable was having
4  with the state in terms of the tax that was being
5  levied against Equitable?
6      A.  It was with accounting that process the
7  severance taxes in Virginia.
8      Q.  And that was one, what was the other one
9  that you recall?
10     A.  The other one was several years ago and I
11 believe it was a royalty issue, but I'm not real --
12 I just remember that I did it, I don't remember
13 what it was about.
14     Q.  Do you remember what state it was in?
15     A.  I think it was Kentucky.  It was probably
16 late 1990s.
17     Q.  Were you ever deposed in the Equitable
18 class action that was filed here in southern West
19 Virginia?
20     A.  Yes.
21     Q.  So that would have been a third
22 deposition?
23     A.  You're -- yes, that's correct.
24     Q.  Would that have been sometime in the mid

Page 20

1  2000s?
2      A.  That was late -- that was probably 2008,
3  '09.
4      Q.  Do you recall if that deposition was
5  pre-settlement or post-settlement?
6      A.  Pre-settlement.
7      Q.  Who was representing Equitable in that
8  class action, if you recall?
9      A.  Richard Gottlieb.
10         MR. HENDRICKSON:  Let me just make sure
11 you're aware.  He also did a post-settlement
12 deposition over the telephone in the same matter.
13 I'm not sure he...
14     A.  Right.  It was informational, yeah.  It
15 was very brief.
16     Q.  The pre-settlement deposition you gave in
17 that case, was it essentially along the same areas
18 of inquiry set forth in my notice that I filed in
19 this case?
20     A.  It was more IT informational on the data
21 that we provided and how we provided it.
22     Q.  Now, as in your role as director of
23 accounting or revenue accounting -- I'm sorry, let
24 me make sure I get that right -- director of

Page 21

1  revenue accounting?
2      A.  Right.
3      Q.  Are you overseeing the, I guess, the
4  collection of data from the field with respect to
5  volume of gas produced?  Is that part of your job
6  duties?
7      A.  It is not.
8      Q.  The volumes though do make it into your
9  accounting system?
10     A.  That's correct.
11     Q.  Who's in charge -- who at Equitable
12 Production is in charge of overseeing the
13 collection of volume data from the field into EQT
14 Productions?
15     A.  That's the gas measurement group.  There's
16 been some change in personnel so I'm actually not
17 sure who's totally responsible for that.
18     Q.  Who was responsible for that?
19     A.  Frank King.
20     Q.  Is he still with the company?
21     A.  Yes.
22     Q.  What's his current position?
23     A.  I'm not sure.  He did change jobs.
24     Q.  Was he demoted or promoted?

Page 22

1    A.  I think it was just a change in jobs.
2    Q.  How long did Frank King have that job, if
3  you recall?
4    A.  Three or four years.
5    Q.  Do you remember who did it before?
6    A.  Chris Akers.
7    Q.  Do you recall how long Chris held that
8  position?
9    A.  I don't recall.
10    Q.  Are you familiar with the process that is
11  utilized by EQT Production in terms of collecting
12  and inputting the data with respect to volume?
13    A.  Yes.
14    (Exhibit 3 marked for identification.)
15    Q.  Mr. Crites, I'm going to hand you what's
16  been marked as Exhibit 3 to your deposition.  This
17  is a document that was produced by your counsel in
18  this case.  It is Bates Numbered WWEQT321 through
19  WWEQT337.  And the front page is a -- it appears to
20  be an organizational chart for EQT Corp as of
21  December 31st, 2011.  Have you seen this document
22  before?
23    A.  Briefly.
24    Q.  Let me back up.  When you came on with the

Page 23

1  company in '84 and it was Equitable Resources did
2  Equitable Resources have a parent company, if you
3  know?
4    MR. HASTINGS:  Mark, I hate to interject,
5  I think Equitable Resources was a parent company at
6  that time.  He may not -- I don't know if he knows
7  the names, who --
8    MR. ADKINS:  And I'll ask him if that's
9  the parent company.  And again, if you have this
10  somewhere and could show it that would be awesome.
11    MR. HASTINGS:  Yeah.  Well, there's some
12  information that I was talking about before, it's
13  listed behind the --
14    MR. HENDRICKSON:  Yeah, it goes all the
15  way back.
16    MR. ADKINS:  Okay.  Let's go --
17    MR. HASTINGS:  That's information I was
18  referring to earlier.
19    MR. ADKINS:  Here we go.
20    MR. HENDRICKSON:  I call it a -- this is
21  the organization 2002 to 2004.
22    MR. ADKINS:  2002 to 2004.
23    MR. HASTINGS:  Mark, if you want to go off
24  the record for a second Ms. Brisendine and I can

Page 24

1  probably give you a two minute crash course.  It
2  may be easier for you.
3    MR. ADKINS:  Yeah, let's do that real
4  quick.
5    THE VIDEOGRAPHER:  Going off the record.
6  The time is 9:53 a.m.
7    (Discussion was held off the record.)
8    THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 9:56 a.m.
10    (Exhibit 4 marked for identification.)
11    Q.  (By Mr. Adkins) Mr. Crites, I'm going to
12  be asking you some questions about the accounting
13  system here in a moment, which in your position I'm
14  sure you're very familiar with.
15    I'm going to hand you what's been marked
16  as Exhibit 4 to your deposition.  And these are the
17  discovery responses submitted by your counsel on
18  behalf of EQT Production Company.  And you don't
19  need to look through those just yet, I'll direct
20  you to where you need to in a moment, but in these
21  responses, and I can show you where if you need to
22  see, but it indicated that EQT Production did not
23  operate any wells in West Virginia before February
24  of 2000.

Page 25

1    A.  That's correct.
2    Q.  Did any of the predecessor companies of
3  EQT Production operate wells in West Virginia prior
4  to 2000?
5    A.  Yes.
6    Q.  And what company was that?
7    A.  That would have been Equitable Resources
8  Energy Company.
9    Q.  So --
10    A.  Those properties were sold in, I believe,
11  1995.
12    Q.  Sold by whom to whom?
13    A.  Sold to Enervest, which was a Texas based
14  company, by Equitable at that point.
15    Q.  So Equitable kind of sold out its
16  properties in '95?
17    A.  Right.
18    Q.  And did they at some point buy them back
19  or what happened in February of 2000?
20    A.  I wasn't here with the company at that
21  time.
22    Q.  Sure.
23    A.  But I believe they acquired Eastern
24  States -- is that right -- Statoil, which are part

Page 26

1   of the properties that we currently own in West
2   Virginia.
3       Q.   So was Equitable not doing business as a
4   gas production company in West Virginia from '95 to
5   February 2000?
6       A.   Correct.
7       Q.   Let's talk about the accounting system.
8   If you could turn to Page 5.
9       A.   Actually --
10      Q.   Oh, I'm sorry, go ahead.
11      A.   No, that's fine.  Actually, Equitable did
12  own some properties in West Virginia and
13  Pennsylvania, those were the Equitran wells.  Those
14  were all northern West Virginia and southern
15  Pennsylvania properties.
16      Q.   So to be specific, from 1995 when the
17  transaction with Equitable and -- is it Enavest?
18      A.   Enervest.
19      Q.   Enervest.  Enervest took place, from '95
20  to February 2000 Equitable did not have any
21  interest in gas wells in southern West Virginia but
22  they did in northern West Virginia?
23      A.   That's correct.
24      Q.   If you could take a look at Exhibit 4,

Page 27

1   page 5.  At the top of the page it talks about from
2   February 2000 to December 2001, revenue
3   distributions were performed on the Phoenix oil and
4   gas accounting system.  Now, I don't believe you
5   were with the company at that time?
6       A.   That's correct, I was not.
7       Q.   So you're -- are you not familiar with
8   that accounting system?
9       A.   I have heard about it, but I'm not
10  familiar with it.  I know that's a true statement,
11  but I was never...
12      Q.   And then I guess the -- in January 2002
13  the accounting system was changed to the Enertia
14  oil and gas accounting system?
15      A.   Correct.
16      Q.   And again, you weren't there when the
17  changeover took place?
18      A.   That's correct.
19      Q.   But it's my understanding that is the
20  system that is still in place with Equitable?
21      A.   That's correct.
22      Q.   So that is probably a program that you --
23  and a system that you use on a daily -- deal with
24  on a daily basis?

Page 28

1       A.   Correct.
2       Q.   Now, if you could, and I'm sure this is a
3   very complicated program, but if you could describe
4   for me kind of the data that is in -- that is --
5   that Equitable inputs into this system on a daily
6   basis?
7       A.   There is really not a daily basis.  The
8   volumetric data is captured from the field into a
9   system called Flow-Cal.  Flow-Cal transfers that
10  data to Enertia.  And Enertia is where the revenue
11  distribution process takes place.
12      Q.   Now, is Enertia specifically related to
13  revenue distribution?
14      A.   Yes.
15      Q.   Is the sale price -- how is the sale price
16  for gas introduced into the Enertia system?
17      A.   That comes from our marketing company.
18      Q.   What company is that?
19      A.   EQT Energy.
20      Q.   EQT -- and we're going to get into this in
21  a lot more detail later, but EQT Energy is actually
22  the company that buys the gas from EQT Production?
23      A.   Correct, correct.
24      Q.   So the sale price that EQT Energy pays for

Page 29

1   the gas to EQT Production is the sale price that
2   would be indicated in the Enertia system?
3       A.   Correct.
4       Q.   Is the sale price for the gas that EQT
5   Energy gets when it sells it, is that anywhere in
6   the Enertia system?
7       A.   I don't believe so, no.
8       Q.   I guess that would be in EQT Energy's
9   computer system?
10      A.   Correct.
11      Q.   Do you know what kind of accounting system
12  they use?
13      A.   I do not.
14      Q.   Do you know who the director of revenue
15  accounting is at EQT Energy?
16      A.   That would be Jimmi Sue Smith.
17      Q.   Jimmi -- what was the?
18      A.   Jimmi Sue Smith.
19      Q.   Sue Smith?
20      A.   Right.
21      Q.   Where's he located?
22      A.   That's a she.
23      Q.   Oh, she, I'm sorry.
24      A.   She's in Pittsburgh.

Page 30

1    Q.  Is the sale price -- I mean, in terms of
2  the sale price of gas that EQT Production sells gas
3  to EQT Energy, is that a -- how is that entered?
4  Is that entered on contract price that is just
5  inserted on a per MCF basis?
6    A.  It's typically an index price.
7    Q.  How often is that -- the index checked and
8  changed?
9    A.  Well, the index changes every month.
10   Q.  So the index price in the Enertia system
11 is changed monthly?
12   A.  Yes.
13   Q.  If there is in fact a change?
14   A.  There's always a change.
15   Q.  And is that your department that makes
16 that change in the Enertia system?
17   A.  It comes from Equitable Energy down to us,
18 but yes, at the end of the day we're the ones that
19 make the changes.
20   Q.  How is it transmitted from Equitable
21 Energy to Equitable Production?
22   A.  Via wire transfer and a file that supports
23 that.
24   Q.  What do you mean by a wire transfer?  Are

Page 31

1  you talking about a transfer of funds?
2    A.  Yes.
3    Q.  Well, I was kind of -- I'm sorry, maybe I
4  asked my question poorly, I apologize.
5        I was talking about the index price that
6  actual data, you know, if it's a per MCF number or
7  per MMBTU, that index price, how it would be
8  communicated from Equitable Energy to Equitable
9  Production and placed in the Enertia system for the
10 calculation?
11   A.  Again, it's a wire transfer that has the
12 prices in it, and the revenue dollars associated
13 with each meter that it flows from.
14   Q.  So along with money they provide you with
15 data to advise you how those calculations were
16 made?
17   A.  Correct.
18   Q.  It's -- in the discovery responses it's
19 also stated that for the period of January '95 to
20 June 1997 the data I requested, specifically the
21 royalty data, from Equitable could not be produced
22 from the database that was in place at the time.
23 Do you know why that is or?
24   A.  I don't know.  The change of accounting

Page 32

1  systems occurred while I was gone.
2    Q.  Because that would have been the time
3  period that Enervest would have had the -- would
4  have controlled the royalty calculations, correct?
5    A.  Not on those properties.
6    Q.  Not on the southern West Virginia
7  properties?
8    A.  No.
9    Q.  I thought that's what was sold in '95?
10   A.  No.
11   Q.  Okay, I'm sorry.
12   A.  What was sold in '95 were the old Union
13 Drilling properties that Equitable acquired in
14 1984.
15   Q.  My clients' properties in southern West
16 Virginia in the Logan and Mingo County area, who
17 would have owned those properties in this January
18 '95 to June '97?
19   A.  Statoil.
20   Q.  And are you familiar with the type of -- I
21 believe the system that Statoil used was the
22 Phoenix oil and gas accounting system?
23   A.  That's correct.
24   Q.  And I know that Equitable was able to

Page 33

1  produce some information or royalty data from the
2  Phoenix system but not for '95 through '97, but you
3  don't know why?
4    A.  I'm not sure, no.
5    Q.  Now, continuing on, on page 5, middle of
6  the page under the heading General I want to talk
7  to you a little bit about the gathering system
8  that's in place.
9        It's my understanding, at least as of
10 right now, there's a separate company called EQT --
11 there's actually several EQT Gathering,
12 Incorporated, and EQT Gathering Equity, LLC, and
13 then EQT Gathering, LLC.  With respect to the
14 gathering system that's in place in southern West
15 Virginia do you know which of those companies owns
16 that gathering system?
17   A.  I do not.
18   Q.  I'll represent to you, and I'm sure your
19 counsel will correct me, I believe it is Equitable
20 Gathering Equitable, LLC; is that correct?
21     MR. HASTINGS:  Yeah.
22   Q.  Are you familiar with those gathering
23 companies and their roll in the process?
24   A.  I know the purpose that they serve, yes.

Page 34

1    Q.   Do you have any dealings with them
2  directly?
3    A.   Occasionally.
4    Q.   Do they have a director of accounting?
5    A.   Yes.
6    Q.   Do you know who that is?
7    A.   I believe it's Jeff Mitchell.
8    Q.   Where's Mr. Mitchell located?
9    A.   In Pittsburgh.
10   Q.   Where is -- is your office, or the offices
11 of EQT Production, is that located in a different
12 location than Equitable -- EQT Energy and EQT
13 Gathering Equity, LLC?
14   A.   No, they're primarily located all in the
15 same office in Pittsburgh.  There are field offices
16 but primarily the headquarters is in Pittsburgh.
17   Q.   The corporate centers are in the same
18 location?
19   A.   Right.
20   Q.   Looking at this general description it's
21 my understanding that with respect to this
22 gathering of the gas on EQT Production's property
23 that the gas is measured for a particular well, it
24 is measured at the well, is that your

Page 35

1  understanding?
2    A.   That's correct.
3    Q.   So is each well in EQT Production's system
4  have a meter at the well?
5    A.   Yes.  There's a possibility that old, old
6  wells that don't produce much may be un-metered and
7  had well tests from time to time, but for the most
8  part, yes, they're all metered.
9    Q.   Or may have a collection of wells on a low
10 producing set of wells that may meet in a certain
11 area and the meter may be located there?
12   A.   Right.
13   Q.   But from your experience as it stands the
14 vast majority of the wells on EQT Production's
15 system are metered at the well?
16   A.   Correct.
17   Q.   Is there any measurement done at the well
18 of BTU or caloric value?
19   A.   Yes.
20   Q.   How is that done if you know?
21   A.   There are gas samples that are taken at
22 the well.
23   Q.   Do you know how frequently?
24   A.   I do not.

Page 36

1    Q.   Who's in charge of that?  Is that part of
2  the gas measurement --
3    A.   Yes.
4    Q.   -- department?
5    A.   Yes.
6    Q.   And who is -- and I'm sorry, I apologize,
7  who is the head of that department for EQT
8  Production?
9    A.   I would think it's Bill Sibert.
10   Q.   Is he located in Pittsburgh?
11   A.   Yes.
12   Q.   And he would probably have more
13 information as to how the BTU or caloric intake is
14 measured at a well and how frequently?
15   A.   Yeah.
16   Q.   Is that value taken into consideration in
17 the payment of royalties?
18   A.   Overall, yes.
19   Q.   At what point in the process is that done?
20   A.   At the sales meters.
21   Q.   And the sales meter, that's at the point
22 where the gathering system meets the interstate
23 pipeline; is that correct?
24   A.   That's correct.

Page 37

1    Q.   And that may reflect a large number of
2  wells that come through at that point?
3    A.   That's correct.
4    Q.   How is Equitable Production able to
5  distinguish at the sales meter one well that may
6  have a higher BTU value versus another meter or
7  well that may have a lower BTU value?
8    A.   Well, typically, geographical areas the
9  BTU is very consistent.  But the BTU at the sales
10 meter is allocated back to the wells that are
11 behind that sales meter.
12   Q.   And is the BTU value for the wells that
13 are behind the sales meter essentially averaged
14 out?
15   A.   Yes.
16   Q.   How long -- has that always been the case
17 since you've been with Equitable?
18   A.   Yes.
19   Q.   Is the measurement of volume taken at the
20 well, at the wellhead, is that the volume
21 measurement that is then reported by Equitable
22 Production to the West Virginia Department of
23 Environmental Protection?
24   A.   Yes.

