1          IN THE UNITED STATES DISTRICT COURT FOR THE
2                NORTHERN DISTRICT OF WEST VIRGINIA

3                             -----

4    THE KAY COMPANY, LLC;
     H. DOTSON CATHER, Trustee of
5    Diana Goff Cather Trust; and
     JAMES E. HAMRIC III and all other
6    persons and entities similarly
     situated,
7
8         Plaintiff,

9    vs.                        Civil Action No. 1:13-CV-151

10
11   EQT PRODUCTION COMPANY;
     EQT CORPORATION; EQT ENERGY, LLC;
     EQT INVESTMENTS HOLDING, LLC'
12   EQT GATHERING, LLC;
     EQT MIDSTREAM PARTNERS, LP,
13
          Defendants.
14
15                            -----

16           DEPOSITION OF H. DOTSON CATHER,

17   a Plaintiff herein, called for examination by the

18   Defendants, pursuant to the Federal Rules of Civil

19   Procedure, by and before Stacy Isabell, a Court

20   Reporter and a Notary Public in and for the State of

21   West Virginia at the Holiday Inn Express & Suites

22   Bridgeport, 20 Sweetbriar Lane, Bridgeport, West

23   Virginia on Wednesday, October 7th, 2015, beginning

24   at 3:45 p.m.

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

-----

THE KAY COMPANY, LLC;
H. DOTSON CATHER, Trustee of
Diana Goff Cather Trust; and
JAMES E. HAMRIC III and all other
persons and entities similarly
situated,

        Plaintiff,

vs.                        Civil Action No. 1:13-CV-151

EQT PRODUCTION COMPANY;
EQT CORPORATION; EQT ENERGY, LLC;
EQT INVESTMENTS HOLDING, LLC'
EQT GATHERING, LLC;
EQT MIDSTREAM PARTNERS, LP,

        Defendants.

-----

DEPOSITION OF H. DOTSON CATHER,

a Plaintiff herein, called for examination by the
Defendants, pursuant to the Federal Rules of Civil
Procedure, by and before Stacy Isabell, a Court
Reporter and a Notary Public in and for the State of
West Virginia at the Holiday Inn Express & Suites
Bridgeport, 20 Sweetbriar Lane, Bridgeport, West
Virginia on Wednesday, October 7th, 2015, beginning
at 3:45 p.m.

1

COUNSEL PRESENT

Marvin W. Masters, Esq.
The Masters Law Firm, LC
181 Summers Street
Charleston, West Virginia  25301
        Counsel for Plaintiff

J. Kevin West, Esq.
Steptoe & Johnson, PLLC
Huntington Center,
South High Street, Ste. 2200
Columbus, Ohio  43215
        Counsel for Defendant

Carl L. Fletcher, Esq.
Henderickson & Long, PLLC
214 Capitol Street
Post Office Box 11070
Charleston, West Virginia  24924
        Counsel for Defendant

2

PROCEEDINGS

-----

H. DOTSON CATHER,

a witness herein, having been first duly
sworn, was examined and testified as follows:

-----

EXAMINATION

BY MR. WEST:

Q.   Can you please state your name?

A.   H. Dotson Cather.

Q.   Mr. Cather, where do you live?

A.   Clarksburg.

Q.   And you lived there your whole life?

A.   No.

Q.   How long have you lived in Clarksburg?

A.   Since 1962.

Q.   And what's your occupation?

A.   I'm retired.

Q.   And before you retired, what did you do?

A.   By education I'm an engineer.

Q.   Was there a particular concentration in
engineering in which you focused your practice?

A.   Mechanical and mining.

Q.   And in your work as an engineer, did you

3

ever do any work in the oil and gas business?

A.   Yes.

Q.   We don't need to get into great detail,
but would you just briefly explain what the nature
of that work would have been?

A.   We had a string of oil and gas wells,
mostly gas wells.  And I managed and ran those for
maybe 10 or 12 years.

Q.   And was that for a company that you worked
for?

A.   No.  It was within the family.

Q.   And just one last question.  As far as
your work in engineering, were you involved in
private practice as an engineer?  Did you work for
an engineering firm or did you work for different
companies that may have been involved in mining for
instance?

A.   To put it in proper perspective, I taught
engineering at different schools for 20 years and I
worked for some large corporations.

Q.   Were any of those oil and gas companies
the large corporations?

A.   Yeah.  One of them was, SO.  That shows
you about my age.

4

1    Q.   I remember SO.  And then as far as the oil
2  and gas wells that you kind of managed for your
3  family, were those located in West Virginia?
4    A.   Yes.
5    Q.   What was the nature of the work that you
6  did on them?  Did you hire contractors to do well
7  tending or did you actually do work on the well
8  sites?
9    A.   I hired the well tenders.  When we worked
10  on the wells, we hired contractors.  If we were
11  drilling one down, we hired drilling contractors.
12  Pretty standard stuff.
13    Q.   Let me ask you.  There's a complaint
14  that's been filed in the United States District
15  Court of the Northern District of West Virginia.
16  The Kay Company, H. Dotson Cather, Trustee of Diana
17  Goff Cather Trust and James E. Hamric, the third
18  versus EQT Production Company and some other EQT
19  companies.  Are you familiar with that lawsuit?
20    A.   Yes.
21    Q.   In that lawsuit it's alleged that you have
22  some oil and gas leases for which EQT production is
23  the lessee and you or the trust that you represent
24  are the lessor.  Are you familiar with the leases

5

1  that are mentioned in the complaint?
2    A.   Of course.
3    Q.   And how many leases with EQT is it you're
4  understanding that the trust has?
5    A.   Well, first of all, there are two trusts.
6  One trust has two leases with EQT or something owned
7  by EQT.  And the other trust has one lease to the
8  best of my knowledge.
9    Q.   And that's with EQT, the other trust?
10    A.   There are two trusts.
11    Q.   Yes, sir.
12    A.   I will say it again.  One trust has two
13  leases with EQT or one of its et als.  And the other
14  has one lease to the best of my knowledge.
15    Q.   And, as far as the lawsuit's concerned,
16  the name of the plaintiff in the lawsuit is the
17  Diana Goff Cather Trust.  Is that one trust or is
18  that two trusts?
19    A.   Two trusts.  Let me be specific.  This is
20  important to me.  The Diana Goff Cather C Trust,
21  capital C Trust, and the Diana Golf Cather M,
22  capital M, Trust.
23    Q.   Do either of those trusts have oil and gas
24  leases with other oil and gas producers?

6

1    A.   Oh, yeah.
2    Q.   Do you recall what other oil and gas
3  producers you have leases with?
4    A.   We probably had three dozen leases.  I can
5  tell you the names of some of them.
6    Q.   Just what you can remember here today is
7  fine, sir.
8    A.   I don't know that I want to name ...
9         MR. MASTERS:  He's not asking you what
10  the leases are.  He's asking who is the lessee, who
11  at the present time was --
12         MR. CATHER:  Yeah.  I just don't know
13  if I want to name -- is it okay if I just name a
14  few?
15         MR. MASTERS:  Sure.
16    A.   Well, there is Mountain State, there's my
17  God, there's -- if you want a list, I'll give them
18  to you.  There's just so many of them.
19    Q.   You know what, that's fine.  We can send a
20  written request and we'll go that route.  That will
21  be fine.
22    A.   I don't know if the leases have a damn
23  thing to do with this suit or not.
24    Q.   Okay.

7

1         MR. MASTERS:  We'll talk about that.
2    Q.   We've talked about the C Trust and the M
3  Trust.  Do you personally have any leases with the
4  exception of these trusts where you have a lease
5  with EQT in your name personally?
6    A.   No.
7    Q.   Do you have an ownership interest in any
8  entity other than these two trusts, the C Trust and
9  the M Trust, which has an oil and gas lease with
10  EQT?
11    A.   If I understood your question, no.
12    Q.   Now we talked about the complaint and
13  where it's pending.  And I believe Mr. Masters had a
14  copy of the complaint that he showed to you which
15  you just glanced at.  Have you reviewed the
16  complaint?  Are you familiar with the allegations in
17  the complaint?
18    A.   Probably so.
19    Q.   And what is your understanding of what the
20  claims that are raised in the lawsuit are?
21    A.   Really pretty simple.  We're not getting
22  the correct royalty.  And in the case of the M
23  Trust, we haven't received a nickel from EQT this
24  calendar year, not a dime's worth of royalty.  And

8

1  in the case of the C Trust, there are two leases.
2          And in one of the leases, I have -- I
3  became concerned at the tremendous percentage of
4  deducts that were taken out of the royalty.  And
5  then did a little investigating and we found out
6  that we -- I don't think -- were being paid.
7          I'm not talking about the flat-rate
8  royalty.  I'm talking about the one eighth of
9  royalty.  We're not being paid on the correct volume
10 or for the correct sale amount.
11     Q.   Now after you did your investigation and
12 found what you thought were inconsistencies or that
13 you weren't being paid the correct amount for the
14 two leases in which the C Trust was the lessor, did
15 you contact anyone with EQT?
16     A.   No.
17     Q.   Are you aware in the complaint that was
18 filed where the trust is a plaintiff that we've been
19 talking about that that complaint has been alleged
20 and filed as a class-action complaint?
21     A.   Of course I'm aware of that.
22     Q.   And you are aware that you have been named
23 as a --
24     A.   Plaintiff.

9

1      Q.   -- plaintiff?
2      A.   Yes.
3      Q.   And you are seeking to be a class
4  representative; is that correct?
5      A.   Seeking?  I guess I am.
6      Q.   What's your understanding of what a class
7  action is?
8      A.   I've been involved in about eight or nine
9  of them.  As I told you, I was an engineer, not a
10 lawyer.  Don't ask me for a definition.
11     Q.   I'm sorry, sir.  Go ahead.  I'm just
12 asking for your understanding of what a class action
13 is.  I'm not asking for --
14     A.   You know, I was also a plaintiff in the
15 first class-action suit.
16     Q.   I am aware of that.
17     A.   If you're aware of that, then you must be
18 aware of the fact that I'm probably aware of what a
19 class-action suit is.
20     Q.   You said that you've been a class
21 representative of eight or nine.  We know about the
22 other one that was filed against EQT, I think, in
23 2007 or 2006.  Were any of the other eight or nine
24 that you referenced against oil and gas companies?

