# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT CLARKSBURG

The Kay Company, LLC, H. Dotson Cather, Trustee of Diana Goff Cather Trusts, and James E. Hamrick, III, and all other persons and entities similarly situated, Plaintiffs

Patrick Leggett, Katherine F. Leggett, George D. McKain Geer, by his attorney in fact, Anita Kathryn McKain Greer and Adel S. McDougal, Plaintiffs

v

EQT PRODUCTION COMPANY, a Pennsylvania corporation;
EQT CORPORATION, a Pennsylvania corporation;
EQT ENERGY, LLC, a Delaware limited liability company;
EQT INVESTMENT-S HOLDING, LLC, a Delaware limited liability company;
EQT GATHERING, LLC, a Delaware limited liability company;
EQT MIDSTREAM PARTNERS, LP, a Delaware limited liability company, Defendants.

## AFFIDAVIT

I am Daniel L. Selby. I am a certified public accountant, a certified valuation analyst and certified in financial forensics. (MBA, CPA, CVA, CFF)

I hold a master degree in Business Administration (MBA) from West Virginia University and a B.A. in Business from Otterbein University.

I have been qualified as a financial and accounting expert in courts in in West Virginia, Pennsylvania, Ohio, Kentucky, Virginia, Maryland, North Carolina, South Carolina and Florida, and I have issued reports in Texas, Louisiana and Wyoming.

I am the sole member / owner of Selby & Associates, PLLC located at 23 Chase Drive, Hurricane, West Virginia, 25526, a forensic accounting firm.

I am a US Citizen and a resident of Putnam County, West Virginia.

I have been asked to render opinions as to the following issues:

(a) Determine whether the rate charged back to the royalty holders, for the "cost of service" in taking gas from the wellhead to the point of sale, is inclusive of reasonable and actual costs, and is otherwise, in compliance with the requirements of Tawney.

(b) Secondly determine, in my opinion, whether EQT Corporation and its subsidiaries and limited partnership operate as and are one company in fact and substance.

**Methodology and Basis for Opinions**

**Information Reviewed**

I have been provided with voluminous data associated with planned expenses and tax expenses that have been used as the basis for deductions from royalty payments on a uniform basis for the EQT's West Virginia lessors. I have reviewed, in part to date, the voluminous records, inclusive of expense account compilations provided by the Defendants. I have also reviewed the depositions of Nicole King, Michael Lancaster, Joe Piccirilli, and John Bergonzi. In addition, I have reviewed the SEC form 10 K for EQT Corp for 2015 and the Company's SEC Form 10-Q for the period ending September 30, 2015. Further I have been provided with organizational charts of EQT Corporation & Subsidiaries spanning from March 31, 2009 through October 1, 2014.

I have also reviewed the context of the Wellman v Energy Resources, Inc., and the Estate of Tawney v. Columbia Natural Resources, LLC., along with W.W. McDonald Land Co., Plaintiff v. EQT Production Company, et al., Defendant and Mr. Reineke's deposition and affidavits.

**Methodology and Basis for Opinions**

The midstream costs to bring gas from the wellhead to market pipeline circumstance should not be charged back to royalty holders. From an accounting and financial transactional context, the cost of a royalty is solely a payment for right to obtain and sell natural gas, in the absence of any contractual notice of a "cost sharing" component in the lease document. From an accounting standpoint and practice, the context of the lease would be recorded and accounted for in compliance with the known and declared writing of the lease. A royalty should be termed a payment for access to gas from the royalty lessor, in the absence of any cost sharing or shifting provision. If costs are allowed to be charged back to the royalty owners, the costs should be actual costs and reasonable. If costs are not direct costs associated with movement of gas, they are not includable or reasonable. The forecasted, budgeted, or non-includable costs should be eliminated, along with profit function since they would be unreasonable and not actual.

As I understand it, the required business practice is that "if an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable." Furthermore, the requirement business practice is that the lease shall "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs."

