IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

THE KAY COMPANY, LLC,
WILLIAM CATHER, Trustee
of Diana Goff Cather Trusts,
and JAMES E. HAMRIC III,
and all other persons and
entities similarly situated,

        Plaintiffs,

v.                                    Case No. 1:13-CV-151
                                    Honorable John Preston Bailey

EQT PRODUCTION COMPANY,
a Pennsylvania corporation;
EQT CORPORATION,
a Pennsylvania corporation;
EQT ENERGY, LLC, a
Delaware limited liability company;
EQT INVESTMENTS HOLDINGS, LLC, a
Delaware limited liability company;
EQT GATHERING, LLC, a
Delaware limited liability company; and
EQT MIDSTREAM PARTNERS, LP,
a Delaware limited partnership,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR CLASS CERTIFICATION**

## I.  FACTUAL BACKGROUND

**A.      INTRODUCTION**

      Plaintiffs are the owners and lessors of natural gas interests subject to leases held by

EQT, as lessee.[1]    Plaintiffs bring this action, on behalf of themselves and others similarly

---

[1] Plaintiffs contend that all defendants are responsible for the conduct complained of herein, as explained below.  All defendants EQT Production Company, EQT Corporation, EQT Energy, LLC, EQT Investments Holdings, LLC, EQT Gathering, LLC and EQT Midstream Partners, LP are referred to collectively as EQT defendants.  EQT Production claims to be the sub-lessee of said leases.

situated against defendants in this case, to recover royalties defendants owe them for natural gas extracted and produced from their property or leasehold.[2]  This action is brought for damages, including punitive damages, which occurred after December 8, 2008, pursuant to plaintiffs' causes of action in this case based upon breach of contract, constructive and actual fraud, including fraudulent concealment, and intentional breach of contract.  Plaintiffs also claim that EQT Corporation is the alter ego of the other defendants, which are wholly owned subsidiaries of EQT Corporation, except for Midstream.  EQT Corporation is not the sole owner of Midstream, but it is controlled by EQT.  Defendants were acting in concert and in combination with one another with respect to shorting plaintiffs' royalty.  Each of the defendants are liable to plaintiffs and the class based upon their own acts, conduct and omissions and the conduct of each of the other defendants as a result of (a) agency, (b) alter ego, (c) joint venture and (d) contract among themselves.

Plaintiffs therefore seek the Court's approval to prosecute the claims for monetary relief on behalf of the following class:

> A.      All EQT natural gas lessors that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their natural gas or mineral estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period.)  (*See* exception below.)

While there are overarching issues common to all of the class, plaintiffs seek to prosecute the classes for relief on behalf of two subclasses:

---

[2] A previous class action preceded this civil action which resolved by a class action settlement, effective on December 8, 2008.  All participants of the previous settlement entered into releases, resolving said claims which relieved EQT from any further liability prior to December 8, 2008, but retained plaintiffs' claims for any liability and damages from December 8, 2008, forward.  (**Exh. 1**)

(a)    All EQT natural gas lessors with flat rate leases converted by operation of *W. Va. Code*, § 22-6-8 and that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period.)

(b)    All EQT natural gas lessors that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period,) except for those lessors holding flat rate leases converted according to *W. Va. Code*, § 22-6-8.

There would be excepted from the class the following:

(1)    Flat rate leases which have not been converted unless by operation of *W. Va. Code* § 22-6-8, the West Virginia Supreme Court finds that they are to be converted or grants relief in the appeal now pending before the West Virginia Supreme Court.

(2)    Excluded from the classes are officers and agents of any defendant or subsidiary of any defendant named in this lawsuit or any lawsuit involving the same or similar claims as those alleged in this lawsuit; any attorney for any such defendant; any attorney for any plaintiff in this lawsuit or in any lawsuit involving the same or similar claims as those alleged in this lawsuit against any such defendant; and any judicial officer who presides over this lawsuit or over any other lawsuit involving the same or similar claims as those alleged in this lawsuit against any such defendant.

Attorneys for plaintiffs represent that other subclasses may be useful in managing the case at trial.[3]  Some of the "flat rate" subclass issues are presently pending before the Supreme Court of the State of West Virginia, pending in a separate case via certified question.  *Patrick D. Leggett, et al. v. EQT Production Company*, et al., Docket No. 16-0136.  (Honorable Frederick P. Stamp, Jr.)

---

[3] For example, the Court may separate out leases by category or groups for separate trials or it may try all issues in one trial.

3

**B.**     **STATEMENT OF FACTS**

**1.**     **Plaintiffs**

a.      The Kay Company, L.L.C. is a small West Virginia land holding company which leases its coal, oil and gas rights to producers, including EQT defendants.  The relevant lease language of Kay's lease is:

> (i)      Lessee agrees to pay Lessor for each gas well from the time and while the gas is marketed, at the rate of one-eighth (1/8) of the current wholesale market value at the well of the gas, gasoline and other products thereof, based on the usual price paid therefor in the general locality of said leased premises, payable each three months, all pursuant to subsection (a) of this article, and determined at the point or points provided in subsection (b) of this article.  In no event shall the current wholesale market value of such gas at the well for the purposes hereof be less than 18¢ per mcf.

b.      William Cather, Trustee of Diana Goff Cather Trusts, is a trust which holds family natural gas interests, a part of which is presently leased to EQT defendants.  The relevant leases and lease language is as follows:

> (i)      …Second—to pay as royalty for all gas produced and marketed from each well when and as the gas is marketed, one-eighth (1/8) of the wholesale market value thereof at the well based on the usual price paid therefor in the general locality of the leased premises, payable on or before the 25th day of the month following that in which the gas was delivered into the marketing pipeline.  Said payments shall constitute the entire consideration to Lessors for such gas including the gasoline and other content thereof except as hereinafter provided.

> (ii)      ...and 2d-To pay SEVENTY-FIVE and 00/100 ($75.00) Dollars each three months in advance for the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises as a gas well, said payment to be made on each well from date utilized, and to be paid each three months thereafter while the gas from said well is so marketed and used.

> (iii)      To pay quarterly one-eighth (1/8) of the proceeds received for the gas from each and every gas well drilled on said premises, the production from which is marketed and used off the premises, while the gas from said well is so marketed and used.

4

c.     James E. Hamric, III, owns certain natural gas rights and leases same to EQT defendants.  The relevant lease language is as follows:

(i)     The Lessee shall pay Lessor as royalty one-eighth (1/8) of the proceeds from the sale of gas as such at the mouth of the well where gas, condensate, distillate or other gaseous substance is found.

The plaintiffs' leases include flat rate and leases without mention of deductions, yet defendants take deductions, including taxes and do not pay plaintiffs for liquids.

2.     **Defendants**

a.     EQT Corporation is a publicly traded corporation which, among other endeavors, directly or indirectly enters into contractual arrangements to receive monetary benefits from West Virginia lessors through the taking of deductions through, and by the use of subsidiaries, joint venturers and partners, it leases and acquires leases by assignment or otherwise of certain natural gas rights within the boundaries of the State of West Virginia and elsewhere, and it produces, gathers, transports and represents that it sells the same at "points of sale" on interstate natural gas pipelines at published index prices.

All other EQT defendants are solely owned subsidiaries of EQT Corporation.  As set out below, EQT Corporation operates its natural gas business through various subsidiaries, including the other EQT defendants which are mere departments and business segments of EQT Corporation.[4]

All defendants and other subsidiaries also work together by the use of "groups" which are made up of personnel sometimes including EQT Corporation employees and various of the subsidiaries.  EQT Corporation and each of the defendants, except perhaps Investment, have charges and expenses which are included in the bucket of service charges which are deducted

---

[4] Plaintiffs can prove that EQT Corporation is as alter ego of the other defendants.  *Norfolk Southern Ry. Co. v. Maynard*, 437 S.E.2d 277, 282 (W.Va. 1993),  See *infra*.

5

from plaintiffs' royalty.   Therefore, the parent and all defendant subsidiaries profit from the deductions taken from plaintiffs and the class by getting together and deciding how much goes into the basket and how much each gets from it.

b.   <u>EQT Production</u> is the designated lessee of plaintiffs and the putative class.   It owns the leases, drills the wells and claims to sell the gas to EQT Energy, another subsidiary. EQT Energy purchases **all** of Production's natural gas and sells it at "first liquid trading point" which is defined as at the interstate pipeline, such as the TCO at "index price" or other index prices, which is the published trading price for that day.[5]

c.   <u>EQT Energy</u>, however, does not pay Production the price it receives at the actual point of sale.   Instead, Energy deducts the price that a different wholly-owned subsidiary, <u>EQT Gathering</u>, charges for taking the gas from the wellhead to the point of sale.   Energy then claims that it buys the gas at the wellhead and Production claims it sells the gas at the wellhead. Energy, however, doesn't pay plaintiffs for the volume at the wellhead.

d.   <u>EQT Midstream Partners</u> is part of the gathering group.   It is a publicly traded, limited partnership which, along with EQT Gathering, gathers the gas from West Virginia wells and delivers it to the "point of sale" and charges plaintiffs part of gathering charges.   EQT Corporation is the principal owner and controls the board of directors of Midstream.   (**Exh**.2, Deposition of Jimmi Sue Smith, pp. 19-22)

e.   <u>EQT Investment Holdings, LLC</u>, among other duties, handles loans among and between  EQT  Corporation  and  subsidiaries  and  assists  in  managing  and  financing  the subsidiaries for and on behalf of EQT Corporation.   While it may have no direct involvement

---

[5] Plaintiffs complain that this arrangement was part of a fraudulent scheme to pay plaintiffs less than the royalty to which they were entitled.

6

with deductions, it does provide bases for the joint venture and alter ego of the subsidiaries, to the extent it uses Corporation's money to run subsidiaries.

## C.    THE STANDARD

In West Virginia, unlike some other states, the evaluation and analysis of the duties and responsibilities of lessees with respect to paying royalties to their lessors necessarily requires reference to at least two cases decided by the Supreme Court of the State of West Virginia.  The *Tawney* Court relying, in part, on the case of *Wellman v. Energy Resources, Inc.*, 210 W.Va. 200, 557 S.E.2d 254 (2001,) answered the certified question as follows:

> In light of the fact that West Virginia recognizes that a lessee to an oil and gas lease must bear all costs incurred in marketing and transporting the product to the point of sale unless the oil and gas lease provides otherwise, is lease language that provides that the lessor's 1/8 royalty is to be calculated "at the well," "at the wellhead" or similar language, or that the royalty is "an amount equal to 1/8 of the price, net all costs beyond the "wellhead," or "less all taxes, assessments, and adjustments" sufficient to indicate that the lessee may deduct post-production expenses from the lessor's 1/8 royalty, presuming that such expenses are reasonable and actually incurred?

> Answer: No

> Further, the Court held in Syllabus points 2 and 10 of *Tawney* that:

> "If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were <u>actually incurred and they were reasonable</u>. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable." Syllabus Point 5, <u>*Wellman v. Energy Resources, Inc.,*</u> 210 W.Va. 200, 557 S.E.2d 254 (2001).  *Tawney*, Syllabus 2.

> "Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs."  *Tawney*, Syllabus 10.

*Estate of Tawney v. Columbia Natural Resources, L.L.C.,* 219 W.Va. 274, 633 S.E.2d 30 (2006.)

