IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

THE KAY COMPANY, LLC,
*et al.*,

                Plaintiffs,

v.                                       CIVIL ACTION NO. 1:13-cv-151
                                       (Honorable John Preston Bailey)

EQT PRODUCTION COMPANY, *et al.*,

                Defendants.

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Come EQT Production Company ("EQT Production"), EQT Corporation, EQT Energy, LLC ("EQT Energy"), EQT Investments Holdings, LLC ("EQT Investments"), EQT Gathering, LLC ("EQT Gathering"), and EQT Midstream Partners, LP ("EQT Midstream") (collectively referred to as "Defendants"), and for their Memorandum in Opposition to Plaintiffs' Motion for Class Certification state as follows:

### INTRODUCTION

As Defendants previously established in their response to Plaintiffs' initial class certification motion, Plaintiffs seek class certification based upon claims and facts virtually identical to those in *Adkins v. EQT Production Company,*[1] a gas royalty deduction case in which the Fourth Circuit found that class certification was inappropriate. In *Adair*, the Court described the inherent impediment to certifying a class in a gas royalty deduction case, stating:

---

[1] *Adkins* was one of five cases decided in *Adair v. EQT Production*, 764 F.3d 347 (4th Cir. 2014), in which orders certifying each of five classes were reversed.

> Although the district court recognized the problem of lease language variation, it did not see it as a barrier to class certification in any of these cases.  In our view, however, ***these variable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis.***

*Adair, supra,* at pp. 367-368 (emphasis added).  The Fourth Circuit's opinion in *Adair* provides a roadmap for the Court in evaluating the Plaintiffs' Motion for Class Certification in this action.

As in their initial class certification motion, Plaintiffs largely ignore *Adkins* and do not demonstrate that class certification is appropriate in this case.  The only difference between this case and *Adkins* is that, here, more variation exists between class members.  In the instant action, at issue are:

(1) more leases, amendments, ratifications, and settlements governing royalties[2];

(2) more wells with differing production types and histories;

(3) more lease-specific payment histories;

(4) more sales points, causing more indices to be applied;

(5) more royalty owners, creating more heirship issues;

(6) more types of development utilized;

(7) more owner-specific communications and courses of dealings; and

(8) more plan rates and more variations in plan rates applied, depending on the location of the wells.

These circumstances clearly compel the conclusion the Fourth Circuit reached–that gas royalty deduction cases require individual analysis.  In the face of the Fourth Circuit's clearly

---

[2] For instance, the Plaintiffs on remand in *Adkins* assert that EQT Production has approximately 3,700 Virginia leases.  *See* Affidavit of Alyce Hoge, *Adkins v. EQT Production Company,* U.S. Dist. Ct., W.D. Va., Case 1:10-cv-00037 JPJ-PMS, DE 567-19.  In Virginia, EQT has only three operational districts with most production being sold at the same index price (East Tennessee).

expressed reservations regarding class actions of this type, and the fact that the class here would be much larger, Plaintiffs have failed to explain why this case should be treated differently than *Adkins*.  As demonstrated below, Plaintiffs' Motion must be denied.

## STATEMENT OF FACTS

EQT Production Company ("EQT Production") explores for and produces natural gas in six states, including West Virginia. Affidavit of John Bergonzi attached as Exhibit 1.   It sells natural gas it produces to EQT Energy, LLC ("EQT Energy"). *Id.*  EQT Energy purchases natural gas from many producers, including EQT Production, and then sells that gas at various sales points to numerous purchasers. *Id.*  EQT Gathering, LLC ("EQT Gathering") transports natural gas for a fee, usually from the point it is produced to a processing facility or interstate pipeline. Its customers include EQT Energy and many other unaffiliated customers. *Id.* EQT Corporation, EQT Investments Holding, LLC, and EQT Midstream Partners, LP, are not directly involved in the production, gathering, or marketing of any West Virginia natural gas. *Id.*

### A.    Historical Sales and Royalty Calculation

In February 2000, Equitable Production Company ("EPC"), EQT Production's predecessor, acquired all of the West Virginia, Virginia, and Kentucky oil and gas interests of Statoil Energy, Inc., and one of its subsidiaries ("Statoil").  *Id.*  At the time EPC acquired Statoil, EPC did not own or operate any gas wells in West Virginia. *Id.* Almost all of the West Virginia wells currently operated by EQT Production are the result of the Statoil acquisition or new well drilling after February 2000.  *Id.* Following the Statoil transaction, revenue distributions continued on the accounting system acquired from Statoil. *Id.*  In January 2002, that system was

replaced by Enertia, an oil and gas accounting system still utilized by EQT Production, with information from the Statoil accounting system downloaded to the new Enertia system. *Id.*[3]

Until 2005, Equitable Energy, LLC (now EQT Energy) purchased EQT Production's gas at the interstate connection. *Id.* On leases where royalty was to be paid "at the well" and did not prohibit the deduction of downstream costs, EQT Production deducted the royalty owners' share of downstream costs from the sales price received, as shown on its royalty statements, a sample of which is attached as Exhibit 2. This method of calculating the wellhead price by deducting post-production costs from the downstream sales price is generally referred to as the "work back method" and had long been used in West Virginia and other states to set a wellhead price. *Id.*

### B.   Current Sales and Royalty Calculation

Before 2005, EQT Production's predecessor, Equitable Production Company, operated two businesses: production and gathering. Bergonzi Aff., Exh. 1. On January 1, 2005, EQT Production reorganized to separate out its "midstream" business to, among other things, better track and analyze the cost structure of its production, gathering, and marketing businesses to ensure that each business was generating a fair rate of return. *Id*. This reorganization resulted in the formation of EQT Gathering, LLC, and EQT Gathering Equity, LLC, the entities responsible for gathering, compressing, and transporting natural gas. As part of the reorganization, EQT Production entered into gas purchase contracts with EQT Energy, LLC (formerly Equitable Energy). The contracts' pricing provisions utilized the "work back method"[4] to calculate the

---

[3] EPC made no changes to Statoil's royalty payment practices.

[4] At the time EQT Production incorporated the work back method into its sales contract, the Fourth Circuit had already recognized the method as a valid means of determining the wellhead price. *See Imperial Colliery Co. v. Oxy USA, Inc.,* 912 F.2d 696, 701 (4th Cir. 1990), (acknowledging "that there was no available wellhead price does not necessarily preclude computation of the gas' wellhead price. For example, … such a computation might simply be made by taking Equitable's purchase price and deducting compression and gathering expenses.")

4

wellhead value of the gas sold. The contracts provided for a sales price based on the following objective formula:

> [The] Applicable First of the Month Index Price applicable to the interstate pipeline(s) into which the Gas is delivered, less prevailing gathering related charges and retainage applicable to such point(s), less any other agreed applicable fees or charges.

*Id.* EQT Energy, in turn, entered into gathering contracts with the newly-created gathering companies, allowing EQT Energy to transport gas purchased from EQT Production to a point of sale at the interstate connection in exchange for the payment of a cost-of-service rate charged by the midstream companies. *Id.* Under this new framework, EQT Energy began buying gas from EQT Production at the wellhead and paying EQT Production based on the price and volumes it sold the gas for at the interstate pipeline connection(s). *Id.* The gas purchase contract was renegotiated in 2012, but the pricing formula remains the same. *Id.*

EQT Gathering transports EQT Energy's gas through the Weston, Brenton, Madison, Weston (Marcellus), KA-8, Saturn, WG-100, Pandora, and H-156 gathering systems, pursuant to separate, negotiated gathering agreements for each system. *Id.* Each year, EQT Gathering calculates "plan rates" to be charged for its gathering services on the Weston, Brenton, Madison, Weston (Marcellus), KA-8 systems.[5] Bergonzi Aff., Exh. 1. These annual rates are based on EQT Gathering's business plan, which projects what its operational costs will be for the next year. *Id.* The rate varies by geographic area and type of development, depending on what costs are allocated to each area and the nature of gas being transported. *Id.* This rate charged to EQT

---

[5] Plaintiffs' repeated assertion that only three (3) plan rates exist is incorrect. Justin Friend testified that there are eight primary districts in West Virginia, plus additional sub-districts. Deposition of Justin Friend, Exh. 3, p. 15. Separate gathering agreements are negotiated for Weston, Brenton, Madison, Weston (Marcellus), KA-8, Saturn, WG-100, Pandora, and H-156 gathering systems, and the rate varies by geographic area and the type of development. In fact, one of Plaintiffs' witnesses testified that there are at least eight (8) different rates. Deposition of Daniel Reineke, Exh. 4, pp. 79-80; 118.

Energy is a fully-burdened rate (meaning it includes all of the costs that typically go into gathering the gas), which EQT Energy applies to the pricing formula set forth in the gas purchase contracts with EQT Production. *Id.* While EQT Production bears the full burden of this plan rate in its payment from EQT Energy, EQT Production determines, with assistance from EQT Gathering, how much of that rate reflects charges for EQT Gathering's rate of return, depreciation, and income taxes. EQT Production then adds that amount back in to the sales price before it pays royalty owners. *Id.*[6]

### C.   Plaintiffs' Claims and Leases

The Kay Company, LLC; H. Dotson Cather, Trustee of Diana Goff Cather Trusts; and James E. Hamric III ("the named Plaintiffs") filed a complaint against the Defendants on behalf of all others similarly situated alleging breach of contract, breach of fiduciary duties (associated with leases), and fraudulent misrepresentation. *See* Amended Complaint ECF No. 29, pp. 15-16. All three of these claims essentially allege the same thing: that EQT Production took improper deductions from royalty payments and that the Plaintiffs were not paid all of the revenues to which they claim entitlement. *Id.* With regard to deductions, they claim that for some leases, deductions cannot be taken, and, for others, the deductions were excessive.[7] With regard to

---

[6] Thus, EQT Production does not pay royalties on an amount less than it receives. Royalty owners receive more than $1/8^{th}$ of the price paid to EQT Production because income taxes, depreciation, and return on investment are added back into the sales price before calculating the royalty.

