# *EXHIBIT 12*

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF WEST VIRGINIA
 2

 3                              - - - - -

 4   THE KAY COMPANY, LLC;
     H. DOTSON CATHER, Trustee of
 5   Diana Goff Cather Trust; and
     JAMES E. HAMRIC III and all other
 6   persons and entities similarly
     situated,
 7
          Plaintiff,
 8

 9   vs.                        Civil Action No. 1:13-CV-151

10
     EQT PRODUCTION COMPANY;
11   EQT CORPORATION; EQT ENERGY, LLC;
     EQT INVESTMENTS HOLDING, LLC'
12   EQT GATHERING, LLC;
     EQT MIDSTREAM PARTNERS, LP,
13
          Defendants.
14

15                              - - - - -

16              DEPOSITION OF H. DOTSON CATHER,

17   a Plaintiff herein, called for examination by the

18   Defendants, pursuant to the Federal Rules of Civil

19   Procedure, by and before Stacy Isabell, a Court

20   Reporter and a Notary Public in and for the State of

21   West Virginia at the Holiday Inn Express & Suites

22   Bridgeport, 20 Sweetbriar Lane, Bridgeport, West

23   Virginia on Wednesday, October 7th, 2015, beginning

24   at 3:45 p.m.
```

**Page 13**

1  tell him anything that you and I have discussed
2  because I'm your lawyer.
3      Q.  Just things that you have done personally.
4  And I'm not asking for any communications between
5  you and Mr. Masters.
6      A.  You wouldn't get them anyway. What have I
7  personally done? Is that your question?
8      Q.  Yes, sir.
9      A.  Give me an example of what ...
10     Q.  Well, have you made any effort to -- have
11 you gone to a courthouse and found out other people
12 who had leases with EQT and then contacted them with
13 regard to how their royalties have been calculated
14 by EQT?
15     A.  I don't want to put lawyers out of
16 business.
17     Q.  Have you gone to any courthouse to look
18 for leases that were between EQT and any other
19 lessors?
20     A.  I repeat I don't want to put the lawyers
21 out of business.
22         MR. MASTERS: I think that's a no.
23     Q.  And I'm not going down the same path.
24 It's just kind of a variation of that question.

**Page 14**

1  You've not reviewed the leases of anyone else that
2  has a lease with EQT to see what kind of royalty
3  provision are in the leases, have you?
4      A.  Well, as a matter of fact, I did talk to a
5  couple of other friends who have oil and gas leases
6  with EQT or some version there of. And I let them
7  tell me -- I can't lie about that. I won't lie
8  about that.
9      Q.  Was that before you filed this lawsuit?
10     A.  No. Well, I don't remember. It might
11 have been before when we started getting low
12 royalties or it might have been after. I don't
13 know.
14     Q.  Who were the people that you spoke with?
15     A.  I don't want to name them. They're my
16 friends.
17     Q.  So as we sit here today, do you know the
18 number of West Virginia residents who would fall
19 into the definition --
20     A.  No, I don't.
21     Q.  Could you let me finish the question
22 please because we're taking a record here? If I
23 don't finish the question, no one's going to know
24 exactly what I was asking.

**Page 15**

1      I think you probably did correctly
2  anticipate what my question was going to be. Do you
3  know the number of West Virginia residents who would
4  fall under the definition contained in paragraph 28
5  of your complaint?
6      A.  No, I don't.
7      Q.  Now you mentioned the fact that you were a
8  plaintiff in another class action that was filed
9  against EQT Production and some other EQT
10 subsidiaries; is that correct?
11     A.  I've already answered that question.
12     Q.  The trust was a plaintiff in a case
13 against EQT?
14     A.  Both trusts were.
15     Q.  And is it your understanding that that
16 lawsuit was ultimately settled, that there was a
17 settlement reached with regard to that lawsuit?
18     A.  Of course.
19     Q.  I'm going to hand you a document that I
20 guess will be marked as Deposition Exhibit 1.
21         (Deposition Exhibit No. 1 was marked
22 for identification.)
23     Q.  And I will ask if you are familiar with
24 that document, Mr. Cather. I think it's the same

**Page 16**

1  one that we've marked that as an exhibit to go with
2  the deposition transcript.
3      A.  Are these two copies of the same thing?
4      Q.  They are or they were certainly meant to
5  be if you want to look and make sure. But the one
6  we can just work off of Exhibit 1 there because
7  that's one that is going to be made part of the
8  official record.
9      A.  Why do I have two copies?
10     Q.  Because I made a mistake. I forgot to get
11 the one that has been marked with an exhibit sticker
12 marked before I started asking questions. And I'll
13 give this one to Mr. Fletcher.
14         MR. MASTERS: I have a copy right
15 here.
16     A.  This is from the first suit.
17     Q.  Yes, sir. And that's my question. We
18 were talking about the first suit. And on the
19 second page of that Exhibit 1, it appears that
20 there's a letter there that purports to have your
21 signature to the claims administrator providing them
22 certain information in order to assist them with
23 assessing your claim. On the second page there, on
24 the letter dated September 16, 2010, is that your

**Page 25**

1 earlier, the reason that we became concerned about
2 this particular lease in the M Trust is because we
3 haven't received a nickel this calendar year. The
4 last check we received was in December of last year,
5 a small check.
6   Q.   Prior to that, were you receiving royalty
7 checks?
8   A.   Yes.
9   Q.   Do you know how --
10   A.   And these were culmination wells.
11 Initially, they produced oil and then they produced
12 gas.
13   Q.   Do you know how many wells are located on
14 this lease?
15   A.   I believe -- without getting into the
16 records, I believe six or seven.
17   Q.   Do you know when the most recent well
18 would have been drilled on this lease?
19   A.   It would have been years ago. They
20 drilled seven wells, I believe. And those wells
21 were drilled shortly after this lease. And only 80
22 acres were productive.
23       And you ain't going to drill that many
24 more wells after you drill seven or eight wells on

**Page 26**

1 80 acres. But now go ahead with your questions.
2   Q.   To your knowledge, have any wells been
3 drilled on this acreage encompassed by this lease
4 that were horizontal wells?
5   A.   No. Not to my knowledge.
6       (Deposition Exhibit No. 3 was marked
7 for identification.)
8   Q.   I'm going to hand you another document,
9 Mr. Cather, which I have marked as Exhibit 3. And
10 I'll ask you to take a look at that document and
11 tell us if you are familiar with it?
12   A.   Now you're over in Calhoun County all of a
13 sudden.
14   Q.   Yes. And I'm just going to ask you, I
15 mean, it appears that you and your wife were parties
16 to this lease. Are you familiar with this lease?
17   A.   Yeah. It was the royal. And it's the
18 Charles Despard estate. It's a bear. Yeah. When
19 did we do this? '67. Okay.
20   Q.   Let me ask you this. To your knowledge,
21 is this lease still an active lease? Is there any
22 production coming from this lease?
23   A.   Yes. What does Equitable have to do with
24 this?

**Page 27**

1   Q.   Well, in their records, at one point,
2 their records indicated they had an interest in this
3 lease. So that's why I'm asking you about it, if
4 you're claiming that there's any production by EQT
5 production currently under this lease?
6   A.   For the record, I have no knowledge of EQT
7 having anything to do with this lease from its
8 inception.
9       (Deposition Exhibit No. 4 was marked
10 for identification.)
11   Q.   I'm going to hand you another document
12 which I have marked as Exhibit 4. And I will ask
13 you if you are familiar with this lease.
14   A.   Yes, I'm aware of this lease.
15   Q.   And would you agree that the royalty
16 provision in this lease calls for a flat-rate
17 payment?
18   A.   Yeah, it's a flat-rate lease.
19   Q.   And are you receiving payments from EQT or
20 is the trust receiving payments from EQT under this
21 lease?
22       MR. CATHER:   Marvin, should I ...
23       MR. MASTERS:   Do you want to talk to
24 me?

**Page 28**

1       MR. WEST:   Yeah. We can take a break
2 if you want to talk to Mr. Masters. We'll step out.
3       (A short break was taken.)
4 Resuming:
5   A.   Would you repeat your question please?
6       MR. WEST:   Could you read the question
7 back please?
8       (Court reported read back question.)
9   A.   The original lease -- I guess I can look
10 -- five or six flat-rate wells. And then, at some
11 point, I guess EQT must have obtained a lease. Then
12 they drilled down one of the wells.
13   Q.   Do you know when that was that EQT drilled
14 that other well?
15   A.   It might be in some of the data. They
16 drilled it down and started paying a one eighth,
17 either EQT did or whoever held the lease at that
18 time. And this is the lease where when EQT had it,
19 and the last year in particularly, this year where
20 the deducts became astronomical.
21   Q.   So you think on this lease you're getting
22 a one eighth payment with deductions being taken?
23   A.   This is what it calls for. But we became
24 aware that neither the volume reported in the