Page 38

1    Q.   Who is in charge of reporting that
2  volumetric measure to the DEP?
3    A.   Our engineering group.
4    Q.   With Equitable Production?
5    A.   Correct.
6    Q.   And who's the director of that department?
7    A.   The individual that reports that is Chuck
8  MacCartney.
9    Q.   MacCartney?
10   A.   Yes.
11   Q.   M-C-C-A-R-T-N-E-Y?
12   A.   Yes.
13   Q.   And is he located in Pittsburgh?
14   A.   I'm sorry, no, it's M-A-C.
15   Q.   M-A-C.
16   A.   Right.
17   Q.   Chuck would probably get mad at me if I
18  misspelled it that way wouldn't he?
19   A.   Probably.
20   Q.   Is located in Pennsylvania?
21   A.   He's in Pittsburgh, yeah.
22   Q.   That measurement that you indicated was
23  reported for a particular well that's reported to
24  the West Virginia DEP, is that -- and that's done

Page 39

1  on a monthly basis, correct?
2    A.   It's annual.
3    Q.   It's annual?
4    A.   It's reported annual.
5    Q.   I know that the DEP --
6    A.   At least I -- let me step back and say I
7  believe it's reported annually.
8    Q.   And I'm going to show you later on in your
9  deposition that the DEP has it on their web site
10  per well on a monthly basis.
11   A.   That's correct. It's reported annually
12  but it's reported on a monthly basis.
13   Q.   I'm with you. And I guess I wasn't
14  talking about the timing of the reporting, I was
15  talking about the substantive part of the reporting
16  in terms of what is reported, and that they in
17  fact, EQT Production, reports on an annual basis
18  but by month.
19   A.   By month, that's correct.
20   Q.   Now, that month figure, monthly figure for
21  a particular well, is that also the same number
22  that a lessor would see on their royalty statement?
23   A.   No.
24   Q.   We'll get into that a little bit later.

Page 40

1         The meters at the wellhead, are you
2  familiar with how often those are inspected for
3  quality assurance?
4    A.   I am not.
5    Q.   And would that be the gas measurement
6  department?
7    A.   Yes.
8    Q.   I would need to talk to Bill Sibert?
9    A.   Yes.
10   Q.   And it's my understanding that from the
11  wellhead is the point where EQT Energy purchases
12  the gas but the custody of the gas then goes
13  through an EQT gathering company?
14   A.   Correct.
15   Q.   And EQT, for purposes of our discussion,
16  EQT Gathering Equity, LLC, takes custody of the gas
17  as part of a gathering agreement it has with EQT
18  Energy?
19   A.   Correct.
20   Q.   And it delivers it to a sales meter?
21   A.   Correct.
22   Q.   At which point at the sales meter it is
23  then sold?
24   A.   Correct.

Page 41

1    Q.   Other than the meter at the well and the
2  sales meter are there other, to the best of your
3  recollection, other meters that may measure the
4  volume of the gas during that process?
5    A.   Can you repeat that?
6    Q.   We're looking at the meter at the well and
7  then you have the point of sale, the sales meter?
8    A.   Right.
9    Q.   And throughout that gathering process
10  between those two points do you know if there's any
11  other meters in the gathering system?
12   A.   I'm not aware of any.
13   Q.   At the bottom of -- I'm a little bit
14  confused here on the bottom of page 5 it talks
15  about third-party custody transfer meters.
16   A.   Right.
17   Q.   Is that the sales meter?
18   A.   Yes.
19        MR. HENDRICKSON: It is a tricky term.
20        MR. ADKINS: You-all -- the next page you
21  say sales meters, why didn't you just say sales
22  meter on the page before. Trying to trick me.
23        MR. HENDRICKSON: Right here.
24        MR. ADKINS: I know. The life of an

Page 42

1    associate.  I'm glad those days are over.
2         MR. HASTINGS:  Rick may have drafted
3    that.  I'm kidding.
4         Mark, can I interject something on the
5    sales point?
6         MR. ADKINS:  Why not.
7         MR. HASTINGS:  This is at a point in
8    time --
9         MR. ADKINS:  Do you want me to swear you
10   in?
11        MR. HASTINGS:  No, but -- I'm just trying
12   to help you.  There may be other things in the
13   gathering system that he didn't know about, EQT
14   Production Company itself may not be involved with
15   that.
16        MR. ADKINS:  And I'm going to get to talk
17   to him -- that's what I was going to.
18        MR. HASTINGS:  Sorry.
19   Q.   (By Mr. Adkins) Who maintains the sales
20   meter?  Is that EQT Gathering or EQT Energy?
21   A.   What do you mean when you say maintains?
22   Q.   Well, one, make sure they're not broken;
23   two, check them for quality assurance, collects the
24   data?

Page 43

1    A.   Yeah, I mean, EQT Energy has those
2    readings, EQT Gathering has those readings.  There
3    are standard operating procedures that require --
4    and I don't know the specifics but require like
5    dual testing of those meters.  When I say dual I
6    mean if it's a Dominion meter or a Columbian meter
7    it requires, you know, EQT to be there along with
8    Dominion or Columbia to test a meter.
9         I don't know the standard operating
10   procedures and the time lines, whether it's 60
11   days, 90 days, 120 days, but there's dual testing
12   of those meters to ensure their accuracy.
13   Q.   So is it possible that at the point of
14   sale the sales meters at the -- where the gathering
15   system connects to the interstate pipe line, is
16   that possibly the meter -- I'm trying to understand
17   who actually owns the meter; is that the company
18   that has the interstate pipeline at that point?
19   A.   Yes.  Yes, they report the sales, yes.
20        MR. HENDRICKSON:  You're talking about the
21   sales meter?
22        MR. ADKINS:  Yes.
23   A.   Right, right.
24   Q.   Now, in your discovery response you also

Page 44

1    talk about that the gas is moved by compressors.
2    And I believe there's a map that I have, I can show
3    it to you if you need to, that outlines not only
4    the gathering system but the amount of compressors
5    in that particular gathering system.
6         Do you know that if -- do you know whether
7    or not there are any compressors located on my
8    clients' properties?
9    A.   Not specifically I do not.
10   Q.   Does EQT Production own any compressors or
11   is that all the property of EQT Gathering?
12   A.   That's all EQT Gathering.
13   Q.   So they're the ones that maintain the
14   compressors?
15   A.   That's correct.
16   Q.   And EQT Gathering is also -- its
17   responsibility is to maintain the gathering lines?
18   A.   Correct.
19   Q.   Make sure there's repairs and they have
20   minimal line loss and so forth, correct?
21   A.   Right, right.
22   Q.   Is it also EQT Gatherings job to remove
23   any liquids from the natural gas?
24   A.   If they exist, yes.

Page 45

1    Q.   Do you know in this part of the state, in
2    this area, Logan-Mingo area, for those wells do
3    those generally have natural gas liquids?
4    A.   No.
5    Q.   They do not?
6    A.   They do not.
7    Q.   And just so we're clear, I mean, they have
8    very minimal amounts or they have almost none?
9    A.   Almost none.
10   Q.   What parts of the state do in fact -- does
11   EQT find that there are -- that the wells produce
12   natural gas liquids, or NGL?
13   A.   Only in northern West Virginia.
14   Q.   Because those are in fact -- have a higher
15   value than the actual natural gas, correct?
16   A.   Correct.
17   Q.   Around 35 percent more, roughly?
18   A.   I mean, the bottom line is, is if you
19   extract liquids it's to make the gas pipeline
20   quality, all right, like the major transporters
21   will not take high BTU gas, and the Brenton
22   District where your clients' wells are, the BTU is
23   not that high.
24   Q.   Is there any -- and again, this is

Page 46

1    probably the response -- well, you can tell me if
2    it's the responsibility of another company, but is
3    there any processing of the natural gas to get to
4    market in this Brenton district?
5       A.  Not that I'm aware of.
6       Q.  Now, in your discovery responses it talks
7    about Enertia, upon receiving the amount of gas
8    recorded at the sales meter, that measurement is
9    then placed in the Enertia system, and Enertia then
10   allocates the volume from the third -- from the
11   sales meter back to each well for each well's, I
12   guess, proportionate share of produced value?
13      A.  Correct.
14      Q.  And that's the sales volume?
15      A.  Correct.
16      Q.  Per well, correct?
17      A.  Yeah.
18      Q.  And that sales volume that's allocated per
19   well is different from the measurement taken at the
20   wellhead meter?
21      A.  That's correct.
22      Q.  That allocation, does it take into account
23   the -- strike that.
24          In order to make that allocation does

Page 47

1    Enertia have to utilize the measurement at the
2    wellhead versus -- to kind of set the percentage
3    allocation for that well in relation to the overall
4    measurement taken at the sales meter?
5       A.  Yes.
6       Q.  Is that wellhead measurement used for any
7    other calculation other than that allocation?
8       A.  No.
9       Q.  And is that sales volume, is that the
10   number that is indicated on a lessor's royalty
11   statement?
12      A.  That's correct.
13      Q.  But that's not the number that's reported
14   to the West Virginia Department of Environmental
15   Protection?
16      A.  That's correct.
17      Q.  Is there a department in EQT Production
18   that reviews leases, oil and gas leases, to
19   determine the manner in which a particular lessor
20   or group of lessors is going to be paid royalty?
21      A.  Land administration reviews the leases.
22   Typically we pay royalties on the revenues we
23   receive, on the gas that's sold.  If there is a
24   specific lease that says otherwise then we would

Page 48

1    treat it that way, but typically the gas sold is
2    the revenue that's paid.
3       Q.  This land administration, is that part of
4    EQT Production?
5       A.  No, it's part of our shared services
6    group.
7       Q.  What's the name of that corporate entity?
8       A.  I'm not sure.
9       Q.  We'll make a note to ask that later.
10      A.  I can find it out.  They're a shared
11   services group for all of EQT Corporation.
12      Q.  Well, why don't we take a look at Exhibit
13   3 and see if we can pinpoint who that may be.
14   Would that be EQT Investment Holdings?
15      A.  No.
16          MR. HENDRICKSON:  Why don't we just do
17   this, on a break we'll find out.
18          MR. ADKINS:  Okay.
19          MR. HENDRICKSON:  And then you can ask
20   him.
21          MR. ADKINS:  Sure.
22      Q.  (By Mr. Adkins) Is this a department
23   that's been a part of Equitable since you came on
24   board in '84?  There's always been a land

Page 49

1    administration?
2       A.  There's always been a land administration.
3       Q.  So if there was a question about how do we
4    treat this lease or this royalty provision, that's
5    who you ask?
6       A.  Right.
7       Q.  Do you know who the current person in
8    charge of that department is?
9       A.  Yes.
10      Q.  Who's that?
11      A.  Louise Bugna.
12      Q.  How do you spell that?
13      A.  B-U-G-N-A.
14      Q.  And where is she located?
15      A.  Pittsburgh.
16      Q.  In your same office complex?
17      A.  Yes.
18      Q.  As you sit here today are you aware if
19   Equitable Production is the lessee on oil and gas
20   leases that do allow for deductions for line loss
21   and compression?
22      A.  Yes, I'm sure there is.
23      Q.  Likewise, are you aware if Equitable --
24   EQT Production is the lessee on oil and gas leases

Page 50

1   that do not allow for deduction for compression and
2   line loss?
3           MR. HENDRICKSON:  As it relates to your
4   clients?
5           MR. ADKINS:  No, in general.  System wise
6   in West Virginia.
7           MR. HENDRICKSON:  I don't think that's
8   relevant.
9           MR. ADKINS:  Well, but he can still
10  answer.
11          MR. HENDRICKSON:  I understand that, but
12  if it's -- I mean, it's not calculated to give
13  admissible evidence.  They've got lots of leases
14  with lots of different people and what I don't want
15  to do is get him bogged down in to trying to
16  distinguish how we treat all other people.  We may
17  have a hundred different ways.  I don't know --
18          MR. ADKINS:  And I'm not getting down to
19  that level of detail.  I'm just asking him -- I
20  mean, he indicated in his testimony just a moment
21  ago that if a lease -- if a royalty provision in a
22  lease designates a certain manner in which that
23  lessor is to be treated then it's obviously coded
24  in his accounting system like that.  And I've got

Page 51

1   documents which I can talk to him.
2           So obviously he has some familiarity in
3   his job designation in terms of dealing with that
4   coding.  And his familiarity --
5           MR. HENDRICKSON:  I'll let him go ahead
6   and answer, but I want to restrict his testimony to
7   your clients in this lawsuit, not what they do as a
8   whole.
9           MR. ADKINS:  But in the essence that he
10  has a policy and procedure that he -- that EQT
11  Production treats the lessors in West Virginia in a
12  standard format, and my clients are included in
13  that, I think I can talk to him about his policies
14  and procedures.
15          MR. HENDRICKSON:  I'll listen to your
16  question.  Go ahead and answer.  Do you remember
17  the question?
18      A.  No.
19      Q.  (By Mr. Adkins) Likewise, does -- is EQT
20  Production the lessee on oil and gas leases in West
21  Virginia that do not allow for deductions of line
22  loss and compression?
23      A.  Yes.
24      Q.  In your job duties is there special codes

Page 52

1   in the accounting system to make those
2   distinctions, per lessor?
3       A.  The land administration has to advise us
4   of that.  I mean, we're just accounting, right, and
5   so we're not interpreting leases, we're not
6   deciding what's allowable, what's not allowable and
7   so on and so forth.  They tell us and then we code
8   it accordingly.
9       Q.  And Mr. Crites, and I understand that,
10  but -- and my question was, and I apologize if I
11  didn't ask it properly, is, I'm not asking you if
12  you or your group or department is making the
13  distinction, I'm saying in terms of running the
14  accounting system is there coding that you have to
15  enter, and as you indicated at the bequest of the
16  land administration department, to code a lessor
17  with respect to whether or not deductions are
18  permitted?
19      A.  Yes.
20      Q.  And can you tell me the process in terms
21  of how that's done with respect to the accounting
22  system?
23      A.  Right.  Well, each well has a division of
24  interest, okay, and that division of interest

Page 53

1   specifies who the owners are, working interest and
2   royalty interest.  And on that well you can exempt
3   someone from deductions and treat them differently
4   than somebody else based on their lease language.
5   So at the well level for individuals you have the
6   ability to set how they are to be paid.
7       Q.  If you have, let's say, several leases
8   behind a sales meter, that's a hypothetical, well,
9   it may not be a hypothetical, it may be true, I
10  just can't point to the leaseholder, groups of
11  lease holds that would fit this example, but if you
12  have several leases behind the sales meter and some
13  leases allow deductions or you're instructed by
14  land administration --
15      A.  Sure.
16      Q.  -- that some leases allow for deductions
17  and some do not.
18      A.  Sure.
19      Q.  And those are coded appropriately in the
20  Enertia system.
21      A.  Correct.
22      Q.  It's my understanding that the way it
23  works right now is gas is sold at the well to
24  Equitable Energy, Equitable Energy then takes the

**Page 54**

1 measurement at the sales meter, calculates that
2 revenue, deducts its gathering and compression
3 charges that it incurs from Equitable Gathering
4 Equity, deducts that from the overall sales revenue
5 and pays EQT Production; is that a correct
6 description?
7   A.  That's correct.  That's correct.
8   Q.  If you have -- again, going back to the
9 collection of leases behind the sales meter, some
10 allow for deductions and some don't, how do you
11 allocate gathering deductions per lease, per well,
12 if you have some that aren't paying for the
13 gathering and some that are?  Do you understand my
14 question?
15   A.  If there -- if there are gathering
16 deductions on a lease that doesn't permit those
17 then EQT Production will pay those.
18   Q.  Pay that lessor's share?
19   A.  Right, correct.
20     (Exhibit 5 marked for identification.)
21   Q.  Mr. Crites, I'm going to hand you what's
22 been marked as Exhibit 5.  This is a document that
23 was produced by your counsel.  It's entitled
24 McDonald Land Company, Et Al. Leases.  And it

**Page 55**

1 appears to be dated October 17, 2002.  Have you
2 seen this document before?
3   A.  I don't believe so.
4   Q.  So it's probably likely that you didn't --
5   A.  I may have, but I don't recall.
6   Q.  You weren't with the company during this
7 time period were you?
8   A.  I was not.
9   Q.  So you wouldn't have participated in the
10 creation of this document?
11   A.  I would not have, no.
12   Q.  Is this something that -- based upon your
13 experience with EQT does this appear to be
14 something you might see come out of the land
15 administration department?
16   A.  Possibly.
17   Q.  How is it communicated to you about
18 whether or not deductions are permitted on a
19 particular lease or particular well?  Do you
20 receive spreadsheets with checkmarks or, from the
21 land administration group, how is it communicated?
22   A.  We receive an e-mail or a spreadsheet for
23 new wells that are turned in line with the way the
24 leases need to be treated, the wells on that need