10

1      A.   Yes.
2      Q.   Were they in Federal Court in West
3  Virginia?
4      A.   Some of them were in State Court.  I'd
5  have to check on that.  Some of them -- can you help
6  me with that one?
7          MR. MASTERS:  Yes.  One was in State
8  Court.  The others were in Federal Court.
9      Q.   Was the one in State Court, was it in
10 Roane Circuit Court or what county was it in?  Do
11 you know?
12     A.   I can't remember all that stuff.  I don't
13 even remember which Federal Court they were all in.
14     Q.   Were they all in West Virginia?
15     A.   Yes.
16     Q.   Now in the complaint that's been filed
17 where you have been named or the trust has been
18 named as a plaintiff, in paragraph 28, it says that
19 the action was brought for individual claims and
20 pursuant to Rule 23.  And if you'll -- we'll wait a
21 second so you can take a look at what I'm reading.
22     A.   What paragraph?
23     Q.   Paragraph 28.  It says the action is
24 brought for individual claims and pursuant to Rule

11

1  23 of the Federal Rules of Civil Procedure as a
2  class action on behalf of the named plaintiffs and
3  on behalf of all West Virginia residents and others
4  who have entered into or who are parties or
5  beneficiaries of oil and gas leases with defendants
6  or with others who have been assigned with duties
7  and responsibilities of leases to defendants and or
8  which have been assumed by defendants from who EQT
9  has wrongfully taken deductions from their oil and
10 gas royalties since December 9th, 2008 or otherwise
11 have not paid plaintiffs their royalty which is due
12 them under and pursuant to their leases.  Do you see
13 that allegation there?
14     A.   Of course.
15     Q.   Now with regard to where it says it's on
16 behalf of all West Virginia residents and then it
17 goes into a description, what efforts have you made
18 to determine who would fall into that class, who the
19 members of the class would be?
20     A.   Personally?
21     Q.   Yes, sir.
22     A.   Have I personally?
23     Q.   Yes, sir.
24         MR. MASTERS:  And you don't have to

12

1 tell him anything that you and I have discussed
2 because I'm your lawyer.
3     Q.   Just things that you have done personally.
4 And I'm not asking for any communications between
5 you and Mr. Masters.
6     A.   You wouldn't get them anyway.  What have I
7 personally done?  Is that your question?
8     Q.   Yes, sir.
9     A.   Give me an example of what ...
10     Q.   Well, have you made any effort to -- have
11 you gone to a courthouse and found out other people
12 who had leases with EQT and then contacted them with
13 regard to how their royalties have been calculated
14 by EQT?
15     A.   I don't want to put lawyers out of
16 business.
17     Q.   Have you gone to any courthouse to look
18 for leases that were between EQT and any other
19 lessors?
20     A.   I repeat I don't want to put the lawyers
21 out of business.
22         MR. MASTERS:  I think that's a no.
23     Q.   And I'm not going down the same path.
24 It's just kind of a variation of that question.

13

1 You've not reviewed the leases of anyone else that
2 has a lease with EQT to see what kind of royalty
3 provision are in the leases, have you?
4     A.   Well, as a matter of fact, I did talk to a
5 couple of other friends who have oil and gas leases
6 with EQT or some version there of.  And I let them
7 tell me -- I can't lie about that.  I won't lie
8 about that.
9     Q.   Was that before you filed this lawsuit?
10     A.   No.  Well, I don't remember.  It might
11 have been before when we started getting low
12 royalties or it might have been after.  I don't
13 know.
14     Q.   Who were the people that you spoke with?
15     A.   I don't want to name them.  They're my
16 friends.
17     Q.   So as we sit here today, do you know the
18 number of West Virginia residents who would fall
19 into the definition --
20     A.   No, I don't.
21     Q.   Could you let me finish the question
22 please because we're taking a record here?  If I
23 don't finish the question, no one's going to know
24 exactly what I was asking.

14

1         I think you probably did correctly
2 anticipate what my question was going to be.  Do you
3 know the number of West Virginia residents who would
4 fall under the definition contained in paragraph 28
5 of your complaint?
6     A.   No, I don't.
7     Q.   Now you mentioned the fact that you were a
8 plaintiff in another class action that was filed
9 against EQT Production and some other EQT
10 subsidiaries; is that correct?
11     A.   I've already answered that question.
12     Q.   The trust was a plaintiff in a case
13 against EQT?
14     A.   Both trusts were.
15     Q.   And is it your understanding that that
16 lawsuit was ultimately settled, that there was a
17 settlement reached with regard to that lawsuit?
18     A.   Of course.
19     Q.   I'm going to hand you a document that I
20 guess will be marked as Deposition Exhibit 1.
21         (Deposition Exhibit No. 1 was marked
22 for identification.)
23     Q.   And I will ask if you are familiar with
24 that document, Mr. Cather.  I think it's the same

15

1 one that we've marked that as an exhibit to go with
2 the deposition transcript.
3     A.   Are these two copies of the same thing?
4     Q.   They are or they were certainly meant to
5 be if you want to look and make sure.  But the one
6 we can just work off of Exhibit 1 there because
7 that's one that is going to be made part of the
8 official record.
9     A.   Why do I have two copies?
10     Q.   Because I made a mistake.  I forgot to get
11 the one that has been marked with an exhibit sticker
12 marked before I started asking questions.  And I'll
13 give this one to Mr. Fletcher.
14         MR. MASTERS:  I have a copy right
15 here.
16     A.   This is from the first suit.
17     Q.   Yes, sir.  And that's my question.  We
18 were talking about the first suit.  And on the
19 second page of that Exhibit 1, it appears that
20 there's a letter there that purports to have your
21 signature to the claims administrator providing them
22 certain information in order to assist them with
23 assessing your claim.  On the second page there, on
24 the letter dated September 16, 2010, is that your

16

1  signature?

2      A.   Yes.

3      Q.   Do you recall sending information to the

4  claims administrator in order to demonstrate that

5  the two trusts, I guess, were claimants who were

6  entitled to receive payment under the terms of the

7  settlement?

8      A.   Yes.

9      Q.   And then I'll direct you back to about

10  four pages from the end of the series of documents

11  that I have given to you.  And actually I'll direct

12  you back to a couple of pages before that.

13           There's a document that says Kay Company

14  versus Equitable Production Company Settlement.  Do

15  you see that document?  I think it's a couple of

16  pages before the one you're looking at right now.

17      A.   What page are you on?

18      Q.   If you'll go two pages before the one that

19  you're looking at right now.  And there was a blank

20  page?

21           MR. MASTERS:  Why don't you just find

22  it and hand it to him so I can follow it too?

23           MR. WEST:  Okay.  And I'm not going to

24  ask you any questions about the document.  I'm just

17

1  trying to identify this document.  And there's that

2  first page that identifies it as the settlement.

3  And then two pages later --

4           MR. MASTERS:  That's it right there,

5  right?

6           MR. WEST:  Yeah.  Correct.

7           MR. MASTERS:  Page one.  I got it

8  right here.

9      Q.   And then two pages later, it appears to be

10  signed by you on behalf of the trust.  Do you see

11  that at the bottom?

12      A.   It says page 2 ...

13      Q.   Yes, sir.

14      A.   For the C Trust?

15      Q.   Yes.

16      A.   Yes.

17      Q.   And so that is your signature; is that

18  correct?

19      A.   Yes.

20      Q.   Do you recall sending that document into

21  the claims administrator?

22      A.   I suppose I did if I signed it and sent

23  it.

24      Q.   You said this one is on behalf of the C

18

1  Trust.  Do you recall sending a similar document to

2  the claims administrator on behalf of the M Trust?

3      A.   I must have.

4      Q.   Thank you.  And I don't have any further

5  questions on that particular document.

6      A.   Do I give this back to you?

7      Q.   You give the one that's marked to the

8  court reporter.  And then you can keep or give to

9  Mr. Masters or do whatever you please with that one

10  I've given ...

11      A.   Okay.

12      Q.   Next, I am going to hand you a document

13  that I marked as Exhibit 2 and ask if you recognize

14  this document.

15           (Deposition Exhibit No. 2 was marked

16  for identification.)

17      A.   Yes.

18      Q.   And does that appear to be a lease

19  between, I think it says H. Diana Goff Cather, H.

20  Dotson Cather, Laura Goff Fireman, Louise Reece

21  Ernest Swiger, Trustee under the will of Guy Goff,

22  deceased and Mack Worl.  Are you familiar with this

23  lease?

24      A.   Yeah.

19

1      Q.   And who are the lessors on this lease?

2  Are those people that you're familiar with?

3      A.   The lessors are the granddaughters of Guy

4  D. Goff.  Diana Goff, Katherine Goff, Laura Goff

5  Fireman are sisters.  And Louise Reece was their

6  first cousin once removed.  And Swiger was a Trustee

7  on that other side of the Goff family.  Yeah.  I

8  know who they are.

9      Q.   Now the H Dotson Cather that's a lessor

10  under that lease, is that you?

11      A.   That is I.

12      Q.   Were you involved in negotiating this

13  lease, Mr. Cather?

14      A.   Yes.

15      Q.   Can you tell us what you remember as far

16  as the negotiation of the lease?  How it all came

17  about?  Did Mr. Worl approach you and the others

18  about taking the lease or did you approach him or

19  how did that all come about?

20      A.   My recollection is that Mack Worl wanted

21  to take the lease.  My recollection is that a piece

22  to the north of this 163 acres had just had a oil

23  well drilled on it.

24      Q.   Did he present you and the others with a

20

**Page 21**

1 lease that he wanted you to sign?

2    A.  He probably did present us with a lease.

3 And that is probably not the lease that was signed.

4    Q.  And that's the reason that --

5    A.  Because, at that time, Howard Caplan, who

6 was -- he was a really -- he was a ex US District

7 Attorney.  And he was kind of the dean on the

8 Harrison County bar really.  He was the

9 administrator of the Nathan Goff estate.  And he had

10 to prove everything.

11    Q.  And if you'll look at, I guess, starting

12 at the second page, going into the third and fourth

13 pages, actually going on into the fifth, it has

14 language that discusses calculation of royalty.

15      Do you see that?  I guess starting at the

16 bottom of what's page 2 under the lease that was

17 actually recorded and then going through the middle

18 of page 5?