In applying the above requirements of Tawney, Judge Goodwin, United States District Judge for the Southern District of West Virginia, reviewed a lease that allowed "a reasonable charge for compressing, desulphurization and/or transporting gas from the well to the point of sale." The Court found the language to be unambiguous and that the leases only permit deductions for

2 | Page

"compressing, desufphurization and/or transporting gas." Accordingly, the Court found that expenses for "meals and entertainment, uniforms, meter operations and repair, and personal property taxes are not costs of compression, desulphurization or transportation." Further, the Court found that deductions for "personnel costs, indirect costs, production management costs, depreciation and return on capital investment, are too vague to be specifically related to compression, desulphurization or transportation. Accordingly, Judge Goodwin stated, "[T]hese costs are not identified with what I predict the Supreme Court of Appeals of West Virginia would find to be sufficient 'particularity.'"

In my opinion, what Judge Goodwin has classified as excludable costs, as in accord with good accounting practices as well, are **indirect costs** and costs not associated with the actual activities that move gas along to a market point from the wellhead. Direct costs of compression, desulphurization or transportation, in my opinion, may be includable costs. However, costs that are indirect or unrelated to direct activities are unreasonable and are not includable in a charge back to the royalty holders as shared costs.

- I have reviewed lease language to ascertain the deductions listed in various leases that Equitable claims it is entitled to take. Various leases contain language identifying the categories of deductions as follows: compression, processing, transportation, post-production costs, etc. Some leases note adjustments to royalties as in "minus any and all reasonable and actual post production costs and expenses".

- Most of the lease language reviewed does not offer any compliance with a "reasonable and actual" standard. Saying it is reasonable in the lease does not make it so.

- In addition, my review of the leases provided no indication of any methodology that would provide formulae or disclosures as to how the cost of service rate was to be determined nor was there any identification of the specific detail of expenses to be included in the determination of any rate charged to the royalty holder. It is my opinion that each of the leases reviewed failed to comply with the requirement that the lease set forth "the method of calculating the amount to be deducted from the royalty for such post-production costs." In fact, EQT puts almost everything in the cost basket contrary to required WV business practices.

I then reviewed the depositions of John Bergonzi and Joe Piccirilli who described the process by which the gathering rate that is charged to the lessors is determined. In essence, the depositions showed that EQT Gathering determines the costs incurred in the prior year for Operation and Maintenance, Selling/General and Administrative Costs, and asset expensing. Included within those amounts are costs allocated from EQT Corp. and or other "business segments" (subsidiaries). From this total, the rate makers claim to remove depreciation, return on investment and income taxes. They then estimate what volumes of gas will be produced in the next year, as well as any expected changes in costs, and divide the net expenditures by the projected volume of gas to arrive at a price per mcf. Next, they negotiate a final rate with EQT Production to arrive at the rate to be charged to EQT Production which is passed on to the royalty owners across the board and then present a proposal to the Board of Directors of EQT Corporation and the Board must approve the cost of service rate.

Next, I reviewed multiple documents provided by EQT which set out various line items of costs which make up the Operation and Maintenance and Selling/General and Administrative Cost components of the gathering rates. It was not clear whether these lists were all of the costs. A

vast majority of these costs clearly do not pass the standard and fail to comply with either the particularity and/or reasonableness standard in West Virginia required by any accounting or business standard. In general, corporate allocated costs, indirect costs, costs relating to maintaining a corporate and business segment structure and complexities, costs meant to motivate future labor performance, costs of non-direct labor like retirement benefits and post-retirement labor costs, capital costs, taxes are excludable attributes applying these standards.

Examples of indirect and excludable costs include but not limited to the following:

- BS EQT -Gathering 0416361 - 0416362        2001
  85509 Allocated
  855011 Other Employee Compensation
  855012 Bonuses
  855030 G&A -FB Brdn Cl-Gen Ex
  855053 Pension Plan Expense
  855058 Post Retirement Benefits
  855074 Professional Fees
  855081 Dues and Subscriptions
  858213 Damages
  855220 Environmental Expense
   81240 Medical Expenses
  881330 Meals and Entertainment

- General Ledger listing for Weston G&A for 2011 December YTD (Not Bate Stamped)

  655012 Bonuses
  655030 G&A FB Brdn Cl-Gen Ex
  655062  Meals & Entertainment
  655077 Telephone
  655078  Field Communications
  855079  Uniforms
  655082  Professional advancement
  655089  Allocated -Facilities
  655213  Damages
  655305  Insurance
  655320  Personal Property Taxes
  680150  Bonuses
  681010  Gen Ex
  681330   Meals and Entertainment
  682365   Telephone
  682392   Materials and Supplies

- General Ledger listing of Weston G&A for 2010 December YTD.