A fair reading of *Tawney* and *Wellman* is that the lessee must prove or prepare and have records to prove that "[b]efore being entitled to such credit, however, <u>the lessee must prove</u>, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable." *Id.* This has become a factual issue in this case because after discovery, plaintiffs contend that defendants did not comply with the objective legal requirements of West Virginia's statutory or common law, including the explicit direction of the West Virginia Supreme Court that defendants must prove they complied with the standard **before** they take deductions.

Because West Virginia has held that there are implied covenants that are applicable and enforceable with oil and gas leases, the standards set forth in *Wellman* and *Tawney* are directly relevant in the determination of whether EQT defendants breached the duties and responsibilities to their lessors. It is important to note also that "the general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee." Syllabus Point 1, *Martin v. Consolidated Coal & Oil Corp.,* 101 W.Va. 721, 133 S.E. 626 (1926). *Tawney, supra,* Syl. 7. Another case which has addressed the holdings in *Tawney* and *Wellman* is *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F. Supp.2d 790 (2014). The Wellman court held:

(5)    The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead. I predict with confidence that, if confronted with this issue, the Supreme Court of Appeals would hold the same. *See Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla. 2004) ("an intra-company contract is not an arm's length transaction, [and] it is not a legal basis on which [a producer] can calculate royalty payments"); *Beer v. XTO Energy, Inc.*,

8

CIV-07-798-L, 2010 WL 476715 (W.D. Okla. Feb. 5, 2010) (gas sale at wellhead between two controlled, affiliated companies not appropriate for royalty calculation).

(6)    To determine the wellhead price, the defendants use a "work-back method" which "involves subtracting postproduction costs that enhance the value of the gas from the interstate connection price." (Mem. in Supp. of Defs.' Joint Mot. for Summ. J. [Docket 170], at 25). Absent lease language to the contrary, *Tawney* requires lessees to pay royalties free of these costs. The defendants cannot avoid *Tawney* by simply reorganizing their businesses and making intra-company wellhead sales. Accordingly, I **FIND** that *Tawney*'s specificity requirements apply to royalty payments made under the defendants' work-back method after 2005.

Therefore, the *McDonald* Court ruled that defendants' sister subsidiaries' plan nor the works back method are effective in avoiding the holdings in *Tawney*.

Therefore, the *Wellman* and *Tawney* decisions leave no doubt concerning what language must be incorporated in the lease in order to entitle it to take deductions and further it left no doubt but that lessee had the burden of proof to prove that they had actually incurred the costs and further that they were "reasonable."

## D.    THE DEFENDANTS' CONDUCT

### 1.    The Background

As set forth above, this is the second class action filed against EQT and one or more of its subsidiaries, alleging breaches of contract and other causes of action as a result of EQT's practice with respect to its obligations to pay royalty to its lessors.  The first case[6] was settled effective on or about December 8, 2008.  Plaintiffs have learned that defendants merely adjusted their straps and basically continued to do what they had done before, which is take unreasonable deductions from essentially each and every one of their lessors and not pay plaintiffs at the index price at the real or actual point of sale.  The only type lease that defendants claim they do not take deductions on is a "proceeds" lease which has no specific language allowing for deductions. (**Exh**. 3, Bergonzi Deposition II, pp. 91-93.)  There are a few others which defendants have

---

[6] The Kay Company, et al. v. Equitable Production Co., US District Court, S.D., West Virginia, Civil Action No. 2:06-cv-00612.

inserted language not allowing for deductions usually to large oil and gas owners. The decision to continue taking deductions from plaintiffs after Tawney and the first class action settlement, was a "corporate" decision by EQT Corporation. *Id*. 42-44; 93-95.

      2.      EQT's Failure to Exercise Due Diligence With Respect to Lease Analysis

As set forth above, defendants purchased and were assigned the right to Eastern States' leases in 2000. Defendants also purchased leases from other third parties and they have land men who seek out and enter into leases between EQT Production and owners of natural gas in West Virginia. The land men work for Lease Administration, but under EQT Production. *Id*.

There is a "group" at EQT called Land Administration whose responsibility it is to receive all leases and enter them into the Enertia and Docusphere database systems. (Bergonzi Deposition, 7/19/16, pp. 12-14.) It is at this stage where EQT reviews the lease and determines "whether various deductions should be taken and what type of deductions." *Id*. 13.

Plaintiffs have recently, since July this year, been provided discovery and deposition testimony which sheds light on the information EQT has had throughout this case with which it could have provided to the plaintiffs' counsel. Previously, defendants produced the entire lease files, not the specific operative leases relevant to the time period subject in this case and plaintiffs had to pick out leases they believed were operative; there was no index to tell them which lease was the operative one. Plaintiffs recently discovered the following:

(1)     Defendants have lease analysts who review the lease and categorize them. (**Exh**. 4, Alma Tolman Deposition, pp. 14, 23.

(2)     All leases are on a system called Docusphere which is an electronic database. *Id*. pp. 13-15.

(3)     Docusphere has an index and Ms. Tolman explained what tools are available to her:

A. In the way the index works. It can be agreements, lease ownership changes, miscellaneous, correspondence.
Q. It has, like, a column that you can pick whatever you want?
A. Yes.

Ms. Tolman stated that it would take her 5 minutes to pull up a lease and there are various codes she could use to access a long list  of significant documents.  Ms. Tolman stated that they do not discriminate between which states the lessors are in.  They treat all lessors the same, whether West Virginia, Pennsylvania or Kentucky.  *Id.* p. 25.  Of course, these states have different laws than West Virginia.

3.      Defendants' West Virginia Leases[7]

All of the leases which defendants own in West Virginia began with the purchase in the year 2000 by EQT of all of Eastern States' leases in West Virginia.  *Id.* 36.   After EQT purchased these leases, they continued to pay the lessors in the same manner, including taking deductions and paying royalty like Eastern States did.  *Id.* 36.  EQT simply transferred or merged Eastern States' electronic data into the database and system of EQT known as J.D. Edwards, which was then migrated into EQTs' present system called Enertia.  *Id.* 37-38.   The leases themselves are stored in a database and system called Docusphere.  *Id.* 10.

Lease Administration has "Lease Analysts" who review the leases.  (**Exh**. 3B, Bergonzi Deposition, p. 15.)  Mr. Bergonzi testified that "analysts" determine whether deductions apply and, if so, they enter a yes or no in a column titled G&C which is Gathering and Compression and another column titled Taxes where they enter a yes or no as to whether taxes are to be deducted.  *Id.* 16 (See also, Bergonzi Deposition, Exh. **62F**, **Exh.** 6, 2015 G&C Worksheet.)[8]

---

[7] Mr. Bergonzi was deposed on July 19, 2016, as a Fed.R.Civ.P. 30(b)(6) witness.  (**Exh**. 5, Notice of Deposition.)
[8] Bergonzi Deposition, **Exh**. 62F is for 2015; 2009-2014 are deposition exhibits 62-62E.

All the information lessors are provided concerning deductions are "Deductions" and Taxes. However, there are numerous other codes which identify specific items beyond G&C and taxes. *Id.* 33-35. (See **Exh**. 7, plaintiffs' royalty statements.) The Lease Analysts are provided training by EQT and guidelines[9] as to how to categorize the leases as to whether and what to deduct. *Id.* 144. Mr. Bergonzi, the 30(b) witness, claimed he had not reviewed the guidelines and couldn't answer questions related to same.[10]

As a result of *Tawney*, EQT undertook to review the leases through an outside counsel. After this review, EQT changed nothing and continued to take deductions the same way except with respect to EQT's claim that they do not take deductions from proceeds leases. *Id.* 40-41; 43-44.

In 2008, the defendants prepared a list of leases and categorized them.[11] *Id.* pp. 39-41. See List of Leases, **Exh**. 9, Deposition Exh. 63, p. 58 and Group of Leases, **Exh**. 10, Deposition Exh. 64, pp. 64-68. The groups[12] were:

1.      WV - SILENT LS 01_08; All West Virginia leases with royalty clauses which were silent with regard to the taking to deductions

2.      WV - FLAT LS 01-08; All West Virginia leases with flat rate royalty clauses

3.      WV Market Value – Silent on Deducts; All West Virginia leases with market value royalty clauses which are silent with regard to the taking of deductions

4.      WV - ALLOWS LS 01_08; All West Virginia leases with royalty clauses which specifically allow post production deductions

---

[9] Defendants were requested to produce these guidelines, but never have. (See **Exh**. 8, Request for Documents.)

[10] Importantly, plaintiffs have never been provided the guidelines in discovery and first learned of their existence on July 19, 2016, at Mr. Bergonzi's deposition.

[11] Defendants refused producing **Exh**. 9 and **Exh**. 10, Bergonzi Deposition **Exh**. 63 and 64, until a Court Order was entered.

[12] In addition, there are several other categories that are for specific companies which have similar categorizations such as "WV-McDonald 300554," a WV lease with W.W. McDonald Company.

5.     WV Leases that allow deducts 081009; All West Virginia leases with royalty clauses which allow post production deductions

6.     WV- FIXED LS 01_08; All West Virginia leases with fixed rate royalty clauses

7.     WV Flat Rate; All West Virginia leases with flat rate royalty clauses

8.     WV Proceeds Lease – Silent on Deducts; All West Virginia leases with proceeds royalty clauses which are silent with regard to the taking of deductions

9.     WV Proceeds Lease – Allow Deducts; All West Virginia leases with proceeds royalty clauses which allow the taking of deductions

10.    WV - Fixed Rate; All West Virginia leases with fixed rate royalty clauses

11.    WV - Mixed Rate; All West Virginia leases with royalty clauses which were hybrids of other types of clauses

12.    WV Proceeds Lease – Prohibits Deducts; All West Virginia leases with proceeds royalty clauses which prohibit the taking of post-production deductions

Plaintiffs in this case also have characterized the leases.  As previously set forth in various motions, defendants have been aggressively recalcitrant[13] in providing their own categories, regardless of West Virginia law which requires that if a lessee wishes to take deductions from royalty, they <u>must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.</u>" Syllabus Point 5, <u>*Wellman v. Energy Resources, Inc.,*</u> 210 W.Va. 200, 557 S.E.2d 254 (2001).  (Emphasis added.) *Tawney,* Syl. 2.

Plaintiffs' categorization of leases are based upon the common royalty language, e.g., "amount realized" or "market value."  (**Exh**. 11, "Lease Categorization, Table A."   The deductions are not shown on this table for brevity.  However, see Sample Deductions on Table B.  Defendants set about after *Tawney* to re-lease many of the leasehold in order to be able to

---

[13] Plaintiffs have filed several motions to compel documents and discovery.  Plaintiffs' Motions to Compel, (Doc. Ids. 69,  148, 180.)  The Courts' Orders with respect to plaintiffs' motions to compel are (Doc Ids. 117, 207, 232, 238, 242)

take deductions.  These leases for the most part are identified on Table A, C-1, **Exh**. 11,) there are approximately 4000 with the same or similar royalty clauses, and with the same or similar deduction language.  Table B shows sample deduction language for some of these leases.  (**Exh**. 12, Table B-1.)  Importantly, if defendants had complied with their duty under Fed.R.Civ.P. and answered plaintiffs' discovery, plaintiffs lists could have been final a long time ago.