[7] Plaintiffs claim that deductions are excessive because EQT Gathering's gathering rate is not "actual and reasonable" and assert that *Tawney v. CNR*, 219 W.Va. 266, 633 S.E.2d 22 (2006) "made clear that any cost deductions be incurred by the lessee." (ECF No. 182, p. 5). Plaintiffs consistently misstate the impact of that decision and its application to this case. The relevant inquiry is not whether EQT Gathering's gathering rate is "actual and reasonable," but whether any deductions taken were **based on costs actually and reasonably incurred by EQT Production**.

revenues, they claim they are entitled to payment for all volumes of gas produced at the wellhead rather than the volumes upon which EQT Production (and EQT Energy) is paid, and that they are entitled to a portion of revenue received from the sale of natural gas liquids. *Id.* [8]

The named Plaintiffs have separately negotiated leases with EQT Production.  Their leases all have material variations (*i.e.*, they are not form leases).  *See* Affidavit of Bryant Wayne Bowman attached as Exhibit 5; Reineke Depo, Exh. 4, pp. 87-88.   For instance, the Kay Company's lease appears to contain a negotiated royalty clause:

> Lessee agrees to pay Lessor for each gas well from the time and while the gas is marketed, at the rate of one-eighth (1/8) of the current wholesale market value at the well of the gas, gasoline and other products thereof, based on the usual price paid therefor in the general locality of said leased premises, payable each three months, all pursuant to subsection (a) of this article, and determined at the point or points provided in subsection (b) of this article.   In no event shall the current wholesale market value of such gas at the well for the purposes hereof be less than 18 cents per mcf.

Bowman Aff, Exh. 5.  The Dianna Goff Cather Trust is also party to a clearly negotiated lease, rather than a form lease, which has a complicated royalty provision initially providing:

> Second – to pay as royalty for all gas produced and marketed from each well when and as the gas is marketed, one-eighth (1/8) of the wholesale market value thereof at the well based on the usual price paid therefor in the general locality of the leased premises, payable on or before the 25th day of the month following that in which the gas was delivered into the marketing pipeline.

This lease then has an **additional** royalty provision outlining the sharing of "pumping" costs and providing the lessor with the option to elect an additional royalty based on one of two options:

---

[8] Throughout their memorandum, the named Plaintiffs insinuate that EQT has been obstructive in providing discovery. That is simply not true. EQT has produced tens of thousands of documents (including all of its West Virginia lease files in March, 2015) and has supplied witnesses to be deposed by Plaintiffs on twelve occasions.

> "to deliver to the credit of the Lessors as additional royalty the equal one thirty-second (1/32) part of the working interest oil, less the equal one thirty-second (1/32) part of the lifting and pumping costs; and to pay as an additional royalty for all gas produced and marketed from said first well … the equal one thirty-second (1/32) part of the wholesale market value of the working interest gas, less the equal one thirty-second (1/32) part of the pumping costs, if any; and Lessee further covenants and agrees that from the second well on the leased premises which yields royalty oil or produces gas in marketable quantities, to deliver to the credit of the Lessors as an additional royalty the equal one thirty-second (1/32) part of the working interest oil less the equal one thirty-second (1/32) part of the lifting and pumping costs; and to pay as additional royalty for all gas produced and marketed from said second well when as the gas is marketed, the equal one thirty-second (1/32) part of the pumping costs, if any."

The lease of named Plaintiff James E. Hamric, III, differs greatly from the two unique leases of the other named Plaintiffs. The royalty clause of that lease provides:

> And to pay Lessor for gas produced from any oil well and used by Lessee for the manufacture of gasoline or any other product as royalty one-eighth (1/8) of the market value of such gas at the mouth of the well, if such gas is sold by the Lessee, then as royalty one-eighth (1/8) of the **proceeds of the sale thereof at the mouth of the well**.

*Id.*

Further, natural gas produced from the Hamric lease is sold to Mountaineer Gas, a local distribution company, at or near the well located on the lease. Gilmore Affidavit, attached as Exhibit 6. No deductions have been taken in calculating Hamric's royalty since 2007. Affidavit of Michael Barbour attached as Exhibit 7.

None of the named Plaintiffs have flat rate leases that have been converted pursuant to W. Va. Code § 22-6-8. *Id.*

D.     **EQT Production's West Virginia Leases**

EQT Production has approximately 25,000 individual West Virginia lease documents. *See* Affidavit of Alma Tolman attached as Exhibit 8; Deposition of Alma Tolman,  Exh. 9, pp.40-41.[9] There are leases in West Virginia that allow deductions of certain types in calculating royalty but prohibit deduction of other expenses. Barbour Affidavit, Exhibit 7; Deposition of Michael Barbour, Exh. 13, p.57.

In addition to examining the named Plaintiffs' royalty provisions, Wayne Bowman, a landman with nearly 20 years of experience, also reviewed a sampling of more than 500 of EQT Production's West Virginia leases and determined that significant variations exist in their royalty provisions, including at least 61 leases or amendments with royalty clauses unique from the named Plaintiffs' leases and the other leases in the sampling. For example, some sampled leases have royalty provisions explicitly authorizing deductions, and the types of allowed deductions vary widely among leases.   Bowman Affidavit, Exh. 5. Some calculate royalty based on measured production and variable price; others calculate royalty based upon a flat rate per well or a fixed or minimum price. *Id.* The royalty clauses below are a few of the 61 distinct royalty clauses identified in the sampling. They illustrate the extreme variation found in EQT Production's West Virginia leases:

- "a royalty equal to one-eighth (1/8th) of the Amount Realized (as defined below) by Lessee from the first sale of such gas.  The Lessor will be paid a royalty based on the volumes of oil and gas sold by Lessee and shall not be entitled to royalty payments for any volumes not sold, regardless if produced or measured at any point other than the point of sale."

---

[9] Named Plaintiffs made no effort to identify the number of West Virginia leases prior to initiating this action.  *See* Depo. of James Hamric, Exh. 10, p. 13; Depo of Christopher Thomas, Exh. 11, p. 9; Depo H. Dotson Cather, Exh.12, p. 13.

- "one-eighth (1/8th) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas."

- "One and one-half (1 1/2¢) per thousand cubic feet for all gas produced while the same is marketed or used off said premises"

- "the sum of two and one half cents (2 1/2¢) for each thousand cubic feet (MCF) of gas produced and marketed from the leased premises, and, in addition thereto, one-eighth (1/8) of the selling price thereof, in excess of twenty (20¢) per thousand cubic feet (MCF), received by Lessee for the gas sold by it at a price higher than twenty cents (20¢) per thousand cubic feet (MCF)."

- "one-eighth (1/8) of the sale price by Lessee at the well of all gas produced hereunder, as shown to have been delivered at the well or wells in each month by meter measurement into marketing pipelines; but such payment to Lessor shall be not less than three and one-eighth cents (3-1/8¢) for each one thousand cubic feet (1 MCF) of gas produced and sold in any month."

- "On gas, including casinghead gas, methane or other gaseous substances, produced from said lands and sold on or off the premises, or used off the premises, the value of 1/8th of the gas so sold or used; where gas from said lands is processed in a plant for the purpose of extracting products therefrom, Lessor shall receive as royalty 1/8th of the value at the plant of the products so extracted and 1/8th of the value of the residue gas remaining after extraction of said products…"

- "On gas, including casinghead gas and all other gaseous or vaporous substances, produced from said land and sold or used of the leased premises or in the manufacture of gasoline or in the extraction of sulphur or any other product, the market value at the wells of one eighth (1/8) of the gas so sold or used, such market value at the wells in no event to exceed the net proceeds received by Lessee calculated or allocated back to the wells from which produced, making allowance and deduction for a fair and reasonable charge for gathering, compressing, and making merchantable such gas…"

- "should gas be produced and used off the premises the Lessors shall be paid at the rate of two hundred dollars annually so long as the gas is so used and sold."

- "for each and every well drilled upon said land, which produces Natural Gas only, in a quantity sufficient for the Lessee to convey to market, a money royalty computed at the rate of Three Hundred and No/100 ($300.00) Dollars per annum payable quarterly in advance…"

Bowman Affidavit, Exh. 5.

Additionally, Plaintiffs have created "lists" of leases based on differing royalty provisions. *See* Requests for Admission, attached as Exhibit 14. In these lists, Plaintiffs acknowledge that there are at least 96 different royalty provisions in the sampling of West Virginia leases they reviewed. *See id.*

### E.     Difficulty in Identifying West Virginia Lessors

EQT Production and the named Plaintiffs were parties to earlier royalty litigation. *See The Kay Company v. Equitable Production, et al.,* U.S. Dist. Ct., S.D. W. Va., Civil Action No. 2:06-0612) (hereinafter "*Kay Company*"). When administering the 2008 *Kay Company* litigation settlement, it was difficult to determine who was entitled to payment because many of the original lessors' heirs were unknown. Tolman Affidavit, Exh. 8. Generally speaking, it is challenging to locate individuals who are entitled to royalty payments under an oil and gas lease. This is illustrated by the fact that there are approximately 3,500 West Virginia lessors whose interests are being held in suspense. *Id.* This difficulty is further illustrated by the inability of the named Plaintiffs to identify other interest holders in their **own** leases. *See* Thomas Depo., Exh. 11, p. 9; Cather Depo., Exh. 12, p. 27.