```
 1                    CERTIFICATE

 2

 3         I, Stacy Isabell, a Notary Public in and
   for the State of West Virginia, do hereby certify
 4 that the witness, H. DOTSON CATHER, was first duly
   sworn to testify to the truth, the whole truth and
 5 nothing but the truth; that the foregoing deposition
   was taken at the time and place stated herein, and
 6 that the said deposition was recorded
   stenographically by me and then reduced to
 7 typewriting under my direction, and constitutes a
   true record of the testimony given by said witness,
 8 all to the best of my skill and ability.

 9         I further certify that the inspection,
   reading and signing of said deposition was not
10 waived by counsel for the respective parties and by
   the witness.
11
           I further certify that I am not a relative
12 or employee or attorney or counsel of any of the
   parties, nor am I a relative or employee of such
13 attorney or counsel, and that I am in no way
   interested, directly or indirectly in this either
14 counsel and that I am in no way interested, directly
   or indirectly, in this action.
15
           I further certify that the attached
16 transcript meets the requirements set forth within
   Article 25, Chapter 47 of the West Virginia Code, to
17

18         IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal in my office on this 30th
19 day of October 2015.

20

21

22         [Signature: Stacy Isabell]
23              Stacy Isabell
                Court Reporter
24
```

[Notary seal: OFFICIAL SEAL, Stacy Isabell, Notary Public, State of West Virginia, My Commission Expires February 18, 2023, P.O. Box 3133, Elkins, WV 26241]