**Page 56**

1 to be treated.
2   Q.  Now, I'd like to take you to page 6 of
3 Exhibit 4 and talk about the revenue distribution
4 process pre-2005, because that's how these are
5 broken down essentially in the discovery responses.
6     In prior to 2005, and I understand you
7 didn't come back on until 2003, was there a set
8 company that purchased all of the gas produced by
9 Equitable Production?
10   A.  Yeah, it would have been EQT Energy.
11   Q.  What about pre-2000 when you left the
12 company, say '84 to 2000?
13   A.  Same.
14   Q.  Same.  So there was always a, I'll call it
15 a sister company but --
16   A.  Correct, correct, a marketing.
17   Q.  Sister company -- huh?
18   A.  Yes.
19   Q.  A marketing company?
20   A.  Right.
21   Q.  It might have had different names but it's
22 always been kind of Equitable Energy, right?
23   A.  Right.
24   Q.  And that's who always purchased the gas of

**Page 57**

1 Equitable Production?
2   A.  Right.
3   Q.  Has there always been a separate gathering
4 company who transported the gas from the wellhead
5 to the point of sale for Equitable Energy?
6   A.  No.
7   Q.  Tell me about the process pre-2005 of how
8 the gathering, to the best of your knowledge, how
9 the gathering was handled?
10   A.  I believe pre-2005 all the gathering lines
11 were owned by the production company.
12   Q.  So the production company owned the
13 gathering lines and maintained the gathering lines?
14   A.  Correct.
15   Q.  What was the point of sale for royalty
16 calculations pre-2005?
17   A.  Sales meter.
18   Q.  And that's changed, right now post -- or
19 from 2005 on the point of sale is in fact the
20 wellhead?
21   A.  Correct.
22   Q.  Pre-2005 how was the sales price of the
23 gas negotiated or set with Equitable Energy?
24   A.  It would have been set at the third-party

Page 58

1    custody transfer point.
2      Q.  But how is the actual price set?  Was it
3    an index price?
4      A.  Index, for the most part, yes.
5      Q.  You say for the most part, would there
6    have been other factors that would play in the --
7      A.  I mean, there could be other sales on the
8    system not at a major point.
9      Q.  Tell me more about those?
10     A.  There could be sales to other third-
11   parties off the system before it got to the major
12   sales point.
13     Q.  Is that a common occurrence?
14     A.  Generally no.
15     Q.  Would that have happened in the area
16   surrounding my clients' lease estates, is that
17   something --
18     A.  I'm not sure.
19     Q.  So generally speaking the majority -- at
20   least the vast majority of transactions of gas
21   sales that occurred pre-2005 would have been from
22   Equitable Production to Equitable Energy?
23     A.  Correct.
24     Q.  And that would have been paid at an index

Page 59

1    price?
2      A.  Right.
3      Q.  For the allocated measurements set at the
4    sales meter?
5      A.  Correct.
6      Q.  What index would Equitable have used
7    pre-2005 for the gas price?
8      A.  It would depend on where the gas was
9    delivered, whether it would be a Dominion or
10   Columbian.
11     Q.  For the Logan-Mingo area where would the
12   gas be delivered?
13     A.  Both of those.
14     Q.  Dominion or what was the other?
15     A.  Or Columbian, and those are published
16   indexes.
17     Q.  In your experience are those indexes --
18   Dominion and Columbian are pretty close together in
19   price?
20     A.  Yes.
21     Q.  And likely I think you indicated earlier
22   in your testimony those have been -- pre-2005 those
23   were the index prices you would change on a monthly
24   basis?

Page 60

1      A.  Yes, they always change.
2      Q.  In the pre-2005 time period would
3    Equitable Production and Equitable Energy have a
4    sales contract for the sale of gas?
5      A.  I'm not sure.
6      Q.  Are you aware currently if Equitable
7    Energy and -- well, EQT Energy and EQT Production
8    have a sales contract for the sale of gas?
9      A.  Yes.
10     Q.  Do you know who negotiated that contract?
11     A.  I do not.
12     Q.  Do you know who at EQT Production is in
13   charge of negotiating such contracts?
14     A.  I do not.
15     Q.  Now, when Equitable Energy -- again, we're
16   talking pre-2004 --
17     A.  Sure.
18     Q.  -- when Equitable Energy would buy the gas
19   at the sales meter, Equitable Energy would pay
20   Equitable Production the revenue for the volume
21   measured at the sales meter minus charges that it
22   might incur from -- if it had to be transported on
23   third-party gathering lines?
24     A.  Only on third-party pre-2005.

Page 61

1      Q.  Let's talk about -- and I've got some maps
2    if you need to look at it, but are you familiar
3    with any other third-party gathering lines in the
4    Logan-Mingo area?
5      A.  I'm not.
6      Q.  So as you sit here today that probably
7    wouldn't have been an issue for my clients' wells
8    in pre-2005, that they would have incurred any
9    third-party gathering fees?
10     A.  I'm not sure.
11     Q.  Is that something that your department
12   could research and determine?
13     A.  Yes, we can research that.
14     Q.  So again, from essentially a hypothetical
15   standpoint, if one of my clients' wells, the gas
16   from one of its wells was transported on Equitable
17   Production's gathering system and then sold at the
18   point of sale and there were no third-party
19   gathering fees, and Equitable Production -- or I'm
20   sorry, Equitable Energy would then pay Equitable
21   Production the index price of the gas -- the
22   allocated gas produced from that well?
23     A.  Correct, pre-2005.
24     Q.  Pre-2005?

Page 62

```
 1     A.  Right.
 2     Q.  At that point would Equitable Production
 3   make any deductions for its -- for its role in
 4   moving the gas along its gathering lines?
 5     A.  Yes.
 6     Q.  And how was that gathering fee calculated?
 7       MR. HENDRICKSON:  If you know.
 8     A.  Yeah.
 9       MR. HENDRICKSON:  I mean...
10     A.  I mean, granted, there would have been a
11   fee, I'm not sure.
12       MR. HENDRICKSON:  We're not saying it
13   didn't occur, I just don't think this witness can
14   answer that question.
15       MR. ADKINS:  Okay.  Well, now, this was a
16   pretty important part of my notice, so is EQT
17   Production going to name somebody else that can
18   testify about the manner in which the gathering
19   fees were calculated and assessed?
20       MR. HENDRICKSON:  Yes.
21       MR. ADKINS:  Because we'll need to do
22   that.  Because that is a --
23     A.  Pre-2005, right?
24     Q.  Yeah, yeah, yeah.  And I'll say for the
```

Page 63

```
 1   record, Mr. Crites, you're being very forthcoming
 2   and helpful, but that --
 3       MR. HENDRICKSON:  He can talk about some
 4   of it, but I mean, if you want to get down to
 5   everything that was deducted and how they
 6   calculated that I don't --
 7     A.  I can't speak to that.
 8       MR. HENDRICKSON:  He doesn't know that.
 9     A.  I can't speak to that.
10     Q.  What about post-2005, the manner in which
11   the gathering fees are calculated?
12     A.  I...
13     Q.  We'll get into that.
14     A.  That's fine.
15     Q.  But you really don't know the nuts and
16   bolts of that?
17     A.  No, that's not our side of the business.
18     Q.  Well, pre-2005 that would have been
19   Equitable Production's side of the business,
20   because they were in fact in charge of gathering?
21     A.  Right, right.
22     Q.  And was there a separate department within
23   Equitable Production that handled that aspect of
24   the business?
```

Page 64

```
 1     A.  It wasn't revenue accounting.
 2     Q.  Would it end up in revenue accounting?
 3     A.  I don't really recall, like, who that was,
 4   but it wasn't our group, my group, that calculates
 5   gathering rates.
 6     Q.  I mean, it would -- those rights would
 7   eventually end up in your department because they
 8   would come out of the revenue generated?
 9     A.  Right, right, and I can research that and
10   find out, you know, who was responsible for that
11   then, but I don't -- that's seven, eight years ago,
12   I don't remember.
13       MR. ADKINS:  I appreciate it and I'll just
14   ask counsel --
15       MR. HENDRICKSON:  We'll find it out.
16       MR. ADKINS:  Okay, and let me know and
17   we'll want to set that deposition.  But just for
18   the purposes of the record I will say that that
19   would come under this same notice in terms of a
20   designated representative.
21       MR. HENDRICKSON:  We understand.
22     Q.  (By Mr. Adkins) Do you know whether or not
23   the gathering rates or the gathering charges are
24   something that would have been set forth in a
```

Page 65

```
 1   contract between Equitable Production and Equitable
 2   Energy?
 3     A.  No, I do not.
 4     Q.  Now, those gathering charges, those would
 5   be what I would call monetary deductions, i.e.,
 6   there was a charge assessed for gas from these
 7   wells to get to the meter and this dollar figure is
 8   going to be taken out of the royalty; is that a
 9   correct --
10     A.  That's correct.
11     Q.  But in the instance where you have a
12   allocated gas measurement, i.e., the difference
13   between the gas measured at the well versus the gas
14   measured at the sales meter and then allocated back
15   to the well, you're going to have a difference in
16   volumetric measurements, correct?
17     A.  Correct.
18     Q.  And is it -- is that something that EQT --
19   or Equitable Production, again, pre-2005, would
20   designate as a volumetric deduction for, say, line
21   loss or compression?
22     A.  Well, it's the sales meter allocated
23   back.  I mean, we pay royalties on the gas that's
24   sold.  So it's not a calculation, it's part of an
```

17 (Pages 62 to 65)

Page 66

1  allocation.
2      Q.  Is there any type of coding in the Enertia
3  accounting system for leases that specify that
4  they're to be paid one-eighth royalty from gas at
5  the wellhead versus one-eighth royalty at the point
6  of sale?
7      A.  If that exists, then yes, there would be.
8      Q.  Are you familiar with such things existing
9  in your system, such designations?
10     A.  Not specifically, no.
11     Q.  Is that something that you can research
12  and let me know if there are -- if that designation
13  is made for any of my clients for example?
14     A.  Sure.
15         MR. HENDRICKSON:  Could we take a short
16  break?
17         MR. ADKINS:  Absolutely.
18         THE VIDEOGRAPHER:  Going off the record.
19  The time is 10:56 a.m.
20             (Break.)
21         THE VIDEOGRAPHER:  We are back on the
22  record.  The time is 11:12 a.m.
23     Q.  (By Mr. Adkins) Mr. Crites, we were
24  talking about coding of deductions or the coding in

Page 67

1  the Enertia accounting system with respect to
2  deductions being allowed or not allowed.
3         Are you familiar with any instance where
4  your department would receive notification from the
5  land administration department that for a
6  particular lessor that one deduction may be allowed
7  and another may not be allowed?  For example, have
8  you ever been told in your experience that under a
9  particular lease deduction for line loss is
10  permitted but not for compression?
11     A.  I think the land administration department
12  communicates that type of information, not
13  specifically to me, to, you know, my employees who
14  then set up the wells in the system.  So if that
15  occurred, then yes, they would have received that
16  communication.
17     Q.  Is there -- is the coding in the Enertia
18  system, does it allow for such specific tailoring
19  of the deductions?
20     A.  Yes.
21     Q.  So when Equitable Production, specifically
22  your department, is given the data with respect
23  to -- I'll just generally call them gathering
24  charges, are those charges communicated to your

Page 68

1  department in enough detail that you can separate
2  deductions made for compression, deductions made
3  for line loss, deductions made for, say,
4  condensation?
5      A.  The communications should be specific.
6      Q.  And can you tell me --
7      A.  To the best of my knowledge it's specific.
8      Q.  Okay.  And could you tell me maybe how
9  specific it is, maybe the categories of deductions
10  that are communicated to your department and placed
11  in the Enertia system, if you know?
12     A.  I don't know how specific.
13     Q.  Okay.  Would someone in your department be
14  able to tell me how specific or would you be able
15  to find out that information?
16     A.  I can find that out.
17     Q.  But in your experience you do know that if
18  such -- if the land administration did communicate
19  a distinction between for a particular lessor as to
20  what deductions are permitted and what are not
21  permitted under the lease, the Enertia system would
22  be able to compensate for that?
23     A.  Correct.
24     Q.  And pre-2005 those gathering charges --

Page 69

1  again, I'm using that term to cover kind of all of
2  these deductions -- that would be data collected
3  and measured internally within Equitable
4  Production, correct, pre-2005?
5      A.  I think that's correct.
6      Q.  Whereas post-2005 that would be data that
7  would be measured and collected by Equitable
8  Gathering Equity and then communicated to someone?
9      A.  Right, post-2005.
10     Q.  We were also talking about, again
11  pre-2005, the index used for the payment of
12  royalties, or the index used, I'm sorry, for the
13  sale of gas to Equitable Energy, and that it could
14  be either, at least for the area where my clients
15  leases are located, either the TECO index or the
16  Dominion index, correct?
17     A.  That's correct.
18     Q.  Now, is it specified per sales meter or is
19  it a blended rate?
20     A.  The index is per sales meter depending on
21  who the custody transfer person is, whether it's
22  Dominion or TECO.  But the overall rate would be a
23  blended rate.
24     Q.  For that gathering system?

Page 70

1    A.  Correct.
2    Q.  So how are the royalties calculated, on a
3  blended system or per index per sales meter?
4    A.  On a blended.
5    Q.  Who kind of blends the rates?  Is that
6  something your --
7    A.  The system does that automatically.
8    Q.  On a monthly basis?
9    A.  Correct.
10   Q.  Why is it not allocated per well per index
11 price for that particular sale point?
12   A.  Because you can not take a molecule of gas
13 and dedicate it to a single meter if the gathering
14 system provides that that gas can be delivered to
15 multiple points.
16   Q.  Meaning the gas produced from a particular
17 well may enter the gathering system and you won't
18 be able to tell whether or not it enters that sales
19 point or that -- the sales point for TECO or sales
20 point of Dominion?
21   A.  That's correct.
22   Q.  If it could potentially be delivered in
23 different locations at a sales meter how is
24 Equitable Production able to allocate it from the

Page 71

1  sales meter back to the wellhead?
2    A.  Enertia has delivery systems set up.
3  Those delivery systems have groups of wells and
4  multiple sales points that those wells can deliver
5  to.  So from those sales points the revenue, the
6  gas that's sold, gets allocated back to the wells
7  that are behind those points.
8    Q.  Even though some of the gas from those
9  wells may have ended up not at that sales meter but
10 at another sales meter?
11   A.  Correct.
12   Q.  Wouldn't that affect the manner in which
13 Equitable Production calculated the line loss and
14 the allocated production from that particular well?
15   A.  In the Brenton District where the McDonald
16 wells are located there was considerable effort put
17 in a few years ago to be able to move gas to
18 multiple points to avoid curtailments.  So at any
19 point in time the field guys can move gas in any
20 direction to avoid curtailments.
21   Q.  What do you mean by curtailments?
22   A.  An example of a curtailment is let's say
23 that TECO contacts our gas measurement group or
24 Equitable Energy and says this meter can no longer

Page 72

1  flow, the system is full, so EQT Gathering has put
2  in mechanisms to be able to divert that gas to
3  other meters.
4        MR. HENDRICKSON:  Keeps it from being shut
5  in.
6    A.  Exactly, exactly.
7    Q.  It keeps production flowing?
8    A.  Yes, exactly, it avoids curtailment.
9    Q.  Meaning you don't want a cessation of
10 production from a particular well due to the -- any
11 problems or issues that might occur at a sales
12 meter?
13   A.  Right.
14   Q.  When did that take place?  You said that
15 was a couple years ago.
16   A.  I'm not sure.
17   Q.  It would have been after 2005 though,
18 right?
19   A.  It would have been, yes.
20   Q.  Pre-2000 -- pre --
21   A.  Well, let me step back and say I think it
22 was somewhere around 2005, 2006 that Equitable, you
23 know, put in extra infrastructure to make sure that
24 curtailments could be avoided.

Page 73

1    Q.  What would happen before that time period
2  with respect to curtailment?
3    A.  If curtailments occurred then gas would be
4  shut in, restricted.
5    Q.  You also talked about other points of sale
6  other than the sales meter within a gathering
7  system.  Were you referring to maybe field taps?
8    A.  If they exist, yes.
9    Q.  Do you know if any existed in this Brenton
10 area?
11   A.  I don't know for sure.  It's not uncommon
12 for that to happen.
13   Q.  How is -- pre-2005 how would any gas that
14 was -- that left the system at a field tap, how
15 would that be factored in, in terms of royalties?
16   A.  If it was a field tap to a residence it
17 would be at a residential rate.  If it was to a
18 municipality then it would be at the rate that EQT
19 Energy had with that municipality.
20   Q.  How would the lessor be paid for any gas
21 that was produced at its well that might have been
22 left at a field tap?
23   A.  The gas that -- those -- those sales would
24 all be part of the overall allocation.