19    A.  Yeah, I see it.

20    Q.  And it appears that on pages 3 and 4 there

21 are two options that are given that the lessors may

22 elect with regard to --

23    A.  Yeah, I'm aware of that.

24    Q.  -- partially calculating the royalty.  Do

21

**Page 22**

1 you see that?

2    A.  Yes.  I see option one and option two.

3    Q.  And have you other interests in other oil

4 and gas lease, or the trust does in fact -- would

5 you agree that this language in this lease is a

6 little more complex and involved than you might

7 typically see in an oil and gas lease?

8    A.  No.  This is a one eighth royalty.  What's

9 complicated with that?

10    Q.  Looking at option one and option two --

11    A.  I'm looking at the bottom of page 2 which

12 is what you told me to look at.

13    Q.  Yes.  And I'm also asking you to look at

14 pages 3, 4 -- 3 and 4 in particular, the two options

15 that are given to the lessor.

16      MR. MASTERS:  The question that you

17 asked him was -- you know ...

18    A.  As far as the royalty, it was a one eighth

19 royalty.  Pretty standard.  Those two options had

20 nothing to do with the one eighth royalty.  It just

21 gave -- it gave the owners of the oil and gas a

22 place -- an option of taking a piece of the action,

23 a 1/32.  And that is a little unusual granted.

24    Q.  And I think you said that --

22

**Page 23**

1    A.  That didn't have a thing to do with the

2 royalty.

3    Q.  Is the negotiation of this lease that you

4 and the other lessors had employed counsel to assist

5 you with, in regard to the negotiation of this

6 lease?  Did I understand that correctly?

7    A.  That's my recollection.

8    Q.  Now with regard to this lease, is this a

9 lease that ultimately became part of one of the

10 trusts, either the C Trust or the M Trust we have

11 been talking about?

12    A.  Yeah, I did.

13    Q.  And which trust did it become a part of?

14    A.  It became part of the M Trust.

15    Q.  And how did that come about just

16 generally?

17    A.  It was put in the M Trust by the executor.

18    Q.  The executor of your wife's mother's

19 estate?

20    A.  Of my wife's estate.

21    Q.  And the property that's encompassed by

22 this lease, is it located in Harrison County?

23    A.  No.

24    Q.  Where is that located?

23

**Page 24**

1    A.  It says it there.  It's half in Gilmer

2 County and half in Braxton.  163 acres, about half

3 in each county.

4    Q.  Do you know anything about the quality of

5 the gas that is produced from this lease?  And

6 that's to say do you know anything about the BTU

7 content of the gas produced from this property?

8    A.  No.  Not offhand.  Probably a little over

9 a thousand BTUs per standard cubic foot.  Hell, it's

10 all the same.  They're all -- in general, as you

11 know.  But that gets into the engineering part.  And

12 we're not talking about that.

13    Q.  I guess my question is have you had

14 testing done to determine the BTU content of the gas

15 produced from this lease, you or the trust?

16    A.  The trust hasn't.  We may have been party

17 -- may have been parties to some testing back when

18 these wells first came in.

19    Q.  Back in the '60s?

20    A.  Yes.  This lease was drilled pretty much

21 as soon as that lease was signed.

22    Q.  Are you receiving royalty checks for gas

23 produced from this lease from EQT?

24    A.  No.  And that's a big problem.  As I said

24

1  earlier, the reason that we became concerned about
2  this particular lease in the M Trust is because we
3  haven't received a nickel this calendar year. The
4  last check we received was in December of last year,
5  a small check.
6      Q.   Prior to that, were you receiving royalty
7  checks?
8      A.   Yes.
9      Q.   Do you know how --
10     A.   And these were culmination wells.
11 Initially, they produced oil and then they produced
12 gas.
13     Q.   Do you know how many wells are located on
14 this lease?
15     A.   I believe -- without getting into the
16 records, I believe six or seven.
17     Q.   Do you know when the most recent well
18 would have been drilled on this lease?
19     A.   It would have been years ago.  They
20 drilled seven wells, I believe.  And those wells
21 were drilled shortly after this lease.  And only 80
22 acres were productive.
23          And you ain't going to drill that many
24 more wells after you drill seven or eight wells on

25

1  80 acres.  But now go ahead with your questions.
2      Q.   To your knowledge, have any wells been
3  drilled on this acreage encompassed by this lease
4  that were horizontal wells?
5      A.   No.  Not to my knowledge.
6          (Deposition Exhibit No. 3 was marked
7  for identification.)
8      Q.   I'm going to hand you another document,
9  Mr. Cather, which I have marked as Exhibit 3.  And
10 I'll ask you to take a look at that document and
11 tell us if you are familiar with it?
12     A.   Now you're over in Calhoun County all of a
13 sudden.
14     Q.   Yes.  And I'm just going to ask you, I
15 mean, it appears that you and your wife were parties
16 to this lease.  Are you familiar with this lease?
17     A.   Yeah.  It was the royal.  And it's the
18 Charles Despard estate.  It's a bear.  Yeah.  When
19 did we do this?  '67.  Okay.
20     Q.   Let me ask you this.  To your knowledge,
21 is this lease still an active lease?  Is there any
22 production coming from this lease?
23     A.   Yes.  What does Equitable have to do with
24 this?

26

1      Q.   Well, in their records, at one point,
2  their records indicated they had an interest in this
3  lease.  So that's why I'm asking you about it, if
4  you're claiming that there's any production by EQT
5  production currently under this lease?
6      A.   For the record, I have no knowledge of EQT
7  having anything to do with this lease from its
8  inception.
9          (Deposition Exhibit No. 4 was marked
10 for identification.)
11     Q.   I'm going to hand you another document
12 which I have marked as Exhibit 4.  And I will ask
13 you if you are familiar with this lease.
14     A.   Yes, I'm aware of this lease.
15     Q.   And would you agree that the royalty
16 provision in this lease calls for a flat-rate
17 payment?
18     A.   Yeah, it's a flat-rate lease.
19     Q.   And are you receiving payments from EQT or
20 is the trust receiving payments from EQT under this
21 lease?
22          MR. CATHER:  Marvin, should I ...
23          MR. MASTERS:  Do you want to talk to
24 me?

27

1          MR. WEST:  Yeah.  We can take a break
2  if you want to talk to Mr. Masters.  We'll step out.
3          (A short break was taken.)
4  Resuming:
5      A.   Would you repeat your question please?
6          MR. WEST:  Could you read the question
7  back please?
8          (Court reported read back question.)
9      A.   The original lease -- I guess I can look
10 -- five or six flat-rate wells.  And then, at some
11 point, I guess EQT must have obtained a lease.  Then
12 they drilled down one of the wells.
13     Q.   Do you know when that was that EQT drilled
14 that other well?
15     A.   It might be in some of the data.  They
16 drilled it down and started paying a one eighth,
17 either EQT did or whoever held the lease at that
18 time.  And this is the lease where when EQT had it,
19 and the last year in particularly, this year where
20 the deducts became astronomical.
21     Q.   So you think on this lease you're getting
22 a one eighth payment with deductions being taken?
23     A.   This is what it calls for.  But we became
24 aware that neither the volume reported in the

28

1 remittance statements nor the price paid for the gas
2 were correct from EQT. This got my attention as
3 a trustee.
4     Q.   So under this particular lease, you're not
5 receiving flat-rate payments?
6     A.   Yes. On several wells we get flat-rate
7 payments. This is the Burton W. Despard estate. So
8 we don't get much, but, yes. And EQT pays -- at
9 least to the trust, pays us flat rates, like $12.50
10 a year on one of them.
11    Q.   But are you saying they are also paying
12 for some wells under this lease -- on one well --
13    A.   One well we received a one eighth royalty
14 after they drilled it down in accordance with state
15 law. I think in my memory that state law was passed
16 in 1982. You probably know all about it.
17    Q.   Yes, sir. I've shown you three leases.
18 And I can't recall, did you say that -- how many
19 leases did you say that the C Trust is a party to
20 and how about the M Trust?
21    A.   The 163-acre lease, I believe, that EQT
22 owns at least two of the wells that were originally
23 drilled on that 163 acres. That's the M Trust.
24    Q.   That's the M Trust?

29

1     A.   Yes.
2     Q.   Now on the C Trust, we've looked at this
3 Exhibit 4. You say that's from the C Trust. And
4 that's one of the leases you talked about early on
5 in the deposition as being a lease between the trust
6 and EQT?
7     A.   Yes. On the 433 acres there in center
8 district of Gilmer County.
9     Q.   And by my calculation then, there's one
10 lease that we've not looked at that you say there's
11 a lease between C Trust and EQT; is that correct?
12    A.   Yes. On 149 acres in Gilmer County. It's
13 held by one old flat-rate well.
14    Q.   And you receive a flat-rate payment on it?
15    A.   Up until now.
16    Q.   So the only one that the trust is
17 receiving a percentage royalty payment is on one
18 well under Exhibit 4 and then one well under Exhibit
19 2, the lease that was executed?
20    A.   Now wait a minute.
21    Q.   Is that the one?
22    A.   That's the one we weren't paid a nickel on
23 this year.
24          MR. MASTERS: But they had been up

30

1 until ...
2     Q.   But they had been?
3     A.   Well, yeah. We had been receiving a
4 little something from those wells. Now Haden
5 Harper, as far as I know, owns the other wells on
6 that parcel.
7          Who in the hell it was that split those
8 wells up on that 80 acres on that 163 -- I would
9 have to go back. I can't remember. It was not a
10 good idea.
11    Q.   And then there's that lease, the one in
12 Exhibit 2, the trust owns an interest or there are
13 other parties that currently own an interest in that
14 lease also?
15    A.   Exhibit 2?
16    Q.   Yes, sir.
17    A.   The trust only has an undivided interest
18 in most of these leases. It can range from a half
19 interest to in the case of this, Burton's estate --
20 it's small.
21    Q.   Did you ask any of the other folk that
22 have an interest in that lease if they want to be a
23 plaintiff in this case?
24    A.   Ask me again. Say it again. I'm sorry.