  655012 Bonuses
  655030 Gen Ex
  655079 Uniforms
  655089 Allocation – Facilities

   655215  Right-of-Way
   65305   Insurance
   655320  Personal Property Tax
   681010  G& A Gen Ex

- EQT analysis of 2014 Plan and Forecast -Variance -Difference

   Imputes a 5% "inflation" adjustment of
   655320 Plans for Personal; Property Taxes of
   655053 Plans for pension plan contributions
   655058 Plans for Post-Retirement Benefits
   682450 Plans Environmental
   655305 Plans Insurance
   65508 Plans Post-Retirement Benefits
   Note: Inflation was .8% in 2014

- EQT Rate Summary- Madison 2015 – 2009          Brenton 2015-2009

| | | Madison | Brenton |
|---|---|---|---|
| SG&A (Allocated) | 2009 | $1,829,388 | $3,334,656 |
| Gathering Rate | 2010 | 2,118,919 | 3,721,592 |
| | 2011 | 1,580,296 | 3,186,231 |
| | 2012 | 2,815,947 | 4,936,944 |
| | 2013 | 3,164,464 | 5,364,537 |
| | 2014 | 3,607,263 | 5,814,304 |
| | 2015 | 2,053,817 | 3,083,219 |

These are a few examples of a repetitive theme in the compilations of costs EQT has included in the rate formulation in discovered ledgers, cost listings, expense planning and emails up through to the present.

In annual gathering rate determinations covering 2011 through 2014, applicable to Madison, Brenton, and Weston contained the following components of cost that are excludable under the standards required in WV.

- A general personnel cost is infused, while not distinguishing between direct and indirect personnel costs;

- Direct office costs are infused without distinguishing direct and indirect costs;

- Environmental / Safety costs are indirect costs that have been included;

- Compliance and training costs are indirect costs have been included;

- Insurance is an indirect cost that has been included;

- Facilities Engineering is not segmented into direct and indirect costs;

- Allocated SG&A costs were included, while they are indirect costs.

- Property taxes are included in the calculations. These are not reasonable since the royalty owners have no equity ownership interest in the gathering system.

The Defendant's compilations of charges violate the concepts and applications set forth under West Virginia standards as to reasonable cost to lessors and the determinations deviate from the characteristics attached to includable costs in the determination of costs to be imposed upon the royalty owner.

The Defendants claim that the "EQT Gathering, LLC did not violate any standard cost accounting procedures, and both the procedures used to calculate the gathering rate each year and the resulting rate itself appear to be reasonable." The consideration of a standard cost accounting system **has nothing to do with the proper classification of costs for inclusion in a charge back rate to royalty owners**. In writing, EQT expressly includes indirect costs, allocated indirect costs, and inapplicable costs. The compilations of costs and the resulting rate are not reasonable for a charge back determination applicable to royalty owners.

The Defendant fail to eliminate indirect and unreasonable costs in the determination of a cost of service rate charged back to royalty owners.

Additional considerations are as follows, associated with costs that are excludable.

- The Defendant's cost of service charge is not actual; the charges are estimates. Expenses are a function of forecasts that are not reconciled with actual amounts from period to period in the determination of adjustments and deductions in and from royalties. Actual costs are not found to be formulated on the basis of any "true-up" or settlements with the framework of net royalty payments within any time frames. The error rate in forecasting is not expelled from the costs applied to the royalties. The deductions are overstated when forecasts exceed actual cost incurrence. (Deposition of Joe Piccirilli)

- All **compression costs** are not chargeable. Compression costs that are incurred to stimulate or generate production should be classified as production costs not post-production costs. I find no reporting to royalty interest owners as to the differentiation between compression for production purposes as opposed to that which allows volume into a pipeline. Compression related costs are not reasonable unless they can be shown to be properly classified as post-production costs to get gas from the wellhead to a pipeline.