From the data and working with the data, the Court can decide one lease which will perhaps solve approximately 4000.  (**Exh**. 13, Reineke deposition, pp. 145-148.)  The Court can resolve one flat rate lease and solve approximately 2000 leases, one market value lease and solve approximately 1200 and so forth.  The judicial economics of the procedure is significantly in favor of handling these claims by class action.

4.      EQTS' Concerted Action and Joint Venture  - "At the Wellhead Price"/Fraud

Mr. Bergonzi testified that "our view now is that ---that the gas is sold at the wellhead and that these deducts are shown so that we can calculate back an approximate market value at the wellhead, even though we don't consider them to be deducts." (**Exh**. 3b, Bergonzi Deposition, p. 149.)  He then stated that the deductions which are shown on the "remittance advice" was and is done for "transparency" so that no one could say we're hiding the ball." *Id*.

Therefore, the point of sale was changed by EQT in 2005, during the *Tawney* case, from the interstate pipeline to the wellhead, solely to mislead the lessors and to decrease the price and short its own West Virginia lessors by paying them on a fraudulent price.  *Id*. 98-99.

5.      Proxy Price

Defendants then argue that EQT are entitled to pay royalty at a reduced value "at the wellhead" because it sells its gas to a sister company.  Mr. Bergonzi admitted that the price at the wellhead which is where they pay for the gas is less than market value at the interstate pipeline.

*Id*. 111.  Mr. Bergonzi explained the process and how they rationalize their decision and practice of paying the lessors at a reduced value:

> **"So the value at the well head, how we calculate that at EQT Production is we take the proceeds at the first liquid trading point, deduct the costs to get it to that trading point and consider that a <u>PROXY</u> for what the market value would be at the well head."**  *Id*. **111.  (emphasis added.)**

The only logical reason for changing the point of sale was to attempt to fraudulently conceal the fact that defendants were intending to claim that, as they did in *McDonald*, *supra*, that they sell the gas at the wellhead and therefore, claim they are authorized to take deductions.

EQT  Energy has contracts for purchase of the gas with EQT Production.  *Id*.  pp. 101, 131.  The contract provides that the price is for the first of the month Index Price applicable to the interstate pipeline, less prevailing gathering related charges and less retainage, less any other agreed applicable fees or charges.  The EQT Energy contract is signed by John Bergonzi, Vice President and Corporate Controller and Assistant Treasurer of <u>EQT Corporation</u> and Phillip Conti, Vice President and CFO of <u>EQT Corporation</u> and also they are Assistant Treasurers of EQT Production and Energy.  (**Exh.** 15, EQT Energy Contract,  **Exh**. 25, SEC 10-K,) indicating its own liability and control, concerted action, joint venture, and alter ego relationship between and among all the defendants.

6.      The Deductions are not Reasonable or Actual

Dan Selby is an accountant with extensive experience in business and accounting.  He was asked to review the records provided to determine whether the cost of service rate was reasonable and actual.  He determined summarily that they were neither reasonable nor actual because they were based upon "estimated costs and expenses" or "forecasts."  He then reviewed the record of that accounting and other documents and depositions performed in this case.  He learned that there are many elements of deductions which should not be included in the cost of

service rate and that it violates accepted business practices of West Virginia in taking deductions. (**Exh**. 19, Selby Affidavit, p. 6.)  Incentive compensation, bad debts, corporate airplane costs, legal settlements, corporate allocated costs, profits, etc. should not be charged to the plaintiffs. And, any tax effect should be credited to plaintiffs.  *Id*. pp. 7-8.  Further, EQT lumps all costs into one basket from a variety of separate and distinct corporate entities, including the other defendants who claim to be independent.  *Id*. pp. 8-9.

       7.      Defendants Violated Plaintiffs' Leases

Dan Reineke is a petroleum engineer with extensive experience in the oil and gas industry.  Mr. Reineke analyzed EQT and subsidiaries and their conduct. Among other opinions he stated that the following:

1.      The defendants' deductions are not reasonable nor actual because they simply estimate them and don't "true them up."  *Id*. 85-88.

2.      95% of all royalty owners had deductions taken.  The other 5% appeared to be large landowners.  (**Exh**. 23, Reineke Affidavit, p. 17.)

3.      Defendants are not paying royalty owners the index price that it claims.  It is paying them 5% less than index or average.  (Exh. 23, Reineke Affidavit, p. 13; Exh. 13, Reineke Deposition, pp. 56-158.)

4.      Defendants claimed volume less is unreasonable coming in at more than twice the average for West Virginia.  (Exh. 13, Reineke Deposition, pp. 120, 153, 166.)

5.      The defendants' deductions for SG&A (overhead) from EQT Corporation is not a reasonable deduction to the plaintiffs.  (Exh. 13, Reineke Deposition, pp. 151-152.)

6.      Lessors are entitled to be paid for NGL's.  (Exh. 23, Reineke Affidavit, p. 15.)

7.      EQT does not pay for NGL's.  *Id*. 15.

8.      Sale of gas to EQT Energy was not an arms-length transaction.

9.      Mr. Reineke also explained the rationale for managing these claims by class action litigation.  (**Exh**. 23, Reineke Deposition, pp. 146-147.

16

Defendants have violated class-wide *Tawney* requirements.  They have and continue to take wrongful deductions from plaintiffs' royalty payments, fail to pay plaintiffs for the volume of natural gas produced from plaintiffs' gas reserves and that, regardless of whether the lease may recite that some specific deductions may be allowed to be taken, the deductions are ineffective under the requirements for leases in West Virginia set forth in *Wellman v. Energy Resources, Inc.*, 210 W.Va. 200, 557 S.E.2d 254 (2001) and *Tawney v. CNR,* 219 W.Va. 266, 633 S.E.2d 22, (hereinafter "*Tawney.*") (a) The charges are not "actual" costs related to the items listed in the lease; (b) The deductions are not "reasonable" and (c) The leases nowhere describe how the charges or deductions are to be calculated by a "method specific" in the lease.  Syllabus points 2 and 10 of *Tawney*.  Some of the subject leases have itemized lists of subject matter that defendants state are to be deducted.  However,  defendants nowhere in the leases identify a method for calculating the amount to be deducted, as required by *Tawney*.  While Mr. Piccirilli, defendants' 30(b)(6) witness, explained the general method as to how the costs of service were calculated, he then testified that "the production "revenue accounting team" would make the final decision as to what would be charged to royalty owners.  In other words, he didn't know. (**Exh. 16**, Deposition of Joe Piccirilli, pp. 19, 22.)

7.     Defendants' Deductions Are Not Actual Because They Are Estimates

At the outset, defendants fail in one of the key holdings in *Tawney*, which is that the deductions must be "actual" costs.  Mr. Bergonzi, one of defendants' F.R.C.P. 30(b)(6) witnesses, testified that the rates plaintiffs were charged as deductions are "estimates" of what defendants forecast might be their "cost of service" for gathering the gas from well to market or point or sale.  Defendants did this by averaging the total cost ("revenue" for EQT Gathering,) which each subsidiary of EQT (including defendant subsidiaries,) "bargains" for during the

business planning process for the next year.  (**Exh. 3**, Deposition of Bergonzi, p. 40.)  This "bargaining" is between and among defendants' subsidiaries and EQT Corporation and is not arms-length.  *Id*. 40. Then, after estimating a rate to be charged, defendants do not conduct an audit or accounting to determine whether there is an amount to be credited to the royalty owners for overcharging them.  *Id*. 48.  And the royalty owners do not get a refund or reimbursement when they are overcharged.  *Id*. 48-49.

Further, Mr. Piccirilli's group follows the accuracy of that information on a monthly basis.  "[W]e are comparing actuals to that business plan.  Both Midstream and Production would do that."  (**Exh. 16**, Deposition of Piccirilli, p. 29.)  Mr. Piccirilli explained where the costs come from, Midstream, O & M which is operations and maintenance, *Id*. 35-36, pipeline and compression, indirect operating costs, field measurement, overhead, shared service costs, S G & A which is Selling, General and Administration costs.  *Id*. 33.  It would also include the corporate function charges.  *Id*. 37.  Further, Mr. Piccirilli stated, "what makes up O & M, there could be a laundry list of specific costs that would go into that O & M line item."  *Id*. 36.  It would include " a lot of costs that I may not see the specific details."  *Id*. 37.  Mr. Piccirilli stated he would have to look at documents in order to provide "specific detail, line item by line item." *Id*. 36.  However, the line items are determined as part of the "plan process."  *Id*. 36.

8.      The Royalty and Deductions are Common in the Defendants' Three Districts

There are 3 EQT districts in West Virginia:  Weston, Brenton and Madison.  Each district ultimately ends up with a gathering rate which is different as to each district, but is a constant from year to year in that particular district for all royalty owners within that district a postage stamp rate.  *Id*. 113.  These costs are not actual and they are not reasonable.  Mr. Cather, now deceased, was charged as much as 74.4% for deductions for royalty and Kay Company was

18

charged as must as 25%.  (**Exh.** 17, Deposition of Dotson Cather, p. 42; **Exh.** 18, Deposition of Chris Thomas, p. 18.)  Further the costs that go into the rate for royalty owners includes the kitchen sink and comes from all quarters, including corporate headquarters and most all subsidiaries and business groups of EQT Corporation, who play any part in operations.  The list includes bonuses, educational costs, professional dues, tuition reimbursements, meals, entertainment, cell phone costs, conferences, seminars and training.  (**Exh. 16**, Deposition of Piccirilli, p. 56; **Exh. 19**, Affidavit of Dan Selby.)  They are forecasts.  *Id*. 54.

Therefore, not only do defendants fail to indicate on the leases information as to how to calculate the deductions, they do not disclose this methodology to plaintiffs.  Therefore, since defendants credited itself with estimates - not actual costs - and with unreasonable costs and never indicated in the leases since this litigation has ensued, the "method of calculating" the credit it took from the lessors, the lessees are not entitled to credit for any of  the deductions.

## IV.  LEGAL ANALYSIS

The claims and causes of actions being asserted by Plaintiffs when conducting its class-certification analysis under Rule 23 of the Federal Rules of Civil Procedure provides a background of the courses of action and elements of proof for the common issues.  Plaintiffs will briefly discuss the elements of their various claims before turning to the analysis required by Rule 23 below:

### A.    Defendants are Liable as a Result of Vicarious or Imputed Liability

Plaintiffs have asserted several alternative theories of vicarious or imputed liability against the Defendants, including claims of alter ego, joint venture, and agency.  None of these claims of vicarious or imputed liability should preclude class certification under Rule 23 because they would all involve common issues concerning the Defendants' relationships and agreements

between one another and not involve any individualized issues concerning any uncommon or unique interactions with any members of the proposed class.