### F.     Individual Lessor Communications with EQT Production

EQT Production maintains a royalty owner relations line so that royalty owners may call it to raise any questions or concerns regarding their royalty payments. Tolman Affidavit, Exh. 8. A call log documents that EQT's Land Administration Department received over 130 calls from

11

lessors with questions about deductions from their royalty payments between March 29, 2010 and March 11, 2015. *Id.* The lessors who called EQT Production did not initiate legal proceedings. *Id.* None of the named Plaintiffs called EQT Production's royalty owner's relations line to raise questions or concerns over their royalty payments. *Id.*

As part of the settlement of the earlier class action, some West Virginia lessors signed lease modifications and ratifications in which they acknowledged that their royalties were properly calculated through the date of execution and providing for a future royalty rate based upon a percentage of blended price indices, while other West Virginia lessors did not. *Id.* Even more lessors signed separately negotiated and unique lease modifications outside of the class action claims administration process, acknowledging the propriety of EQT's royalty payment practices. None of the named Plaintiffs executed such a document. *Id.*

### G.  Gas Content Variance

Whether natural gas liquids are sold from a particular well is dependent on the BTU (British Thermal Unit) or heat content of the natural gas produced. The heat content differs depending on where the gas is produced. Affidavit of Justin Friend, attached as Exhibit 15. Whether West Virginia-produced gas is processed also depends on the geographic location of the well where it is produced. Friend Depo., Exh. 3, p. 20. Defendants analyzed the flow of gas from the Plaintiffs' wells and determined that natural gas liquids are not produced from any of the named Plaintiffs' leases. Friend Depo., Exh. 3, pp. 94-99. The named Plaintiffs made no effort to determine if natural gas liquids are produced or sold from their leases. *See* Hamric Depo., Exh.10, p. 13; Thomas Depo., Exh.11, p. 9; Cather Depo., Exh.12, p. 13. In fact, one of their proffered expert witnesses admitted that he is unable to conclude that natural gas liquids are

produced or sold from any of the named Plaintiffs' leases and that he has not calculated any

damage amount for such a claim. Reineke Depo., Exh. 4, pp. 31-33; 121-124.[10]

H.     **Plaintiffs' Class Certification Request**

Plaintiffs' seek to certify the following class:

> All EQT natural gas lessors that received or were due to be paid royalties from
> defendants and EQT's production or sale of natural gas which was produced
> within the boundaries of the State of West Virginia from their natural gas or
> mineral estates during the period beginning after December 8, 2008, and
> extending to the present (during any time within their leasehold period.)

Mot. for Class Cert., ECF No. 300, p. 2.   Additionally, Plaintiffs propose the following

subclasses:

> (a) All EQT natural gas lessors with flat rate leases converted by operation
> of W. Va. Code, § 22-6-8 and that received or were due to be paid royalties from
> defendants and EQT's production or sale of natural gas which was produced
> within the boundaries of the State of West Virginia from their estates during the
> period beginning after December 8, 2008, and extending to the present (during
> any time within their leasehold period.)

> (b) All EQT natural gas lessors that received or were due to be paid
> royalties from defendants and EQT's production or sale of natural gas which was
> produced within the boundaries of the State of West Virginia from their estates
> during the period beginning after December 8, 2008, and extending to the present
> (during any time within their leasehold period,) except for those lessors holding
> flat rate leases converted according to W. Va. Code, § 22-6-8.

*Id.* [11]

## STANDARD OF LAW FOR CLASS CERTIFICATION

A class action lawsuit is "'an exception to the usual rule that litigation is conducted by

and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 99 S. Ct. 2545 (1979)). "To come within the

---

[10] Defendants have contemporaneously filed a Motion to Exclude the testimony of Plaintiffs'
expert witnesses, Daniel Reineke and Daniel Selby.

[11] The Plaintiffs' proposed class definitions are typical of the shotgun approach they have taken
to class certification. Their definitions of the class and subclasses include anyone receiving or
due royalty, and are not even limited to royalty owners alleged to have been paid improperly.

exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

The Fourth Circuit has found that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable,' meaning, "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (internal citations omitted).   If this threshold requirement is met, plaintiffs must demonstrate that the class complies with Federal Rule of Civil Procedure 23.  Pursuant to Rule 23, plaintiffs must demonstrate that:

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ.  23(a).  The purpose of these requirements is to limit class claims to those of the named representatives of the class. *Wal-Mart*, 131 S. Ct. at 2550.

In addition to satisfying Rule 23(a)'s requirements, pursuant to Rule 23(b)(3), plaintiffs must demonstrate:

> (3)   …that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A)      the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B)      the extent and nature of any litigation concerning the controversy already begun by or against class members;

        (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        (D)  the likely difficulties in managing a class action.

Fed. R. Civ.  23(b)(3).  The Fourth Circuit has explained that class certification under Rule 23(b)(3) requires a plaintiff to: (1) satisfy all  Rule 23(a) requirements; (2) demonstrate that common questions of law or fact predominate over any questions affecting only individual class members; and (3) show that proceeding as a class is superior to other available methods of litigation. *Adair*, 764 F.3d at 357.

        Further, plaintiffs cannot merely plead the elements of class certification—they must present evidence supporting class certification.  *Id.* (citing *Wal-Mart*, 121 S. Ct. at 2551; *Comcast Corp.*, 133 S. Ct. at 1432); *Wal-Mart*, 131 S. Ct. at 2551 (finding that Rule 23 is not merely a pleading standard, but also an evidentiary requirement that a plaintiff "prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  While plaintiffs bear the burden of showing that a class complies with Rule 23, the "district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied."  *Wal-Mart*, 131 S. Ct. at 2551.  To determine whether a plaintiff has met its burden under the stringent requirements of Rule 23, a court will "probe behind the pleadings before coming to rest on the certification question" and will consider merits questions to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) (internal quotation marks omitted).

## ARGUMENT

As demonstrated below, class certification is inappropriate in this action because:

(1) The class is not readily identifiable due to the number of unknown individuals, heirs, and estates with interests in the identified leases.

(2) A class-wide proceeding would not provide common *answers* to the claims raised by Plaintiffs due to variations in individual leases, the type of gas produced from each well, and differing points of sale.

(3) Plaintiffs do not possess the same interests and did not suffer the same alleged injuries as the purported class members.  For example, although Plaintiffs assert a claim that the purported class was improperly denied payment for natural gas liquids, such liquids are not produced from any wells located on the named Plaintiffs' property.

(4) The named Plaintiffs are not adequate class representatives, particularly with regard to their liquids claims.

(5) Common questions do not predominate over individual questions because to determine liability and, if necessary, damages, the Court must interpret the individual language of thousands of leases, and individually consider the type and quality of gas produced from each well and the location of each well.

(6) If Plaintiffs are awarded damages, damages will have to be calculated individually for each class member.

(7) A class action is not the superior method of adjudicating the asserted claims because thousands of mini-trials will be required to determine issues including, but not limited to, whether deductions are allowed under the particular language of each lease, the type of gas that is produced from the wells attached to each plaintiffs' leases, the specific volume of gas lost from each well, and who owns the royalty interest under each lease.

(8) The proposed class includes all West Virginia lessors, regardless of whether deductions are permitted or even taken in calculating royalty.

For all of these reasons, Plaintiffs' Motion must be denied.

## A.    The Class is Not Readily Identifiable

As a threshold matter, class certification is inappropriate because the class is not readily

identifiable.  The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit

threshold requirement that the members of a proposed class be 'readily identifiable' [or "ascertainable"]." *Adair*, 764 F.3d at 358 (citing *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir.1972)); *In re A.H. Robins Co.,* 880 F.2d 709, 728 (4th Cir.1989) abrogated on other grounds, *Amchem Prods., Inc. v. Windsor*, 117 S. Ct. 2231(1997)). "[A] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Adair*, 764 F.3d at 358 (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583,593 (3d Cir. 2012); *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579–80 (1st Cir.1986)). "[P]laintiffs need not be able to identify every class member at the time of certification. But if class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id*. (quotations omitted).

Finally, "[a]scertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b) (3) class action lawsuit." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). The Court of Appeals for the Third Circuit explained the purpose of "ascertainability" requirement as follows:

> First, it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members. . . . Second, it protects absent class members by facilitating the "best notice practicable" under Rule 23(c) (2) in a Rule 23(b) (3) action. . . . Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (citations omitted) (quotations omitted).

Mineral royalty owners have repeatedly been denied class certification because class members are not readily identifiable due to ownership issues and varying lease provisions. In fact, the Fourth Circuit addressed this very issue in *Adair*. In *Adair*, the Court stated that class

certification of cases involving numerous past and current mineral royalty owners is difficult because the current royalty owners are not often readily identifiable.  *Id.* at 358. The Court explained that changes in royalty interest ownership create a significant administrative burden, requiring review of thousands of title documents to resolve heirship, intestacy, and other title issues.  *Id.*  The Fourth Circuit concluded that the administrative burden may prevent plaintiffs from readily identifying the class members, and remanded the case to the district court for reconsideration.  *Id.* at 360.