Page 74

```
 1      Q.  Would the lessor be paid the index price
 2  or would it be paid, say for example, the contract
 3  price with the municipality?
 4      A.  The contract price with the municipality.
 5      Q.  What if there was an issue with -- that
 6  the lessors royalty provision said index price
 7  versus, say, sale price?
 8      A.  It would still be the sales price.
 9      Q.  The contract price?
10      A.  Because overall it's a -- it's an overall
11  weighting of a price.  Because once the gas enters
12  the pipeline and the molecules mix you can't
13  specify it back to any particular point.
14      Q.  Do you know if there is a coding within
15  the Enertia system that a particular lease, oil gas
16  lease, calls for that they are to be paid at an
17  index price or market price versus the actual sales
18  price?
19      A.  If that exists and we are notified then
20  that's what we would do.
21      Q.  Are you familiar with such coding being
22  put in the Enertia system?
23      A.  Not specifically, no.
24      Q.  Can you find out if such coding exists in
```

Page 75

```
 1  West Virginia?
 2      A.  Sure.  With respect to your clients?
 3      Q.  Yes, but procedurally as well.
 4      A.  Okay.
 5      Q.  I don't need to know the -- I'm not asking
 6  you to give me specifics of any other lessors other
 7  than my clients but I do want to know if such a
 8  procedure exists within EQT Production for West
 9  Virginia.
10      A.  Right.
11      Q.  Now, for this particular area is it
12  Brenton District or Brenton Region?
13      A.  It's a district.  We have operating areas
14  referred to as districts.
15      Q.  Yes, sir.  Okay, the Brenton District, do
16  you know if within that district there are working
17  interest owners?
18      A.  It's possible but I'm not familiar with
19  that.
20      Q.  But you are familiar with instance -- I'm
21  sorry, strike that.
22          You are familiar with instances of within
23  EQT Production's system, again pre-2004, where you
24  would have a working interest owner?
```

Page 76

```
 1      A.  Yes.
 2      Q.  And would that working interest owner,
 3  would that have a specific certain coding in the
 4  Enertia system for how they would be treated?
 5      A.  Yes.
 6      Q.  Would they be paid -- strike that.
 7          Would they pay, say, different gathering
 8  charges than say a normal lessor would be?
 9      A.  No.
10      Q.  They're paid the same?
11      A.  Yes.
12      Q.  Or they pay the same in gathering charges?
13      A.  Yes.
14      Q.  The allocation is the same?
15      A.  Yes.
16      Q.  Would it also depend upon the lease or
17  agreement that they have with EQT Production or
18  Equitable Production pre --
19      A.  If it applied, yes.
20      Q.  We talked about the type of monetary
21  deductions taken in pre-2005, and that would be the
22  cost for compression -- would compression be a
23  volumetric deduction or monetary deduction?
24      A.  It could be both.
```

Page 77

```
 1      Q.  Meaning that when Equitable Production is
 2  compressing the gas in its gathering system it's
 3  going to factor in its cost in compress -- its
 4  internal cost in compressing the gas, and then
 5  allocate one-eighth of that cost to the various
 6  wells?
 7      A.  EQT Gathering, yes.
 8      Q.  Well, I'm talking pre-2005?
 9      A.  Oh, okay.
10      Q.  So is my statement correct?
11      A.  Yes.
12      Q.  But in addition to that internal cost that
13  they are going to -- that EQT -- or Equitable
14  Production would take a monetary deduction
15  allocated amongst the wells, there would also be a
16  use of gas in that compression; is that correct?
17      A.  It's possible, yes.
18      Q.  And that would in turn decrease the amount
19  of gas that reaches the sales meter?
20      A.  Correct.
21      Q.  And that reduction in the volume of gas
22  that reaches the sale meter would in essence become
23  a volumetric deduction that would be allocated back
24  to the well?
```

Page 78

1    A.  Yeah, the volume at the sales meters is
2  what would be allocated back.
3    Q.  By using gas at the compression station
4  would in essence mean that less gas would be
5  allocated back to the well from the sale meter?
6    A.  Correct.
7    Q.  So -- strike that.
8       Is there any monetary deduction formula
9  that Equitable Production used pre-2005 in relation
10  to line loss?
11    A.  I can research that for you.  I don't know
12  that answer.
13    Q.  We'll make a note of that, but the reason
14  I'm asking that is, you know, I just asked you
15  questions about kind of the monetary deduction and
16  volumetric deduction characteristics of using gas
17  for compression.  What I wanted to know now is if
18  there was -- you know, obviously as we've already
19  discussed pre-2005 there is a volumetric deduction
20  factored into the royalty calculation in relation
21  to line loss, i.e., we have a measurement taken at
22  the well, a measurement at the sales meter which is
23  allocated back, and those two numbers aren't going
24  to match and the difference is the line loss?

Page 79

1    A.  That's correct.
2    Q.  And also possibly the use of gas at
3  compression?
4    A.  Correct.
5    Q.  Another factor in this gathering process
6  which I'm not that familiar with, Mr. Freund I'm
7  sure is, but condensation.  What is your
8  understanding of how condensation comes into play
9  with respect to the production of gas?
10    A.  I'm not familiar with that.
11    Q.  People a lot smarter than me refer to that
12  term and I just wanted to get your input on it.
13  I'll ask somebody else, so I guess you're off the
14  hook on that one.
15    A.  Okay.
16    Q.  Pre-2005 -- and if I asked this previously
17  I apologize -- but pre-2005 in this Brenton
18  District were all the gathering lines owned by
19  Equitable Production?
20    A.  Yes.
21    Q.  Do you know when Equitable Production
22  started making deductions from royalties to lessors
23  for gathering?
24    A.  I would think those have always existed.

Page 80

1    Q.  So when you came on in '84 -- well, when
2  you were with Union Drilling, starting I think in
3  '83, right?
4    A.  Actually, '81 was Union.
5    Q.  '81, I'm sorry.  Was Union Drilling taking
6  deductions for gathering?
7    A.  I don't remember.  I don't recall.
8    Q.  Do you recall when you started with
9  Equitable in '84 if they took deductions for
10  gathering?
11    A.  I don't recall.  I do think that they most
12  likely existed the entire time.  I don't know why
13  they wouldn't have.
14    Q.  As you sit here today you don't recall
15  there being a time when gathering charges weren't
16  deducted from royalties and then they switched and
17  started taking them?
18    A.  Not that I'm aware of, no.
19    Q.  I'm sorry, bear with me just a moment.
20       And do you know how often -- and I asked
21  you earlier about if you knew how the gathering
22  charges were calculated or set up and done and you
23  said you weren't familiar with that process.  Do
24  you know how often in pre-2005 adjustments of the

Page 81

1  gathering rates or the gathering charges, how often
2  they were made and how they were communicated to
3  your department to be placed in the system?
4    A.  I do not.  I can certainly find that out.
5    (Exhibits 6, 7 and 8 marked for identification.)
6    Q.  Mr. Crites, I'm going to hand you what's
7  been marked Exhibit 6 to your deposition and I've
8  got a couple more I want to show you.  This is 7
9  and this is 8.
10       MR. ADKINS:  I'm keeping -- I'm getting
11  the right numbers on the Deposition Exhibits aren't
12  I?
13       THE REPORTER:  I believe so.
14       MR. ADKINS:  Okay, you may need to double
15  check.
16    Q.  And then this is Exhibit 8.  Now, I'll go
17  through those.  Exhibit 6 is a royalty statement
18  for one of my clients for -- some of these dates
19  are a little cut off but the production date is
20  November 2003.
21    A.  Okay.
22    Q.  Exhibit 7 is a printout from the West
23  Virginia DEP web site for Well API 05-01338, which
24  I will represent to you is the -- that is the well

Page 82

1    number for -- at least the internal well number is
2    214571 for Equitable Production.
3         And then Exhibit 8, a revenue payment
4    history by owner for property 214571 which is from
5    1999 to December 2011.  Now, Exhibit 8, is this a
6    document produced from the Enertia system?
7         A.  Yes.
8         Q.  So this is a document you're probably
9    pretty familiar with?
10        A.  I've seen it, yes.
11        Q.  Or this type of document I should say?
12        A.  Yes.
13        Q.  Now, Exhibit 6, the royalty statement, are
14   you -- is this a document -- the royalty
15   statements, is this a type of document that is
16   generated from your department?
17        A.  Yes, it is.
18        Q.  So you're also very familiar with this?
19        A.  Yes.
20        Q.  Looking at Exhibit 6, I'm going to be
21   focused on the second to last entry for -- and it's
22   a little cut off but it's Well No. 214571 at the
23   bottom; do you see that?
24        A.  Yep.

Page 83

1         Q.  And it's got Cole, Crane, Consol, it has
2    decimal interest, and then under the heading Gross
3    Volume, Owner Volume, the gross volume, is that the
4    1,843.40 number?
5         A.  That's correct.
6         Q.  Is that MCF?
7         A.  Yes.
8         Q.  And in the owner volume of 49.44, that's
9    for that particular owner's interest in this well,
10   correct?
11        A.  Correct.
12        Q.  And that's 49.44 MCF?
13        A.  Correct.
14        Q.  Is the index price listed on here, is that
15   the 5.09?
16        A.  Yes.
17        Q.  Can you -- is that -- would that be a
18   blended rate in relation to the TECO and Dominion
19   index?
20        A.  That is a blended rate on an MCF basis.
21        Q.  And it's blended between those two
22   indexes?
23        A.  I would need to look at the well to see
24   what sales point -- I believe that the Brenton

Page 84

1    wells, district wells, are primarily TECO and
2    Dominion.  It could have some other very, very
3    small prices in it also.  I don't mean small
4    prices, I don't mean low prices, I just mean a very
5    small percent of that total.
6         Q.  And the next column is the gross revenue
7    which is essentially the MCF multiplied by the
8    price per MCF of 5.09, correct?
9         A.  Correct.
10        Q.  And then apparently under the Gross Taxes,
11   Owner Taxes column there's no taxes deducted.  And
12   then you have Gross Deducts, Owner Deducts of --
13   from an overall well you have $385.16?  That is in
14   dollars, correct?
15        A.  Correct.
16        Q.  And then for that particular owner $10.33,
17   correct?
18        A.  Correct.
19        Q.  Do you know what -- by the fact that
20   deductions are listed in this column would you
21   conclude that this is a -- at least in the Enertia
22   system this is a well or a lease that permits
23   deductions?
24        A.  Correct.

Page 85

1         Q.  And there were such distinctions made in
2    the Enertia system pre-2005?
3         A.  Yes.
4         Q.  Of then of course the Well Net Revenue,
5    Owner Net Revenue is listed, and essentially that
6    is gross revenue, owner revenue, with the deduction
7    taken out, correct?
8         A.  Correct.
9         Q.  Now, if we could take a look at Exhibit 7,
10   and we'll focus in on the November 2003 gas
11   production that was submitted by Equitable to the
12   West Virginia DEP, and that number is 2,219, is
13   that in MCF?
14        A.  Yes.
15        Q.  And that would be the recorded volume of
16   gas produced at the wellhead?
17        A.  On Exhibit 7 that's correct.
18        Q.  Whereas the gross volume produced for that
19   well for that month in the royalty statement is
20   $1,843 -- or I'm sorry, 1,843.40 MCF?
21        A.  Correct, that's what -- that's the volume
22   that made it to the sales point.
23        Q.  Or that was based upon the metered gas at
24   the sales point allocated back to that well?

Page 86

1     A.  Correct, that's correct.
2     Q.  Because I think as you indicated
3  previously you can't measure --
4     A.  There are multiple sales points, right.
5     Q.  So based upon the formula in the Enertia
6  system -- is the Enertia system the system that
7  does the allocation back to the well?
8     A.  Yes.
9     Q.  Taking a look at Exhibit 8 now, if you'll
10  turn to the Bates Number page EQT002681.
11     A.  26801?
12     Q.  No, 2681.
13     A.  2681, okay.
14     Q.  And I had a little hard time reading this,
15  so maybe you can help me, but towards the top
16  middle of this page there are actually several
17  entries that say 11/1/2003.  And what I'm trying to
18  be able to understand is which entries are for the
19  November 2003 production.  I've got a highlight if
20  that helps, but I thought you would probably be
21  able to explain this statement better than I
22  could.
23     A.  I...
24     MR. HENDRICKSON:  Again, if you don't

Page 87

1  know --
2     A.  Yeah, you know what, I need to do some
3  math here, but these should all add up.  And this
4  is just -- this revenue payment history is just for
5  this owner.
6     Q.  Yes, correct.
7     A.  Is that correct.
8     Q.  Yeah.  This is just for that owner.
9     A.  Yeah, so if you add the entries that are
10  here that should equal the total on Exhibit 6.
11     Q.  Well, there is a line item of 241.47 which
12  is, you know, a cent off of the owner net revenue
13  on Exhibit 6.  And I'm just -- to be honest with
14  you, Mr. Crites, I'm trying to figure out what
15  these mean, all these figures in this mean.
16     MR. HENDRICKSON:  Do you want to go off
17  the record and do the math?
18     A.  Yeah, that'd be fine.
19     MR. HENDRICKSON:  Why don't we do that.
20  Can you get a calculator?
21     THE VIDEOGRAPHER:  Going off the record.
22  The time is 11:46 a.m.
23     (Break.)
24  (This exchange occurred off the video record.)

Page 88

1     MR. HENDRICKSON:  Counsel is going to
2  agree that any sections of the deposition referring
3  to the witness' -- referring to the witness' DUI
4  will be put under seal and not to be opened unless
5  by agreement of counsel or order of the court.
6     MR. ADKINS:  Yeah, and counsel for
7  Plaintiffs agree to that.
8     THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 11:54 a.m.
10     A.  Okay, so on Exhibit 8, on Exhibit 8 on the
11  left-hand side there's an accounting date and a
12  production date, which was the confusing part to me
13  when I first saw this.
14     Q.  Okay.
15     A.  If you look down the page the accounting
16  date -- the numbers you want to look at are 50 MCF,
17  56 MMBTU or dekatherms.
18     Q.  All right.
19     A.  All right.  And that -- I'm just guessing
20  that it's a rounding issue from looking at Exhibit
21  6.
22     Q.  Okay.
23     A.  The money is the -- let's see, actually I
24  apologize, if you go down a little further you're

Page 89

1  going to see the 251.80, and right above that is
2  the penny that goes with it to get the amount on
3  Exhibit 6.
4     Q.  What is that penny from?
5     A.  That my guess is probably the allocation
6  of the farm tap value.
7     Q.  And that would be the -- on Exhibit 6
8  that's the gross owner revenue?
9     A.  Correct, 251.80 plus the penny.  And then
10  to the left is the volume, 49 MCF and 55
11  dekatherms.
12     Q.  So the 49 is MCF?
13     A.  Correct.
14     Q.  And the 55 is dekatherm?
15     A.  Correct.  And if you look at Exhibit 6
16  you'll see 49.44 which obviously will round down to
17  49.
18     Q.  Is the dekatherm reference on Exhibit 6
19  anywhere?
20     A.  No.
21     Q.  How does that factor into the royalty
22  calculation?
23     A.  Exhibit 6 is merely a remittance advice, a
24  royalty statement.  The calculations for the

Page 90

1    revenues to be paid to the royalty owners are based
2    on dekatherms because that's how the gas is sold.
3    When we talk index prices they're dekatherm prices,
4    right.  Enertia does this based on dekatherms for
5    the money side of it.  Its an allocation of MCF.
6         Q.   Well, that's a very important point that
7    I'd like to go to.  Has that always been the case
8    pre- and post-2005 that the sale price of the gas
9    at the point of sale is paid on an index price by
10   dekatherm?
11        A.   That's correct.
12        Q.   Not MCF?
13        A.   No.  I mean the software -- the software
14   package that we have, Enertia, this is the format
15   that it produces, all right.  It's not a custom
16   package for just EQT, they have lots and lots of
17   customers and this is the software and the
18   presentation that it makes on the remittance
19   statement.
20        Q.   What is the difference in being paid on --
21   well, let me back that up.  What would be the
22   difference in the price of gas sold by dekatherm at
23   the point of sale versus if it was sold per MCF?
24        A.   Well, the difference between the MCF and

Page 91

1    the dekatherm is the heating content of the gas,
2    and the gas is sold on a dekatherm basis at the
3    sales point.  So the MCF is just a component of the
4    heat factor of the gas.  So the MCF price is going
5    to be higher than the dekatherm price.  But the
6    dekatherm price is what's actually used in
7    calculating revenue.  So that's how the gas is
8    sold.
9         Q.   How does the dekatherm price factor in
10   with respect to an individual lessor's royalty,
11   pre-2005, because I'm trying to stay in that area?
12        A.   It's just the rate at a sales point, then
13   allocated back to all the wells, that's volume
14   flowed to that sales point.
15        Q.   So pre-2005 the gas would be measured at
16   the sales point by MCF, and then based upon the BTU
17   content of the gas produced at that sales point it
18   would then be paid on the dekatherm basis?
19        A.   Correct.
20        Q.   So back to these documents, we've got
21   the -- you've shown me where you came up with
22   the -- or the gross owner revenue on here and how
23   that is calculated, because it's got the volume and
24   MMBTU, the volume, there is -- let's see, the next

Page 92

1    column is Total Netting, Total Roy -- I assume
2    that's Royalty Burden, what is that column for?
3         A.   Netting would be if you're a working
4    interest owner and you have lease operating
5    expenses, those would be deducted.  But in the case
6    of the royalty those don't exist.
7         Q.   And then the next column, Total Taxes,
8    Total Deducts.  Now, there's a couple figures here,
9    at least for 11 -- November 2003.  And some of
10   these may be related to this month and some may
11   not.  This 10.47, what's that number?
12        A.   That is -- actually that's --
13        Q.   Or is that for October?
14        A.   That's October.  The counting month is the
15   first date.
16        Q.   How do you tell which one is the
17   accounting month?
18        A.   Because if you look at the top of the page
19   on Exhibit 8, accounting month is going to be
20   listed first and production month is underneath it.
21        Q.   I see.  I bet this is color coded at your
22   office isn't it?  I'll have Dave and Steve spring
23   for the color copies next time.
24            MR. HASTINGS:  Actually, we produced this

Page 93

1    in whatever color format it came on.
2            MR. ADKINS:  Well, then next time you
3    ought to have Equitable spring for the color
4    copies.
5         Q.   (By Mr. Adkins) Anyway, so the deduct for
6    this month, is that the 10.33?
7         A.   Correct.
8         Q.   And that's the monetary deductions
9    actually taken out?
10        A.   Of the sold volume, that's correct.
11        Q.   And then that shows up, you have, I guess,
12   the 241.47, and then the single cent which you
13   think may be a field tap or something?
14        A.   Correct, which would allude with the fact
15   that it's a very small piece of the entire sales
16   volume for that month.
17        Q.   And that number is in fact reflected in
18   the owner net revenue on Exhibit 6?
19        A.   Right.
20        Q.   But you would agree with me though, would
21   you not, that the volumetric deduction is not
22   indicated on Exhibit 6?
23        A.   That's correct.  Exhibit 6 represents an
24   allocation of volume that was sold.