31

1     Q.   I'm sorry. You were looking at something.
2 I should have waited. On Exhibit 2, you said some
3 other folks own an interest in that lease that the
4 trust only owns a portion of the lessor's interest
5 on that lease; is that correct?
6     A.   Yeah. As I said, the trust mostly has
7 undivided interest in these oil and gas parcels in
8 other counties.
9     Q.   And my question was did you ask any of the
10 folks that own a portion of the other interest
11 whether they wanted to be plaintiffs in this
12 lawsuit?
13    A.   No. Some of them are dead and I don't
14 know their successors in title.
15    Q.   Okay.
16    A.   Again, I think I told you I don't want to
17 run the lawyers out of business.
18    Q.   And then on Exhibit 4, I'm going to have
19 the same type of question. Are there folks other
20 than the trust that own an interest, a portion of
21 the lessors interest under the lease that we marked
22 as Exhibit 4?
23    A.   Oh, my goodness, yes.
24    Q.   It's the same situation where are a number

32

1 of folks and you've not talked to them; is that
2 correct?
3     A.   Yes.  This is the Burton W. Despard
4 estate.  And it has a whole bunch of people who have
5 an interest in this lease.  I'm not even aware of
6 who some of them are now.  I ran the title years
7 ago. But people die and other people -- I have no
8 idea.
9     Q.   And I believe you've testified about some
10 issues that you had with EQT and the way they're
11 calculating your royalty.  One was the volumes; is
12 that correct?
13     A.   To the best of my belief, they're not
14 reporting the true volume or the true sale's tax.
15 So I'm getting rooked on both.
16     Q.   And on the sales price, there is something
17 specific about what you believe they are doing
18 wrong?
19     A.   To the best of my knowledge and belief,
20 they're not reporting on the remittance statements
21 the true price that they should be paying under the
22 terms of the lease.  They mickey-moused it and put
23 in another company and all this stuff.  It just
24 isn't right.

33

1     Q.   Are there any other issues you have with
2 the way they are calculating your royalty?
3     A.   Good Lord, that's enough.
4     Q.   I'm just asking --
5     A.   Taking deducts you shouldn't take and
6 reporting the wrong price.  You know.  Come on.
7     Q.   You say deducts you shouldn't take.  What
8 do you mean by that?
9     A.   If you're not reporting the right price
10 that you should be doing, then somebody's taking
11 deducts from the true sales price.  That's obvious
12 to me.
13     Q.   And is there anything else then?
14     A.   There may be.  But that seems to be enough
15 for me that we're not getting paid the right price.
16     Q.   In paragraph 47 of the complaint -- and
17 I'll let you and Mr. Masters look at that.
18          MR. MASTERS:  47 you say?
19          MR. WEST:  Yes.
20     Q.   You allege that the defendants concealed,
21 suppressed and omitted material facts with intent
22 that plaintiffs would rely on the same connection
23 for the basis for charging plaintiffs for specific
24 services for marketing, transporting and processing

34

1 and for other service charges.
2          With regard to that allegation, what do
3 you see EQT and any of the EQT defendants did in
4 that respect?
5          MR. MASTERS:  And you're not to
6 discuss things that you and I -- you're not to
7 testify about things that you and I have talked about as
8 your lawyer.
9          If you know things independent of you and
10 me, our conversations, then you can testify to it.
11 But as far as what you and I have discussed, no.
12     A.   Then I won't tell the gentlemen the things
13 that you and I have discussed and you have divulged
14 to me.
15     Q.   Is there anything that you would say in
16 response to the question about the allegations in
17 paragraph 47 other than things that you've learned
18 or that were discussed in conversations between you
19 and Mr. Masters or another attorney other than Mr.
20 Masters?
21          MR. MASTERS:  Besides what you've
22 already testified to?
23     A.   I'm not sure I even understand that
24 question.  But the point is, at some point in

35

1 previous time, I became convinced that EQT was not
2 reporting the proper sales price and that they were
3 taking deducts for things that they weren't supposed
4 to take deducts for according to the terms of our
5 lease.
6     Q.   Do you know if --
7     A.   You pay a one eighth royalty on the well
8 head price and of the gas that they got.
9     Q.   When do you think they started doing that,
10 that they started calculating your royalty wrong?
11     A.   I had supplied to our attorneys monthly
12 remittance statements showing the deducts every
13 month.  From my memory, without referring to any
14 files, it's been particularly bad this calendar
15 year.
16          The deducts from our royalty based on a
17 wrong price are upwards of 70 percent.  When did
18 they start?  I'm sure Mr. Masters will have a better
19 idea of that.  I've been sending them to him.
20     Q.   Have you supplied documents to Mr. Masters
21 which would reflect when you thought that they'd
22 begun, when you thought EQT began calculating your
23 royalty improperly?
24     A.   Yes.  I would generally send them to Tom

36

1 Pettit, with whom you may be acquainted.
2    Q.   Have you had any conversations with any
3 employees, representatives or agents at EQT?
4    A.   No.
5    Q.   And by that answer I assume that you've
6 never contacted EQT about your complaints, about the
7 way the royalty was calculated?
8    A.   That is correct.
9    Q.   And have you discussed your concerns and
10 your complaints about the way EQT is calculating
11 your royalty and has been calculating your royalty
12 with anyone other than Mr. Masters, Mr. Pettit or
13 any other attorney?
14    A.   No other attorney.
15        MR. MASTERS:  Other than what he's
16 already testified to.
17    Q.   Do you know the amount that you're
18 claiming as far as your damages in this lawsuit?
19    A.   Since I don't know the true price for
20 which your people sold that gas, the answer has got
21 to be no.  I don't know at this moment.
22    Q.   And do you know what categories of damages
23 you're seeking as part of this lawsuit, what you're
24 seeking compensations for?  I mean, for instance,

37

1 it's pretty apparent that you thought royalty was
2 calculated wrong.
3        So to the extent that it was wrong, you
4 want it how it should have been, the difference
5 between how it should have been and how it was done?
6 Is there anything else that you can think of that
7 you're asking for in this lawsuit?
8    A.   That would be the minimum amount.
9    Q.   And what else are you asking for?
10    A.   Whatever else we can get.
11    Q.   But as we sit here today --
12    A.   Punitive damages and all kinds of stuff
13 that's all engineers are of.  You know it better
14 than I do.  You tell me what you owe us.
15    Q.   As we sit here today, are there any facts
16 that you think would support your claim for punitive
17 damages?
18    A.   I don't know.  Again, the lawyers would
19 have to tell us if we have any eligibility or not.
20 I don't know.  The amount of deducts that are being
21 taken from a royalty that is less than an eighth --
22 Marvin can show you those numbers.  They are
23 unconscionable.
24        I'm talking about 70 percent that it has

38

1 risen to.  It's been rising this year, the
2 percentages that EQT has been taking out.  It just
3 boggles the mind that they would have the balls to
4 do that.
5    Q.   And you supplied Mr. Pettit with documents
6 with regard to that issue?
7    A.   Of course.  Absolutely.  Every month.
8        MR. WEST:  If you'll give us just a
9 minute, I think we're about finished here.
10        (A short break was taken.)
11 Resuming:
12        MR. WEST:  Mr. Cather, the only thing
13 I am going to ask you to do and we'll be done is if
14 you could -- the court reporter has a copy of
15 Exhibit 1.  We've been talking about 2, 3, and 4
16 which I think you've got an extra copy in front of
17 you and that we've been working off of.  If you can
18 hand her one copy of Exhibits 2, 3 and 4, we'll be
19 finished.
20        MR. CATHER:  Where's Exhibit 1?
21        MR. WEST:  She's got it.
22        MR. CATHER:  Where are my copies of
23 these?
24

39

1        MR. MASTERS:  I've got them.  I have
2 them over here.
3        MR. WEST:  And we're finished.  Mr.
4 Fletcher and I appreciate your time, Mr. Cather.
5        MR. CATHER:  Were you going to show
6 him --
7        MR. MASTERS:  Yeah.  I think it's a
8 good idea.  You'll be asking for it anyway.
9        MR. WEST:  Are those the ones you were
10 working off of during -- you've got something else.
11        -----
12        EXAMINATION
13 BY MR. MASTERS:
14        (Deposition Exhibit No. 5 was marked
15 for identification.)
16    Q.   We'll mark this as Exhibit 5.  Mr. Cather,
17 I'm showing you Exhibit 5.  And I don't want to
18 belabor this because you already testified about the
19 percentages, but this is a Despard 1814 lease,
20 correct?
21    A.   The Despard 1814 well which was an old
22 flat-rate well that was drilled down and therefore
23 became a one eighth royalty well.  Yes, sir.
24    Q.   And when you indicated that, you had

40

**Page 41**

1 checked on the deductions and it shows the
2 deductions.  This one on the front page is 31.4
3 percent; is that correct?
4    A.   Yes.
5    Q.   And is it your understanding that they
6 shouldn't be taking any deductions from your well?
7    A.   They just ought to pay the one eighth
8 royalty.
9    Q.   So, in any event, you put in there your
10 various percentages going through over a period of
11 time, correct?
12    A.   Yes.
13    Q.   And back here in 2012 it was 50 percent,
14 right?
15    A.   Yes.
16    Q.   And then going back to I think '012 was
17 about the last -- but anyway, this was some of maybe
18 not all, but some of the documents you sent to Mr.
19 Pettit?
20    A.   This is a few of them.  I don't see
21 anything about 2014 or 2015.
22    Q.   This is '13, the first one.  This is '14.
23    A.   There is '14, all right.  December of '14.
24    Q.   March of '14 and so forth.  Okay?

41

**Page 42**

1    A.   All right.
2         MR. MASTERS:  That's it.  That's the
3 one he was talking about.
4         MR. CATHER:  You weren't going to show
5 him any of the 2015?
6         MR. MASTERS  I'm not sure I have
7 them.  I'm going to have copies of them though.
8         MR. CATHER:  My problem is if I give
9 them to him, I'm not going to have any.
10        MR. MASTERS:  I wasn't aware that you
11 brought any.  Let me help.  In your file, here's one
12 July 15 at 74.4 percent.  Would you just want us to
13 send this to you?
14        MR. WEST:  Just send it to us.  That's
15 fine.
16        MR. MASTERS:  That's easy.  That way
17 he gets to keep his copies.
18        MR. WEST:  That's fine.
19        MR. CATHER:  And you wanted from me a
20 list of something?
21        MR. WEST:  A list of the folks that
22 you have -- we'll send a written request to Mr.
23 Masters and he'll get with you.  That way we'll have
24 a record of what we're asking for.