- **Incentive compensation** does not cause any current incremental royalties. Incentive pay do not create known and measurable incremental increases in current revenue yields. The impact of incentive pay is speculative at best. Incentive pay is prospective in nature and the current royalties are not affected. Incentive costs are not reasonable to impose onto royalty owners.

- **Bad debts** are not reasonable to include in royalty offsets. The bad debts are the result of failed sales; not any way connected to the process of effectuating gas to market at the outset. The risk of bad debt is outside of the scope of the process of getting gas from the wellhead to a marketable position. It should be EQTs risk to obtain a sale proceed.

- **Corporate airplane costs** have no detectable incremental impact on royalty levels. The related costs are no reasonably applied to offsets to royalties.

- **Annual development meeting costs** are prospective in nature and do not create current royalty impacts in a current royalty year. The costs should be eliminated from offsets.

- **Legal settlements** do not enhance a royalty interest. Settlements are the risk burden of EQT. Disputes with third parties are outside the scope of reasonable offsets for normal costs of operations. The costs should be eliminated from the offsets.

- Per reference to the 2014 SG&A Expense Business Plan, prospective costs are built into "estimated" costs to be incurred through requested components. Costs are not incurred, but "requested and prospective costs" that are not in compliance with *Tawney* actually incurred cost functions. The costs cover requested construction, design engineering, gas system planning & analysis, internal gas measurement, storage engineering, accounting, business development and rates, gas management, land, and strategic planning and process implementation staffing additions. There is no evidence that these request will be incrementally beneficial current royalty holders. These **requested costs** should be eliminated from any royalty offsets.

- **Corporate allocated costs** are costs that are incurred due to the complexity of the corporate structure. Significant amounts of these costs are fixed in nature and support the infra-structure of the consolidated entity. Corporate allocated costs are indirect costs and have not been shown to provide any certain incremental benefit to royalty owners.

- EQT Gathering and EQT Midstream make a **profits** on gas that is obtained from the royalty holders, per reference to business segment income statements embedded in the SEC Form 10K for 2015. All costs of operation of both of these entities inside EQT Corporation are recovered. Cost reimbursements from royalty owners, as offsets to royalties, cause a double recovery of costs and a profit function in excess of a fair rate of return embedded in the price paid by Energy. In essence, EQT is making a further profit off of the royalty owner. There should be an offset for the profit function realized by EQT Gathering and EQT Mainstream. The profit function offset will place the charge on an "actual" basis. The percentage of profit to cost should serve as an offset to the charged costs back to royalty. Actual net costs are measured after profit is eliminated.

- The Royalty holders should receive an **offset for the tax effect** of the expensing of such "passed along costs" in the form of a tax adjustment. If we assume that the effective tax rate of EQT Corporation is 31.86% (average of 2014-2012); then there should be an offset / reduction of 31.86% of the charged costs to the royalty holders. As the costs are deducted by EQT, taxes are reduced. In substance, EQT is paying 68.14 cents of the expense given the reduction in income taxes of 31.86 cents out of each expense dollar. The costs allocated to the royalty owners should be offset by the tax effect realized by EQT to expense expenditures. To ignore the tax savings that occur in tandem with expenses is to force unreasonable expense functions on

the royalty owner. The lack of an offset for tax affects is unjust enrichment at least. The lack of a tax adjustment causes a profit on the recovery of cost from the royalty owner.

- Furthermore, the costs assessed to the lessor are not actually incurred. They are **estimated**. As noted above, the "rate" charged to the lessor is based on a forecast of the amount of gas to be produced as well as the costs associated with getting the gas to market in the next year. According to Piccirilli, EQT Gathering does not make any adjustments to the amount charged to the lessor based on the actual cost of service incurred during the year.

- The costs that are reasonable and actual should be rooted in the context that the includable costs that are **direct costs** should be reflective of an actual direct event to get gas from the wellhead to points of sale as well as specified with particula, in the context of Judge Goodwin's findings.