### 1.     EQT Corporation is the Alter Ego of its Subsidiaries

As to the claim of an alter ego relationship, while the law presumes that two separately incorporated businesses are distinct entities, however, this presumption is disregarded when a parent corporation or shareholder dominates and controls a corporation and the corporate form is being used to perpetrate injustice, defeat public convenience, or justify wrongful or inequitable conduct.  *See Laya v. Erin Homes, Inc.*, 177 W.Va. 343, 347-48, 352 S.E.2d 93, 97-99 (1986). The West Virginia Supreme Court of Appeals has set forth non-exhaustive lists of factors relevant to determining whether such an "alter ego" relationship exists so as to justify piercing the corporate veil.  *Norfolk Southern Ry. Co. v. Maynard*, 190 W.Va. 113, 118, 437 S.E.2d 277, 282 (1993) (discussing relevant factors between parent and subsidiary corporations); *Laya v. Erin Homes, Inc.*, 177 W.Va. at 347-48, 352 S.E.2d at 98-99 (discussing 19 relevant factors between shareholder and corporation); *Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 788, 320 S.E.2d 515, 523 (1984) (setting forth relevant factors to consider); *Southern States Cooperative, Inc. v. Dailey*, 167 W.Va. 920, 929-30, 280 S.E.2d 821, 827 (1981) (discussing relevant factors).[14]

---

[14] "(1)     Whether the parent corporation owns all or most of the capital stock of the subsidiary;

"(2)     Whether the parent and subsidiary corporations have common directors and officers;

"(3)     Whether the parent corporation finances the subsidiary;

"(4)     Whether the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

"(5)     Whether the subsidiary has grossly inadequate capital;

"(6)     Whether the parent corporation pays the salaries and other expenses or losses of the  subsidiary;

"(7)     Whether the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

"(8)     Whether in the papers of the parent corporation or in the statement of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own;

"(9)     Whether the parent corporation uses the property of the subsidiary as its own;

A.   Equitable Corporation Is The Alter Ego Of Equitable Production Company

EQT Corporation is the alter ego of EQT Production and the remaining subsidiary defendants.  Therefore, contrary to defendants' argument, EQT Corporation is the real party in interest and it is deemed just as, if not more, responsible as Production.  Since all defendants were involved in a joint effort to take and use plaintiffs' royalty for its operating expenditures, then all are liable under theories of alter ego, joint venture and agency.  When a parent corporation or shareholder dominates and controls a corporation, the parent may be deemed under the law to be an alter ego of the subsidiary.  *See Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 97-98 (W.Va. 1986).[15]

EQT Corporation, Inc. is a publicly traded Pennsylvania Corporation.  Attached are corporate subsidiary organizational charts for EQT Corporation.  **Exh.** 20 is the last one produced by defendants for 2014.  **Exh.** 21 includes all organizational charts from 2009 to 2014.  As can be seen, EQT Corporation changes the subsidiary organization frequently, but its method of operating has remained essentially the same.  It has a corporate or limited liability company to perform most every function, yet controls its operations through its own officers and board of directors.  In other words, its subsidiaries are merely departments or divisions of EQT Corporation, all of which report to it.

Defendants offered Jimmy Sue Smith as a F.R.C.P. 30(b)(6) witness to testify about the intercompany (subsidiary) arrangements between EQT Corporation and its subsidiaries and among all subsidiaries and EQT Corporation.  (**Exh. 2,** Deposition of Smith.)  Ms. Smith testified that she was Vice President and Controller of Midstream and Commercial companies.

---

"(10) Whether the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest; and

"(11) Whether the formal legal requirements of the subsidiary are not observed.  [Citation omitted.]"

[15] The factors relevant to establishing an alter-ego relationship will be discussed more fully *infra*.

*Id.* at 11.   She is also responsible for Midstream Partners which is a publicly traded entity.   She is also responsible for EQT Corporate Accounting which then would include all of EQT.   *Id.* at 12.  All of EQT Corporation's and subsidiary's financial statements are consolidated as was the tax returns.  *Id.* 13-14.  The offices for all of Corporate and subsidiaries are located in one office complex in Pittsburgh, except for EQT Investments and a few other small subsidiaries.  *Id.* at 14.  "Each business has at least one floor" in this building.  *Id.* at 14.   Ms. Smith attended the subsidiary audit committee meetings and board of directors meetings of EQM (Midstream) and EQT.  *Id.* at 15.  See also  *Id.* pp. 151-153; See Exhibit 5, Smith deposition.

EQT Investment (EQTI) finances the intercompany loans.  *Id.* at 19.  "We paper the loans for like large amounts of money."  *Id.* at 19.  If a subsidiary needed operating cash, EQTI would provide them money.  These loans would be "eliminated when you get to the consolidated level."  *Id.* at 19-22.   Mr. Bergonzi was another F.R.C.P. 30(b)(6) witness.   When asked how EQT Corporation gets its money, he testified that:

> A.   Well, the subsidiaries pay – can pay dividends to the corporation.  The corporation is actually the entity that borrows money from the public, so if there is a bond issue, that money comes into EQT Corporation and is passed down through inter-company loans.  So it is just like any other set of companies accounted for.  Separately, there's receivables and payables.  There's interest bearing loans.  There's dividends paid.  There's payment for expenses and fees.

(**Exh. 3**, Deposition of Bergonzi, pp. 121-122.)

EQT subsidiary officers were common to all of the subsidiaries.  They reported to EQT Corporation's officers.  For example, EQT Gathering's president was Randy Crawford.  Randy Crawford, above, was also senior vice president of EQT Corporation.  (**Exh. 2,** Smith Deposition, pp. 68, 69, 92, 94-95.)  Mr. Crawford was also president of EQT Energy and he reported directly to Dave Porges, who was president and CEO of EQT Corporation.  *Id.* 66.

Nicole King was secretary of essentially all of the subsidiaries.  (**Exh. 22**, Deposition of King, p. 6.)  Even the publicly traded EQM Partners was controlled by EQT Corporation.  Its employees ran the partnership and four of the seven directors were EQT Corporation employees or officers.  (**Exh**. 2, Smith Deposition, pp. 155-156.)  EQT operates also through business segments or "groups" which cross corporate and subsidiary boundaries.  *Id.* 159-160.  (See also, **Exh. 3**, Bergonzi Deposition, pp. 182-183.

The above factors in the Maynard case fit this case.  EQT Corporation owns all of the stock of all the subsidiaries.  They have more than merely common directors and officers.  The officers of the subsidiaries actually report to the CEO and President of EQT Corporation.  The subsidiary defendants are financed by loans from EQT Corporation and the taxes and financial statements are consolidated.  EQT Corporation caused the incorporation of the subsidiaries and the subsidiaries even depend on EQT Corporation for approval of even their budgets and business plans.  They are required to meet with other subsidiaries and bargain for what they can get the next year and what they can expend and then, every budget and business plan must be approved by EQT Corporation.  EQT Corporation obviously borrows money and passes it down as loans and there are inter-subsidiary loans and it is therefore liable ultimately for the subsidiaries' losses and pays the parent its dividends.  Essentially, all of defendants' business is with EQT Corporation or sister companies. EQT Corporation refers to its subsidiaries as "groups" and business segments.  They are in the same building as the parent.  A review of EQT Corporation's SEC 10K demonstrates that it refers to all subsidiary business as its own, and subsidiary officers do not and cannot act independently of the parent and they actually report to the Corporate officer.

Therefore, plaintiffs have alleged and provided more than sufficient evidence that EQT Corporation is the alter ego of the subsidiary defendants and that EQT Corporation is liable for all acts of subsidiaries.

**Defendants are Engaged in a Joint Venture**

As to a claim of joint venture, "[a] joint venture or, as it is sometimes referred to, a joint adventure, is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.  It arises out of a contractual relationship between the parties.  The contract may be oral or written, express or implied."  Syl. Pt. 2, *Price v. Halstead*, 177 W.Va. 592, 355 S.E.2d 380 (1987). *Accord* Syl. Pt. 4, *Sipple v. Starr*, 205 W.Va. 717, 520 S.E.2d 884 (1999).  Applying principles of general agency law, the tort liability of one participant of a joint venture is imputed to all participants.  *See id.*; 46 Am. Jur.2d, *Joint Ventures*, §§ 57 & 58.  *See also Alban Tractor Co. v. Sheffield*, 220 Va. 861, 863, 263 S.E.2d 67, 68 (1980) (discussing joint enterprise).

A joint venture existed here if the Court finds that the defendants are independent of EQT Corporation or are not alter egos.  They cannot be as involved as the facts demonstrate and either be acting as departments of EQT Corporation or as venturers.  They all receive part of the compensation from the budget of the cost of service.  They take direction from EQT Corporation and Corporation approves their own budgets and even must approve the cost of service rate for deductions.

**AGENCY**

The subsidiary defendants were agents of Corporation.  The term "agency," in its legal sense, always imports commercial or contractual dealings between two parties by and through the medium of another. In an agency relationship, ... the one who acts for and represents the

principal, and acquires his authority from him, is known and referred to as an "agent."'" *State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.*, 203 W.Va. 690, 714, 510 S.E.2d 764, 788 (1998) (quoting 3 Am.Jur.2d *Agency* § 1, at 509-10 (1986) (footnotes omitted))); *Harper v. Jackson Hewitt, Inc.*, 277 W.Va. 142, 154, 706 S.E.2d 63, 75 (2010) (same).   Under general principles of agency law, a principal is liable for the acts, conduct and omissions of its agent committed within the scope of his agency.   Syl. Pt. 3*, Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981).   *Accord* Syl. Pt. 3, *Barath v. Performance Trucking Co., Inc.*, 188 W.Va. 367, 424 S.E.2d 602 (1992).

**Defendants Breach Their Contract with Plaintiffs**

"A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages."   *Sneberger v. Morrison*, 235 W.Va. 654, 669, 776 S.E.2d 156, 171 (2015).

Defendants clearly owed a duty to plaintiffs to pay plaintiffs according to the law of West Virginia, given their leases.   *Tawney* holds that the leases are subject to an implied covenant to transport and market the gas to the market and bear the costs.   We know they didn't comply with all of *Tawney*'s requirements, they took deductions by "estimates without true ups and they took deductions where the leases did not describe a method for calculating deductions, they did not pay the full index price and they provided a false statement of sale price and they failed to pay for liquids and they failed to pay for NGL's.   These were all breaches of contract and was all clearly intentional because they intentionally set up a sister subsidiary to "purchase" the gas "at the wellhead" and then falsely claimed it was an actual arms-length sale.   They breached the contract.

**Defendants are Liable for Civil, Actual and Constructive Fraud**

As to a claim of fraud,

"The essential elements in an action for fraud are:
`(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.' *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737 (1927)."  Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981).

Syl. Pt. 5, *Kidd v. Mull*, 215 W.Va. 151, 595 S.E.2d 308 (2004).

The West Virginia Supreme Court of Appeals has also held:

"'an action for fraud can arise by the concealment of truth.'"  *Teter [v. Old Colony Co.*, 190 W.Va. 711, 717, 441 S.E.2d 728, 734 (1994)] (quoting *Thacker v. Tyree*, 171 W.Va. 110, 113, 297 S.E.2d 885, 888 (1982)).  Such a basis for a claim of fraud is possible because "[f]raud is the concealment of the truth, just as much as it is the utterance of a falsehood."  *Frazier v. Brewer*, 52 W.Va. 306, 310, 43 S.E. 110, 111 (1902). . . .

*Kessel v. Leavitt*, 204 W.Va. 95, 127, 511 S.E.2d 720, 752 (1998).

"Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose,[16] coupled with an intention to mislead or defraud."

*Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W.Va. 578, 584, 567 S.E.2d 294, 300 (2002)

(citing *Silva v. Stevens*, 156 Vt. 94, 589 A.2d 852, 857 (1991)).

Generally speaking, "[f]raud has been defined as including all acts, omissions, and concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconscientious advantage is taken of another."  *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76, 285 S.E.2d 679, 682 (1981) (citations omitted).  *Accord Dickel v. Smith*, 38 W.Va. 635, 641, 18 S.E. 721, 723 (1893).

*Kessel v. Leavitt*, 204 W.Va. at 127, 511 S.E.2d at 752.

---

[16] Several circumstances or relationships may create a duty to disclose, including, but not necessarily limited to, when a defendant is in a fiduciary relationship with the plaintiff; when the defendant had exclusive knowledge of material facts not known to the plaintiff; when the defendant actively conceals a material fact from the plaintiff; and when the defendant makes partial representations but also suppresses some material facts.  *See, e.g.,* 37 Am. Jur.2d §§ 200, 204 & 205; Restatement (Second), Torts § 551; 26 Willston on Contracts § 69:17 (4th ed.); *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1324 (10th Cir. 1998) (discussing cases);  *Pospisil v. Pospisil*, 757 A.2d 655 (Conn. 2000); *Wilkins v. National Broadcasting Co., Inc.*, 84 Cal. Rptr.2d 329 (2d Dist. 1999).

However, as to the scope and breadth of fraudulent acts and omissions, the West Virginia Supreme Court of Appeals has held that fraud, in its general sense, is deemed to comprise anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another.  *Wallace v. Wallace*, 170 W.Va. 146, 147-48, 291 S.E.2d 386, 387-88 (1982).  *See also Hale v. Hale*, 62 W.Va. 609, 59 S.E. 1056, 1061 (1907.)  And West Virginia has long held that fraud may be proven by circumstantial evidence as well as direct evidence.  Indeed, the Court has noted that circumstantial evidence may be the only evidence of fraud.  *Ridenour v. Roach*, 77 W.Va. 551, 87 S.E. 881, 883 (1916)

Fraud by concealment is easily proven in this case.  Plaintiffs were provided statements which were false, with a false price, volume and deductions.  Defendants intentionally entered into a scheme with its subsidiaries and "groups" of employees, including its own, to overcharge plaintiffs deductions in order to pay less royalty and to keep some of plaintiffs' royalty.  The royalty was also shorted.  This was concealed from plaintiffs.

**Overall Principles Governing Rule 23 Class-Certification Analysis**

"A party seeking class certification must satisfy the requirements found in Federal Rule of Civil Procedure 23(a) and also demonstrate satisfaction of at least one of the subdivisions found in Rule 23(b)."  *Good v. American Water Works Co., Inc.*, 310 F.R.D. 274, 283 (S.D.W.Va. 2015) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir.2006)).  *Accord Monroe v. City of Charlotesville*, 579 F.3d 380, 384 (4th Cir. 2009); Rubenstein, 3 Newberg on Class Actions § 7:18 (5th ed.).

27

Provisions of Rule 23 (a) and (b) are set out below.  This litigation qualifies for class action approval.

RULE 23(a)

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

RULE 23(b)(3)

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
....

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

RULE 23(c)(4)

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses
....

(4) Particular Issues. When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

Fed. R. Civ. P. 23(a), (b)(3), (c)(4).  *See generally Thorn v. Jefferson-Pilot Life Ins. Co.*, 445

F.3d 311 (4th Cir. 2006); *Good*, 310 F.R.D. at 283.

> In addition to satisfying the foregoing standards under Rule 23, the class must be
> ascertainable. Our court of appeals observed long ago that "[i]n order to
> determine whether a class action is proper, the district court must determine
> whether a class exists and if so what it includes. Although not specifically
> mentioned in the rule, the definition of the class is an essential prerequisite to
> maintaining a class action." *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th
> Cir.1976). That settled principle of case law, in a nutshell, defines the concept of
> ascertainability. In 2003, the long-implicit concept of ascertainability was added
> to Rule 23(c)(1)(B), providing that "[a]n order that certifies a class action must
> define the class ...." Fed. R. Civ. P. 23(c)(1)(B).

*Good*, 310 F.R.D. at 284.  *See, e.g., Kingery v. Quicken Loans, Inc.,* 300 F.R.D. 258, 264

(S.D.W.Va. 2014) ("The class definition must be 'sufficiently definite so that it is

administratively feasible for the court to determine whether a particular individual is a member.'

Charles Alan Wright & Arthur R. Miller, 7A *Federal Practice & Procedure* § 1760 (3d ed.

2009)."); *Solo v. Bausch & Lomb, Inc.,* 2009 WL 4287706, * 4 (D.S.C. 2009); *Kirkman v. North*

*Carolina R. Co.,* 220 F.R.D. 49, 53 (M.D.N.C. 2004).  *See also, EQT Production Co. v. Addair,*

2014 WL 4070457, *7 (4th Cir. 2014).

When conducting a Rule 23 analysis, it is important to recognize that although the United

States Supreme Court holds that the Court is not to decide the merits of the case:

> cautioned that a court's class-certification analysis must be "rigorous" and may
> "entail some overlap with the merits of the plaintiff's underlying claim," *Wal–*
> *Mart Stores, Inc. v. Dukes,* 564 U.S. ——, ——, 131 S.Ct. 2541, 2551, 180
> L.Ed.2d 374 (2011) (internal quotation marks omitted), Rule 23 grants courts no
> license to engage in free-ranging merits inquiries at the certification stage. *Merits*
> *questions may be considered to the extent—but only to the extent—that they are*
> *relevant to determining whether the Rule 23 prerequisites for class certification*
> *are satisfied.* See *id.,* at ——, n. 6, 131 S.Ct., at 2552, n. 6 (a district court has no
> "'authority to conduct a preliminary inquiry into the merits of a suit'" at class
> certification unless it is necessary "to determine the propriety of certification"
> (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40
> L.Ed.2d 732 (1974))); Advisory Committee's 2003 Note on subd. (c)(1) of Fed.

Rule Civ. Proc. 23, 28 U.S.C.App., p. 144 ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.").

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, ___ U.S. ____, 133 S.Ct. 1184, 1194-95, 185 L.Ed.2d 308 (2013) (emphasis added).  Accordingly, "'[t]he likelihood of the plaintiffs' success on the merits ... is not relevant to the issue of whether certification is proper.'" *Good*, 310 F.R.D. at 284 (quoting *Thorn*, 445 F.3d at 319).  *See also Comcast Corp. v. Behrend*, ___ U.S. ____, 133 S.Ct.  1426, 1432-33, 185 L.Ed.2d 515 (2013) (noting that the rigorous analysis required by Rule 23 may "'overlap with the merits of the plaintiff's underlying claim'" because "'"the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."'" (quoting *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. at 2551 (internal citations omitted))); *Good*, 310 F.R.D. at 284-85.

"Throughout the inquiry, it is important to bear in mind that Rule 23 should receive 'a liberal, rather than a restrictive, construction ... [with] a standard of flexibility that will "best serve the ends of justice for the affected parties and ... promote judicial efficiency."'  *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 424 (4th Cir.2003)."  *Good*, 310 F.R.D. at 285.  *Accord Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. 156, 159 (S.D.W.Va. 1996) ("The recent trend in class certification decisions is to interpret Rule 23 flexibly and give it a liberal construction." (citations omitted)).

## A.     The Class is Ascertainable

West Virginia has established an objective criteria and a standard for lessees to follow before they are allowed to take credits off of plaintiffs' royalty.  Plaintiffs' evidence is that defendants violated the requirements of *Tawney* and that the violations were across the entire class.

The plaintiffs class includes defendants' lessors over a specific period of time beginning on December 8, 2008, which is the ending date for a previous class action settlement. The plaintiffs are lessors of EQT. The defendants' databases, called Enertia, contains the name, address, lease and well number and ownership interest in the lease of each lessor, the history of each lease and the volume of production of natural gas from each well on each lease during each month of production, the price per dekatherm applied to each lessor's production, the amount deducted from the royalty and the amount paid to each lessor which is the gross royalty minus all deductions. In addition, the system allegedly contains defendants' lease codes which identify defendants own identification as to the type of lease and a list of leases and lease files which contain the leases. Both plaintiffs and defendants have prepared category lists which demonstrate that there exists thousands of same or similar leases which the Court can dispose of by deciding the lease issues from one. See *supra*.

Royalty owners are treated uniformly and their right to damages can be calculated across the class. (**Exh**. 23, Reineke Affidavit; see also **Exh**. 3, Bergonzi Desposition, pp. 194-211.) Mr. Reineke testified in his deposition as to the manner in which he or others could accurately determine damages based upon utilization of EQT's databases and type of lease that was applicable to the plaintiffs and the class. (**Exh**. 24, Reineke Deposition, pp. 143-147.) This includes shortage on volume. *Id*. 148-150; 153-155. It can be calculated for the price differential, as well. *Id*. 155 and for natural gas liquids (NGL's.) *Id*. 161-164; (also **Exh**. 23, Reineke Affidavit, p. 17.)

As the Court in *Adair v. Equitable Production*, 764 F3d 347, 358 (4th Cir. 2014) stated, the plaintiffs need not be able to identify every class member at the time of certification. But

"[i]f class members are impossible to identify without extensive and individualized fact-finding mini-trials, then a class action is inappropriate."  That is not the case here.

The class members are identified by defendants' own records which defendants have a duty to keep and maintain.  It is part of the business practices of the oil and gas industry that oil and gas leases are generally assignable and many are decades old and have been assigned more than once and it is true that the owners may pass away and leave heirs their gas interests.  However, the lessee is taking gas from the lessor's property interest and has a duty to pay the lessor the rental or royalty required by the lease.

It is not necessary for the Court and defendants to undertake the initial analysis of thousands of the same leases.  That is what discovery is for.  Plaintiffs, as set forth *supra*, and to the best of their ability, identified the lease language, whether there is language in each lease which allows deductions or provides a method for calculating deductions or states that the lessor will be responsible for any post-production costs.  Plaintiffs have determined the number and identity of the flat rate leases.

It is obvious that it is more efficient and a superior method of litigating this case by class action than having thousands of separate parties litigate the same lease.  *Tawney* and *W.Va. Code*, § 22-6-8 resolves this issue with respect to most all of the liability issues in this case.  *Tawney* and Wellman explained above, resolved the issue of what deductions or costs a lessor may credit itself from the lessor's stated royalty and it places the burden on lessees to prove that the deductions are actual and reasonable.  Defendants ignore the language in *Tawney* and *Wellman* that states that they "must prove" they incurred it and it was reasonable.

### B.   <u>Numerosity</u>

The requirement of numerosity[17] is liberally interpreted and applied in the Fourth Circuit.

> In *Brady v. Thurston Motor Lines,* 726 F.2d 136, 145 (4th Cir.), *cert. denied,* 469 U.S. 827, 105 S.Ct. 110, 83 L.Ed.2d 53 (1984), the court noted the *Rule* 23(a)(1) requirement that the class be " 'so numerous that joinder of all members is impracticable.' " *Id.* (quoted authority omitted). The court further stated " 'No specified number is needed to maintain a class action.' " *Id.* (quoted authority omitted). In analyzing sheer numbers, the same court elaborated further:

*Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. at 160.