The administrative burden in this case is even greater than that warned of in *Adair.*  EQT Production is a party to over 25,000 West Virginia lease documents. Plaintiffs contend that the class should be readily identifiable from EQT Production's records because EQT Production pays royalties.  This contention is unsupported by the evidence.  For example, due to difficulties in identifying or locating royalty owners, EQT is currently holding approximately 3,500 oil and gas interests in suspense.  Tolman Affidavit, Exh. 8. [12]  Additionally, when administering the 2008 *Kay Company* settlement, it was difficult to determine who was entitled to payment because so many of the lessors' heirs were unknown. *Id.* Indeed, due to these administration issues, the claims administration process lasted for more than six years.  Given the broad class definitions proposed by Plaintiffs, the Court will not only face the enormous burden of determining whether thousands of lessors have viable claims related to their leases with EQT Production, but will also have to identify the exponential number of individuals, heirs, and estates with interests in those leases.

---

[12] Moreover, Plaintiffs gloss over that Adair was the ownership case.  There are heirship issues here, but the court focused in *Adkins*, *supra*, (the deduct case) on lease variation and practice variation, issues that Plaintiffs ignore.

The named Plaintiffs have not helped the Court in this regard, as they have made no effort to identify other potential class members. *See* Hamric Depo Exh.10, p. 13; Thomas Depo, Exh. 11, p. 9; Cather Depo. Exh. 12, p. 13. Two of the named Plaintiffs cannot even name all of the interest holders with respect to their own leases. *See* Thomas Depo, Exh.11, p. 9; Cather Depo, Exh.12, p. 27.  If the named Plaintiffs cannot determine all interest holders of their own leases, it is unreasonable to expect the Court to undertake such a process in a class action.  In short, Plaintiffs have not shown that potential class members can be identified with any degree of certainty.[13]

Thus, to identify class members, this Court would have to (1) conduct an individualized review of thousands of leases; (2) find the individuals identified in those leases; (3) find all missing individuals, heirs, and estates with interests in those leases; and (4) adjudicate the multitude of conflicting claims to the oil and gas interests. This would require a never-ending series of mini-trials.  *See Adair*, 764 F.3d at 358 (concluding that "if class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.").   The Fourth Circuit and other federal courts have steadfastly refused to certify such a class. *See Adair*, 764 F.3d 347; *Johnson v. Kan. City S.*, 224 F.R.D. 382, 389 (S.D. Miss. 2004) (denying certification on ascertainability grounds because "thousands of title documents containing differing and diverse conveyance language [] would have to be analyzed according to the specific language used and applicable case law [reviewed] to ascertain the intention of the parties to the conveyances and the legal effect of the instruments"), aff'd sub nom. *Johnson v. Kan. City S. Ry. Co.*, 208 Fed. Appx. 292, 297 (5th Cir. 2006).

---

[13] Plaintiffs attempt to broadly categorize leases of putative class members in their memorandum but offer no factual support for their sweeping categorizations.

Even if the Court is able to identify and locate all lessors with valid royalty interests and resolve disputes as between adverse claimants to the royalties, it would still have to determine whether the identified individuals and entities have valid claims. To do this, the Court must examine each and every lease and corresponding royalty statement to determine whether deductions were improperly taken from the leases.[14] This process would be especially difficult given the broad class definitions proposed by Plaintiffs and the plethora of unique royalty provisions in EQT Production's West Virginia leases.[15]   It is this individualized analysis, and identification of the missing royalty interest owners, that create an insurmountable administrative burden precluding identification of the proposed class members. Therefore, Plaintiffs' proposed class and subclasses do not satisfy the ascertainability requirement.

### B.   Plaintiffs Have Not Demonstrated Compliance with Rule 23(a)

Even if Plaintiffs met the threshold requirement of ascertainability, they have not demonstrated compliance with Rule 23(a).  Pursuant to Rule 23(a), Plaintiffs must prove four elements: numerosity, commonality, typicality, and adequacy of the class representatives.  Fed. R. Civ. P. 23(a).  While the class is sufficiently numerous, class certification is prohibited because Plaintiffs have not demonstrated commonality, typicality, or adequacy of the class representatives.

---

[14] This also raises the questions:  What would the "actual and reasonable" portion of trial look like?  How can an accounting for the entire class be accurate without presenting individualized data in a series of mini trials?  Would the accounting be limited to costs incurred as they pertain to the named Plaintiffs?  Plaintiffs do not address these significant issues.

[15] In a review of a sampling of only approximately 500 of the 25,000 EQT West Virginia lease documents, there were at 61 lease variations identified. Bowman Affidavit, Exh. 5.  The variation identified by this sampling is even larger than the number pointed out in the *Adkins* case – variations that the Fourth Circuit relied upon in reversing class certification there.

### 1.   Plaintiffs Fail to Meet Rule 23(a)'s Commonality Requirement

As in *Adair*, the named Plaintiffs have not met Rule 23(a)'s commonality requirement. *Adair*, 764 F.3d at 362. The crucial factor in satisfying the commonality requirement "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate **common answers** apt to drive the resolution of the litigation. . . . Dissimilarities within the proposed class . . . have the potential to impede the generation of common answers." *Wal-Mart,* 131 S. Ct. at 2551 (quotations omitted) (emphasis added).   A common question of law or fact "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. Class certification will be denied when variations in claims among class members affect the heart of the action. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).

Plaintiffs purport to raise eleven "common" questions.  Such questions are insufficient to satisfy the commonality requirement because they will not "generate **common answers** apt to drive the resolution of the litigation."  *Wal-Mart,* 131 S. Ct. at 2551 (emphasis added).  Instead, numerous dissimilarities exist that impede the generation of common answers.   Those dissimilarities include: variances in lease language; variances in gas content; variances in points of sale and location of wells; and individualized issues related to lessors' dealings with EQT Production.  Moreover, Plaintiffs have not even attempted to demonstrate that any of the putative class members have lease language similar to the named Plaintiffs.

### i.   Variances in Lease Language

Certifying a class of mineral royalty owners is problematic because they have unique leases, which require individual review.  *Adair*, 764 F.3d at 362.  In West Virginia, like any other

contract, a lease, "must be considered as an integrated whole, giving effect if possible, to all parts of the instrument." *Moore v. Johnson Serv. Co.*, 158 W. Va. 808, 815, 219 S.E.2d 315, 320 (1975). In *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, the West Virginia Supreme Court of Appeals held that lease language must expressly allow deductions, and set forth the specific deductions and the method of calculating them. 219 W. Va. 266, 274 (2006). Whether the *Tawney* test is satisfied depends on the meaning given to the precise words in each lease. *See, e.g., W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 805 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014), reconsideration denied (Apr. 11, 2014) (reviewing fewer than a dozen leases and reaching differing results regarding the deductibility of post-production expenses under the *Tawney* analysis based on lease language variation). Thus, *Tawney* requires examination of the language of each individual lease and any modifications to the lease to determine whether deductions are proper. Plaintiffs' own proffered expert testified that every lease must be individually analyzed to "see whether or not it specifically allows for deductions or not (sic)." Reineke Deposition, Exh. 4, p. 87. The Fourth Circuit concluded that "such individualized review precludes a finding of commonality." *Adair*, 764 F.3d at 363.[16]

In their brief, Plaintiffs hardly address the Fourth Circuit's findings in *Adair*, and instead attempt to support their motion by arguing that EQT Production's acts and omissions were common across the whole class.[17] Plaintiffs acknowledge that "[t]here will be differences

---

[16]*See also Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir.2001) (finding class certification "decidedly inappropriate" when the case involved "different conveyances by and to different parties made at different times over a period of more than a century"); *Johnson*, 208 F. App'x at 297 (concluding that a class failed to satisfy Rule 23(a) when the case involved "a multitude of property owners, each with individual conveyances stating different things").

[17] Plaintiffs also cite to several inapposite cases from foreign jurisdictions to support their arguments. Pl.'s Mot. for Class Cert, ECF No. 300, pp. 34, 40. Such cases are factually

between large groups" but state that those differences "have nothing to do with liability."  Pl.'s Mot. for Class Cert., ECF No. 300, p. 33. These arguments are without merit.

First, Plaintiffs' contention that the class is treated the same is not based on the evidence in the record, as EQT Production's practices vary depending on the area, play, pipeline, lease, and well.  John Bergonzi, a 33-year employee and former Vice President of Finance and Chief Accounting Officer of EQT Corporation, testified repeatedly that the specific language of each individual lease dictates the extent to which a deduction can be taken from a lease, if at all. Bergonzi Depo., Exh. 16-A, pp. 9-12, 17, 27, 31, 42-43, 45, 185-186.  Each individual lease is reviewed to determine what downstream costs will be taken into account prior to permitting a cost to be included in the royalty calculation. *See id*. at pp. 17, 27, 31, 42-43, 45, 185-186; *see also* Tolman Depo, Exh. 9, pp. 21-22.

Further, to the extent that EQT engages in common practices, those practices are not relevant to the ultimate issues of liability in this case.  *See Adair* 764 F.3d at 367 (finding that the district court abused its discretion where it "focus[ed] only on the number of common practices without considering the significance of the defendants' disparate conduct in the broader litigation.").  On this point, the Fourth Circuit explained as follows:

> [T]he question of whether a gathering charge is legitimate will produce different answers for class members whose leases specifically authorize that charge versus those whose leases specifically forbid it. Such dissimilarity will preclude the generation of a common answer to the plaintiffs' common question. *See, e.g., Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218–1219 (10th Cir. 2013) (concluding that the plaintiffs failed to demonstrate commonality when there was significant evidence of lease language variation); *Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed.Appx. 938, 942–44 (10th Cir. 2013) (remanding to allow the district court to

distinguishable and are not mandatory law in this jurisdiction.  *Adair*, on the other hand, is directly on point and is a Fourth Circuit case.

examine whether lease language variations in a similar royalty underpayment case defeat commonality).

*Adair*, 764 F.3d at 368. In this case, the varying lease language defeats any purported commonality resulting from common practices. Even if EQT Production took the same deduction from each and every royalty payment, it may result in liability in one instance but not in another. [18] Under these circumstances, evaluating common practices will not provide *common answers*.