Page 94

1    Q.   So would you agree with me that Exhibit 6
2  does accurately represent the monetary deductions
3  taken out of this lessor's royalty but not the
4  volumetric deduction?
5    A.   That's correct.
6    Q.   Was it ever discussed pre-2005 internally
7  about using the allocated volume on the royalty
8  statements versus the actual produced volume?
9    A.   I'm not aware that that discussion ever
10 took place.
11   Q.   At least not in your presence?
12   A.   Right.
13   Q.   And of course pre-2005 Equitable
14 Production paid royalties on the allocated volume
15 not the actual volume?
16   A.   Correct, on the volume that was sold.
17   Q.   For all wells?
18   A.   Correct.
19   Q.   In West Virginia?
20   A.   Correct.
21   Q.   As I think you indicated earlier you're
22 not aware of any natural gas liquids present in the
23 Brenton District that would be a factor in
24 calculating royalties?

Page 95

1    A.   No, there are none.
2    Q.   Is it a factor -- and I think you
3  indicated that that is present in northern West
4  Virginia, is that a factor in calculating
5  royalties?
6    A.   Yes.
7    Q.   Does -- is a royalty owner receive
8  compensation for the natural gas liquids that are
9  extracted from their gas and then sold?
10   A.   Yes.
11   Q.   Now we're going to move post-2005.  What
12 changed?  I mean, why did things change in 2005?
13   A.   I'm not sure I know the entire reason for
14 that.  But I think -- I believe in 2005 was when
15 EQT decided to create a mixturing company, all
16 right, so all the gathering lines that were
17 formally owned by the production company were moved
18 to the mixturing company.  That's the major change
19 that occurred.
20   Q.   Well, I guess the process for that change
21 I guess would have started in probably 2004,
22 because I know the contracts were signed effective
23 as January 1st, 2005.
24   A.   Right.

Page 96

1    Q.   So the 2004 would have been I guess when
2  you learned that these things were going to happen?
3    A.   Right.
4    Q.   But you're not aware of what the corporate
5  decision making process in moving to this different
6  process of having a gathering company separate and
7  apart from Equitable Energy and Equitable
8  Production?
9    A.   No.  The only thing that I'm -- was aware
10 of is that there was a focus on separating the two
11 and concentrating on having a midstream asset and a
12 production asset.
13   Q.   Because before, pre-2005, it was you had
14 the production asset and I think you called it the
15 marketing asset?
16   A.   Right.
17   Q.   Whereas now you're going to have
18 production, gathering and marketing?
19   A.   Correct.
20   Q.   Now, there was a contract executed for the
21 sale of gas per district between EQT Production and
22 -- well, I guess in 2005 it was still Equitable
23 Production and Equitable Energy; are you familiar
24 with that?

Page 97

1    A.   To the extent that they exist, yes.
2    Q.   You weren't involved anywhere with the
3  negotiation of the contract?
4    A.   No.
5    Q.   Who, post-2005 or after January 1st, 2005,
6  and that's what I mean by post-2005 --
7    A.   Sure.
8    Q.   -- post-2005 who within Equitable
9  Production would have been involved in negotiating
10 that contract?
11   A.   I'm not sure.  I can certainly find that
12 out, but I don't know.
13   Q.   I mean, of course this is with a -- a
14 contract between Equitable Production and
15 Equitable --
16   A.   Sure.
17   Q.   -- energy is obviously a contract between
18 sister companies?
19   A.   Sure.
20   Q.   That are in the same building, correct?
21   A.   Correct.
22   Q.   And in West Virginia essentially Equitable
23 Energy bought almost all of the gas produced by
24 Equitable Production?

25 (Pages 94 to 97)

Page 98

1    A.  That's correct.
2    Q.  And continues to do so?
3    A.  That's correct.
4    Q.  And with the exception of maybe some field
5  taps for municipalities for homeowners that want a
6  tap, that's -- all the gas is getting purchased by
7  Equitable Energy, right?
8    A.  That's correct.
9    Q.  Now, when this gathering component was
10  initiated, i.e., Equity Gathering Equity I believe
11  is what it was called, under that gas sales
12  contract the point of sale changed?
13    A.  Correct.
14    Q.  What -- post-2005 what was the point of
15  sale?
16    A.  At the wellhead.
17    Q.  Why did the point of sale change?
18    A.  I don't know the answer to that.  That was
19  -- I mean, we'll find out who wrote the contracts
20  and understand the rationale behind that.
21         From my perspective as revenue accounting
22  we're going to still continue to get the same
23  information we got before and our process doesn't
24  really change.

Page 99

1    Q.  What do you mean your process doesn't
2  change?
3    A.  The allocation of sales to produced for
4  the gas that's sold, we continue to just operate
5  this under the same -- from an accounting
6  perspective we continue to operate the same way.
7    Q.  Well, that brings up a question I was
8  going to ask you, because looking at the
9  description of the manner in which royalties are
10  calculated post-2005 versus pre-2005, it seemed
11  like the allocation was essentially the same, as a
12  result royalties were calculated the same?
13    A.  Right.
14    Q.  So even though the point of sale changed
15  post-2005, the manner in which royalties were
16  calculated for lessors did not?
17    A.  That's correct.
18    Q.  I'm sorry, bear with me just a moment.
19         Did the breakdown of the royalty
20  calculations, essentially the data provided in a
21  royalty statement to the lessor, did it change in
22  the post-2005 time frame?
23    A.  No.
24    Q.  So everything we discussed a moment ago

Page 100

1  with respect to what was disclosed or not disclosed
2  on a royalty statement pre-2005 stayed the same
3  post-2005?
4    A.  That's correct.
5    Q.  And remains the same today?
6    A.  Correct.
7    Q.  Now, the one change that I understand that
8  took place post-2005 is now Equitable Production
9  essentially turned over the gathering system to
10  Equitable Gathering Equity.  By the way, was that
11  an asset sale or how did that transaction
12  logistically take place?
13    A.  I'm not sure.  I can ask in-house counsel
14  to clarify that for me.
15    Q.  The way I understand it from the discovery
16  responses of how the process works, gas being
17  produced, is -- correct me if I'm wrong, gas is
18  produced at the well, it is measured at the well by
19  the well meter, and it is sold, technically sold,
20  at the wellhead, or is purchased by Equitable
21  Energy.  It then enters the Equitable Gathering
22  Equity pipeline system or gathering system.  Then
23  enters the sales meter at the interstate pipeline
24  where it is again measured.

Page 101

1         Equitable Energy takes that measurement at
2  the sales meter -- does Equitable Energy do the
3  calculation of the allocation back to the well or
4  is that something Equitable Production does?
5    A.  That occurs -- Equitable Production in
6  Enertia.  Equitable Energy still provides us with
7  all the components, they provide us with the
8  gathering costs, the sales volume and the sales
9  price, which is why we're still able to provide all
10  the detail on the remittance statements.
11    Q.  Now, the gathering system or the -- since
12  Equitable Energy purchases the gas at the well,
13  Equitable Energy contracts with Equitable Gathering
14  to move the gas?
15    A.  That's correct.
16    Q.  And as such Equitable Energy pays
17  Equitable Energy to move the gas?
18         MR. FREUND:  Pays Equitable Gathering.
19    Q.  Oh, what did I say?  Equitable Gathering,
20  I'm sorry.
21    A.  Yes.  Equitable Energy pays Equitable
22  Gathering.
23    Q.  I should have had codes or something
24         MR. HENDRICKSON:  Mark, look on page 331

26 (Pages 98 to 101)

Page 102

1   of Exhibit No. 3. It's the -- I think that
2   explains to you what type of a sale it was.
3         MR. ADKINS: 331?
4         MR. HENDRICKSON: Yeah, 00331.
5         MR. ADKINS: Gathering organization. I'm
6   not sure if that completely helps me but -- I'm
7   just trying to get an idea of how -- if there was a
8   stock sale, asset sale. We'll figure it out.
9         MR. HENDRICKSON: We'll find it.
10        MR. ADKINS: But thank you for that.
11        Q.   (By Mr. Adkins) So at the point of sale
12  Equitable Energy has the -- measures the sales
13  volume, and that's how they calculate how much
14  they're going -- they use that number to calculate
15  how much they're going to pay Equitable Production?
16        A.   Right, but Equitable Energy doesn't
17  measure it, they get the volumetric readings from
18  the third-party.
19        Q.   Yes. They receive that figure. Then they
20  calculate -- is it Equitable Energy that then
21  calculates the index price that they're going to
22  pay on?
23        A.   The index price is a published price
24  inside. So whatever that -- whatever that index is

Page 103

1   at that point is what they're going to...
2         Q.   Now, the index price used post-2005, is
3   that really the same methodology that was used
4   pre-2005?
5         A.   Yes.
6         Q.   And that's going to be as we discussed at
7   times, a mixed index rate?
8         A.   Right.
9         Q.   Now Equitable Gathering Equity charges
10  Equitable Energy to move the gas?
11        A.   Correct.
12        Q.   Is that on a per MCF basis or do you know?
13        A.   It's either per MCF or per dekatherm. I
14  can find that out for you.
15        Q.   Do you know how that rate is set?
16        A.   I do not. That goes from mixturing --
17  from EQT Gathering to EQT Energy.
18        Q.   Does Equitable Production involve itself
19  any with the manner in which Equitable Gathering
20  calculates or sets the gathering rate?
21        A.   No.
22        Q.   Should it?
23        MR. HENDRICKSON: Well, I'm going to
24  object to that question. Go ahead and answer it.

Page 104

1         A.   EQT midstream gathering calculates the
2   rate which is approved by the CEO and then
3   ultimately by the board of directors, then that
4   rate is given to EQT Energy.
5         Q.   CEO and board of directors of what
6   company?
7         A.   EQT Corporation.
8         Q.   And that of course is the ultimate parent
9   company --
10        A.   Correct.
11        Q.   -- of Equitable Production, correct?
12        A.   Correct.
13        Q.   As well as Equitable Energy and Equitable
14  Gathering Equity?
15        A.   Correct.
16        Q.   So if they say it's okay, then it's okay?
17        A.   It's okay.
18        Q.   So as a result of that process the money
19  that is wired from Equitable Energy to Equitable
20  Production for the sale of gas is already going to
21  be the net payment?
22        A.   That's correct.
23        Q.   Is there any gathering charges that
24  Equitable Production has that is included or made

Page 105

1   part of the royalty that originates from Equitable
2   Production not Equitable Gathering?
3         A.   No.
4         Q.   So all of the monetary gathering charges
5   that a royalty owner received post-2005 is charges
6   that are allocated to it from Equitable Gathering
7   Equity?
8         A.   That's correct. And if there are any
9   third-party gathering charges that Equitable Energy
10  has to pay to get the gas to point of sale, then
11  those would be passed on to us too.
12        Q.   But for the Brenton District you're not
13  aware of any third-party gathering services?
14        A.   I'm not aware, no.
15        Q.   Now that there is this gathering component
16  in the system, i.e. Equitable Gathering Equity,
17  does Equitable Production's gas measurement group
18  still play a role in this process?
19        A.   Yes.
20        Q.   On what level of the system? Is that only
21  at the well or is it also well and sales meter?
22        A.   It's well and sales meter.
23        Q.   Why does Equitable Production take a role
24  in -- or the gas measurement department or gas

27 (Pages 102 to 105)

Page 106

```
 1   measurement group of Equitable Production take a
 2   role in the sales meter if the gas is sold at the
 3   well?
 4       A.  They're still receiving the wellhead
 5   readings and the sales readings, because that's
 6   part of their -- the Flow-Cal system.  And then
 7   that information needs to feed into Enertia for
 8   Enertia to do its allocation.  So they need to
 9   receive both pieces of that in gas measurement to
10   send to the production company and Enertia to do
11   the allocation.
12       MR. HENDRICKSON:  The guy that does this
13   is in the gathering department.  EQT Gathering is
14   not in production.
15       Q.  That's the gas measurement group?
16       A.  Yes.
17       MR. HENDRICKSON:  Yeah.
18       Q.  Well, let me back up, okay.
19       MR. HENDRICKSON:  I didn't want you to go
20   through...
21       Q.  No, that's fine.  And that was kind of
22   where I was going with that.  What I want to know
23   is post-2005 did the gas measurement group of
24   Equitable Production then become the gas
```

Page 107

```
 1   measurement group of Equitable Gathering Equity,
 2   i.e., did that department kind of change employers,
 3   if you know?
 4       A.  I'm not sure.  I don't think I know the
 5   answer to that.
 6       MR. HENDRICKSON:  We can find out.
 7       A.  I'm not sure who the gas measurement
 8   department...
 9       MR. HENDRICKSON:  It looks like the
10   gathering group but we will find out.
11       Q.  Is the data that is received -- and in
12   fact originated from Equitable Gathering Equity,
13   those charges, is it still broken down into enough
14   detail that it delineates monetary deductions for
15   line loss, monetary deductions for compression?  Do
16   you know?
17       A.  There are no monetary deductions for line
18   loss.
19       Q.  That's going to be just --
20       A.  That's part of the volumetric allocation.
21       Q.  Because that's --
22       A.  But as far as the cost --
23       Q.  I'm sorry, I didn't mean to interrupt
24   you.  Go ahead.
```

Page 108

```
 1       A.  Yes.  That's fine.  As far as the actual
 2   cost, yes, they give us that detail monthly, which
 3   is why we can continue to provide that detail on an
 4   owner statement.
 5       Q.  For the monetary deduction?
 6       A.  Correct.
 7       Q.  The volumetric deduction isn't indicated
 8   on the royalty statement?
 9       A.  Right, it's not.
10       Q.  Currently does Equitable Production have
11   any gathering lines, are they all owned by
12   Equitable Gathering?
13       A.  They currently own a couple in
14   Pennsylvania, but other than that, no.
15       Q.  Can you tell me what type of data
16   Equitable Production receives from Equitable Energy
17   in terms of the volumes at the point of sale, the
18   amount of gathering fees it incurs, and any other
19   data it would receive on a regular basis?
20       A.  No, that's pretty much it.
21       Q.  That's pretty much it?
22       A.  That's pretty much it.
23       Q.  I guess it would also receive the index
24   price you use for the point of sale?
```