42

**Page 43**

1         MR. CATHER:  I think he was asking for
2 a list of my lessees.  Does he have any right to
3 that?
4         MR. MASTERS:  We'll talk about it.
5         MR. WEST:  We'll keep the lawyers
6 employed.
7              -----
8         EXAMINATION
9 BY MR. WEST:
10        Q.   Let me ask you just one question about
11 this Exhibit 5.  There's some handwriting on here.
12 Is that all your handwriting?
13        A.   Yes.
14             MR. MASTERS:  Thank you guys.  It was
15 good seeing you.
16        (The signature was not waived.)
17        (The deposition was concluded at 5:13 P.M.)
18             -----
19
20
21
22
23
24

43

**Page 44**

1              ERRATA SHEET
2         I, the undersigned, H. DOTSON CATHER, do hereby
   certify that I have read the foregoing deposition
3 and that, to the best of my knowledge, said
   deposition is true and accurate (with the exception
4 of the following corrections listed below):
5 PAGE/LINE     CORRECTION AND REASON FOR CORRECTION
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 See attached sheet(s) for additional information:
   ___Yes___No
14
15
16 (Signature)
17
18      Subscribed and sworn to before me this
19 _____ day of _____, 2015.
20
21
22            Notary Public
23
24 My commission expires:
   _____

44

## CERTIFICATE

I, Stacy Isabell, a Notary Public in and
for the State of West Virginia, do hereby certify
that the witness, H. DOTSON CATHER, was first duly
sworn to testify to the truth, the whole truth and
nothing but the truth; that the foregoing deposition
was taken at the time and place stated herein, and
that the said deposition was recorded
stenographically by me and then reduced to
typewriting under my direction, and constitutes a
true record of the testimony given by said witness,
all to the best of my skill and ability.

I further certify that the inspection,
reading and signing of said deposition was not
waived by counsel for the respective parties and by
the witness.

I further certify that I am not a relative
or employee or attorney or counsel of any of the
parties, nor am I a relative or employee of such
attorney or counsel, and that I am in no way
interested, directly or indirectly in this either
counsel and that I am in no way interested, directly
or indirectly, in this action.

I further certify that the attached
transcript meets the requirements set forth within
Article 25, Chapter 47 of the West Virginia Code, to

IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal in my office on this 30th
day of October 2015.

```
 1              ERRATA SHEET

 2       I, the undersigned, H. DOTSON CATHER, do hereby
      certify that I have read the foregoing deposition
 3    and that, to the best of my knowledge, said
      deposition is true and accurate (with the exception
 4    of the following corrections listed below):

 5    PAGE/LINE      CORRECTION AND REASON FOR CORRECTION

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    See attached sheet(s) for additional information:
      ___Yes___No
14

15

16    _____
      (Signature)

17

18          Subscribed and sworn to before me this

19    _____ day of _____, 2015.

20

21                 _____
22                        Notary Public

23
      My commission expires:
24    _____
```

< Dates >
**December 9th, 2008** 12:10
**October 2015.** 45:34
**October 7th, 2015** 1:37
**one july 15** 42:11
**September 16, 2010** 16:24
**$12.50** 29:9
**'012** 41:16
**'13** 41:22
**'14** 41:23, 41:24
**'14.** 41:22, 41:23
**'67.** 26:19

< 1 >
**1** 15:21, 16:6, 16:19, 39:20
**1.** 15:20, 39:15
**1/32.** 22:23
**10** 4:8
**11070** 2:19
**12** 4:8
**13-CV-151** 1:17
**149** 30:12
**163** 20:22, 24:2, 29:23, 31:8
**163-acre** 29:21
**181** 2:4
**1814** 40:19, 40:21
**1962** 3:16
**1982.** 29:16
**1:** 1:17

< 2 >
**2** 18:12, 19:13, 19:15, 21:16, 22:11, 30:19, 31:12, 31:15, 32:2, 39:15, 39:18
**20** 1:36, 4:19
**2006.** 10:23
**2007** 10:23
**2012** 41:13
**2014** 41:21

**2015** 41:21, 42:5
**2015.** 44:26
**214** 2:18
**2200** 2:12
**23** 12:1
**23.** 11:20
**24924** 2:20
**25** 45:30
**25301** 2:5
**28** 11:18, 15:4
**28.** 11:23

< 3 >
**3** 21:20, 22:14, 26:6, 39:15, 39:18
**3.** 26:9
**30th** 45:33
**31.4** 41:2
**3:45** 1:38

< 4 >
**4** 21:20, 22:14, 27:9, 30:18, 32:18, 32:22, 39:15, 39:18
**4.** 27:12, 30:3
**43215** 2:13
**433** 30:7
**47** 34:16, 34:18, 35:17, 45:30

< 5 >
**5** 21:18, 40:14
**5.** 40:16, 40:17, 43:11
**50** 41:13
**5:13** 43:17

< 6 >
**60s** 24:19

< 7 >
**70** 36:17, 38:24

**74.4** 42:12

< 8 >
**80** 25:21, 26:1, 31:8
**___yes___no** 44:16

< A >
**ability** 45:13
**Absolutely** 39:7
**accordance** 29:14
**according** 36:4
**accurate** 44:5
**acquainted** 37:1
**acreage** 26:3
**acres** 20:22, 24:2, 25:22, 26:1, 29:23, 30:7, 30:12, 31:8
**Action** 1:17, 10:7, 10:12, 11:19, 11:23, 12:2, 15:8, 22:22, 45:26
**active** 26:21
**actually** 5:7, 17:11, 21:13, 21:17
**additional** 44:15
**administrator** 16:21, 17:4, 18:21, 19:2, 21:9
**affixed** 45:33
**age** 4:24
**agents** 37:3
**ago** 25:19, 33:7
**agree** 22:5, 27:15
**ahead** 10:11, 26:1
**ain't** 25:23
**allegation** 12:13, 35:2
**allegations** 8:16, 35:16
**allege** 34:20
**alleged** 5:21, 9:19
**already** 15:11, 35:22, 37:16, 40:18
**als** 6:13
**amount** 9:10, 9:13, 37:17, 38:8, 38:20

**answer** 37:5, 37:20
**answered** 15:11
**anticipate** 15:2
**anyway** 13:6, 40:8, 41:17
**apparent** 38:1
**appear** 19:18
**appears** 16:19, 18:9, 21:20, 26:15
**appreciate** 40:4
**approach** 20:17, 20:18
**Article** 45:30
**assessing** 16:23
**assigned** 12:6
**assist** 16:22, 23:4
**assume** 37:5
**assumed** 12:8
**astronomical** 28:20
**attached** 44:15, 45:28
**attention** 29:2
**Attorney** 21:7, 35:19, 37:13, 37:14, 45:21, 45:23
**attorneys** 36:11
**aware** 9:17, 9:21, 9:22, 10:16, 10:17, 10:18, 21:23, 27:14, 28:24, 33:5, 42:10

< B >
**Back** 17:9, 17:12, 19:6, 24:17, 24:19, 28:7, 28:8, 31:9, 41:13, 41:16
**bad** 36:14
**balls** 39:3
**bar** 21:8
**based** 36:16
**basis** 34:23
**bear** 26:18
**became** 9:3, 23:9, 23:14, 25:1, 28:20, 28:23, 36:1, 40:23
**become** 23:13

**began** 36:22
**beginning** 1:37
**begun** 36:22
**behalf** 12:2, 12:3, 12:16, 18:10, 18:24, 19:2
**belabor** 40:18
**belief** 33:13, 33:19
**believe** 8:13, 25:15, 25:16, 25:20, 29:21, 33:9, 33:17
**below** 44:6
**beneficiaries** 12:5
**Besides** 35:21
**best** 6:8, 6:14, 33:13, 33:19, 44:4, 45:13
**better** 36:18, 38:13
**big** 24:24
**blank** 17:19
**boggles** 39:3
**bottom** 18:11, 21:16, 22:11
**Box** 2:19
**Braxton** 24:2
**break** 28:1, 28:3, 39:10
**Bridgeport** 1:36
**briefly** 4:4
**brought** 11:19, 11:24, 42:11
**BTU** 24:6, 24:14
**Btus** 24:9
**bunch** 33:4
**Burton** 29:7, 31:19, 33:3
**business** 4:1, 13:16, 13:21, 32:17

< C >
**calculated** 13:13, 37:7, 38:2
**calculating** 21:24, 33:11, 34:2, 36:10, 36:22, 37:10, 37:11
**calculation** 21:14, 30:9

**calendar** 8:24, 25:3, 36:14
**Calhoun** 26:12
**called** 1:31
**calls** 27:16, 28:23
**capital** 6:21, 6:22
**Capitol** 2:18
**Caplan** 21:5
**Carl** 2:16
**case** 8:22, 9:1, 15:12, 31:19, 31:23
**categories** 37:22
**CATHER** 1:8, 1:9, 1:30, 3:3, 3:10, 3:11, 5:16, 5:17, 6:17, 6:20, 6:21, 7:12, 15:24, 19:19, 19:20, 20:9, 20:13, 26:9, 27:22, 39:12, 39:20, 39:22, 40:4, 40:5, 40:16, 42:4, 42:8, 42:19, 43:1, 44:2, 45:5
**Center** 2:11, 30:7
**certain** 16:22
**certainly** 16:4
**CERTIFICATE** 45:1
**certify** 44:3, 45:4, 45:15, 45:20, 45:28
**Chapter** 45:30
**charges** 35:1
**charging** 34:23
**Charles** 26:18
**Charleston** 2:5, 2:20
**check** 11:5, 25:4, 25:5
**checked** 41:1
**checks** 24:22, 25:7
**Circuit** 11:10
**Civil** 1:17, 1:32, 12:1
**claim** 16:23, 38:16
**claimants** 17:5
**claiming** 27:4, 37:18
**claims** 8:20, 11:19, 11:24, 16:21, 17:4, 18:21, 19:2

**Clarksburg** 3:12, 3:15
**class** 10:3, 10:6, 10:12, 10:20, 12:2, 12:18, 12:19, 15:8
**class-action** 9:20, 10:15, 10:19
**Code** 45:30
**Columbus** 2:13
**coming** 26:22
**commission** 44:34
**communications** 13:4
**companies** 4:16, 4:21, 5:19, 10:24
**Company** 1:7, 1:20, 4:9, 5:16, 5:18, 17:13, 17:14, 33:23
**compensations** 37:24
**complaint** 5:13, 6:1, 8:12, 8:14, 8:16, 8:17, 9:17, 9:19, 9:20, 11:16, 15:5, 34:16
**complaints** 37:6, 37:10
**complex** 22:6
**complicated** 22:9
**concealed** 34:20
**concentration** 3:21
**concerned** 6:15, 9:3, 25:1
**concerns** 37:9
**concluded** 43:17
**connection** 34:22
**constitutes** 45:11
**contact** 9:15
**contacted** 13:12, 37:6
**contained** 15:4
**content** 24:7, 24:14
**contractors** 5:6, 5:10, 5:11
**conversations** 35:10, 35:18, 37:2
**convinced** 36:1