Conclusions

(1) The lack of disclosed rate determination methodology in leases is clear. The inclusion of aggregate cost descriptions does not allow for the differentiation of costs directly involved in getting gas from the wellhead to the point of sale and those costs that are indirectly incurred as well as those costs that are maintaining and supporting the corporate structure between the integrated "business segments".

(2) The costs of service charged to the royalty owner through a cost of service charge, in the absence of contractual agreement as to cost sharing in lease documents, is not actual and are not reasonable, given the forecasted nature, prospective benefit nature, and inapplicable nature of the components of the charge. The charge shifts risk and costs to the royalty owner without providing any incremental yield benefit to the royalty holder. Further, indirect costs recovered in the charge causes an incremental profit to be realized from the royalty owner without the proper relationship of costs and benefits.

(3) There is no methodology noted in leases reviewed that shows the costs included in the charge back rate. There is no disclosure of adequate cost breakdown of costs included in the charge back rate embedded in reviewed leases.

(4) The inclusion of aggregate costs does not allow for the differentiation of costs directly involved in getting gas from the wellhead to the point of sale and those costs that are indirectly incurred as well as those costs that are maintaining and supporting the corporate structure between the integrated "business segments".

(5) It is my opinion, based on West Virginia standards, that none of the indirect, allocated and unrelated costs should be charged to the lessor.

(6) The "rate" charged to the lessor is based on a forecast of the costs associated with getting the gas to market in the next year. According to Piccirilli, EQT Gathering nor EQT Production does not makes no adjustments to the amount charged to the lessor based on the actual cost of service incurred during the year.

(7) The lack of disclosed rate determination methodology in leases is evident per review of leases. The inclusion of aggregate costs in rate determinations does not allow for the differentiation of costs directly involved in getting gas from the wellhead to the point of sale and those costs that are indirectly incurred as well as those costs that are maintaining and supporting the corporate structure between the integrated "business segments". EQT lumps all costs into one basket without regard to the requirements of the WV standards.

**EQT Corporation has such effective and functional control over its subsidiaries and its affiliated limited partnership, so that the entities operate in an integrated and intertwined fashion so much so that they are one company in fact and substance.**

**The review and discovery of the following provide the basis for the above noted opinion.**

- The formulation of financial statements indicates that the parent company exercises material control over the operations of its subsidiaries. Per reference to Intermediate Accounting, fourth edition, Welsch, Zlatkovich and White, 1976, "Consolidation, while using the equity method, carries a presumption that the investor owns a sufficient number of shares of the other companies to exercise significant influence over the operating and the financial policies of the other company. "

- EQT and its subsidiaries have interlocking management, per reference to page 29 of EQT's SEC Form 10K for the year ending December 31, 2015.

- EQT maintains access to capital for subsidiary capital needs, per page 53 of the Company's SEC Form 10K for the years ending December 31, 2015.

- Per reference to page 38 of the Company's SEC from 10K for the year ending December 31, 2015, "The company reported the components of each segment's operating income from continuing operations and various operational measures in the sections below, and where appropriate, has provided information describing how a measure was derived. **EQT's management believes that presentation of this information provides useful information to management and investors regarding the financial condition, operations and trends of EQT's business segments without being obscured by the financial condition, operations and trends for other segments or by the effects of corporate allocations of interest, income taxes and other income. In addition, management uses these measures for budget planning purpose.** The Company's management reviews and reports the EQT Production segment results with third-party transportation and processing costs reflected as a deduction from operating revenues as management believes this presentation provides a more useful view of average net sales price and is consistent with industry practices. Third-party costs incurred to gather, process and transport gas produced by EQT Production to market sales points are recorded as a portion of transportation and processing costs in the Statements of Consolidated Income. Purchased gas costs at EQT Midstream include natural gas purchases, including natural gas purchase from affiliates, purchased gas costs adjustments and other gas supply expenses. These purchased gas costs are primarily with affiliates and are eliminated in consolidation. Consistent with consolidated results, energy trading contracts recorded within storage, marketing and other are reported net within operating revenues, regardless of whether the contracts are physically or financially settled. The Company has reconciled each

segment's operating income to the Company's consolidated operating income and net income in Note 4 to the Consolidated Financial Statements" This disclosure denotes control on a collective fashion.