In the instant case, Defendants admit that "[t]here are more than 8,000 leases which could fall within the putative class" and "more than 10,000 putative class members."[18]   Accordingly, the numerosity requirement is easily met.

### C.   <u>Commonality</u>

Importantly, plaintiffs have the same causes of action.  There will be differences between large groups, but the issues have nothing to do with liability.   Under Federal Rule of Civil Procedure Rule 23 (a)(2), the proposed class must share a common question of law or fact. Plaintiffs have identified some of the common questions of law and fact, *infra*. "For purposes of Rule 23(a)(2) [e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Duke,* ___ U.S. ___, 131 S.Ct. 2541, 2556, 180 L.Ed. 2d 374 (2011).   "Though the *Dukes* Court found commonality lacking, the requirement is easily met in most cases." Rubenstein, 3 Newberg on Class Actions § 3:20 (5th ed.). "This factor is stated in the disjunctive," meaning that either common questions or law or fact can establish sufficient commonality. *Black v. Rhone-Poulenc, Inc.,* 173 F.R.D. 156, 161 (S.D. W.Va. 1996).   The class representative cannot satisfy

---

[17] This issue is generally obvious, easily met, ordinarily receives only summary treatment, and is often uncontested. *See* Rubenstein, 3 Newberg on Class Actions § 3:12 (5th ed.).
[18] EQT Production's answers and responses to plaintiffs' interrogatories and requests for production of documents, Doc. Id. 166, pp. 2-3.

commonality by simply asserting that the class has suffered a violation of the same law, but must show that the class members have suffered the same injury. *Wal-Mart,* at 2551.

Plaintiffs and the putative class have each suffered the same type damages which will be resolved by the common questions of law and fact in this case.  Defendants' relevant acts and omissions were common across the entire class.[19]  First, the defendants established set postage stamp rates for deductions from all lessors from which it took deductions in each of its 3 West Virginia districts, Brenton, Weston and Madison.  The common issues therefore, for all class members, include all those set forth in "Commonality" class.

As a result of the same conduct by defendants, the plaintiffs suffered the same type of damages as was suffered by putative class members which was that defendants deducted from their royalty payments unreasonable post-production deductions which were not actual, but estimates without incorporating into the lease any method for calculating the same.  Some of the common issues, therefore, include, but are not limited to, the following:

(1)    Is EQT the alter ego of the other subsidiaries and, therefore, liable as a result, is it liable as a result of its own misconduct or by virtue of a fraudulent scheme or joint venture?

---

[19] *See, e.g., Naylor Farms v. Anadarko OGC Co.*, No. CIV-08-668-R, 2009 WL 8572026, at * 5 (W.D.Okla. Aug. 26, 2009) (Russell, J.) ("Additionally, there are fifteen 'categories' of lease royalty provisions at issue. As a result, Defendant contends commonality is lacking. However, Mike Butcher, designated corporate representative for Defendant Questar, testified in deposition that all royalty owners are treated in the same manner with regard to the calculation of royalty payments. . . . The Court concludes that in light of Mr. Butcher's testimony, that the differing language of the leases is not an impediment to certification of the class on the basis of commonality."); *Davis v. Devon Energy Corp.*, 147 N.M. 157, 163, 218 P.3d 75, 81 (2009) ("Given Defendants' standardized treatment of all class members in deducting certain costs, we agree with the district court that it would be in a position to declare the rights of the parties on a class-wide basis with respect to the propriety of those deductions. For those agreements in which the marketable condition rule may be implied, a matter we address later in this opinion, the court would be in a position to adjudicate on a class-wide basis whether the costs uniformly deducted by Defendants were necessary to put the CBM gas in a marketable condition.").  *See also Arkansas Louisiana Gas Co. v. Morris*, 294 Ark. 496, 499, 744 S.W.2d 709, 710 (Ark. 1988) ("We are able to determine from the record a common question of fact that all "fixed price" lessors in the Cecil Field have been treated identically by the defendant lessees for a number of years. The parties have for some reason ignored the royalty amount fixed in the original leases and have paid and accepted royalties of different amounts. It is apparent that the common question of law in this case is whether the defendants' course of conduct gives rise to a cause of action in favor of the "fixed price" lessors in the Cecil Field.").

     (2)      Did defendants breach their contractual duties, implied or otherwise, to plaintiffs and the class?

     (3)      Are the deductions reasonable under the terms of *Tawney*?

     (4)      Are the deductions actuals costs?

     (5)      Did the defendants provide a "method for calculating" the costs to be deducted?"

     (6)      Are defendants entitled to any of the deductions based upon their non-compliance with *Tawney*?

     (7)      Are plaintiffs and the class entitled to payment from the volume at the wellhead?

     (8)      Did the defendants fraudulently charge plaintiffs for the deductions?

     (9)      Did the defendants intentionally and maliciously over-charge plaintiffs for deductions?

     (10)    Are plaintiffs entitled to be paid for liquids?

     (11)    Are plaintiffs entitled to punitive damages?

**D.**    **Typicality**

Pursuant to Rule 23(a)(3), a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality overlaps with commonality because they both measure the degree of interrelatedness between the claims in a class action. Rubenstein, 3 Newberg on Class Actions § 3:31 (5th ed.).  As set forth in *Wal-Mart*:  "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims and class claims are so interrelated that the class member will be fairly and adequately protected in their absence."  *Wal-Mart*, ___ U.S. ___, 131 S.Ct. 2541, 2551, n. 5, 180 L.E.2d 374 (2011) (quotations omitted).

"Factual differences will not render a claim atypical if the claim arises from the same… practice or course of conduct that gives rise to the claims of the class members and is based on

the same legal theory." Rubenstein, 3 Newberg on Class Actions § 3:34 (5ᵗʰ ed.).  Courts have conclusively held and routinely found that variations in the amount of relief sought will not render the proposed class representative's claims atypical." Rubenstein, 3 Newberg on Class Actions §§ 3:42 and 3:43 (5ᵗʰ ed.).  *See Deiter v. Microsoft Corp*., 436 F.3d 461, 466 (4th Cir. 2006) (factual variations defeat typicality only when "the variation strikes at the heat of the respective causes of action.").

Plaintiffs' claims are that defendants wrongfully withheld money from their royalty payments and did not pay them for the volume of gas produced at the wellhead, nor paid them for liquids.  In order to litigate plaintiffs' claims, it is necessary for them to prove that (1) defendants' methodology for determining deductions are not "actual" and not "reasonable;" and (2) defendants, nevertheless, took deductions when they were not permitted under the terms of *Tawney* and owed them but didn't pay for liquids.  All of the issues set forth above as the common issues must be litigated by plaintiffs to resolve their claims which obviously must be litigated to recover for each of the approximately 25,000 lessors.

While there are some variations in lease language, defendants have maintained lease files for all of its lessors and a list of leases categorized within its Enerita electronic database.  None of the leases however, provide a methodology for calculating deductions.  Therefore, resolution of this issue will resolve the "questions class-wide" as to whether the lessee could take the deductions it took.  And plaintiffs' proposed subclasses separate the leases into those where there exists specific deductions and those which do not, among the relevant leases are groups of leases with the same or very similar characteristics which , if necessary, can be evaluated as a group or subclass, including flat rate leases and amended leases.

36

A question plaintiffs must answer is how can the Court fairly manage this proposed class where there does exist some variations in lease language.  The Fourth Circuit dealt with these issues in *EQT Prod. Co. v. Adair*, 764 F.3d at 366-71, and found that the district court should have given more "consideration to Rule 23 factors that affect only certain classes," for example, how variations in the defendants' royalty obligations implicate the commonality and predominance inquiries in certain leases where the defendants' obligations may vary as to the payment of royalty and post-production deductions.

Defendants have not made plaintiffs' or the Court's task easier in this regard, however.  Defendants have lists of leases and their characteristics documented in lists and within its databases, but as stated above, refuses to produce same or provide how it determines whether and how it is entitled to deductions from each lease.  Nevertheless, plaintiffs have obtained the defendants' lease files which reveal, that while there are a number of variations in lease language, they can easily be broken out into subclasses and/or groups since most producers use similar forms for different periods.  The combination of specificity by the West Virginia Supreme Court in *Tawney* sets a standard for lessees to meet in order for lessees to deduct any amount from plaintiffs' royalty.  Defendants' own databases which contain the entire revenue and payment history for each lessor therefore demonstrate that the predominance and superiority requirements are easily met.  The Court should therefore consider the following:

1.     Some plaintiffs' claims are based upon the fact that the deductions taken are an "estimate" and not "actual," and/or that the deductions are "unreasonable" and/or that the "method" provided for calculating same is not provided for in any lease, the claim crosses all leases where deductions are taken.  As demonstrated above, plaintiffs, by the tables and documents provided, that can be proven.

2.     Plaintiffs' claims based upon the fact that the lease does not provide any specific deductions is easily addressed, as well.  These leases account for a significant portion of the leases.

3.     Unlike in the *Adair* case, defendants agree they are supposed to pay its lessors uniformly at the "point of sale," which is at the natural gas interstate pipeline, at published rates which are not contested in this case.  However, they don't, as described by Mr. Reineke.

4.     Defendants take deductions from flat rate leases converted by *W. Va. Code*, § 22-6-8.  Defendants take the position that, regardless of *Tawney*, the defendants can deduct post production expenses from a lessors' royalty.  The Court's resolution of that legal question will resolve the question of all of these leases.

5.     Defendants have the right and obligation as lessees of a number of other leases which, list one or more items of deductions of post-production expenses, but defendants still charge plaintiffs the same rate regardless.  Further out of the 9,000 leases, there are groups which do not satisfy *Tawney* in other ways.  For example, there are leases which claim that lessee is allowed to deduct "reasonable and actual post-production expenses" copying a portion of Tawney, but not following *Tawney's* requirement to specify, etc.  This presents the Court with a legal question to resolve.

6.     Plaintiffs have and can determine the amount of liquids owed by defendants to each lease and/or lessor.

7.     Finally, unlike in *Adair*, the *Tawney* decision has already addressed rules for lessees in West Virginia in order to take deductions.  It is settled law and provides an objective standard for lessees to follow which either permits or precludes deductions.

E.     **Adequacy**

Rule 23(a)(4) permits a class action to be maintained only if "the parties will fairly and adequately represent the interests of the class."  Fed. R. Civ. P 23(a)(4).

> Although the term "party" is usually used to refer to the litigants themselves, in interpreting Rule 24(a), courts have used it as a mandate for scrutinizing both the litigants proposed to serves as class representatives and the lawyers proposed to serve as class counsel.  Thus, the standard for adequacy splits into two prongs: adequacy of the proposed representative and adequacy of the attorney seeking appointment as counsel.

Rubenstein, 3 Newberg on Class Actions § 3:54 (5th ed.).  *See Stay the Course West Virginia v. Tennant,* 2013 WL 209489, 3 (S.D. W.Va. 2013) (referring to the "two basic guidelines" of adequate representation as being "1) the absence of conflict between the representative and members of the class and 2) the assurance that the representative will vigorously prosecute the matter on behalf of the class.").  Further, when the class representative's claims are for the same

38

type of relief as those of the class, there is no obstacle to them being an adequate representative. Rubenstein, 3 Newberg on Class Actions § 3:59 (5th ed.). The size of plaintiff's individual claim as compared to other class members is immaterial to adequacy. *Id*.