Furthermore, despite Plaintiffs contention that any differences between the purported class "ha[s] nothing to do with liability," differences in royalty provisions, gas content, etc. are *necessarily* tied to liability (and damages) issues. EQT Production's obligations to each royalty

---

[18] To the extent that Plaintiffs allege commonality based on their contention that the deductions are not "actual and reasonable," their arguments are based on a misreading of *Tawney*. Plaintiffs misstate the impact of that decision and its application to this case. Plaintiffs' proffered expert, Daniel Selby, opined that the costs incurred by EQT Production were not "actual" because they were based on "forecasts." Selby Aff. ECF No. 299-20, p. 8. Without providing any support, he opines that the costs incurred by EQT Production are unreasonable and violate West Virginia standards. These opinions have no basis in fact or law and are unreliable (*see* Defendants' Motion to Exclude). Moreover, the relevant inquiry is not whether EQT Gathering's **gathering rate** is "actual and reasonable," but whether any deductions taken were **based on costs actually and reasonably incurred by EQT Production**. The testimony of Plaintiffs' other expert, Daniel Reineke, supports this conclusion. When asked what "actual" means, he testified as follows:

> Q:      Okay.   You were asked a question about what actual and reasonable meant.  Would you agree that . . . the word "actual" reflects that it is an expense actually that is being paid by the producer to the company that's doing the transportation on the gathering system?
> A.      Actually incurred, I believe, is the language, and that would be money changing hands?
>
> Q.      Yes.
>
> A.      Right.  Somebody writing somebody a check.

Reineke Depo., Exh. 4, pp. 170-71.

owner depend on the specific language of a lease.  Thus, differences between the purported class members' leases are intimately tied to any liability determination.

In addition, outside of the mineral royalty context, the Fourth Circuit and other federal courts have repeatedly denied class certification in cases involving varying contract language.  In *Broussard v. Meineke Disc. Muffler Shops, Inc.*, franchisees of several Meineke shops sued Meineke for breach of franchise and trademark agreements between franchisees and Meineke. 155 F.3d 331, 340 (4th Cir. 1998).  The franchisees alleged that Meineke made improper political expenditures.  *Id.*  Some franchise agreements allowed for the expenditures at issue, while others were ambiguous.  *Id.* at 340. The court concluded that the "significant variations in franchisees' 'factual and legal arguments'" made clear that common questions of law or fact were not present, and held that "plaintiffs cannot advance a single collective breach of contract action on the basis of multiple different contracts." *Id*.

The above case law dictates that Plaintiffs' proposed class and subclasses fail Rule 23(a)'s commonality requirement.  The proposed class and subclasses include leases with numerous unique royalty clauses, a small sampling of which are described in Bowman's affidavit.  Bowman Affidavit, Exh. 5.  In the 500-lease sample of EQT Production's 25,000 lease documents that Bowman examined, at least 61 unique royalty provisions were identified (some of which are listed above).[19]  Plaintiffs themselves have identified at least 96 unique royalty

---

[19] In their brief, Plaintiffs assert that "defendants prepared a list of leases" and categorized them into twelve different groups based upon their royalty provisions.  ECF No. 300, pp. 12-13. Plaintiffs' assertion mischaracterizes the facts.  The referenced categories were created by the *Plaintiffs, not the Defendants,* in the *Kay Company* Litigation.  The categories were only used by EQT to evaluate its exposure and settlement options during that Litigation.  The list was updated in 2011 in anticipation of the current litigation, but was never imported into Enertia for purposes of determining royalty payments or deductions. The lease categories are not, and have never been, used in the ordinary course of EQT Production's (or any of the other Defendants') business.  The categories do not, and were never intended to, reflect the basis of the method in

provisions.  *See* Plaintiffs' Requests for Admissions, Exh. 14.  Incredibly, none of the named Plaintiffs' royalty provisions are exactly the same as the quoted language of the 96 unique royalty provisions they identify.  The named Plaintiffs even have differing royalty provisions, as two of the named Plaintiffs' leases are clearly the product of negotiation and are not form leases. None of the named Plaintiffs have flat rate leases, which are a distinct subclass proposed by Plaintiffs.[20]  Furthermore, contrary to Plaintiffs' unsubstantiated conclusion that EQT uniformly improperly deducted post-production costs from all of the leases in the proposed subclasses, EQT does not take deductions from all leases.[21]  For example, EQT has not taken a single deduction from Hamric's lease since 2007. Barbour Affidavit, Exh. 7.

Most importantly, pursuant to *Tawney*, whether the deductions were proper requires independent review of each lease and any lease modification.[22]  Plaintiffs attempt to avoid this

which EQT Production pays royalties to lessors.  Neither the Land Administration Department nor the Accounting Department uses the referenced lease categorizations in making or calculating royalty payments and/or any deductions from those payments.  Bergonzi Depo, Exh. 16-B, pp. 58-61.  Further, Plaintiffs appear to be under the impression that EQT has all of the leases "coded" according to these categorizations in Enertia.  This is not the case, because these categories are not used in the ordinary course of business.  *Id.*

[20] Flat rate leases will require additional inquiry from the Court, as it will have to determine whether, and to what extent, the leases have been converted pursuant to W. Va. Code § 22-6-8, before it can determine whether deductions were inappropriately taken from those lessors' royalties.

[21] Plaintiffs' proffered expert Daniel Reineke also makes the unsupported assumption that EQT does not pay Plaintiffs based on the "index price".  Plaintiffs have not presented any evidence to support this assertion, nor have they pointed to any specific lease that EQT Production has violated.  Such unsupported claims should not be considered by the Court.

[22] Furthermore, West Virginia law requires a contract to be construed as a whole, meaning that the royalty provisions cannot be read in isolation.  *Johnson Serv. Co.*, 219 S.E.2d at 317. ("As with other contracts, the language of a lease agreement must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument.").  As the United States District Court for the Northern District of Texas explained:

> The court concludes that there are significant differences between the leases of the proposed class members that make answering the question of whether Chesapeake violated the royalty provisions under Texas law a highly individualized inquiry.  While it may be

reality by making conclusory assertions such as "the Court can decide one lease which will perhaps solve approximately 4000," and that "there exists thousands of same or similar leases which the Court can dispose of by deciding the lease issues from one." Pl.'s Mot. for Class Cert, ECF No. 300, p. 14, 31. These sweeping statements ignore firmly established law that requires the Court to conduct an individual analysis of each lease as a whole. These statements also ignore that simply reviewing the lease itself is insufficient, as the entire lease file must be reviewed to determine whether there have been lease modifications or amendments which may affect the royalty provision. Plaintiffs simply cannot demonstrate commonality, because over 25,000 lease documents are at issue in this action.

### ii. Variances in Gas Content

In order to assess whether putative class members were properly paid for production from their leases, the Court would not only have to analyze the language of each lease and its accompanying file, but also the characteristics of the gas associated with each well and whether (and where) gas was processed. All gas that enters the interstate pipeline must meet a BTU and compression standard. The location of a well can play a part in determining whether gas needs to be processed. Reineke Depo., Exh. 4, p. 35; Friend Depo., Exh. 3, pp. 9-21. Thus, the

---

true that the specific portions of the royalty provisions highlighted by the plaintiffs are substantially the same, the court is required to view the contracts as a whole, and should not give a single provision "controlling effect." Accordingly, the contracts in the plaintiffs' A, B, and C groups can be further broken down based on clauses that speak to elements such as "the point of sale" and "cost at the well" that differ, and in some instances are not included, in many of the contracts.

*Dvorin v. Chesapeake Expl., LLC*, No. 3:12-CV-3728-G, 2013 WL 6003433, at *6 (N.D. Tex. Nov. 13, 2013) (internal citations omitted). Similarly, under West Virginia law, the Court must look at a lease as a whole in determining the contracting parties' intent. Thus, not only would the Court be required to review thousands of royalty provisions, but thousands of leases as a whole.

geographic location and quality of gas has a material effect on its marketability, as the amount of compression, dehydration, and transportation needed prior to entering the interstate pipeline will vary. *See Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 F. App'x 938, 943 (10th Cir. 2013) (remanding and directing the district court to consider the varying degree of marketability of gas between leases in its 23(a) commonality analysis); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (directing the district court on remand to consider the extent to which marketability affects commonality).

Additionally, the distance to the interstate pipeline varies between each well. This distance has a direct correlation to the lost and unaccounted for gas attributable to production from a specific lease for which the Plaintiffs claim entitlement to payment. Accordingly, to determine the amount of volume for which Plaintiffs allege they were not paid, the Court will have to consider the volume of gas produced from each well. This will require individual inquiry into each and every well.

Further, due to the diverse geological composition of the gas formations in West Virginia, the type and quality of gas varies. Some regions produce wet gas and others produce dry gas. *See* Friend Affidavit; Exh. 15; Friend Depo., Exh. 3, pp. 9-21; Reineke Depo, Exh. 4, p. 65. Natural gas liquids are typically only processed in those regions that produce wet gas, *i.e.*, regions with high BTU content. As is evident by the map attached to the Friend Affidavit, the BTU content varies between wells, with wet gas being almost exclusively produced in Northern West Virginia. Friend Affidavit, Exh. 15.