Page 109

```
 1       A.  Right, volume, price, revenue and charges.
 2       Q.  Is there anyone at Equitable Production
 3   that monitors the estimated or calculated line loss
 4   that might occur at any given time on a system?
 5       A.  That's a gathering, EQT Gathering role.
 6   It's their job to find -- they're trying to
 7   minimize that, so yeah, there are people who do
 8   look at that.
 9       Q.  And I understand that because obviously
10   they're in charge of the gathering system and it's
11   their job to take care of the gathering system.
12   But as the lessee for these oil and gas leases,
13   Equitable Production -- you would agree with me
14   Equitable Production is the lessee for these
15   leases, correct?
16       A.  Yep.
17       Q.  Is there anybody at Equitable Production
18   that monitors Equitable Gathering to make sure that
19   they are keeping line loss at a minimum?
20       A.  It's certainly in our financial
21   statements.
22       Q.  What do you mean in your financial
23   statements?
24       A.  I mean, in our internal financial
```

Page 110

```
 1   statements we have, you know, line loss by
 2   district.  If it's -- if it's excessive then I'm
 3   sure we would question that.
 4        MR. HENDRICKSON:  I think his question is,
 5   I'm not trying to take over your deposition, do you
 6   know the individual in production that monitors
 7   that?  If you don't know just tell him you don't
 8   know?
 9        A.  No, I don't know.
10        Q.  But he also carried on to where what I was
11   asking for as well, is that there is a report
12   generated by district of the calculated line loss?
13        A.  I believe the financial group and the
14   production company does that.
15        Q.  Is that -- so that's a report generated
16   within Equitable Production?
17        A.  Correct.
18        Q.  Have there been instances during your
19   career in which that is a -- something that you
20   looked at on the financial statement and someone
21   from Equitable Production will report it to someone
22   about maybe we need to look at this?
23        A.  We as -- we as a revenue distribution
24   group when we're running your monthly processes if
```

Page 111

```
 1   we think that that is excessive, meaning that it's
 2   out of the normal month over month over month, then
 3   we contact gas measurement and work with them to
 4   try to figure out whether it's right or whether it's
 5   wrong.
 6        Q.  Who at gas measurement would your group
 7   contact?
 8        A.  There's a multitude of employees.
 9        Q.  It would be in the gas measurement group
10   of Equitable Gathering Equity?
11        A.  Right.
12        Q.  And is the manner in which the BTU value
13   is measured and calculated the same post-2005 as it
14   was pre-2005?
15        A.  Yes.
16        (Exhibit 9 marked for identification.)
17        Q.  I'm going to hand you, Mr. Crites, what's
18   marked as Exhibit 9 to your deposition.  And you
19   may want to pull out Exhibit 8 and Exhibit 7.
20        Specifically on Exhibit 8 if you could
21   turn to Bates Number page EQT002686.  And again I'm
22   going to ask for your help on Exhibit 8.
23   Specifically we're looking at on Exhibit 9 you look
24   to the last full entry on that page for -- I guess
```

Page 112

```
 1   the lessor number would be 214571; do you see
 2   that?
 3        A.  Yes.
 4        Q.  And we're looking at December 2007 is the
 5   time frame.  We've kind of gone through these
 6   figures.  It appears that the blended index price
 7   for this period of time per -- well, tell me, the
 8   price is $8.03, correct?
 9        A.  Correct.
10        Q.  Is that for dekatherm or for MCF?
11        A.  Those are for MCF, the royalty statements
12   are --
13        Q.  For MCF.  And again, we've got gross
14   volume, owner volume, gross revenue, owner revenue,
15   we've got gross deduct, owner deduct as well as
16   well net revenue, owner net revenue, and as you
17   indicated previously this is -- the royalty
18   statements for the post-2005 period did not change?
19        A.  Correct.
20        Q.  Looking now help me out with the numbers
21   of where the -- on the revenue payment history by
22   owner what would be the MCF?
23        A.  The MCF would be 54, and the dekatherms
24   would be 59.
```

Page 113

```
 1        Q.  So 54 is MCF, and this is on Exhibit 8?
 2        A.  Correct.
 3        Q.  The page I referenced earlier.  And then
 4   the 59 is the dekatherm?
 5        A.  Correct.
 6        Q.  What is the -- what is the gross revenue
 7   for this owner, for this lessor?
 8        A.  The lessor's share is the 434.61 and the
 9   35 cents above.
10        Q.  What's the 35 cents?
11        A.  It's most likely domestic usage.  It's the
12   small farm tap piece that we talked about.
13        Q.  And then what number would be the deduct?
14        A.  26.53 and two cents right above it.
15        Q.  Why would there be -- what's the two
16   cents?
17        A.  It's the deduct on the farm tap usage.
18        Q.  Why would there be a deduct on the field
19   tap?
20        A.  Because the gas was moving through the
21   gathering lines to get to that point.
22        Q.  Then of course 26.53, that would be I
23   guess the general charge incurred by Equitable
24   Energy from Equitable Gathering Equity?
```

Page 114

1    A.   Correct.
2    Q.   For a net of -- I guess the 408.08 plus
3 the 33 cents; is that correct?
4    A.   That's correct.
5    Q.   What's the 33 cents -- oh, that's the 35
6 cents minus the two cents.  I'm with you.
7    A.   Yep.
8    Q.   Now, the volume referenced on the -- both
9 the royalty statement, Exhibit 9, and Exhibit 8,
10 which is the internal Enertia printout, that
11 reflects the volume -- the allocated sales volume?
12    A.   Right, that's sales volume, gas that's
13 sold.
14    Q.   Whereas as the -- if you look at Exhibit 7
15 the sale -- or the gas measured at the wellhead for
16 December 2007 was 2,228 MCF?
17    A.   That's correct.
18    Q.   Whereas the gross volume indicated for
19 this well on the royalty statement, Exhibit 9, is
20 2,020.51 MCF?
21    A.   That's correct.
22    Q.   Post-2005 was there ever any discussion --
23 well, strike that.  We'll get to that a little bit
24 later.

Page 115

1        In your discovery responses it referenced
2 remittance statements.
3        MR. HENDRICKSON:  What page?  Exhibit No.
4 4?
5        MR. ADKINS:  Yeah.
6    Q.   Page 7 under heading Deductions.  What do
7 you mean by remittance statement?
8    A.   That's Exhibit 9.
9    Q.   That's the royalty statement?
10    A.   Right.  Correct.
11    Q.   And as we've discussed several times the
12 royalty statements reflect the monetary deductions
13 but not the volumetric deductions?
14    A.   Correct.  The remittance statements
15 reflect the volumes that were sold.
16        (Exhibit 10 marked for identification.)
17    Q.   I'm going to hand you what's been marked
18 as Exhibit 10.  This is a document that
19 Ms. Brisendine provided to my office regarding BTUs
20 and -- have you ever seen this document before,
21 something like it?
22    A.   Yes.
23    Q.   Tell me what's your understanding of this?
24    A.   This document is for the years 1999

Page 116

1 through 2010, volumes by wells on which we had BTU
2 samples.
3    Q.   A few columns down it has Own Deduct,
4 deductions, which I assume means owner deduction?
5    A.   Right.
6    Q.   What type of deductions are those?
7    A.   Those are the --
8    Q.   Monetary deductions?
9    A.   Monetary deductions.
10    Q.   For all these years?
11    A.   Right.  And this is basically a summary of
12 all the wells for all those years, a summary of the
13 volumes, the revenue and the monetary deductions
14 and the BTUs associated with these properties.
15    Q.   Do you know who put this spreadsheet
16 together?
17    A.   I think I did.
18    Q.   Back in 2010?
19    A.   Yeah.  It looks like something I would
20 have generated out of Enertia.
21    Q.   So would you have a BTU content for each
22 well in the Enertia system?
23    A.   This BTU that's on this exhibit is the
24 average BTU for each well for this entire period of

Page 117

1 time.
2    Q.   How often would the BTU value for a
3 particular well be checked?
4    A.   I can't answer that.
5    Q.   Would that be gas measurement that would
6 take care of that?
7    A.   Yes.  That would be --
8    Q.   Of course that would be part of the
9 gathering system?
10    A.   Right.
11    Q.   And gathering or Equitable Gathering would
12 then I guess report that to Equitable Production
13 for entry in the system?
14    A.   Correct.
15    Q.   Does Equitable Gathering have access to
16 the Enertia system in order to place data in
17 directly?
18    A.   Yes, gas measurement does.
19    Q.   What about Equitable Energy, do they have
20 access to the Enertia system in order to be able to
21 input data directly into the system?
22    A.   They do not.
23    Q.   The only parties -- the only entities that
24 have access to the Enertia system are Equitable

Page 118

```
1    Production and the gas measurement department of
2    Equitable Gathering?
3        A.  Correct.
4        Q.  I noticed in the organizational chart,
5    Exhibit 3, there are actually several companies
6    called -- with the name Equitable Gathering.  You
7    have Equitable Gathering, Inc.; Equitable Gathering
8    Equity, LLC; Equitable Gathering, LLC; Equitable
9    Gathering Nora, LLC, if you know, do you know why
10   they have all these different Equitable gathering
11   companies?  Do they cover certain regions or what's
12   the significance of that?
13       MR. HENDRICKSON:  Do you know?
14       A.  I do not.
15       Q.  Okay.
16       A.  I'm sorry, I was just trying to find them
17   all in here.  Yeah, I got them now.
18       (Exhibit 11 marked for identification.)
19       Q.  I'm going to hand you what's been marked
20   as Exhibit 11 to your deposition.
21       MR. HENDRICKSON:  After this if you don't
22   mind could we take a break?
23       MR. ADKINS:  How about we take a break
24   right now.
```

Page 119

```
1        THE VIDEOGRAPHER:  Going off the record.
2    The time is 12:46 p.m.
3        (Break.)
4        THE VIDEOGRAPHER:  We are back on the
5    record.  The time is 12:58 p.m.
6        Q.  (By Mr. Adkins) Mr. Crites, let me ask you
7    a question kind of going back to pre-2005.  You've
8    got Equitable Energy purchasing the gas for a --
9    from Equitable Production at an index rate based
10   upon the allocated sales volume, how does -- how
11   would Equitable Energy generate income for itself,
12   if you know?  I.e., would they go out and sell it
13   at an index plus price?
14       A.  They -- obviously they would sell it to
15   somebody.  I don't know that side of the business,
16   so I...
17       Q.  Do you ever see Equitable Energy's
18   financial statements?
19       A.  I do not.  I know that -- just to be
20   clear, I do know that they sell more gas than just
21   ours.
22       Q.  Okay.  Who else do they sell gas for?
23       A.  I don't know, but I know that they have --
24   there are other third-parties that they buy gas
```

Page 120

```
1    from and sell.  They are a marketing company.
2        Q.  Do they -- do you know whether or not it's
3    just generally maybe smaller producers or is it --
4    or do you know?
5        A.  I don't know.
6        Q.  Do you know, I mean, generally speaking,
7    if Equitable Energy operates on -- is it
8    profitable?
9        A.  I don't know that.
10       Q.  Because the reason I wanted to know is, is
11   that if it sells at an index rate -- does Equitable
12   Energy charge Equitable Production anything other
13   than the fee it has to pay Equitable Gathering?
14       A.  No.
15       Q.  So there's no marketing fee or anything
16   like that?
17       A.  There's no marketing fee.
18       Q.  I think I handed you Exhibit 11.
19       A.  You did.
20       Q.  And these are a series of reports that
21   look to be -- most of which look to be printouts
22   from the Equitable system, and I wanted to kind of
23   go through these with you if you can explain them.
24       The first page of Exhibit 11, can you tell
```

Page 121

```
1    me what kind of report this is?
2        A.  That's a division order report.
3        Q.  What's that?
4        A.  It is -- in Enertia when you run the
5    revenue distribution process and you have volume
6    and revenue on a well, it has to look to a division
7    order to know how to disburse that, either to EQT
8    itself, to a royalty owner, to another working
9    interest owner.  And this report is -- it appears
10   to be -- if you look in the center column you can
11   see the interest type.
12       Q.  Yes.
13       A.  Those are -- an R is for royalty.
14       Q.  So an R1 would mean just what, your
15   standard royalty owner?
16       A.  Correct.
17       Q.  What are some other codes that you might
18   find?
19       A.  The W is a working interest owner.
20       Q.  Are those the only two designations under
21   this type of report, the R and the W?
22       A.  There could be others.
23       Q.  What about -- I think suspense code or SUS
24   --
```

Page 122

1   A.  Right.
2   Q.  What's that?
3   A.  That's if a well is -- if an owner is on
4   suspense for a variety of reasons.
5   Q.  What's the 27 designate?
6   A.  I don't know exactly what that one is.
7   Q.  And working interest, obviously that
8   speaks for itself?
9   A.  Right.
10  Q.  And then the net revenue interest, is that
11  the -- that particular lessor's ownership interest
12  in that lease?
13  A.  In that well.
14  Q.  In that well?
15  A.  Correct.
16  Q.  And then I guess the effective beginning
17  date, is that the date of the lease?
18  A.  No, that's the date of the division
19  order.  Typically land administration sets up the
20  division orders, and I think it's their policy to
21  just start with an 0101 1901 date and an ending
22  date of 12/31/2078 is the date that we would need
23  to renew the Enertia software.
24  Q.  So do those dates really have any

Page 123

1   significance to what you do?
2   A.  No.  Now, it does to the extent if there
3   was a new division order that came out it would
4   have a date other than 1901 -- 0101 1901.
5   Q.  1099 Report?
6   A.  It just means it's reportable on 1099.
7   Q.  And netting allowed?
8   A.  That's almost always going to be yes if it
9   occurs.  That's more of a working interest owner
10  for lease operating expense than a royalty.
11  Q.  So why is -- yeah, because we talked about
12  that on another report we went over, but none of
13  these interests on this page are working interest
14  owners?
15  A.  Right.  You have to continue over to page
16  two.  And if you look halfway down you're going to
17  see that what it's telling you is is that the
18  division order equals 100 percent.
19  Q.  So why is it yes on everyone on netting
20  allowed?  Is it because there is a -- one working
21  interest owner?
22  A.  I believe that's just a default.
23  Q.  The default is yes?
24  A.  Yes.

Page 124

1   Q.  Does that in any way effect how the
2   royalty is paid out?
3   A.  No, it does not.
4   Q.  What's deleted?
5   A.  Deleted is if we were an owner in a well
6   but it was operated by somebody else, and they sent
7   us a check, then their interest is going to be
8   deleted in the well, we're going to be the working
9   interest owner.
10  Q.  So the second page is essentially the
11  second page is the report's on page one, correct?
12  A.  Right.
13  Q.  Looking at the third page, Revenue
14  Transfer Note Listing, can you tell me what this
15  is?
16  A.  Actually, I'm not familiar with this one.
17  I know what transfer means, from one owner to
18  another for a reason, but I'm not familiar with --
19  this is something land administration would do.
20  Q.  So is this kind of related to if an
21  interest in a well is somehow transferred to
22  another person, perhaps maybe not in the system or
23  there is some kind of change in ownership, that
24  would be what that's related to?

Page 125

1   A.  Yes.
2   Q.  Let's look at the next page, this New Well
3   DOI Entry, can you tell me what this is?
4   A.  This would appear to be a land
5   administration document for a well when they enter
6   the division order and they're checking off the
7   relevant information to make sure it was
8   completed.
9   Q.  Are you familiar with this document?
10  A.  No, I've never seen it before, but that's
11  what -- I mean...
12  Q.  If I wanted to ask somebody about it I
13  need to go to land administration?
14  A.  If you want other than what I just told
15  you.  It looks like a checklist for entering the --
16  a new division order.
17  Q.  And land administration, that's still part
18  of Equitable Production, correct?
19  A.  Yeah.  I think we found that out today.
20  Q.  Now, towards the bottom of that document,
21  I know you're not familiar with this document, but
22  it has a -- towards the bottom it has Review
23  leases, Can we deduct G&C charges.  Do you see
24  that?

Page 126

1    A.  Yes.
2    Q.  Do you know what G&C charges are?
3    A.  Gathering and compression.
4    Q.  And then the next box is, If so, notify
5  accounting; do you see that?
6    A.  Yep.
7    Q.  And at this point if that was checked off
8  then they would basically notify your department?
9    A.  Right.  I think earlier we talked about
10  how we find out whether deductions are permitted or
11  not permitted.
12    Q.  The next page appears to be a computer
13  screen printout, can you tell me what this is?  Is
14  this the screen capture from Enertia?
15    A.  Yes.  This would be something, again, that
16  land administration would do.  If you read the note
17  it says, Transferring royalty interest to owner to
18  correct address payments are being sent to.  So
19  they're basically changing a division order.
20    Q.  There is a box up above that where it has
21  owner level deduct; do you know what that is?
22    A.  Yeah, yeah, I found it.  I'm not familiar
23  with what that is.
24    Q.  And then two down is owner free deducts,

Page 127

1  do you know what that is?
2    A.  I do not.  Again, this is a screen that
3  I'm not familiar with or do anything with.  I only
4  understand what it's used for.
5    Q.  So you don't know if it's maybe a default
6  to check those boxes?
7    A.  I do not.
8    Q.  That would be someone at land
9  administration can tell me?
10    A.  Correct.
11    Q.  All right, the next page, Comprehensive
12  DOI Report, I think that's similar to the first
13  page we looked at, correct?
14    A.  That's correct.
15    Q.  And then the next page, this really
16  doesn't have a title, but if you could maybe tell
17  me what this report deals with.
18    MR. HENDRICKSON:  Are you referring to
19  31370?
20    MR. ADKINS:  Yes, I am.
21    A.  I don't think I've ever seen this before.
22    Q.  At the end it has Lease Provisions,
23  although provisions is misspelled, but it has
24  severance, what is severance indicative of?