**copies** 16:3, 16:9, 39:22, 42:7, 42:17
**copy** 8:14, 16:14, 39:14, 39:16, 39:18
**CORPORATION** 1:21
**corporations** 4:20, 4:22
**Correct** 8:22, 9:9, 9:10, 9:13, 10:4, 15:10, 18:6, 18:18, 29:2, 30:11, 32:5, 33:2, 33:12, 37:8, 40:20, 41:3, 41:11
**CORRECTION** 44:7
**corrections** 44:6
**correctly** 15:1, 23:6
**Counsel** 2:1, 2:6, 2:14, 2:21, 23:4, 45:17, 45:21, 45:23, 45:25
**counties** 32:8
**County** 11:10, 21:8, 23:22, 24:2, 24:3, 26:12, 30:8, 30:12
**couple** 14:5, 17:12, 17:15
**course** 6:2, 9:21, 12:14, 15:18, 39:7
**Court** 1:1, 1:33, 5:15, 11:2, 11:4, 11:8, 11:9, 11:10, 11:13, 19:8, 28:8, 39:14, 45:39
**courthouse** 13:11, 13:17
**cousin** 20:6
**cubic** 24:9
**culmination** 25:10
**currently** 27:5, 31:13

< D >
**D.** 20:4
**damages** 37:18, 37:22, 38:12, 38:17

**damn** 7:22
**data** 28:15
**dated** 16:24
**day** 44:26, 45:34
**dead** 32:13
**dean** 21:7
**deceased** 19:22
**December** 25:4,
    41:23
**deductions** 12:9,
    28:22, 41:1, 41:2,
    41:6
**deducts** 9:4, 28:20,
    34:5, 34:7, 34:11,
    36:3, 36:4, 36:12,
    36:16, 38:20
**Defendant** 2:14, 2:21
**Defendants** 1:26,
    1:32, 12:5, 12:7,
    12:8, 34:20, 35:3
**definition** 10:10,
    14:19, 15:4
**demonstrate** 17:4
**Deposition** 1:30,
    15:20, 15:21, 16:2,
    19:15, 26:6, 27:9,
    30:5, 40:14, 43:17,
    44:3, 44:5, 45:7,
    45:9, 45:16
**description** 12:17
**Despard** 26:18, 29:7,
    33:3, 40:19, 40:21
**detail** 4:3
**determine** 12:18,
    24:14
**Diana** 1:9, 5:16,
    6:17, 6:20, 6:21,
    19:19, 20:4
**die** 33:7
**difference** 38:4
**different** 4:15, 4:19
**dime** 8:24
**direct** 17:9, 17:11
**direction** 45:11
**directly** 45:24, 45:25
**discuss** 35:6
**discussed** 13:1,
    35:11, 35:13,

35:18, 37:9
**discusses** 21:14
**District** 1:1, 1:2,
    5:14, 5:15, 21:6,
    30:8
**divulged** 35:13
**document** 15:19,
    15:24, 17:13,
    17:15, 17:24, 18:1,
    18:20, 19:1, 19:5,
    19:12, 19:14, 26:8,
    26:10, 27:11
**documents** 17:10,
    36:20, 39:5, 41:18
**doing** 33:17, 34:10,
    36:9
**done** 13:3, 13:7,
    24:14, 38:5, 39:13
**DOTSON** 1:8, 1:30,
    3:3, 3:10, 5:16,
    19:20, 20:9, 44:2,
    45:5
**down** 5:11, 13:23,
    28:12, 28:16,
    29:14, 40:22
**dozen** 7:4
**drill** 25:23, 25:24
**drilled** 20:23, 24:20,
    25:18, 25:20,
    25:21, 26:3, 28:12,
    28:13, 28:16,
    29:14, 29:23,
    40:22
**drilling** 5:11
**due** 12:11
**duly** 3:4, 45:5
**during** 40:10
**duties** 12:6


< E >
**E.** 1:10, 5:17
**earlier** 25:1
**early** 30:4
**easy** 42:16
**education** 3:20
**effort** 13:10
**efforts** 12:17

**eight** 10:8, 10:21,
    10:23, 25:24
**eighth** 9:8, 22:8,
    22:18, 22:20,
    28:16, 28:22,
    29:13, 36:7, 38:21,
    40:23, 41:7
**either** 6:23, 23:10,
    28:17, 45:24
**elect** 21:22
**eligibility** 38:19
**employed** 23:4, 43:6
**employee** 45:21,
    45:22
**employees** 37:3
**encompassed**
    23:21, 26:3
**end** 17:10
**ENERGY** 1:21
**engineer** 3:20, 3:24,
    4:14, 10:9
**engineering** 3:22,
    4:13, 4:15, 4:19,
    24:11
**engineers** 38:13
**enough** 34:3, 34:14
**entered** 12:4
**entities** 1:11
**entitled** 17:6
**entity** 8:8
**Equitable** 17:14,
    26:23
**Ernest** 19:21
**ERRATA** 44:1
**Esq** 2:2, 2:9, 2:16
**estate** 21:9, 23:19,
    23:20, 26:18, 29:7,
    31:19, 33:4
**et** 6:13
**event** 41:9
**everything** 21:10
**ex** 21:6
**exactly** 14:24
**EXAMINATION** 1:31,
    3:7, 40:12, 43:8
**examined** 3:5
**example** 13:9
**exception** 8:4, 44:5

**executed** 30:19
**executor** 23:17,
    23:18
**Exhibit** 15:20, 15:21,
    16:1, 16:6, 16:11,
    16:19, 19:13,
    19:15, 26:6, 26:9,
    27:9, 27:12, 30:3,
    30:18, 31:12,
    31:15, 32:2, 32:18,
    32:22, 39:15,
    39:20, 40:14,
    40:16, 40:17,
    43:11
**Exhibits** 39:18
**expires** 44:34
**explain** 4:4
**Express** 1:35
**extent** 38:3
**extra** 39:16


< F >
**fact** 10:18, 14:4,
    15:7, 22:4
**facts** 34:21, 38:15
**fall** 12:18, 14:18,
    15:4
**familiar** 5:19, 5:24,
    8:16, 15:23, 19:22,
    20:2, 26:11, 26:16,
    27:13
**family** 4:11, 5:3, 20:7
**far** 4:12, 5:1, 6:15,
    20:15, 22:18, 31:5,
    35:11, 37:18
**Federal** 1:32, 11:2,
    11:8, 11:13, 12:1
**few** 7:14, 41:20
**fifth** 21:13
**file** 42:11
**filed** 5:14, 9:18, 9:20,
    10:22, 11:16, 14:9,
    15:8
**files** 36:14
**find** 17:21
**fine** 7:7, 7:19, 7:21,
    42:15, 42:18

finish 14:21, 14:23
finished 39:9, 39:19, 40:3
Fireman 19:20, 20:5
Firm 2:3, 4:15
first 3:4, 6:5, 10:15, 16:16, 16:18, 18:2, 20:6, 24:18, 41:22, 45:5
five 28:10
flat 29:9
flat-rate 9:7, 27:16, 27:18, 28:10, 29:5, 29:6, 30:13, 30:14, 40:22
Fletcher 2:16, 16:13, 40:4
focused 3:22
folk 31:21
folks 32:3, 32:10, 32:19, 33:1, 42:21
follow 17:22
following 44:6
follows 3:5
foot 24:9
foregoing 44:3, 45:7
forgot 16:10
forth 41:24, 45:29
found 9:5, 9:12, 13:11
four 17:10
fourth 21:12
friends 14:5, 14:16
front 39:16, 41:2

< G >
gas 4:1, 4:6, 4:7, 4:21, 5:2, 5:22, 6:23, 6:24, 7:2, 8:9, 10:24, 12:5, 12:10, 14:5, 22:4, 22:7, 22:21, 24:5, 24:7, 24:14, 24:22, 25:12, 29:1, 32:7, 36:8, 37:20
GATHERING 1:23
gave 22:21

general 24:10
generally 23:16, 36:24
gentlemen 35:12
gets 24:11, 42:17
getting 8:21, 14:11, 25:15, 28:21, 33:15, 34:15
Gilmer 24:1, 30:8, 30:12
Give 7:17, 13:9, 16:13, 19:6, 19:7, 19:8, 39:8, 42:8
given 17:11, 19:10, 21:21, 22:15, 45:12
glanced 8:15
God 7:17
Goff 1:9, 5:17, 6:17, 6:20, 19:19, 19:20, 19:21, 20:4, 20:7, 21:9
Golf 6:21
goodness 32:23
granddaughters 20:3
granted 22:23
great 4:3
guess 10:5, 15:20, 17:5, 21:11, 21:15, 24:13, 28:9, 28:11
Guy 19:21, 20:3
guys 43:14

< H >
H. 1:8, 1:30, 3:3, 3:10, 5:16, 19:19, 44:2, 45:5
Haden 31:4
half 24:1, 24:2, 31:18
Hamric 1:10, 5:17
hand 15:19, 17:22, 19:12, 26:8, 27:11, 39:18, 45:33
handwriting 43:11, 43:12
Harper 31:5

Harrison 21:8, 23:22
he'll 42:23
head 36:8
held 28:17, 30:13
Hell 24:9, 31:7
help 11:5, 42:11
Henderickson 2:17
hereby 44:2, 45:4
herein 1:31, 3:4, 45:8
hereunto 45:32
High 2:12
hire 5:6
hired 5:9, 5:10, 5:11
HOLDING 1:22
Holiday 1:35
horizontal 26:4
Howard 21:5
Huntington 2:11