- Control exists when the parent owns, directly or indirectly through subsidiary(ies), more than one-half of the voting power of an enterprise. Control also exists when an enterprise controls the composition of the board of directors (in the case of a company) or of the corresponding governing body (in case of an enterprise not being a company) so as to obtain economic benefits from its activities. (AICPA consolidation practice)

- These statements are intended to present financial information about a parent and its subsidiary(ies) as a single economic entity to show the economic resources controlled by the group.

- Per reference to the series of organizational charts collectively marked EQT Gathering - 001575 through 001586, EQT Corporation possesses and exercises direct and indirect control of all material operating aspects of EQT Energy, LLC, EQT Investments Holdings, LLC, EQT Gathering, LLC, and EQT Mainstream Partners, LP.

    - In addition, organizational charts numbered EQT Energy 8870, 8874, 8878, 8871, 8875, 8879, 8872, 8876, 8880, 8873, 8877 show an integrated picture of operations and inter-related and collective commingling of operating capacities for the purpose of joint expectation of profit.

    - All fixed and variable costs of operations are planned and coordinated on an integrated fashion; Per EQT Business Plan and Capital Budget EQT Midstream 2014 and EQT SG&A Expense Business Plan.

    - Pricing of units relative to inter-company and external sales are determined through integrated means; (Depositions Piccirilli and Bergonzi)

    - All material aspects of operations are consolidated for reporting purposes and reflective of one entity's results of operations and a consolidated entity's utilization and marshaling of assets and capacities in the pursuit of profits for the benefit of shareholders of EQT Corp. (SEC Form 10K, 2015)

    - The above noted subsidiaries do not operate on a "stand-alone" basis. They operate from common capacities to access capital, to share risk, to share managerial attributes, and to share internal and market economies. (Per SEC Form 10K 2015)

    - Per reference EQT Financial Risk and Credit Policy text, EQT Corporation controls and monitors the risk of operations as partially evidenced by the following: **"the Financial Risk and Credit Policy that describes the risk management and credit philosophy of EQT Corporation and its subsidiaries, including EQT Midstream Partners, LP, referred to herein collectively as the "Company".** "(BS EQT-Gathering 1071429) In Section II, Rules and Responsibilities, bates stamp EQT-Gathering 1071431, indicates EQT Board monitors all operations oversight through the appointment of an Audit Committee. "Oversight of EQT's activities is provided by its Board. The Board appoints the Audit Committee and the Audit Committee

monitors the CRC. The following have the responsibility for financial and credit risk management of EQT: The Corporate Risk Committee (CRC), the three business segments (EQT Production, EQT Midstream and Distribution) the Hedge Committee Corporate Risk Control, Corporate Credit and Corporate Treasury.

- Subsidiaries must get approval for significant expenditures from the CRC. (Per Financial Risk and Credit Policy)

Conclusion:

(1) The EQT Corporation controls in fact and substance the operations of the subsidiaries and the limited partnership so much so that the Consolidated entity is one company and operates with common expectation of profit. Financing, management, investing and operational capacities are commingled for a collective result and purpose.

It is my understanding that Mr. Daniel Reineke has produced a preliminary determination of the damages in this case. I understand that discovery is on-going. When Mr. Reineke finalizes his damage opinions, I will provide a determination of pre-judgement interest. I will follow a process note below.

- Organize damages by historical year of occurrence;

- Determine the number of years the damages have outstanding as of some date certain;

- Apply the WV Statutory Interest Rate using simple interest methodology by multiplying the interest rate by the years outstanding and then by the amount associated with each year; no compounding;

- Example: Damages incurred in 2009 X Interest Rate X number of years outstanding to a terminal date.

If a Federally mandated interest rate is applicable, the same will be used in the calculations.

Daniel L. Selby, MBA, CPA, CFF, CVA

State of West Virginia
Notary Public
Taken, Subscribed, and Sworn to me by Daniel L. Selby, MBA, CPA, CFF, CVA, this 30th day of September, 2016

My commission expires: September 5, 2022

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
Mary M Lingan
600 Redwood Lane
Elkview, WV 25071
My Commission Expires Sept. 5, 2022