With regard to the adequacy of class counsel, Rule 23(a)(4) asks whether counsel are "qualified, experienced, and generally able to conduct the litigation" and whether counsel will "vigorously prosecute the interests of the class." Rubenstein, 3 Newberg on Class Actions § 3:72 (5th ed.). *See also, In re Serezone Prods. Liab. Litig.,* 231 F.R.D. 221, 239 (S.D. W.Va. 2005). "These standards are easily met, with members of the bar in good standing typically deemed qualified and competent to represent a class absent evidence to the contrary." Id. Counsel's finding of adequacy in other class action is persuasive evidence that counsel will be adequate in the present action. Id.

Plaintiffs are lessors of defendants and have no conflict with the class. All share interest common to the class. They willingly have stepped forward to pursue their claims on a classified basis and obtained counsel who are experienced in pursuing similar claims and have demonstrated their resolve in pursuing this case. Plaintiffs' counsel have both had extensive experience in litigating complex cases, including class actions with respect to royalty claims like the subject action. Both were class counsel in *Tawney v. CNR* and other similar cases. (See **Exh**. 26 and 27, Affidavits of Marvin W. Masters and Michael Carey.

**F.     This action satisfies F.R.C.P. 23(b)(3)**

Subdivision (b)(3) permits a class action in circumstances where the prerequisites of Rule 23(a) are met, and two additional criteria are satisfied: (1) that questions of law or fact common to members of the class *predominate* over any questions affecting only individual members and (2) that a class action is *superior* to other available methods for the fair and efficient adjudication

of the controversy. Fed. R. Civ. P. 23(b)(3). There are numerous leases in each of the different groups of leases, 4000 in one, 2000 in another, etc. Therefore, a class action is ___ the superior method of resolving these claims by reference to *Wellman* and *Tawney*. Therefore, partial summary judgments should resolve thousands of these claims. Pursuant to the Rule 23(b)(3), a class may be certified if:

> the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3) (emphasis added).

The common questions which arise in this litigation predominate over individual questions and F.R.C.P. 23(b)(3) class action is superior to any other means of adjudicating the plaintiffs' and the class claims.[20]

[20]In addition to federal and state courts that have certified class actions in this State, numerous courts in other jurisdictions have certified class actions involving claims arising from natural gas leases, the royalties paid under such leases, and/or the deductions taken from such royalty payments, among other related issues. *See, e.g., Seeco, Inc. v. Hales*, 330 Ark. 402, 954 S.W.2d 234 (1997) (involving claims of fraud and constructive fraud, breach of oil and gas leases, breach of duty to market gas reasonably, breach of duty of good faith and fair dealing, violation of statutes governing penalties for fraudulently withholding oil and gas lease payments, unjust enrichment, tortious interference with contractual relations, civil conspiracy, and violation of statute governing calculation of royalties); *Bice v. Petro-Hunt, L.L.C.*, 681 N.W.2d 74 (N.D. 2004) (claims for underpayment of royalties under leases, breach of implied covenant to market hydrocarbons, conversion, unjust enrichment, an accounting, breach of implied covenant of good faith and fair dealing, and declaratory relief); *Freebird, Inc. v. Merit Energy Co.*, Civil Action No. 10-1154-KHV-JPO, 2011 WL 13638 (D.Kan. Jan. 4, 2011) (Vratil, J.) (claims for breach of leases concerning underpayment of royalties, unjust enrichment, and an accounting); *Schell v. Oxy USA, Inc.*, No. 07-1258-JTM, 2009 WL 2355792 (D.Kan. July 29, 2009) (Marten, J.) (claims arising from alleged breach of free gas clause in oil and gas leases and the implied duty to make gas useable for house gas use); *Anderson v. Merit Energy Co.*, Civil Action Nos. 07-cv-00916-LTB, 07-cv-01025-LTB-BNB, 2008 WL 2484187 (D.Colo. June 19, 2008) (Babcock, J.) (claims of breach of leases, the underpayment of royalties, and the implied duty of marketability); *Davis v. Devon Energy Corp.*, 147 N.M. 157, 218 P.3d 75 (2009) (court affirming class certification for declaratory and injunctive relief and reversing denial of class certification for monetary damages in case where royalty owners alleged gas producers had improperly deducted from royalty payments the costs of making coalbed methane gas marketable); *Arkansas Louisiana Gas Co. v. Morris*, 294 Ark. 496, 744 S.W.2d 709 (Ark. 1988) (claims to be paid royalties on new wells drilled based upon the "proceeds" from the sale of gas from the new wells, under 8 to 10 theories of recovery, including estoppel, waiver, and reformation).

### G.  <u>Predominance</u>

A Rule 23(b)(3) class action is permitted where the class "is sufficiently cohesive to warrant adjudication by representation." *Lienhart v. Dryvit Sys., Inc.,* 255 F.3d 138 (4th Cir.2001) (quotations omitted). Where significant common questions can be resolved for class members in one action, it is efficient to deal with class claims on a representative rather than an individual basis. *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1778 (3d ed. 2009). "The predominance inquiry focuses on whether liability issues are subject to class-wide proof or require individualized and fact-intensive determinations. Deciding whether common questions predominate over individual ones involves a qualitative, rather than quantitative, inquiry." *Singleton v. Domino's Pizza, LLC,* No. 11–cv–1823, 2013 WL 5506027, at *6 (D.Md. Oct. 2, 2013) (citations omitted).

> A principle often forgotten is that the balancing test of common and individual issues is qualitative, not quantitative. *Gunnells,* 348 F.3d at 429. Common liability issues may still predominate even when individualized inquiry is required in other areas. *Id.* At bottom, the inquiry requires a district court to balance common questions among class members with any dissimilarities between class members. *See Gunnells,* 348 F.3d at 427–30.

> While courts have denied certification when individual damage issues are especially complex or burdensome, *see, e.g., Pastor v. State Farm Mut. Auto. Ins. Co.,* 487 F.3d 1042, 1047 (7th Cir.2007), where the qualitatively overarching issue by far is the liability issue of the defendant's [actions], and the purported class members were exposed to the same risk of harm every time, such as where a defendant violates a statute in the identical manner on every occasion, individual damages issues are insufficient to defeat class certification under Rule 23(b)(3). *See Murray v. GMAC Mortg. Corp.,* 434 F.3d 948, 953 (7th Cir.2006); *Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d 32, 40 (1st Cir.2003). The same principle would apply here to the alleged liability [issues].

*Good,* 310 F.R.D. at 296-97.

Common issues will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus

rendering unnecessary an evidentiary hearing on each claim." Newberg on Class Actions § 4:50 (5th ed.).   In addition, common issues predominate when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced. Id.

Courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations and a recent dissenting decision of four Supreme Court Justices characterized the point as "well nigh universal." Newberg on Class Actions § 4:54 (5th ed.), *citing Comcast v. Behrend,* 133 S.Ct. 1426, 1437, 185 L.Ed.2d 515 (2013). *See also, Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 428, 31 Employee Benefits Cas.*, 57 Fed. R. Serv. 3d 132 (4th Cir. 2003)

The facts demonstrate that defendants' methodology for determining what costs are to be deducted from plaintiffs' royalty payment is uniform.   Costs are gathered from defendants' subsidiaries and from corporate by one group headed by Mr. Piccirilli, who aggregates all of it and then "estimates" what it should be next year, never accounting for the actual cost and including matters which are not reasonable to charge its lessors under any circumstances.   If defendants' method of calculating its deductions did not comply with *Wellman* and *Tawney*, then none of its deductions should have been taken from the plaintiffs or the class and they are entitled to recover all of said deductions.

Secondly, regardless of whether the leases provided for specific deductions, defendants took deductions from them.   *Tawney* made clear that leases must specifically state what deductions, if any, are to be taken in order for a lessee to deduct same.   For the subclass of those leases which do not provide for specific deductions, resolution of plaintiffs' claims will resolve the liability of all such leases.

### H.   <u>Superiority</u>

For a class to be certified under Rule 23(b)(3), a court must also find that "a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Rule 23(b)(3) requires the proposed class action to be superior to other methods of adjudication so that the class action will "achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quotations omitted).

A primary purpose of class actions lawsuits, particularly money damages claims aggregated under 23(b)(3), is to enable the litigation of small claims like most of these claims, that could not be pursued individually. Newberg on Class Actions § 4:65 (5th ed.). *Accord Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.E. 2d 689 (1997), (such cases are the "core" of the class action mechanism.)

The efficiencies that a class action may achieve are greater when the class is large. Id. The need to avoid duplicative litigation can be significant even when the class is relatively small in number, but it is when there are many potential claimants that class actions bring the greatest efficiencies. *Id.* A class action may enhance judicial efficiency and legitimacy by preventing inconsistent results. *Id.*

The question that courts consider when they analyze manageability is not whether a class action is manageable in the abstract but how the problems that might occur in managing a class suit compare to the problems that would occur in managing litigation without a class suit. *Id.* Manageability should rarely, if ever, be in itself sufficient to prevent certification of a class. *Id.*

*Second*, given the fact that the very concerns that might make a class suit difficult to manage also infect the procedural alternatives, courts within at least seven circuits have held that there is a presumption against dismissing a class action on manageability grounds or that such dismissals are disfavored. Id. *See De Loach v. Philip Morris Companies, Inc.,* 206 F.R.D. 551, 567 (M.D. N.C. 2002) ("Though any case of such magnitude certainly poses problems of manageability … dismissal for management reasons, in view of the public interests involved in class actions, should be the exception rather than the rule.") (internal citations and quotations omitted).

While a judge on the Second Circuit, Justice Sonia Sotomayor wrote, in an oft-cited passage, that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.' " *In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 141 (2d Cir. 2001).  Before denying class certification (here for reasons concerning individualized damages), a court may consider whether any of a number of "management tools" might enable the case to proceed; the listed options included the following:

> (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Id.  See also,* Newberg on Class Actions § 4:80 (5th ed.); *Pitt v. City of Portsmouth, Va*., 221 F.R.D. 438, 447 (E.D. Va. 2004).

Indeed, while certifying a class action can certainly create difficult management concerns, courts must also be

> cognizant of the inefficient, costly and time consuming alternative. Absent the proposed liability issues certification, the issue of fault, for one, would have to be tried seriatim in every case for which a jury is empanelled. That consideration alone tips the balance heavily toward the limited issue certification sought by

44

plaintiffs. *See Gunnells*, 348 F.3d at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues.").

Additionally, absence of the class device would surely discourage potentially deserving plaintiffs from pursuing their rights under the circumstances here presented. That is another factor influencing the outcome sought by plaintiffs. *See Gunnells*, 348 F.3d at 426 (noting in that case that "class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action. As the Supreme Court put the matter, '[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.' " (quoting *Amchem*, 521 U.S. at 617, 117 S.Ct. 2231)).