EQT Production does not dispute that natural gas liquids are produced under some of its West Virginia leases. However, the named Plaintiffs are not adequate class representatives regarding the natural gas liquid revenue claim (as is discussed in more detail, *infra*). Plaintiffs

allege that they are entitled to damages for natural gas liquids.  Yet, none of the named Plaintiffs'

gas is processed to remove any liquids.  Their wells do not produce liquids, aside from an

insubstantial amount of oil that is trucked off and sold separately every few years from only a

couple of wells.  Plaintiffs are paid on this separate sale, and, more importantly, no deductions

are taken from those royalties.  No butanes, propane, or other liquid hydrocarbon is produced or

sold.  Gilmore Affidavit, Exh. 6.  Under these circumstances, Plaintiffs' claims are not common

throughout the class.  This also highlights the individualized inquiry that will be necessary to

determine whether each putative class member has a claim with respect to natural gas liquids.  In

sum, the differences in the geographic locations of wells and the BTU content of gas produced

under EQT's West Virginia leases requires individual inquiries into the issue of marketability of

the gas. Such individual inquiries defeat the purpose of a class action. *See Arkalon Grazing Ass'n*

*v. Chesapeake Operating, Inc.*, No. 09-1394-CM, 2014 WL 3089556, at *3 (D. Kan. July 7,

2014) (holding that the commonality requirement was not met because the court cannot resolve

claims on class-wide basis on the issue of marketability without examining the gas quality of

each individual well).

### iii.   Individual Analysis of Alleged Representations

Plaintiffs' claim for fraud similarly requires individual inquiries into each class members'

claim, precluding a finding of commonality.[23] The essential elements in an action for fraud in

---

[23] To the extent Plaintiffs allege fraudulent concealment based on EQT Production's sale of gas
to EQT Energy; that arrangement was entered into in 2005, well before the *Tawney* decision.  It
is therefore undisputed that EQT Production did not enter into sales agreements with EQT
Energy to avoid the holding in *Tawney*.  Further, EQT Production did not provide false royalty
statements to Plaintiffs.  Any charges that are part of the sales price formula were reflected on
each lessor's royalty statement.  These merits issues, however, are not properly before the Court
at this juncture.  What is at issue is whether such claims are suitable for class resolution.  They
are not.  In order to prove liability for such claims, a fact-finder would have to individually
review each alleged misrepresentation made to a lessor and then individually determine if the

West Virginia are: "(1) that the act of fraud was committed by the defendant; (2) that it was material and false; (3) that plaintiff relied upon the misrepresentation and was justified in relying upon it; and (4) that plaintiff was damaged because he relied upon it." *Martin v. ERA Goodfellow Agency, Inc.*, 188 W. Va. 140, 142, 423 S.E.2d 379, 381 (1992) (citing *Horton v. Tyree*, 104 W.Va. 238, 139 S.E. 737 (1927)).

Fraud and negligent misrepresentation claims are not readily susceptible to class action treatment. *Broussard*, 155 F.3d at 341*; Andrews v. AT & T Co*., 95 F.3d 1014, 1025 (11th Cir.1996) (decertifying class in part because "the plaintiffs would ... have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages"); *Castano v. Am. Tobacco Co*., 84 F.3d 734, 745 (5th Cir.1996) (concluding that "a fraud class action cannot be certified when individual reliance will be an issue"). Claims of fraud inherently require individualized inquiries into reliance and knowledge. *Broussard*, 155 F.3d at 342. This creates such an immense barrier to class certification that federal circuit courts flatly deny class actions based on fraud where individual reliance is an issue. *See Castano*, 84 F.3d 734, 745 (5th Cir.1996). As the Supreme Court explained in *Basic, Inc. v. Levinson,* "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." 108 S. Ct. 978, 989 (1988).

Here, the Court would be required to delve into lessors' individual interactions with EQT to decide the fraud claims. For example, any fraud claims by The Kay Company based upon the fact that EQT Production does not account for wellhead volumes on its check stubs should be

lessor relied on the purported misrepresentation. Such individualized inquiry is not feasible in a class action.

barred by the statute of limitations. The Kay Company – as a class representative in the *Kay Company* litigation filed against EQT in 2006 – was aware via EQT's discovery responses that EQT's wellhead volumes and sales volumes are not the same.  In fact, The Kay Company entered into a settlement agreement with EQT fully aware of EQT's demand that any settlement be based on sales volumes because that was EQT's practice.  EQT has not changed its practices since that time.  Therefore, any fraud claims by The Kay Company should be precluded, as it was fully informed of EQT's practices as part of earlier litigation. This example illustrates the need for individual determinations with regard to each royalty owner's fraud claim.

It is Plaintiffs' burden to show that each class member received uniform representations and reasonably relied upon them. To prove reasonable reliance, Plaintiffs would be required to demonstrate what each lessor actually knew about the contested royalty payments and the extent to which they relied upon EQT's representations. *See Broussard*, 155 F.3d at 341.[24]  Plaintiffs make the conclusory argument that EQT Production made material misrepresentations to class members through uniform communication and practices.  However, Plaintiffs ignore that over 100 potential class members individually contacted EQT Production, inquiring about their royalty payments and thereby creating unique individual reliance issues.  Tolman Affidavit, Exh. 8. As seen in the log attached to the Tolman Affidavit (Exhibit 8), these inquiries were not uniform, and primarily dealt with interpreting and applying the unique royalty provisions of a lessor's lease. Such communications are not applicable to the class as a whole. Furthermore, EQT Production regularly receives inquiries from lessors regarding royalty calculation. For

---

[24] *See also Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) (denying class certification on the basis that common questions do not predominate for claims of securities fraud because reliance of misrepresented facts vary shareholder to shareholder); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (holding that individual hearings are required for claims of fraud when plaintiff's knowledge is at issue).

example, the correspondence attached as Exhibit 17 is just one example of a communication from royalty owners that is not applicable to the class as a whole.

Furthermore, EQT would have distinct estoppel, waiver, and/or statute of limitations defenses against those royalty owners who contacted EQT regarding their royalty payments. These dissimilarities preclude a finding of commonality.

### iv.  Summary

Plaintiffs seek to resolve claims for thousands of leases with varying royalty provisions "in one stroke" by certifying a broad class. This obviously cannot be done because the leases are not uniform, nor is the gas that is produced.  *See Adair*, 764 F.3d at 368 (stating that the dissimilarity between leases in class allowing for gathering charge will produce different answers for class members, thus precluding the generation of common answers to the plaintiffs' common questions).[25]  If Plaintiffs' claims are certified, the Court must make exhaustive inquiries into each lease to analyze differing royalty provisions, marketability of gas, wet versus dry gas production, and the interplay among those issues.  This Court must follow Fourth Circuit precedent and find that the numerous dissimilarities between class members' claims preclude a finding of commonality.

### 2.  Claims Of The Named Plaintiffs Are Not Typical Of Those Of The Class.

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Dieter*, 436 F.3d at 466 (quoting

---

[25] The Fourth Circuit's decertification of materially distinct leases in *Adkins* is consistent with other federal class certification cases. For example, in *Morrison v. Anadarko*, 280 F.R.D. 621 (W.D. Okla. 2012) the court denied certification, holding that "dissimilarities amongst the putative class members' oil and gas leases impedes the generation of common answers because numerous class members hold market value leases whose value are determined at the well and numerous other leases that have no valuation point." *Id.*

*Broussard*, 155 F.3d at 340). The Supreme Court of the United States has "repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 102 S. Ct. 2364, 2370 (1982) (quoting *East Texas Motor Freight Sys. Inc. v. Rodriguez*, 97 S.Ct. 1891 (1977)) (quotations omitted).

In conducting a typicality analysis "a court must compare the plaintiffs' claims or defenses with those of the absent class members. . . . That analysis will necessarily entail [1] a review of the elements of plaintiffs' prima facie case[;] ... [2] the facts on which the plaintiff[s] would necessarily rely to prove [those elements,] and (3) a determination of to what extent those facts would also prove the claims of the absent class members." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 304-05 (4th Cir. 2013) (citations omitted) (quotations omitted).

Despite having the burden to do so, the named Plaintiffs have made no effort to show that their leases are typical of the leases of any, much less all, of the leases of the putative class members. This is because they cannot make such a showing. The named Plaintiffs' claims are not typical of the absent class members because they have uniquely negotiated royalty provisions and do not have natural gas liquids produced pursuant to their leases.

### i. Lease Variance

Due to material differences in the leases and interests between the named Plaintiffs and proposed class members, Rule 23(a)'s typicality requirement cannot be met. Numerous variations in lease language exist as to the deduction of post-production costs and royalties. Bowman Affidavit, Exh. 5.

The named Plaintiffs' leases are not typical of all class members. Differences between the named Plaintiffs' leases and the putative class members' leases include the following:

33

- Two of the named Plaintiffs' leases contain royalty clauses whose claimed damages are solely dependent on the market value point established within each lease. *Id.*

- The lease of the remaining named Plaintiff contains a proceeds royalty provision where damages are dependent on the value EQT received from the gas produced. *Id.*

- Two of the named Plaintiffs' leases contain provisions that were specially negotiated by the parties and are not likely found in any other proposed class member's lease. For example, the Kay Company lease has a price floor of 18 cents per mcf.  *Id.*  This is not a standard provision and is not likely to be found in many, if any, proposed class members' leases.

- The deductions described in the named Plaintiffs' leases are not uniform. The Cather lease explicitly provides for a share of the pumping cost so long as they receive an increase in royalty percentage. *Id.*

- None of the named Plaintiffs' leases contain language identical to the 96 categories they identified in their Requests for Admission.

- None of the named Plaintiffs have "deducts allowed" leases or leases which were modified to specifically allow deductions.

- None of the named Plaintiffs have claims typical of those described in proposed Subclass (a) because none are parties to flat-rate leases that have been converted under W. Va. Code, § 22-6-8. Barbour Affidavit, Exh. 7.