Page 128

1    A.  It's severance tax.
2    Q.  And then it has transportation and
3  gathering, I assume that means --
4    A.  Yes would mean -- yeah, the lease provides
5  that you're allowed to do that.
6    Q.  Does this appear to be a document
7  generated from Enertia?
8    A.  My first inclination is to say no, but
9  again, I'm not familiar with this, so I can't be
10  sure.
11    Q.  Sure.  Then I think the next few pages are
12  pretty much identical.  If you'll just look over
13  those and tell me whether or not you're familiar
14  with those at all?
15    A.  They look exactly the same.
16    (Exhibit 12 marked for identification.)
17    Q.  Okay.  I'm going to hand you what's been
18  marked as Exhibit 12 to your deposition.  This is a
19  document produced by your counsel entitled Base
20  Contract for Sale and Purchase of Natural Gas.  And
21  it has the Brenton Equity little note written at
22  the top.  I assume that is referencing the Brenton
23  District, correct?
24    A.  I would assume so.

Page 129

1    Q.  And this is a base contract for sale and
2  purchase of natural gas between Equitable Energy,
3  LLC and Equitable Production Company; is that
4  correct?
5    A.  It appears so, yes.
6    Q.  And it's effective as of January 1st,
7  2005, at the top, correct?
8    A.  Right, correct.
9    Q.  Are you familiar with this document at
10  all?
11    A.  I think I may have seen it before.  It's
12  not something that I would deal with.  It would be
13  the basis for the rates that Equitable Energy would
14  pay EQT Production.
15    Q.  Were you involved at all with the
16  negotiation of this contract?
17    A.  No.
18    Q.  Who would within Equitable Production?
19    A.  I'm not sure because I looked at the
20  signatures down here and there's not...
21    Q.  Do you know who those people are?
22    A.  Yes.
23    Q.  Who's assistant treasurer that's signed on
24  behalf of Equitable Production?

Page 130

1      A.  Philip Conti.
2      MR. HENDRICKSON:  Actually, he signed on
3  behalf of Equitable Energy.
4      A.  Right.
5      Q.  Look at the third page in Equitable
6  Production, there is a John Bergonzi?
7      A.  Correct.
8      Q.  Is he with Equitable Production?
9      A.  He's retired.
10     Q.  Was he at the time?  January 2005?
11     A.  He was the -- I guess he was the assistant
12  treasurer of Equitable Production Company.
13     Q.  Do you know who he was employed by at that
14  time?
15     A.  Equitable Resources.  Yeah, EQT
16  Corporation.
17     Q.  The parent company?
18     A.  The parent, the parent.
19     Q.  And then the next page -- it's the same,
20  same signature, okay.  And who signed on behalf of
21  Equitable Energy?
22     A.  Philip Conti.
23     Q.  It appears he was assistant treasurer for
24  Equitable Energy, do you know who his employer was

Page 131

1  at that time?
2      A.  The parent company.
3      Q.  That'd be EQT Corp?
4      A.  Correct.
5      Q.  Turn a couple pages in to a document
6  entitled Attachment One to the contract.  Do you
7  see Contract Price?
8      A.  Yes.
9      Q.  Let me read this into the record.
10  Contract Price:  Applicable First of the Month
11  Index price applicable to the interstate pipelines
12  into which the gas is delivered, less prevailing
13  gathering related charges and retainage applicable
14  to such points less any other agreed applicable
15  fees or charges.  And then it says seller.  I don't
16  know if that's cut off or not.
17      Less prevailing gathering related charges,
18  that would be -- would that be the gathering
19  charges that Equitable Energy incurs from Equitable
20  Gathering Equity?
21     A.  Correct.
22     Q.  What about what are they referring to in
23  terms of retainage?
24     A.  Retainage is --

Page 132

1      Q.  Would that be the volumetric deductions
2  we've been discussing?
3      A.  No.  Retainage as it's referred to here
4  would be any third-party retainage.
5      Q.  Can you give me an example of a third-
6  party retainage?
7      A.  Dominion, for example, might hold out 3
8  percent for fuel to move the gas on their system.
9  So if you deliver to Dominion then they could
10  possibly hold out, depending on the meter, they
11  could possibly hold out retention?
12     Q.  Has retainage always been an issue in
13  terms of the sale of gas at the interstate
14  pipeline?
15     A.  Not always.
16     Q.  When did it start becoming an issue?
17     A.  I don't recall exact dates.  I could
18  probably find out for you but I don't recall exact
19  dates.
20     Q.  Do you think it would have been --
21  obviously it being discussed in this contract it
22  was an issue in 2005.  So would you agree with me
23  since it was in this contract that that was
24  obviously an issue that existed as of January 1st,

Page 133

1  2005?
2      A.  Possibly, yes.
3      Q.  How is that reflected in the Enertia
4  system?  Is there a specific data entry for
5  retainage?
6      A.  When Equitable Energy pays us they take
7  the retainage out of the price.
8      Q.  And I assume that based upon a net payment
9  that would be reflected, but my question is -- I
10  know Equitable Production is advised as to what the
11  specific gathering charge is?
12     A.  Right.
13     Q.  At least the monetary charge because it's
14  indicated on the royalty statement, correct?
15     A.  Right.
16     Q.  But if there is a retainage fee that's
17  incurred that affects the sales revenue is that a
18  specific data point that is received by Equitable
19  Production?
20     A.  No.
21     Q.  Who would have a record of what type of
22  retainage is encountered at each sale?
23     A.  Equitable Energy or EQT Energy.
24     Q.  So you would agree with me that would

Page 134

1  affect the bottom line for the individual lessor?
2      A.  Correct.  But again that would be volumes
3  that were actually -- we were able to sell.
4      Q.  But as we've discussed earlier, the
5  volumes produced at the wellhead versus the volumes
6  allocated to each well through the Enertia system
7  differ, and I'm trying to understand the various
8  components of volumetric deductions that are taken
9  out.  And as we discussed, one is compression or
10 line loss use, but also now you have this component
11 of retainage, correct?
12     A.  Correct.
13     Q.  The last part of this section it says less
14 any other agreed applicable fees or charges.  We've
15 talked about the gathering fees charged by
16 Equitable Gathering Equity, and we talked about the
17 instances of retainage, are there any other
18 applicable fees or charges that you're aware of
19 that would affect the bottom line royalty of an
20 individual lessor?
21     A.  The only other charge that I can think of
22 would be if a third-party charged us to move gas on
23 their system.
24     Q.  Which we know from your previous testimony

Page 135

1  for this area, or for the area encompassing --
2      A.  Minimal, minimal
3      Q.  -- my client's, it's minimal?
4      A.  Right.
5      Q.  There might be some -- if you wanted to
6  find out if there are any third-party gathering
7  systems that somehow affect my clients' royalties
8  how would you go about finding that out?
9      A.  I would contact Equitable or EQT Energy,
10 because they would be ultimately responsible for
11 paying those.
12     Q.  And the next page it indicates that the
13 gathering entity for this district is Equitable
14 Gathering Equity, LLC; is that correct?
15     A.  That's correct.
16     Q.  Which is a sub of Equitable Gathering,
17 Incorporated, which is a sister company of
18 Equitable Production?
19     A.  Correct.
20  (Exhibit 13 marked for identification.)
21     Q.  Mr. Crites, I'm going to hand you what is
22 marked as Exhibit 13 to your deposition.  This is a
23 January 1st, 2005 gathering agreement, gas
24 gathering agreement.  Have you seen this document

Page 136

1  before?
2      A.  I don't believe so, no.
3      Q.  And I grabbed a Madison district, and that
4  was my mistake.  Are you aware of whether or not
5  the gas gathering agreements for the various
6  districts are different at all?
7      A.  I don't know that.
8      MR. ADKINS:  Dave, do you know?
9      MR. HENDRICKSON:  I don't know.  I'll find
10 out though.
11     MR. ADKINS:  Well, the thing is, I mean, I
12 can -- we'll talk about it and if it's different --
13 my review I don't think they are, but --
14     MR. HENDRICKSON:  We'll find out.
15     MR. ADKINS:  Well, like I said, I mean,
16 you guys produced the -- maybe I should have pulled
17 that, but anyway, we'll talk about it.
18     MR. HASTINGS:  Which one do you want?
19     MR. ADKINS:  Oh, I've got it.  No, I've
20 probably got it somewhere.
21     MR. HENDRICKSON:  Yeah, he said he grabbed
22 the wrong one.
23     MR. ADKINS:  Yeah, I mean, they looked all
24 the same.

Page 137

1      Q.  (By Mr. Adkins) Well, let me go back.  Are
2  you familiar with this document at all?
3      A.  No.
4      Q.  This would be between Equitable Gathering
5  Equity, LLC and Equitable Energy, LLC?
6      A.  Correct.
7      Q.  And do you know who would have negotiated
8  this contract?
9      A.  No.
10     Q.  We can obviously see who signed off on it.
11     A.  That's what I'm looking for.
12     Q.  And it looks to be -- I'm looking at
13 WWEQT91, and it appears to be the same persons who
14 signed off on the gas sale contract we looked at
15 previously.  And is that John Bergonzi on behalf of
16 Equitable Gathering Equity?
17     A.  Yes.
18     Q.  And you indicated earlier he's assistant
19 treasurer of Equitable Gathering but he's actually
20 employed by EQT Corp?
21     A.  Correct.
22     Q.  I think on the other document he was
23 assistant treasurer for Equitable Production as
24 well?

Page 138

1      A.   Correct.
2      Q.   And then Philip Conti is signing as
3  assistant treasurer on behalf of Equitable Energy,
4  correct?
5      A.   Correct.
6      Q.   But he's in fact employed by EQT Corp?
7      A.   Correct.
8      Q.   If you can turn to page three of this
9  agreement -- well, you indicated you are not
10 familiar with this agreement, you don't have any
11 personal knowledge with respect to how it's applied
12 or utilized?
13     A.   No.
14     Q.   Turn to Page 5.  I'm going to be very
15 limited with this document.  Do you see at 4.1(a)
16 Gathering Fees?
17     A.   Yes.
18     Q.   It says the applicable gathering charges
19 specified on Exhibit C per dekatherm for the total
20 monthly quantity of natural gas delivered by
21 Gatherer at the points of delivery?  Do you see
22 that?
23     A.   Yes.
24     Q.   To the best of your knowledge is that the

Page 139

1  gathering charges that Equitable Gathering charges
2  Equitable Energy?
3      A.   Yes, I would think so.
4      Q.   And if you could, just turn to Exhibit C,
5  which is page WWEQT102, the very last page.
6  Looking at the gathering, the first Interruptible
7  Gathering Fee, As applicable, prevailing commercial
8  terms as specified by Gatherer's agreement with
9  producer.  Do you have any knowledge as to what
10 that means?
11     A.   No.
12     Q.   Done with that document.
13          A couple witnesses that were identified
14 I'd like to ask you about.  Nicki Atkinson, who is
15 she?
16     A.   She's division order supervisor I
17 believe.  I could actually get you her real title.
18     Q.   I think it's going to be on the document
19 that is going to be produced, right, the
20 employee -- all right.  So you don't need to -- you
21 don't need to worry about it.
22          What company is she with?
23     A.   I guess EQT Production.
24     Q.   What about Kelly Thompson?

Page 140

1      A.   Kelly is in the revenue accounting group.
2      Q.   She's in your group?
3      A.   Yeah, she works for me.
4      Q.   Carol Hoke, I know she's no longer there.
5  I think she's at Cabot now, correct?
6      A.   I believe that's correct.
7      Q.   What department was she in with Equitable?
8      A.   She was in the land department, land
9  administration.
10     Q.   And that's part of EQT Production?
11     A.   Correct.
12     Q.   Melissa Richey?
13     A.   No longer with the company, but she was
14 vice president of land.
15     Q.   Land administration?
16     A.   No, just land I think.
17     Q.   Is that dealing with --
18     A.   Lessors and --
19     Q.   Is that kind of the --
20     A.   It's more of -- it's a field position for
21 the most part.
22     Q.   Is that the person that actually kind of
23 dealt with the lessors or potential lessors?
24     A.   Yes.

Page 141

1      Q.   That group?
2      A.   Yes.
3      Q.   We already talked about John Bergonzi,
4  he's --
5      A.   He's retired.
6      Q.   He's retired?
7      A.   Right.
8      Q.   But he was with EQT Corp?
9      A.   Correct.
10     Q.   What was his position there, if you know?
11     A.   He was corporate controller.
12     Q.   Jessica Brisendine, she's in-house
13 counsel?
14     A.   Correct.
15     Q.   Do you what company she specifically works
16 for?
17     A.   EQT Production.
18     Q.   If you needed to deal with someone -- I'm
19 going to ask you for various companies that -- some
20 of the companies that are on this chart, like if
21 you needed to speak with someone work out an
22 issue I want to know if maybe you had a contact
23 person for the particular companies.
24          If there became an issue in which you

Page 142

1    needed to contact EQT Corp who would be the person
2    that you'd generally go speak to?
3        A.  EQT Corp?
4        Q.  Yes.
5        A.  From an accounting perspective?
6        Q.  Yes.
7        A.  Terri Bone.
8        Q.  I'm sorry, what's the name?
9        A.  Terri Bone, T-E-R-R-I -- T-E-R-R-I, Bone,
10   B-O-N-E.
11       Q.  Is that a man or woman?
12       A.  It's a woman.  She's now a corporate
13   controller.
14       Q.  That's corporate controller?
15       A.  Yeah.
16       Q.  What about EQT Investment Holdings, LLC?
17       A.  I'm not sure.  I have no dealings with
18   that.
19       Q.  Do you know what their role is?
20       A.  I do not.
21       Q.  EQT Gathering, Inc., which is the parent
22   company of EQT Gathering Equity?
23       A.  Probably Philip Swisher.
24       Q.  What's his position?

Page 143

1        A.  He is now in corporate accounting, but he
2    most recently was the vice president of the
3    gathering business.
4        Q.  How does that work?  I mean, you have EQT
5    Gathering, LLC, EQT Gathering Equity, which are all
6    companies under the umbrella of EQT Gathering,
7    Inc.?
8        A.  Right, I'm not sure.
9        Q.  You're not sure?
10       A.  How they -- you know, they separate those
11   out.  I just -- I think of it as EQT Gathering.
12       Q.  So do you even know anyone who
13   specifically works for EQT Gathering, LLC or EQT
14   Gathering Equity, LLC, or is it just all your
15   contact with EQT Gathering, Incorporated?
16       A.  It's just EQT Gathering, Incorporated.
17       Q.  So if you needed to deal with any of the
18   LLCs you would probably contact Philip Swisher?
19       A.  Right.
20       Q.  What about EQT Energy, who's your contact
21   person there?
22       A.  Jimmi Sue Smith.
23       Q.  How do spell her --
24       A.  J-I-M-M-I.

Page 144

1        Q.  Sue Smith?
2        A.  Right.
3        Q.  What's her position again, I'm sorry?
4        A.  She's vice president.
5        Q.  VP.  VP of any department or just VP?
6        A.  Just VP.  And if you have any specifics
7    with regard to those -- to those groups, let Dave
8    or Jessica know.  The problem is, is we did shuffle
9    of people, you know, everybody just -- we -- Terri
10   Bone the corporate controller likes to rotate
11   people to give everybody a sense of the different
12   sides of the business.  So the person that I gave
13   you the name for might not be -- that might be the
14   person that's there now but might not be the most
15   knowledgeable, if you understand what I mean.
16       Q.  Yeah, so I think what you're saying is
17   maybe someone who's at EQT Production, the
18   controller might want to move them over to Energy
19   in order to understand that side of the business a
20   little better?
21       A.  Right, correct.
22       Q.  How often does that happen?
23       A.  Every couple years.
24       Q.  Have you ever worked for any of the other

Page 145

1    companies?
2        A.  I have not.
3        Q.  Do you consider yourself fortunate they
4    haven't done that to you?
5        A.  I'm not sure.
6        Q.  Take it as a compliment.
7        A.  Thank you.
8        Q.  Now, obviously this is a civil action
9    relating to a claim that my clients have asserted
10   against Equitable.  Have you had any dealings with
11   my clients?
12       A.  Yes, I have.
13       Q.  Tell me a little bit about that?
14       A.  I believe in 2007 Glen Yost and I, we
15   exchanged some e-mails, had some conversations, we
16   met a couple of times on, you know, selling out the
17   royalty.  They were -- obviously they were opt-outs
18   from our K company suit.  And so we've been in
19   negotiations with them for quite a few years now.
20       Q.  How did they come about opting out of the
21   class action?
22       A.  I don't really recall.  I mean, they just
23   did.  They were one of quite a few that just opted
24   out.