< I >
idea 31:10, 33:8, 36:19, 40:8
identification. 15:22, 19:16, 26:7, 27:10, 40:15
identifies 18:2
identify 18:1
III 1:10
important 6:20
improperly 36:23
in. 11:13, 24:18
inception 27:8
inconsistencies 9:12
independent 35:9
indicated 27:2, 40:24
indirectly 45:24, 45:26
individual 11:19, 11:24
information 16:22, 17:3, 44:15
Initially 25:11
Inn 1:35
inspection 45:15

instance 4:17, 37:24
intent 34:21
interest 8:7, 27:2, 31:12, 31:13, 31:17, 31:19, 31:22, 32:3, 32:4, 32:7, 32:10, 32:20, 32:21, 33:5
interested 45:24, 45:25
interests 22:3
investigating 9:5
investigation 9:11
INVESTMENTS 1:22
involved 4:13, 4:16, 10:8, 20:12, 22:6
Isabell 1:33, 45:3, 45:38
issue 39:6
issues 33:10, 34:1

< J >
J. 2:9
James 1:10, 5:17
Johnson 2:10

< K >
Katherine 20:4
Kay 1:7, 5:16, 17:13
keep 19:8, 42:17, 43:5
Kevin 2:9
kind 5:2, 13:24, 14:2, 21:7
kinds 38:12
knowledge 6:8, 6:14, 26:2, 26:5, 26:20, 27:6, 33:19, 44:4

< L >
L. 2:16
Lane 1:36
language 21:14, 22:5

**large** 4:20, 4:22
**last** 4:12, 25:4,
    28:19, 41:17
**later** 18:3, 18:9
**Laura** 19:20, 20:4
**Law** 2:3, 29:15
**lawsuit** 5:19, 5:21,
    6:15, 6:16, 8:20,
    14:9, 15:16, 15:17,
    32:12, 37:18,
    37:23, 38:7
**lawyer** 10:10, 13:2,
    35:8
**lawyers** 13:15,
    13:20, 32:17,
    38:18, 43:5
**LC** 2:3
**learned** 35:17
**leases** 5:22, 5:24,
    6:3, 6:6, 6:13,
    6:24, 7:3, 7:4,
    7:10, 7:22, 8:3,
    9:1, 9:2, 9:14,
    12:5, 12:7, 12:12,
    13:12, 13:18, 14:1,
    14:3, 14:5, 29:17,
    29:19, 30:4, 31:18
**least** 29:9, 29:22
**less** 38:21
**lessee** 5:23, 7:10
**lessees** 43:2
**lessor** 5:24, 9:14,
    20:9, 22:15, 32:4
**lessors** 13:19, 20:1,
    20:3, 21:21, 23:4,
    32:21
**letter** 16:20, 16:24
**lie** 14:7
**life** 3:13
**list** 7:17, 42:20,
    42:21, 43:2
**listed** 44:6
**little** 9:5, 22:6, 22:23,
    24:8, 31:4
**live** 3:11
**lived** 3:13, 3:15
**LLC** 1:7, 1:21, 1:22,
    1:23

**located** 5:3, 23:22,
    23:24, 25:13
**Long** 2:17, 3:15
**look** 11:21, 13:17,
    16:5, 21:11, 22:12,
    22:13, 26:10, 28:9,
    34:17
**looked** 30:2, 30:10
**Looking** 17:16,
    17:19, 22:10,
    22:11, 32:1
**Lord** 34:3
**Louise** 19:20, 20:5
**low** 14:11
**LP** 1:24

**< M >**
**Mack** 19:22, 20:20
**managed** 4:7, 5:2
**March** 41:24
**mark** 40:16
**marked** 15:20,
    15:21, 16:1, 16:11,
    16:12, 19:7, 19:13,
    19:15, 26:6, 26:9,
    27:9, 27:12, 32:21,
    40:14
**marketing** 34:24
**Marvin** 2:2, 27:22,
    38:22
**MASTERS** 2:2, 2:3,
    7:9, 7:15, 8:1,
    8:13, 11:7, 12:24,
    13:5, 13:22, 16:14,
    17:21, 18:4, 18:7,
    19:9, 22:16, 27:23,
    28:2, 30:24, 34:17,
    34:18, 35:5, 35:19,
    35:20, 35:21,
    36:18, 36:20,
    37:12, 37:15, 40:1,
    40:7, 40:13, 42:2,
    42:6, 42:10, 42:16,
    42:23, 43:4, 43:14
**material** 34:21
**matter** 14:4
**mean** 26:15, 34:8,

37:24
**meant** 16:4
**Mechanical** 3:23
**meets** 45:29
**members** 12:19
**memory** 29:15,
    36:13
**mentioned** 6:1, 15:7
**mickey-moosed**
    33:22
**middle** 21:17
**MIDSTREAM** 1:24
**mind** 39:3
**minimum** 38:8
**mining** 3:23, 4:16
**minute** 30:20, 39:9
**mistake** 16:10
**moment** 37:21
**month** 36:13, 39:7
**monthly** 36:11
**mostly** 4:7, 32:6
**mother** 23:18
**Mountain** 7:16

**< N >**
**name** 3:9, 6:16, 7:8,
    7:13, 8:5, 14:15
**named** 9:22, 11:17,
    11:18, 12:2
**names** 7:5
**Nathan** 21:9
**nature** 4:4, 5:5
**need** 4:3
**negotiating** 20:12
**negotiation** 20:16,
    23:3, 23:5
**neither** 28:24
**Next** 19:12
**nickel** 8:23, 25:3,
    30:22
**nine** 10:8, 10:23
**nine.** 10:21
**No.** 1:17, 3:14, 4:11,
    13:22, 14:10,
    15:21, 19:15, 22:8,
    24:8, 24:24, 26:5,
    26:6, 27:9, 32:13,

37:21, 40:14
**nor** 29:1, 45:22
**north** 20:22
**Northern** 1:2, 5:15
**Notary** 1:34, 44:30,
    45:3
**nothing** 22:20, 45:7
**number** 14:18, 15:3,
    32:24
**numbers** 38:22

**< O >**
**obtained** 28:11
**obvious** 34:11
**occupation** 3:17
**offhand** 24:8
**Office** 2:19, 45:33
**official** 16:8
**Ohio** 2:13
**oil** 4:1, 4:6, 4:21, 5:1,
    5:22, 6:23, 6:24,
    7:2, 8:9, 10:24,
    12:5, 12:9, 14:5,
    20:22, 22:3, 22:7,
    22:21, 25:11, 32:7
**Okay** 7:13, 7:24,
    17:23, 19:11,
    26:19, 32:15,
    41:24
**old** 30:13, 40:21
**omitted** 34:21
**once** 20:6
**one.** 18:7
**ones** 40:9
**option** 22:2, 22:10,
    22:22
**options** 21:21,
    22:14, 22:19
**order** 16:22, 17:4
**original** 28:9
**originally** 29:22
**others** 11:8, 12:3,
    12:6, 20:17, 20:24
**otherwise** 12:10
**ought** 41:7
**owe** 38:14
**own** 31:13, 32:3,

32:10, 32:20
**owned** 6:6
**owners** 22:21
**ownership** 8:7
**owns** 29:22, 31:5, 31:12, 32:4

**< P >**
**P.M.** 1:38, 43:17
**Page** 16:19, 16:23, 17:17, 17:20, 18:2, 18:7, 18:12, 21:12, 21:16, 21:18, 22:11, 41:2
**PAGE/LINE** 44:7
**pages** 17:10, 17:12, 17:16, 17:18, 18:3, 18:9, 21:13, 21:20, 22:14
**paid** 9:6, 9:9, 9:13, 12:11, 29:1, 30:22, 34:15
**Paragraph** 11:18, 11:22, 11:23, 15:4, 34:16, 35:17
**parcel** 31:6
**parcels** 32:7
**part** 16:7, 23:9, 23:13, 23:14, 24:11, 37:23
**partially** 21:24
**particular** 3:21, 19:5, 22:14, 25:2, 29:4
**particularly** 28:19, 36:14
**parties** 12:4, 24:17, 26:15, 31:13, 45:17, 45:22
**PARTNERS** 1:24
**party** 24:16, 29:19
**passed** 29:15
**path** 13:23
**pay** 36:7, 41:7
**paying** 28:16, 29:11, 33:21
**payment** 17:6, 27:17, 28:22,

30:14, 30:17
**payments** 27:19, 27:20, 29:5, 29:7
**pays** 29:8, 29:9
**pending** 8:13
**people** 13:11, 14:14, 20:2, 33:4, 33:7, 37:20
**per** 24:9
**percent** 36:17, 38:24, 41:3, 41:13, 42:12
**percentage** 9:3, 30:17
**percentages** 39:2, 40:19, 41:10
**period** 41:10
**Personally** 8:3, 8:5, 12:20, 12:22, 13:3, 13:7
**persons** 1:11
**perspective** 4:18
**Pettit** 37:1, 37:12, 39:5, 41:19
**piece** 20:21, 22:22
**place** 22:22, 45:8
**Plaintiff** 1:14, 1:31, 2:6, 6:16, 9:18, 9:24, 10:1, 10:14, 11:18, 15:8, 15:12, 31:23
**plaintiffs** 12:2, 12:11, 32:11, 34:22, 34:23
**please** 3:9, 14:22, 19:9, 28:5, 28:7
**PLLC** 2:10, 2:17
**point** 27:1, 28:11, 35:24
**portion** 32:4, 32:10, 32:20
**Post** 2:19
**practice** 3:22, 4:14
**PRESENT** 2:1, 7:11, 20:24, 21:2
**Pretty** 5:12, 8:21, 22:19, 24:20, 38:1
**previous** 36:1

**price** 29:1, 33:16, 33:21, 34:6, 34:9, 34:11, 34:15, 36:2, 36:8, 36:17, 37:19
**Prior** 25:6
**private** 4:14
**Probably** 7:4, 8:18, 10:18, 15:1, 21:2, 21:3, 24:8, 29:16
**problem** 24:24, 42:8
**Procedure** 1:33, 12:1
**processing** 34:24
**produced** 24:5, 24:7, 24:15, 24:23, 25:11
**producers** 6:24, 7:3
**Production** 1:20, 5:18, 5:22, 15:9, 17:14, 26:22, 27:4, 27:5
**productive** 25:22
**proper** 4:18, 36:2
**property** 23:21, 24:7
**prove** 21:10
**providing** 16:21
**provision** 14:3, 27:16
**Public** 1:34, 44:30, 45:3
**Punitive** 38:12, 38:16
**purports** 16:20
**pursuant** 1:32, 11:20, 11:24, 12:12
**put** 4:18, 13:15, 13:20, 23:17, 33:22, 41:9