Surely, the plaintiffs thus receive a benefit from the proposed issues certification. But so, too, do the defendants. As our court of appeals has noted, the focus of Rule 23(b)(3) in the mass tort context is to "ensure that class certification in such cases 'achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *Gunnells*, 348 F.3d at 424 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). As in *Gunnells*, defendants benefit from procedural fairness by certification:

"Furthermore, class certification 'provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications.' This protection from inconsistent adjudications derives from the fact that the class action is binding on all class members. By contrast, proceeding with individual claims makes the defendant vulnerable to the asymmetry of collateral estoppel: If [the Defendant] lost on a claim to an individual plaintiff, subsequent plaintiffs could use offensive collateral estoppel to prevent [the Defendant] from litigating the issue. A victory by [the Defendant] in an action by an individual plaintiff, however, would have no binding effect on future plaintiffs because the plaintiffs would not have been party to the original suit. Class certification thus promotes consistency of results, giving defendants the benefit of finality and repose."

*Gunnells*, 348 F.3d at 427.

*Good*, 310 F.R.D. at 297-98.

I.        **Rule 23(c)(4) Analysis**

While Plaintiffs believe that all of their claims set forth in their Complaint may properly be certified under the above Rule 23 analysis.  It is also important for this Court to realize that Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  Fed.R.Civ.P. 23(c)(4).  As explained in *Good* by the United States District Court of the Southern District of West Virginia, the Honorable John T. Copenhaver, Jr., presiding:

> Consistent with the text of Rule 23(c)(4), one commentator recently observed as follows: "Although traditional claims brought under Rule 23(b) involve 'an all-or-nothing decision to aggregate individual cases,' Federal Rule of Civil Procedure 23(c)(4) allows litigants to resolve <u>specific issues</u> in a case on a class-wide basis." Joseph Seiner, *The Issue Class*, 56 B.C. L. Rev. 121, 132 (2015) (quoting Jon Romberg, *Half A Loaf Is Predominant and Superior to None: Class Certification of Particular Issues Under Rule 23(c)(4)(A)*, 2002 Utah L. Rev. 249, 251 n.96) (emphasis added).

> There is no impediment to certifying particular issues in a case as opposed to entire claims or defenses. That is the very approach urged by the authoritative *Manual for Complex Litigation*:

> "Rule 23(c)(4)(A) permits a class to be certified for <u>specific issues or elements of claims</u> raised in the litigation. [T]his provision may enable a court to achieve the economies ... for a portion of a case, the rest of which may either not qualify under Rule 23(a) .... Certification of an issues class is appropriate only if it permits fair presentation of the claims and defenses and materially advances the disposition of the litigation as a whole.

> An issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages. A bifurcated trial must adequately present to the jury applicable defenses and be solely a class trial on liability."

> *Manual for Comp. Litig.* § 21.24 (4th 2004).

> If otherwise compliant with Rule 23, the proposed liability issue certifications provide an orderly means to resolve some of the central issues in the case. That is an approach that is encouraged by our court of appeals. *See In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir.1989) (noting the need to "take full advantage of the provision in [Rule 23(c)(4)] permitting class treatment of separate issues ... to reduce the range of disputed issues" in complex litigation).

*Good*, 310 F.R.D. at 295-96.  *Accord Gunnells*, 348 F.3d at 428; *Central Wesleyan College v. W.R. Grace & Co.*, 6. F.3d 177, 185 (4th Cir. 1993); *Hill v. Western Elec. Co., Inc.*, 672 F.2d 381, 387 (4th Cir. 1982); *Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. at 159.

Judge Copenhaver further held in *Good* that the weight of authority supports that the law does not "require[ ] a cause of action <u>as a whole</u> be factored into analysis of the predominance requirement of Rule 23(b)(3), as opposed to simply considering that requirement after the court isolates a potentially class-worthy issue under Rule 23(c)(4)."  *Good*, 310 F.R.D. at 298 (citing *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 231 (2d Cir.2006); *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996)).   Judge Copenhaver further explained:

> One commentator so observes:

> "[A]lthough it is clear that plaintiffs seeking issue class certification must establish the four components of Rule 23(a), there is less certainty as to what they must establish under Rule 23(b). Moreover, courts have issued varying opinions in this regard.

> For the most part, appellate courts have agreed that the issue class can proceed under Rule 23(c)(4) even where the predominance requirement of Rule 23(b) has not been satisfied."

> Joseph Seiner, *supra* at 134.

> Another leading Rule 23 commentator has noted likewise that "[m]ost federal courts of appeal hold that a class action may be maintained with respect to a particular issue regardless of whether the claim as a whole satisfies the requirement that common questions of law or fact predominate over questions affecting only individual members." 6 Thomas Smith & Elizabeth Williams, *Cyclopedia of Federal Proc.* § 23:32 (3d ed. elec. 2015). . . .

> . . . The court is not required under Rule 23 . . .  to sacrifice class adjudication of a driving issue in the case simply because many individualized inquiries will remain thereafter. . . .

*Good*, 310 F.R.D. at 298.  *Accord Gunnells*, 348 F.3d at 441-45 (citing cases and authorities).

### J. **Plaintiffs' Fraud Causes of Action Can Be Certified**

Plaintiffs' claims of actual and constructive fraud, including fraudulent concealment, can be certified consistent with the principles of Rule 23.   Numerous courts in other jurisdictions have recognized the wisdom of permitting the element of reliance to be presumed or inferred for members of a plaintiff class action.   *See, e.g., Varacallo v. Massachusetts Mut. Life Ins. Co.*, 332 N.J.Super. 31, 49-51, 752 A.2d 807, 817-18 (2000) ("Where the theory of recovery is common law fraud, in which reliance is required, our analysis of the predominance issue requires resolution of this question:  For purposes of certifying a class, must the plaintiffs offer direct proof that the entire class relied on defendant's representation that omitted material facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued?   We think not."); *Affiliated Ute Citizens of Utah v. United States,* 406 *U.S.* 128, 153, 92 *S.Ct.* 1456, 1472, 31 *L.Ed.*2d 741, 761 (1972) (holding plaintiffs alleging securities fraud in violation of federal law "involving primarily a failure to disclose" do not have to provide "positive proof of reliance" in order to recover); *Murray v. Sevier,* 156 *F.R.D.* 235, 248-49 n. 11 (D.Kan.1994) (it is proper to presume reliance where the omission of material fact is common to the class).[21]

---

[21] *See, e.g., Pocahontas Mining Co. Ltd. Partnership v. Oxy USA, Inc.*, 202 W.Va. 169, 175, 503 S.E.2d 258, 264 (1998) (Workman, J., concurring) ("Obviously, one who is defrauded [by fraudulent concealment] cannot possibly take any affirmative action to indicate reliance, since he knows nothing of the deception.  Yet, it would be ludicrous to reward a fraudulent actor for his skill in perpetrating such a deception.   That is not what the law on fraud, and specifically on the element of detrimental reliance, envisions." (citations omitted)); *Edens v. Goodyear Tire & Rubber Co.,* 858 F.2d 198, 206-07 (4th Cir. 1988) ("direct proof of reliance on the concealment was not required for it was practically impossible to prove, by direct evidence, reliance on that which had been intentionally concealed"; applying South Carolina law permitting the recovery of punitive damages when a breach of contract is accompanied by a fraudulent intent and a fraudulent act); *Basic Inc. v. Levinson,* 485 U.S. 224, 245, 108 S.Ct. 978, 990, 99 L.Ed.2d 194, 217 (1988) ("Requiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted if omitted material information had been disclosed ...  or if the misrepresentation had not been made . . . would place an unnecessarily unrealistic evidentiary burden on the ... plaintiff..." (citations omitted)).  *See also State ex rel. Metro. Life Ins. Co. v. Starcher,* 196 W.Va. 519, 523-26, 474 S.E.2d 186, 190-93 (1996) (as to the issue of identifying class members, the Court rejected MetLife's argument that "individual inquiry is necessary to ascertain the respective intentions of each prospective class member concerning the funding of the additional policy of insurance that they purchased"; also affirming circuit court's holding that plaintiffs' "breach of contract claim and

48

Numerous other courts have recognized that substantive claims of fraudulent concealment, as well as claims of fraudulent concealment made in connection with tolling a statute of limitations, may be certified as a class action. Many of these cases also recognize that the reliance of class members on such fraudulent omissions or concealment may also be presumed across the class and does not constitute an impediment to class certification. *See, e.g., BP America Production Co. v. Patterson*, 263 P.3d 103, 110-14 (Col. En Banc. 2011) (Where plaintiffs in a class action allege similar representations, the reliance issues may be presumed similar as well); *Seeco, Inc. v. Hales*, 330 Ark. 402, 413-14, 954 S.W.2d 234, 240-41 (1997) ("It is clear from our caselaw that individual questions relating to a class member's reliance for an estoppel claim . . . or reliance for a misrepresentation claim . . . will not defeat class certification. . . ." (citations omitted)); *Cope v. Metro. Life Ins. Co.*, 82 Ohio St.3d 426, 696 N.E.2d 1001, 1004-05 & 1008 (1998) ("Courts generally find that the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of a fraud or misrepresentation claim, especially where written misrepresentations or omissions are involved.").

## CONCLUSION

WHEREFORE, plaintiffs respectfully request and move the Court to find that this civil action meets all the criteria of Fed.R.Civ.P. 23 to be litigated and managed as a class action, the plaintiffs be appointed as class representatives, that Marvin Masters and Michael Carey and their firms be appointed as class counsel and for such other further and general relief as the Court deems just and proper.

---

other asserted West Virginia common law claims are not based upon oral testimony but are instead based upon proof of the standard form documents utilized by the defendant [MetLife] in its processing of insurance applications and the issuance of life insurance policies and the standardized rules, procedures and conduct of the defendant in handling these matters").

THE KAY COMPANY, LLC, WILLIAM
CATHER, Trustee of Diana Goff Cather
Trusts, and JAMES E. HAMRIC III, and all
other persons and entities similarly situated,

By Counsel

/s/ Marvin W.  Masters
Marvin W. Masters
West Virginia State Bar No. 2359
Richard A. Monahan
West Virginia State Bar No. 6489
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301

Michael W. Carey                          Thomas W. Pettit
West Virginia State Bar No. 635           West Virginia State Bar No. 2886
Carey, Scott, Douglas & Kessler, PLLC     Thomas W. Pettit, L.C.
707 Virginia Street East, Suite 901       Post Office Box 189
Charleston, West Virginia  25301          Barboursville, West Virginia  25504

Counsel for Plaintiffs
F:\5\903\b018.docx

## CERTIFICATE OF SERVICE

I, Marvin W. Masters, hereby certify that on September 30, 2016, I electronically filed "Plaintiffs' Memorandum in Support of Motion for Class Certification" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

David K. Hendrickson
Carl L. Fletcher, Jr.
Hendrickson & Long PLLC
214 Capitol Street
Post Office Box 11070
Charleston, West Virginia  25339
daveh@handl.com
cfletcher@handl.com
Counsel for Defendants

Michael W. Carey
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301
mwcarey@csdlawfirm.com
Counsel for James E. Hamrick, III

Thomas W. Pettit
Thomas W. Pettit, L.C.
945 Main Street
Post Office Box 189
Barboursville, West Virginia  25504
twpettit@comcast.net
Co-Counsel for H. Dotson Cather

/s/ Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
304-342-3106
mwm@themasterslawfirm.com

51