The named Plaintiffs' leases only reflect three variations among thousands of West Virginia leases.  Because the class representatives do not possess the same interests as the absent class members, typicality is lacking.  *See Dvorin*, 2013 WL 6003433, at *8 (holding that named plaintiffs were not adequate class members because "[t]hey would have no incentive to pursue arguments regarding the conflicting provisions in other class members' leases that do not exist in their own leases"); *Morrison*, 280 F.R.D. 621, 625 (W.D. Okla. 2012) (holding that typicality requirement not met because class members with different valuation provisions in their lease have different interests).

## ii. <u>Gas Quality Variance</u>

The named Plaintiffs' interests are also atypical of those of many putative class members because **no natural gas liquids** are produced under the named Plaintiffs' leases. Friend Depo., Exh. 3, pp. 94-99. As such, the named Plaintiffs have no viable claims for natural gas liquids revenue and cannot assert those claims on behalf of the proposed classes. *Foster*, 285 F.R.D. at 644 (citing *Falcon*, 457 U.S. at 156-57); *see also Gen. Tel. Co. of Sw. v. Falcon*, 102 S. Ct. 2364, 2370 (1982) (finding that "class representative must be part of the class and possess the same interest and suffer the same injury as the class members.").

Compounding the issue is the fact that each class members' breach of contract claim is dependent upon whether natural gas liquids are produced and sold from their lease.  *See Foster*, 282 F.R.D. at 559-60 (holding "if a class were certified in this case,… [it] would merely set the stage for class member-by-class member determinations as to which class members should also be permitted to recover, on the basis of their facts"). Whether natural gas liquids are produced and sold is materially affected by factors such as the composition of the gas, distance from the

interstate pipeline, and requisite processing. These significant differences make the named Plaintiffs' claims for breach of contract atypical of a state-wide class.

### iii.   <u>Fraud Claims</u>

The named Plaintiffs' claims for fraud are also not typical of the class. Each class member received unique written representations from EQT in the form of royalty statements. Additionally, over one hundred proposed class members received additional representations after inquiring into their royalty payments, and others have engaged in individual correspondence concerning royalty calculation. These separate inquiries demonstrate that uniform reliance did not exist by all members of the proposed class. Due to the distinct representations made to proposed class members and the varying degree of their individual reliance on such representations, the named Plaintiffs' claims for fraud are not typical of the class.

In sum, class certification should be denied because the variations in Plaintiffs' breach of contract and fraudulent misrepresentation claims render them atypical of the class.

### 3.   <u>The Named Plaintiffs are Not Adequate Class Representatives.</u>

The named Plaintiffs are not adequate class representatives. Under Rule 23(a)(4) "the representative parties must fairly and adequately protect the interests of the class." Such determination is intertwined with the typicality analysis, as a "class representative may not assert claims on behalf of the class that she herself does not possess." *Foster v. Apache Corp.*, 285 F.R.D. 632, 644 (W.D. Okla. 2012) (citing *Falcon*, 457 U.S. at 156-57). Additionally, basic due process requires that named plaintiffs possess undivided loyalties to class members because they are adjudicating the rights of all class members. *Broussard*, 155 F.3d at 338. Therefore, the district court must closely scrutinize the adequacy of the named plaintiffs and probe behind the pleadings. *See Rattray v. Woodbury County*, 614 F.3d 831, 835 (8th Cir.2010) (citing *Hansberry*

36

*v. Lee*, 311 U.S. 32, 61 S. Ct. 115, 85 L. Ed. 22 (1940); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).

Further, named plaintiffs must "be of such character as to assure the vigorous prosecution or defense of the action so that the members' rights are certain to be protected." Federal Practice- -§ 1766 The Representatives Will Protect the Interests of the Class—Quality Not Quantity Is Significant, 7A Fed. Prac. & Proc. Civ. § 1766 (3d ed.). The adequacy inquiry focuses on the following questions:

> (i) has plaintiff demonstrated the requisite level of knowledge and control of the litigation to ensure that he will vigorously prosecute the claims asserted here and

> (ii) has plaintiff demonstrated the requisite credibility to ensure that he will act as a fiduciary with respect to the class he seeks to represent.

*Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007). "In conducting this two-part inquiry it is important to bear in mind that "**[a]dequacy is for the plaintiffs to demonstrate**; it is not up to defendants to disprove the presumption of adequacy." *Id.* (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir.2001) (internal quotations omitted) (emphasis added).

This Court cannot allow Plaintiffs to proceed as representatives of the proposed class and subclasses. The proposed class definition includes all of EQT's West Virginia lessors, regardless of whether deductions are permitted, or even taken, under each respective lease. The named Plaintiffs' claims are not typical of the class, creating a direct conflict of interest with class members who have differing claims. Two of the three Plaintiffs have unique royalty provisions that are not typical of the proposed class. Further, none of the named Plaintiffs have flat rate leases that have been converted, rendering them inadequate representatives of that proposed

subclass. In addition, none of the named Plaintiffs has a natural gas liquids claim.[26]  Because the named Plaintiffs do not have the same lease provisions as all of the absent class members, and do not have natural gas liquids claims, the absent class members' interests will not be adequately protected in a class action.  Further, the named Plaintiffs have not demonstrated the requisite level of knowledge to ensure that they will vigorously prosecute the class claims.  They did not even make an effort to identify all individuals who have an interest in their own leases.  Because of the conflicts of interest and lack of vigorous advocacy on behalf of the proposed class members, the named Plaintiffs are not adequate class representatives.

### C.  The Stringent Requirements of Rule § 23(b) Are Not Satisfied

For the reasons already supplied, Plaintiffs cannot demonstrate that common questions predominate over individual questions or that proceeding as a class action is a superior method of adjudicating the putative class members' claims.

### 1.  Common Questions Do Not Predominate Over Individual Questions.

"Under Rule 23(b)(3), whether common questions predominate over individual questions is a separate inquiry, distinct from the requirements found in Rule 23(a). . . . This balancing test of common and individual issues is qualitative, not quantitative." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (citations omitted).  The predominance requirement of Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The problem with Plaintiffs' proposed classes is that each lease is a distinctly negotiated contract with varying terms requiring individualized interpretation.  Although the leases may

---

[26] For these reasons alone, claims related to flat rate leases that have been converted and natural gas liquids are inappropriate for class certification.  *See Falcon*, 457 U.S. at 156-57 (finding that a plaintiff cannot assert claims on behalf of a class that she does not possess herself).

share some common provisions, the dissimilarities are pervasive and overwhelming. As previously discussed, each lease was separately negotiated between the lessors and EQT Production, or their respective predecessors. These negotiations created numerous lease variations that cannot be addressed in one stroke. This Court must review each lease and interpret its associated terms to determine whether a proposed class member has a viable claim.

Moreover, all of the unique leases also require individualized interpretations to determine damages. Plaintiffs' expert even acknowledges that individual inquiries will be required to determine damages.  For example, Mr. Reineke opined that damages for unpaid volume can be calculated by (1) "determining the volume at the wellhead by utilizing the West Virginia tax department's data of volume reported **per well** by defendants to the tax department," (2) "subtract[ing] the volume determined by defendants as the volume **sold at the point of sale**," (3) "tak[ing] the result **for each well** and multiply[ing] it by the index price for the gas sold in that relevant time period," and (4) "add[ing] each by month for a total which results in the loss the class suffers for volume loss."  Reineke Aff., ECF No. 299-24, p. 15 (emphasis added).  Mr. Reineke stated that "these calculations can be made for the entire class by lessors **whose leases do not allow deductions**." *Id.* (emphasis added).  Here, Plaintiffs' proposed expert witness acknowledges that damages calculations will require individual analysis of (1) the gas that is produced from each well, (2) the point of sale, and (3) the individual language of each lease.  Mr. Reineke also testified that he had to re-calculate damages for liquids because he "discovered that certain wells do go through a processing plant and certain wells don't go through a processing plant."  Reineke Depo, Exh. 4, p. 32.  This means, to calculate damages for natural gas liquids, the fact-finder will have to consider whether liquids are produced and whether gas from each well goes through a processing plant.  Thus, the affidavit and testimony of Plaintiffs' own

proffered expert demonstrates that common questions do not predominate. *See Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164,180 (4th Cir. 2010) ("To be sure, individualized damage determinations cut against class certification under Rule 23(b)(3)"); *Broussard*, 155 F.3d at 342–43; *Roderick*, 725 F.3d at 1220; *see also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006).

As explained above, Plaintiffs contend, without any factual basis, that EQT Production pays royalties in a uniform manner. Even if this contention were accepted as true,[27] uniform practices alone do not establish that common questions predominate under Rule 23(b) (3) unless "those practices are relevant to assessing the defendants' ultimate liability." *Adair*, 764 F.3d at 366. Specifically, "uniform treatment of all royalty owners will not carry the day where the uniform treatment must be measured against, among other things, a remarkable variety of royalty clauses (to say nothing of marketing conditions—such as distance to an interstate pipeline—at numerous well sites)." *Foster*, 282 F.R.D. at 559; *see also Roderick*, 725 F.3d at 1220 (holding that predominance is not met simply because a uniform payment methodology exists). "Even a plethora of identical practices will not satisfy the predominance requirement if the . . . common conduct has little bearing on the central issue in the litigation—. . .whether the defendants underpaid royalties. Absent such a relationship, there is no basis for concluding that individual issues will not predominate." *Adair*, 764 F.3d at 366.