Page 146

1    Q.   Are they one of the larger lessors in the
2  Equitable system?
3    A.   Yes.
4    Q.   In West Virginia?
5    A.   Yes, in West Virginia.
6    Q.   Do you know if any other individuals from
7  any of the Equitable companies that we discussed
8  here today dealt with my clients with respect to
9  royalty issues?
10   A.   Specifically to settlement on royalty
11  issues or just -- I mean, I don't know anybody
12  specifically, but I'm sure that, you know, the size
13  of your client, I'm sure there has been
14  communications.
15   Q.   You dealt specifically with Glen Yost,
16  correct?
17   A.   Correct.
18   Q.   Was there anyone else on behalf of my
19  clients you might have dealt with?
20   A.   Their attorney Chip -- is it Schaffer?
21        MR. HENDRICKSON:  Chip Schaffer.
22   Q.   And I guess later on it was Tom Lane?
23   A.   Correct.
24   Q.   Do you know if anyone else at Equitable

Page 147

1  had contact with my clients directly about their
2  issues involving the deductions?
3    A.   Not that I'm aware of.
4    Q.   Do you know a gentleman by the name of --
5  with the last name of Feamster; does that ring a
6  bell?
7    A.   No.
8    Q.   There was -- in response to the discovery
9  request -- 14?  I know this stack is thick but
10  we'll go through it quickly, I promise.
11       (Exhibit 14 marked for identification.)
12   Q.   This is marked Exhibit 14.  This is a
13  collection of e-mails and correspondence that were
14  produced in relation to my clients' files with
15  Equitable Production.  You were with the company in
16  1999, correct?
17   A.   I was with EQT but not with the properties
18  that we're discussing now, because we didn't
19  acquire those until 2000.
20   Q.   So these e-mails you wouldn't have been
21  involved --
22   A.   Right.
23   Q.   Or no one at Equitable would have been?
24   A.   These folks would have been working for

Page 148

1  another company.
2    Q.   Who is Bert Jedamski?
3    A.   Right.
4    Q.   Still with the company?
5    A.   No.
6    Q.   What about Melanie Freeman?
7    A.   No.  She is not with the company.
8    Q.   Cindy Harrah?
9    A.   No.
10   Q.   Well, let's skip past these '99 documents,
11  which there's a lot of them.  All right, go to --
12  halfway in there is a letter from W.W. McDonald
13  Land Company dated September 25th, 2002.  I think
14  it's going to be further in than that.
15       MR. HENDRICKSON:  What's the number?
16   A.   EQT 10983.  All these are in chronological
17  order, so that should be --
18   A.   Okay.
19   Q.   You were not at the company at this time,
20  correct?
21   A.   No, I was not.
22   Q.   Take a look at this document and tell me
23  if you're familiar with it at all?
24   A.   I've not seen it before.

Page 149

1    Q.   Is Joe Gilmore still with the company?
2    A.   Yes, he is.
3    Q.   Where is he in the company?
4    A.   He's in Charleston.
5    Q.   Charleston, West Virginia?
6    A.   Yes.
7    Q.   What company is he with?
8    A.   EQT Gathering.
9    Q.   Again, the next e-mail references Bert
10  Jedamski, who I think you indicated is no longer
11  with the company, and Cindy Harrah who is no longer
12  with the company; is that correct?
13   A.   That's correct.
14   Q.   Were you aware that in the 2002 time frame
15  McDonald Land had filed a letter or provided
16  Equitable with a letter of default regarding
17  improper deductions?
18   A.   No, I was not.
19   Q.   For my clients are you aware if there are
20  any codes within the Enertia system in which the
21  leases are coded that deductions are not permitted?
22   A.   I am not -- not aware.
23   Q.   You don't --
24   A.   I mean, I don't specifically know --

Page 150

1    Q.  Recall?
2    A.  -- if that exists or not.
3    Q.  Would you be able to produce something to
4    your counsel from the Enertia system to show what
5    the coding is for these particular lessors?
6    A.  Sure, absolutely.
7    Q.  If you take a look at a letter from
8    Equitable Production dated November 14, 2002.
9    A.  Okay.
10   Q.  It's from Cynthia Harrah.  The middle
11   paragraph it indicates -- second sentence it says,
12   These gathering fees have always been deducted from
13   your royalty payments, however as part of the
14   implementation of a new computer system they have
15   just begun to appear on your distribution
16   statements as of January 2002.  Do you see that?
17   A.  Yes.
18   Q.  Is that consistent with your recollection
19   as to when the monetary deductions began to show up
20   on the lessors' royalty statements?
21   A.  That's correct.
22   Q.  So prior to January 2002 monetary
23   deductions were being made from royalty payments to
24   the lessors but were not disclosed on the royalty

Page 151

1    statement?
2    A.  Correct, that was under the old Statoil
3    system.  January 2002 is when Enertia...
4    Q.  Went into effect?
5    A.  Went into effect.
6    Q.  Next is an e-mail, e-mail chain from
7    February 25th, 2005.  Bruce Turner, who is he?
8    A.  He's with our land group, I believe.  He's
9    in Charleston.
10   Q.  Is that land group part of Equitable
11   Production or Equitable Gathering, if you know?
12   A.  I'm not sure.
13   Q.  But still with the company, correct?
14   A.  Yes, correct.
15   Q.  What about Melanie Freeman?
16   A.  No longer with the company.
17   Q.  Where is she now?
18   A.  I'm not sure.
19   Q.  What was her position in this time period?
20   A.  She worked for land administration.
21   Q.  And at the time that -- well, actually,
22   this is 2005, so would land administration been
23   part of Equitable Production at that time?
24   A.  Yes, correct.

Page 152

1    Q.  You were with the company at this time?
2    A.  Correct.
3    Q.  Are you familiar -- you've seen this
4    e-mail before?
5    A.  I have not.
6    Q.  It appears that Ms. Freeman considered
7    Mr. Yost a pain, do you see that at the bottom of
8    the top e-mail, last sentence?
9    A.  Oh, okay.  Oh, yes, I do see that.
10   Q.  There is a remittance statement, it's not
11   Bates numbered, but there's a note at the bottom,
12   it's dated January 12th or 11th of 2007; do you see
13   that?
14   A.  I do.
15   Q.  We were talking about remittance
16   statements earlier, and we kind of concluded that
17   those were -- what the discovery responses were
18   referring to as remittance statements was a royalty
19   statement.  Now, this doesn't look like a royalty
20   statement to me but --
21   A.  It's an internally produced replica of a
22   check stub remittance.
23   Q.  So if internally Equitable Production
24   wanted to reproduce a -- the information that would

Page 153

1    be contained on a lessor's royalty statement this
2    is what it would look like?
3    A.  This is the report that they would run.
4    Q.  Have you -- is that your handwriting at
5    the bottom?
6    A.  It is not.
7    Q.  Do you know whose signature that is?
8    A.  Yeah.  Jim Spence.
9    Q.  Who's Jim Spence?
10   A.  He is now retired from the company.  He
11   worked for me, joint interest billing.
12   Q.  So he's part of your department?
13   A.  Correct.
14   Q.  And he spoke per telephone call from Tom
15   Hanson, who's Tom Hanson?
16   A.  That's a -- I'm not sure unless he
17   represents C.E. Richner.
18   Q.  Can you read his writing in terms of his
19   notes?
20       MR. HENDRICKSON:  Can you give me a page
21   please?
22       MR. ADKINS:  Well, there is none.  Here it
23   is.  It's right --
24   A.  Keep going back.

Page 154

1    MR. HENDRICKSON:  Okay, I got you.
2    A.  It says, Per telephone call from Tom
3 Hanson, Well 145701, need to have deduct set up
4 like other wells.  Well 506425, new well, needs to
5 be set up like the other wells.  Richner gets
6 royalty interest when they in turn pay out.
7    Q.   Is this referencing perhaps -- what's the
8 set up that he is referring to, if you know?
9    A.  I don't know.
10   Q.  Does this remittance statement reflect the
11 gross volume of gas produced at the well?
12   A.  It does.
13   Q.  It does?
14   A.  Yes.
15   Q.  Where is that?
16   A.  Under -- well, it represents the gross
17 sales volume.
18   Q.  Yeah, not the well volume but the sales
19 volume?
20   A.  Right.  It's under the gross volume, owner
21 volume column.
22   Q.  What I was asking is, is anywhere on here
23 does it reflect the volume that is reported to the
24 DEP?

Page 155

1    A.  It does not.
2    Q.  And then the next page is a December 29th,
3 2009 letter from my partner Tom Lane to you.  Have
4 you seen this document before?
5    A.  I have.
6    Q.  What did do you with this document upon
7 receipt?
8    A.  I sent it to legal counsel.
9    Q.  Did you respond to this letter at all
10 personally?
11   A.  I did not personally respond.
12   Q.  And in fact the next correspondence in
13 this exhibit was the letter from Ms. Brisdendine to
14 Mr. Lane dated January 13, 2010, and you were
15 copied on that as well, correct?
16   A.  Correct.
17   Q.  Next is an e-mail from someone at -- Keith
18 Morgan at Arnett & Foster to various individuals I
19 believe related to the administration of the class
20 action settlement.  Do you remember seeing this
21 e-mail and the associated documents?
22   A.  I don't recall, but I'm sure I did.
23   Q.  And then Exhibit 4 to this letter, does
24 this outline the gross numbers for the settlement

Page 156

1 of the class action?
2    A.  It appears to, yes.
3    Q.  Were you involved in that process, the
4 settlement process for the class action?
5    A.  Not in the calculation of the amounts.
6    Q.  Were you involved in the negotiation
7 process?
8    A.  I was involved in the mediation.
9    Q.  I believe that's all for that exhibit.
10   MR. HENDRICKSON:  Before we leave this
11 exhibit there appears to be on page -- pages
12 EQT016005 through EQT016008 -- what's that?  Okay,
13 it starts back at 004 through -- which appears to
14 be attorney/client.
15   MR. ADKINS:  Now, the 004 is actually a
16 letter to the lessor, so that wouldn't be.
17   THE DEPONENT:  That's what I thought.
18   MR. ADKINS:  Yeah, Feamster is the
19 lessor.  Now, 99 though, I see where you're coming
20 from, but would you be able to assert the privilege
21 since you weren't the client at that time?
22   MR. HENDRICKSON:  To sit here right now, I
23 don't know.  But we will look into that.
24   MR. ADKINS:  I understand.  You'll reserve

Page 157

1 your right to make that objection to that
2 document.
3    MR. HASTINGS:  And retain it under our
4 agreement.
5    Q.  (By Mr. Adkins) Mr. Crites, do you recall
6 when the Tawney decision was entered by the West
7 Virginia Supreme Court?
8    A.  Yes.
9    Q.  How did that affect how Equitable
10 Production Company did business with respect to
11 calculating and payment of royalties?
12   MR. HENDRICKSON:  As it relates to your
13 client?
14   MR. ADKINS:  I was going to ask generally,
15 but -- with respect to lessors in West Virginia,
16 but then we can break it down to my clients.
17   MR. HENDRICKSON:  Go ahead.
18   A.  To the extent that there were any leases
19 that we needed to make changes to from a payment
20 perspective we did that, but we've also been in
21 negotiation with them that entire period of time.
22 So we were trying to settle out, and at that point
23 any deductions that may have been inappropriate
24 would have been refunded.  But obviously now, you

Page 158

1    know, we're -- our communications and our
2    negotiations have ceased.
3        Q.   That would be with respect to my clients?
4        A.   To your clients.
5        Q.   But generally from a procedural standpoint
6    for the West Virginia operations how did how your
7    department do its job, how did it change with the
8    Tawney decision being entered?
9        A.   All the leases in West Virginia were
10   analyzed by outside counsel and the leases that we
11   felt, legal felt, needed change, we changed.
12       Q.   Do you know if any of my clients, the
13   designation for my clients leases, were changed as
14   a result of that review?
15       A.   I don't know that.
16       Q.   Is that something you can find out?
17       A.   I can.  Again, we were in negotiations
18   with your clients, so it was kind of a work in
19   progress.
20       Q.   Do you recall when the negotiations with
21   my clients started?
22       A.   I think 2007.
23       Q.   I'll represent to you the Tawney decision
24   came out in '06, so would it have been --

Page 159

1        MR. HENDRICKSON:  Why don't we check on
2    the exact date and we'll report that back to you.
3        MR. ADKINS:  Okay.
4        MR. HENDRICKSON:  There would be records
5    to reflect that.
6        Q.   Would your records indicate if there were
7    from -- let's go back from 2002 to the present, if
8    any designations were changed for my clients for
9    that period of time with respect to deductions?
10       A.   I could check that.
11       Q.   But I mean is that something you could
12   find out -- for example, let's just -- again, this
13   is a hypothetical, following the Tawney decision in
14   2006 outside counsel did a review of Equitable
15   leases and found one of my client's leases the
16   designation needed to be changed, and that change
17   was made, let's say, in August of 2006.  Would
18   Equitable Production's records be able to identify
19   that a change had been made and when that change
20   took place?
21       A.   I believe so, yes.
22       Q.   What we're going to do is we will ask
23   you -- and we can do it in writing, following this
24   deposition, which I provided to your counsel,

Page 160

1    various things we wanted clarification on, but also
2    for you to go back and do that for my clients, for
3    the period we talked about, I guess the initiation
4    of the Enertia system to the present time.
5        A.   Sure.
6        Q.   Did -- following the entry of the Tawney
7    decision by the State Supreme Court did that in any
8    way affect Equitable Production's business of or
9    procedure of using the allocated sales volume in
10   the calculation of its royalties?
11       A.   No.  We continue to pay royalties on
12   volume sold.
13       Q.   Was there any discussion within Equitable
14   Production about whether or not to use the
15   allocated sales volume in calculating royalties?
16       A.   No, we've always been pretty firm on using
17   the sales volume, volumes that were sold.
18       Q.   And I think as we talked about earlier the
19   royalty statements have not -- the royalty
20   statements have not changed since January 2002?
21       A.   That's correct.
22       MR. ADKINS:  I'd like to talk to
23   Mr. Freund.  Let's go off the record.
24       THE VIDEOGRAPHER:  Going off the record.

Page 161

1    The time is 1:57 p.m.
2        (Break.)
3        THE VIDEOGRAPHER:  We are back on the
4    record.  The time is 2:07 p.m.
5        Q.   (By Mr. Adkins) Mr. Crites, I'm pretty
6    much done with my questioning, I just have a couple
7    follow-ups with respect to your preparation for
8    your deposition here today.
9        I do not want to know what you discussed
10   with your attorneys, but other than your attorneys
11   did you speak with anyone regarding your deposition
12   here today, about in preparation?
13       A.   I do not.
14       Q.   Did you review any documents prior to the
15   deposition today in preparation?
16       A.   No.
17       MR. ADKINS:  I have nothing further.
18       MR. HENDRICKSON:  The only thing is the
19   deposition is all marked as confidential for the
20   purposes of what --
21       MR. ADKINS:  The protective order?  Has
22   the protective order been entered yet?
23       MR. HASTINGS:  I think the protective
24   order may have been entered, if not we'll make sure

Page 162

1   -- you and I need to work and make sure that gets
2   entered into.
3          MR. ADKINS:  I sent the final to you so
4   you can -- I don't know, I think I actually did
5   file it, you gave me the okay, so, but it may not
6   have been entered yet.
7          MR. HASTINGS:  We have an agreement.
8          MR. HENDRICKSON:  And he will read and
9   sign.
10          THE VIDEOGRAPHER:  This concludes the
11   deposition of Rick Crites.  The time is 2:08 p.m.
12              (Read and sign.)
13       (This deposition concluded at 2:08 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 163

1   STATE OF WEST VIRGINIA, To-wit:
2
        I, James D. Nielsen, a Notary Public and Court
3
    Reporter within and for the State aforesaid, duly
4
    commissioned and qualified, do hereby certify that
5
    the video deposition of RICK CRITES, was duly taken
6
    by me and before me at the time and place specified
7
    in the caption hereof.
8
        I do further certify that said proceedings
9
    were correctly taken by me in stenotype notes, that
10
    the same were accurately transcribed out in full
11
    and true record of the testimony given by said
12
    witness.
13
        I further certify that I am neither attorney
14
    or counsel for, nor related to or employed by, any
15
    of the parties to the action in which these
16
    proceedings were had, and further I am not a
17
    relative or employee of any attorney or counsel
18
    employed by the parties hereto or financially
19
    interested in the action.
20
        My commission expires the 15th day of May
21   2016.
        Given under my hand and seal this 9th day of
22   May, 2012.
23       --------------------------
        James D. Nielsen
24       Notary Public