**< Q >**
**quality** 24:4
**question** 4:12, 8:11, 13:7, 13:24, 14:21, 14:23, 15:2, 15:11, 16:17, 22:16, 24:13, 28:5, 28:6,

32:9, 32:19, 35:16, 35:24, 43:10
**question.** 28:8
**questions** 16:12, 17:24, 19:5, 26:1

**< R >**
**raised** 8:20
**ran** 4:7, 33:6
**range** 31:18
**rates** 29:9
**reached** 15:17
**read** 28:6, 28:8, 44:3
**reading** 11:21, 45:16
**Really** 8:21, 21:6, 21:8
**REASON** 21:4, 25:1, 44:7
**recall** 7:2, 17:3, 18:20, 19:1, 29:18
**receive** 17:6, 30:14
**received** 8:23, 25:3, 25:4, 29:13
**receiving** 24:22, 25:6, 27:19, 27:20, 29:5, 30:17, 31:3
**recent** 25:17
**recognize** 19:13
**recollection** 20:20, 20:21, 23:7
**record** 14:22, 16:8, 27:6, 42:24, 45:12
**recorded** 21:17, 45:9
**records** 25:16, 27:1, 27:2
**reduced** 45:10
**Reece** 19:20, 20:5
**referenced** 10:24
**referring** 36:13
**reflect** 36:21
**regard** 12:15, 13:13, 15:17, 21:22, 23:5, 23:8, 35:2, 39:6
**relative** 45:20, 45:22
**rely** 34:22
**remember** 5:1, 7:6, 11:12, 11:13,

14:10, 20:15, 31:9
**remittance** 29:1, 33:20, 36:12
**removed** 20:6
**repeat** 13:20, 28:5
**reported** 28:8, 28:24
**Reporter** 1:34, 19:8, 39:14, 45:39
**reporting** 33:14, 33:20, 34:6, 34:9, 36:2
**represent** 5:23
**representative** 10:4, 10:21
**representatives** 37:3
**request** 7:20, 42:22
**requirements** 45:29
**residents** 12:3, 12:16, 14:18, 15:3
**respect** 35:4
**respective** 45:17
**response** 35:16
**responsibilities** 12:7
**Resuming** 28:3, 39:10
**retired** 3:18, 3:19
**reviewed** 8:15, 14:1
**risen** 39:1
**rising** 39:1
**Roane** 11:10
**rooked** 33:15
**route** 7:20
**royal** 26:17
**royalties** 12:10, 13:13, 14:12
**royalty** 8:22, 8:24, 9:4, 9:8, 9:9, 12:11, 14:2, 21:14, 21:24, 22:8, 22:18, 22:19, 22:20, 23:2, 24:22, 25:6, 27:15, 29:13, 30:17, 33:11, 34:2, 36:7, 36:10, 36:16, 36:23, 37:7, 37:11, 38:1, 38:21, 40:23, 41:8
**Rule** 11:20, 11:24

**Rules** 1:32, 12:1
**run** 32:17

**< S >**
**sale** 9:10, 33:14
**sales** 33:16, 34:11, 36:2
**saying** 29:11
**says** 11:18, 11:23, 12:15, 17:13, 18:12, 19:19, 24:1
**schools** 4:19
**seal** 45:33
**second** 11:21, 16:19, 16:23, 21:12
**seeing** 43:15
**Seeking** 10:3, 10:5, 37:23, 37:24
**seems** 34:14
**send** 7:19, 36:24, 42:13, 42:14, 42:22
**sending** 17:3, 18:20, 19:1, 36:19
**sent** 18:22, 41:18
**series** 17:10
**service** 35:1
**services** 34:24
**set** 45:29, 45:32
**settled** 15:16
**Settlement** 15:17, 17:7, 17:14, 18:2
**seven** 25:20, 25:24
**seven.** 25:16
**several** 29:6
**SHEET** 44:1
**sheet(s** 44:15
**short** 28:3, 39:10
**shortly** 25:21
**shouldn't** 34:5, 34:7, 41:6
**show** 38:22, 40:5, 42:4
**showed** 8:14
**showing** 36:12, 40:17
**shown** 29:17

**shows** 4:23, 41:1
**side** 20:7
**sign** 21:1
**Signature** 16:21, 17:1, 18:17, 43:16, 44:21
**signed** 18:10, 18:22, 21:3, 24:21
**signing** 45:16
**similar** 19:1
**similarly** 1:11
**simple** 8:21
**sir** 6:11, 7:7, 10:11, 12:21, 12:23, 13:8, 16:17, 18:13, 29:17, 31:16, 40:23
**sisters** 20:5
**sit** 14:17, 38:11, 38:15
**sites** 5:8
**situated** 1:12
**situation** 32:24
**six** 25:16, 28:10
**skill** 45:13
**small** 25:5, 31:20
**sold** 37:20
**somebody** 34:10
**soon** 24:21
**sorry** 10:11, 31:24, 32:1
**South** 2:12
**specific** 6:19, 33:17, 34:23
**split** 31:7
**spoke** 14:14
**Stacy** 1:33, 45:3, 45:38
**standard** 5:12, 22:19, 24:9
**start** 36:18
**started** 14:11, 16:12, 28:16, 36:9, 36:10
**starting** 21:11, 21:15
**State** 1:34, 3:9, 7:16, 11:4, 11:7, 11:9, 29:14, 29:15, 45:4
**stated** 45:8

**statements** 29:1, 33:20, 36:12
**States** 1:1, 5:14
**Ste** 2:12
**stenographically** 45:10
**step** 28:2
**Steptoe** 2:10
**sticker** 16:11
**Street** 2:4, 2:12, 2:18
**string** 4:6
**stuff** 5:12, 11:12, 33:23, 38:12
**Subscribed** 44:25
**subsidiaries** 15:10
**successors** 32:14
**sudden** 26:13
**suit** 7:23, 10:15, 10:19, 16:16, 16:18
**Suites** 1:35
**Summers** 2:4
**supplied** 36:11, 36:20, 39:5
**support** 38:16
**suppose** 18:22
**supposed** 36:3
**suppressed** 34:21
**Sweetbriar** 1:36
**Swiger** 19:21, 20:6
**sworn** 3:5, 44:25, 45:6

**< T >**
**taken.** 28:3, 39:10
**talked** 8:2, 8:12, 30:4, 33:1, 35:7
**taught** 4:18
**tax** 33:14
**tenders** 5:9
**tending** 5:7
**terms** 17:6, 33:22, 36:4
**testified** 3:5, 33:9, 35:22, 37:16, 40:18
**testify** 35:7, 35:10,

45:6
**testimony** 45:12
**testing** 24:14, 24:17
**third** 5:17, 21:12
**though** 42:7
**thousand** 24:9
**three** 7:4, 29:17
**title** 32:14, 33:6
**today** 7:6, 14:17, 38:11, 38:15
**Tom** 36:24
**transcript** 16:2, 45:29
**transporting** 34:24
**tremendous** 9:3
**true** 33:14, 33:21, 34:11, 37:19, 44:5, 45:12
**Trustee** 1:8, 5:16, 19:21, 20:6, 29:3
**trusts** 6:5, 6:10, 6:18, 6:19, 6:23, 8:4, 8:8, 15:14, 17:5, 23:10
**truth** 45:6, 45:7
**trying** 18:1
**Two** 6:5, 6:6, 6:10, 6:12, 6:18, 6:19, 8:8, 9:1, 9:14, 16:3, 16:9, 17:5, 17:18, 18:3, 18:9, 21:21, 22:2, 22:10, 22:14, 22:19, 29:22
**type** 32:19
**typewriting** 45:11
**typically** 22:7

**< U >**
**ultimately** 15:16, 23:9
**unconscionable** 38:23
**undersigned** 44:2
**understand** 23:6, 35:23
**understanding** 6:4, 8:19, 10:6, 10:12, 15:15, 41:5
**understood** 8:11
**undivided** 31:17, 32:7
**United** 1:1, 5:14
**until** 30:15, 31:1
**unusual** 22:23
**upwards** 36:17

**< V >**
**variation** 13:24
**various** 41:10
**version** 14:6
**versus** 5:18, 17:14
**Virginia** 1:2, 1:35, 1:37, 2:5, 2:20, 5:3, 5:15, 11:3, 11:14, 12:3, 12:16, 14:18, 15:3, 45:4, 45:30
**volume** 9:9, 28:24, 33:14
**volumes** 33:11
**vs** 1:17

**< W >**
**W.** 2:2, 29:7, 33:3
**wait** 11:20, 30:20
**waited** 32:2
**waived** 45:17
**waived.** 43:16
**wanted** 20:20, 21:1, 32:11, 42:19
**Wednesday** 1:37
**wells** 4:6, 4:7, 5:2, 5:10, 24:18, 25:10, 25:13, 25:20, 25:24, 26:2, 26:4, 28:10, 28:12, 29:6, 29:12, 29:22, 31:4, 31:5, 31:8
**West** 1:2, 1:35, 1:36, 2:5, 2:9, 2:20, 3:8, 5:3, 5:15, 11:2, 11:14, 12:3, 12:16, 14:18, 15:3, 17:23, 18:6, 28:1, 28:6, 34:19, 39:8, 39:12, 39:21, 40:3, 40:9, 42:14, 42:18, 42:21, 43:5, 43:9, 45:4, 45:30
**Whatever** 19:9, 38:10
**WHEREOF** 45:32
**whether** 32:11
**whoever** 28:17
**whole** 3:13, 33:4, 45:6
**whom** 37:1
**wife** 23:18, 23:20, 26:15
**will** 6:12, 7:20, 15:20, 15:23, 19:21, 27:12, 36:18
**within** 4:11, 45:29
**without** 25:15, 36:13
**WITNESS** 3:4, 45:5, 45:12, 45:18, 45:32
**work** 3:24, 4:1, 4:5, 4:13, 4:14, 4:15, 5:5, 5:7, 16:6
**worked** 4:9, 4:20, 5:9
**working** 39:17, 40:10
**Worl** 19:22, 20:17, 20:20
**worth** 8:24
**written** 7:20, 42:22
**wrongfully** 12:9

**< Y >**
**year** 8:24, 25:3, 25:4, 28:19, 29:10, 30:23, 36:15, 39:1
**years** 4:8, 4:19, 25:19, 33:6