The abundance of individual inquiries surrounding the putative class members' claims predominate over any alleged "uniform" royalty practice.  Only after the interest holders have

---

[27]EQT Production demonstrates above that it does **not** treat lessors uniformly. It reviews the particular language of every lease prior to taking a deduction, if any, from a royalty payment. Bergonzi Depo.,Exh.16-A, pp. 17, 27, 31, 42-43, 45, 185-186. It is this individualized treatment, as well as the missing royalty interests, that demonstrate that common questions do not predominate.

been identified, the leases have been interpreted, and the type, quality, volume, and marketability of gas produced from each well has been determined, can the Court compare EQT's actual performance with its individual contractual obligations to determine liability and damages. Under these circumstances, it is evident that such individualized inquiries predominate over any questions common to the putative class and/or subclasses, and that Plaintiffs' have not satisfied Rule 23(b)(3)'s predominance requirement.  *See Adair*, 764 F.3d at 368 ("[V]ariable terms . . . make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis.").[28]

## 2.  A Class Action is not the Superior Method of Adjudicating Thousands of Distinct Contracts.

A class action suit is not the superior method of adjudicating the Plaintiffs' claims. Rule 23(b)(3) requires plaintiffs to demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (3); *Adair*, 764 F.3d at 371.

Here, the class, as proposed by Plaintiffs, is unmanageable. Consideration of manageability "encompasses the whole range of practical problems that may render the class

---

[28] *See also Broussard*, 155 F.3d at 340 (holding that plaintiffs "cannot advance a single collective breach of contract action on the basis of multiple different contracts"); *Dvorin v. Chesapeake Exploration, LLC*, No. 3:12-CV-3728-G, 2013 WL 6003433, at *8 (N.D. Tex. Nov. 13, 2013) (holding that common questions do not predominate in a class action because of varying royalty provisions and post-production clauses); *Arkalon Grazing Ass'n v. Chesapeake Operating, Inc.*, No. 09-1394-CM, 2014 WL 3089556, at *3 (D. Kan. July 7, 2014) (holding that "individual inquiries into the language of each lease and the marketability of gas at each well preclude a finding of commonality"); *Foster*, 282 F.R.D. at 562 (holding that common royalty payment practices does not satisfy Rule 23(b)(3) predominance requirement due to the number of individualized questions associated with each category of leases); *see also Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir.2001) (finding class certification "decidedly inappropriate" when the case involved "different conveyances by and to different parties made at different times over a period of more than a century").

41

action format inappropriate for a particular suit." *Foster*, 282 F.R.D. at 562-63 (quoting *Eisen v. Carlisle & Jacquelin*, 94 S.Ct. 2140 (1974)). Plaintiffs seek to certify two broad subclasses consisting of EQT's West Virginia royalty owners.  To adjudicate the class members' claims, the Court would have to individually review each lease, and examine it along with its associated well(s) to account for variations in gas composition, marketability, differences in processing, and distance from the interstate pipeline. "Certifying a class with as many individual issues as are presented in this case will not advance the efficiency and economy of litigation which is a principal purpose of the procedure." *Foster*, 282 F.R.D. at 562-63 (quoting *Falcon*, 457 U.S. at 159) (citation omitted) (internal quotations omitted).[29]

Moreover, *Tawney* creates another significant manageability issue.  This Court must determine whether costs were "actual and reasonable" with regard to each class member pursuant to Syllabus Point 2 of *Tawney*.  This analysis requires evidence such as that used in an accounting action, including, but not limited to, production volumes, gas characteristic analyses (that would show what downstream activities were necessary to prepare gas for entry into the interstate pipeline system), what the going-rate is in each field for gathering services, and what was actually charged to each owner.  This analysis will require a string of mini-trials that would render the action unmanageable.

Furthermore, due to the individualized nature of the claims and the conflicting interests of the proposed class members, a class action lawsuit is not the superior method of adjudication.

---

[29] *See also Fitzgerald v. Chesapeake Operating, Inc.*, 2014 WL 813861, at *6 (Okla. Civ. App. Feb. 14, 2014) (holding that a class action is not the superior method of adjudicating royalty claims because of varying lease terms  and marketability of each production field).

42

### D.  Certification of Certain Issues Under 23(c) (4) is Inappropriate

Plaintiffs again take a shotgun approach in arguing that certain issues in this case are appropriate for certification under Rule 23(c)(4).  Plaintiffs have not provided any evidence demonstrating that certification under Rule 23(c)(4) is appropriate.  First, Plaintiffs do not even set forth the specific issues or claims that they believe are appropriate for certification under Rule 23(c)(4).  *See* Pl.'s Mot. for Class Cert, ECF No. 300, p. 46-47. Second, for all of the reasons discussed in Sections B and C, *supra*, specific issues or claims cannot be certified under Rule 23(c)(4) because Plaintiffs have not satisfied Rule 23(a)'s commonality, typicality, and adequacy requirements, or Rule 23(b)(3)'s predominance requirement, for *any* of their claims. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) (explaining that "subsection 23(c)(4) should be used to separate "one or more" claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met.").  Accordingly, Plaintiffs' argument that certain issues can be certified for class resolution fails.

### E.  Likelihood of Success on the Merits Is Not Relevant to Issues of Class Certification

To the extent Plaintiffs raise merits issues in their Motion, the likelihood of success on the merits is not relevant when considering class certification.  The Fourth Circuit has held that the "likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citations omitted).  *See also Good v. American Water Works Co., Inc.*, 310 F.R.D. 274, 284 (S.D. W. Va. 2015) (same).  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to

the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d 308, 319 (2013) (citations omitted).[30]

In the present case, issues regarding substantive lease provisions affected by the decision in *Tawney* will be relevant in addressing class certification issues. For example, of the over 25,000 West Virginia leases at issue, some will be affected by *Tawney*, while others will not. Issues touching upon the merits that relate to *Tawney* are relevant at this stage of the proceedings, but issues related to fraud and vicarious liability are wholly premature and have no relevance as to whether class certification is proper.

Furthermore, Plaintiffs' various arguments relating to alter egos, joint ventures, agency, imputed liability, and vicarious liability (Doc. No. 300, pp. 19-25, 9/30/16) were considered and rejected by Judge Stamp in *Leggett, et al. v. EQT Production, et al.*, United States District Court for the Northern District of West Virginia, Case 1:13-cv-00004-FPS-MJA, at pp. 1-18. In that case, Judge Stamp also rejected the same fraud arguments Plaintiffs improperly included in their class certification memorandum. *Id.* at 18-20.

---

[30] The fact that having a "winning argument on the merits" is irrelevant to whether a class should be certified is illustrated by the prohibition against "fail safe" classes. "A fail safe class is one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim. Such a class definition is improper because a class member either wins, or by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Paulino v. Dollar Gen. Corp.*, No. 3:12-CV-75, 2014 WL 1875326, at *3 (N.D.W. Va. May 9, 2014) (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir.2012)) (citing *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir.2011) (affirming denial of class certification because the class "only included those who are 'entitled to relief,'" rendering it an "improper fail-safe class that shields the putative class members from receiving an adverse judgment"); *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir.2010) (recognizing that a fail-safe class is one where "the class itself is defined in a way that precludes membership unless the liability of the defendant is established" and noting that it is "palpably unfair to the defendant").

"Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 133 S. Ct. at 1195, 185 L. Ed. 2d at 319.  Plaintiffs' arguments regarding alter egos, joint ventures, agency, imputed liability, vicarious liability, and fraud are not relevant to the Court's Rule 23 analysis and should be disregarded. More importantly, they have already been rejected in a case pending in this judicial district and the Court should dismiss those claims based upon the sound reasoning employed by Judge Stamp.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Respectfully submitted,

**EQT PRODUCTION COMPANY;
EQT CORPORATION; EQT ENERGY,
LLC; EQT INVESTMENTS HOLDINGS,
LLC; EQT GATHERING, LLC; and
EQT MIDSTREAM PARTNERS, LP,**

**By Counsel.**

*/s/  David K. Hendrickson     10/31/2016*
David K. Hendrickson, Esquire (#1678)
Carl L. Fletcher, Esquire (#1225)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
P. O. Box 11070
Charleston, WV  25339
(304) 346-5500
(304) 346-5515 (fax)
daveh@handl.com
cfletcher@handl.com

45

*and*

John Kevin West (pro hac vice)
**STEPTOE & JOHNSON PLLC**
Suite 2200
Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 458-9889
(614) 221-0952 (facsimile)
kevin.west@steptoe-johnson.com

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

THE KAY COMPANY, LLC,
*et al.*,

        Plaintiffs,

v.                           CIVIL ACTION NO.  1:13-cv-151
                           (Honorable John Preston Bailey)

EQT PRODUCTION COMPANY, *et al.*,

        Defendants.

## CERTIFICATE OF SERVICE

I, David K. Hendrickson, counsel for Defendants, do hereby certify that on the **31st day of October, 2016**, a true and exact copy of **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** was served upon counsel of record as listed below, using the Court's CM/ECF system, which will deliver electronic copies of the same to the following:

Marvin W. Masters, Esquire (#2359)
THE MASTERS LAW FIRM, LC
181 Summers Street
Charleston, West Virginia  25301
*Counsel for Plaintiffs*

Michael W. Carey, Esquire (#635)
CAREY, SCOTT, DOUGLAS & KESSLER, PLLC
Suite 901
707 Virginia Street East
Charleston, West Virginia  25301
*Counsel for Plaintiffs*

    */s/  David K. Hendrickson    10/31/2016*
David K. Hendrickson, Esquire (#1678)
Carl L. Fletcher, Esquire (#1225)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
P.O. Box 11070
Charleston, West Virginia 25339
(304) 346-5500
(304) 346-5515 (fax)
daveh@handl.com
cfletcher@handl.com

47