IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

THE KAY COMPANY, LLC, WILLIAM
CATHER, Trustee of Diana Goff Cather Trusts,
and JAMES E. HAMRIC III, and all other
persons and entities similarly situated,

          Plaintiffs,

v.                                                            Case No. 1:13-CV-151
                                                              Honorable John Preston Bailey

EQT PRODUCTION COMPANY, a Pennsylvania
corporation; EQT CORPORATION, a Pennsylvania
corporation; EQT ENERGY, LLC, a Delaware
limited liability company; EQT INVESTMENTS
HOLDINGS, LLC, a Delaware limited liability
company; EQT GATHERING, LLC, a Delaware
limited liability company; and EQT MIDSTREAM
PARTNERS, LP, a Delaware limited partnership,

          Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT
MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' PROFFERED
EXPERT WITNESSES, DANIEL REINEKE AND DANIEL SELBY**

**I.        INTRODUCTION**

Plaintiffs submit this Response in Opposition to Defendants' Joint Motion to

Exclude Testimony of the Plaintiffs' Proffered Expert Witnesses, Daniel Reineke and

Daniel Selby.  Defendant's memorandum initially raises the issue of whether a full

*Daubert* inquiry at the class certification stage of this proceeding is appropriate.  While

the Fourth Circuit has not ruled on this issue and other circuits are split, the more

appropriate analysis here is a limited *Daubert* analysis, as set forth in *In re Zurn Pex*

*Plumbing Products Liability Litigation,* 644 F.3d 604, 611-614 (8th Cir. 2011).

In *Zurn*, *supra,* the court acknowledged the rigorous analysis a court must conduct in considering class certification. With regard to expert disputes at the class certification stage, the Court found that such disputes, " 'concerning the factual setting of the case' should be resolved at the class certification stage only to the extent 'necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class.' " *Zurn,* 644 F.3d at 611, quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 567 (8th Cir.2005).

As set explained in *Zurn,*

> We have never required a district court to decide conclusively at the class certification stage what evidence will ultimately be admissible at trial.
>
> ****
>
> Zurn urges that we adopt a new rule, requiring a district court to determine conclusively at an early stage, not just whether or not expert evidence is sufficient to support class certification under Rule 23, but also whether that evidence will ultimately be admissible at trial. It urges us to follow the approach used by a Seventh Circuit panel in *American Honda Motor Company, Inc. v. Allen,* 600 F.3d 813, 816–17 (7th Cir.2010) (per curiam).
>
> The plaintiffs in *American Honda* sought to certify a class of motorcycle owners based on an alleged design defect affecting their motorcycles. The plaintiffs relied on an expert who had created his own methodology and standards which he then tested on a single used motorcycle. These tests had been developed only "to assist with a lawsuit and [were] not conceived through the logical flow of independent research," had a "sample size of one," and "lack[ed] acceptance" by the scientific community. *Id.* at 816. The Seventh Circuit panel was thus dealing with a case with expert conclusions based on flawed methodology and a sample size of one when it stated its preference for an early full and conclusive *Daubert* review.
>
> ****
>
> Moreover, we are not convinced that the approach of *American Honda* would be the most workable in complex litigation or that it would serve case management better than the one followed by the district court here.
>
> The district court sought to examine the reliability of the expert testimony in light of the existing state of the evidence and with Rule 23's requirements in mind. The record in this case illustrates why that approach was appropriate and why requiring an even more conclusive *Daubert* inquiry at the class certification stage

2

would have been impractical. As the district court noted with respect to Dr. Blischke:

> Dr. Blischke's analysis was circumscribed by the availability of warranty claims data. However, as merits discovery unfolds and more information becomes available, Dr. Blischke's 40 year estimate for the mean time to failure may or may not be admissible.

It was after all Zurn which sought bifurcated discovery which resulted in a limited record at the class certification stage, preventing the kind of full and conclusive *Daubert* inquiry Zurn later requested. While there is little doubt that bifurcated discovery may increase efficiency in a complex case such as this, it also means there may be gaps in the available evidence. Expert opinions may have to adapt as such gaps are filled by merits discovery, and the district court will be able to reexamine its evidentiary rulings. *See Walzer v. St. Joseph State Hosp.,* 231 F.3d 1108, 1113 (8th Cir.2000) ("Evidentiary rulings made by a trial court during motions in limine are preliminary...."). A court's rulings on class certification issues may also evolve. *See* Fed.R.Civ.P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

Class certification "is inherently tentative," *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), and may "require revisiting upon completion of full discovery," *Blades,* 400 F.3d at 567. Zurn's desire for an exhaustive and conclusive *Daubert* inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings.

*Zurn,* 644 F.3d at 611-613 (footnotes omitted).

The 8th Circuit further explained,

**The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker. The district court's "gatekeeping function" under *Daubert* ensures that expert evidence "submitted *to the jury* " is sufficiently relevant and reliable,** *Bonner v. ISP Technologies, Inc.,* 259 F.3d 924, 929 (8th Cir.2001) (emphasis added), **but "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself,"** *United States v. Brown,* 415 F.3d 1257, 1269 (11th Cir.2005). Similar reasons support less stringent application of *Daubert* in bench trials. *See* Charles Alan Wright, Victor James Gold, 29 *Fed. Prac. & Proc. Evid.* § 6266, n. 90.2 (2010), and cases cited. **The "usual concerns of the [*Daubert* ] rule—keeping unreliable expert testimony from the jury—are not present in such a setting."** *Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 760 (7th Cir.2010).

Zurn correctly points out that we require district courts to rely only on admissible evidence at the summary judgment stage, *see Tuttle v. Lorillard Tobacco Co.,* 377 F.3d 917, 924 (8th Cir.2004), but the questions then are quite different than at the class certification stage. Because summary judgment ends litigation without a trial, the court must review the evidence in light of what would be admissible before either the court or jury. *See* Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In contrast, a court's inquiry on a motion for class certification is "tentative," "preliminary," and "limited." *Coopers & Lybrand,* 437 U.S. at 469 n. 11, 98 S.Ct. 2454; *Blades,* 400 F.3d at 566. The court must determine only if "questions of law or fact common to class members predominate over any questions affecting only individual members [and if] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). As class certification decisions are generally made before the close of merits discovery, the court's analysis is necessarily prospective and subject to change, *Blades,* 400 F.3d at 567, and there is bound to be some evidentiary uncertainty. Because a decision to certify a class is far from a conclusive judgment on the merits of the case, it is "of necessity ... not accompanied by the traditional rules and procedure applicable to civil trials." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

*Zurn,* 644 F.3d at 613-614 (footnotes omitted) (emphasis added).

The *Zurn* Court concluded that the district court did not err by conducting a "focused *Daubert"* analysis that scrutinized the reliability of expert testimony in light of the criteria for class certification and the current state of the evidence. The Court further concluded that the district court conducted the requisite "rigorous analysis" of the parties' claims to determine whether the defendant's liability to all plaintiffs may be established with common evidence. *Zurn*, 644 F.3d at 614. This same analysis can be applied here. This action is in the class certification stage and discovery has been limited. This is not a motion for summary judgment, and the testimony of these experts, at this stage in the proceeding, will be presented to the Court, not a jury. Further, the Court need only determine if Plaintiffs can meet the requirements of Rule 23. This issue involves a decision to certify a class, which is far from a conclusive judgment on the merits of the

case, and it is "of necessity ... not accompanied by the traditional rules and procedure applicable to civil trials."

## II.    LEGAL STANDARD

In assessing a proffered expert's qualifications, courts must " 'consider the proposed expert's full range of experience and training,' not just his professional qualifications." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Once qualified, an expert's testimony is admissible if it will assist the trier of fact and is (1) "based on sufficient facts or data," (2) "the product of reliable principles and methods," and (3) "the principles and methods [have been applied] reliably to the facts of the case." Fed. R. Evid. 702; see *United States v. McLean*, 715 F.3d 129, 144 (4th Cir. 2013). Admissibility of such testimony is governed by a two-part test: the evidence is admitted if "it rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Relevance and reliability is guided by, among other things:

> (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

*United States v. Crisp*, 324 F.3d 261, 266 (4th Cir.2003) (quoting *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786)).

The court need not, however, consider all of the factors in lockstep fashion. *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 282–83 (S.D.W. Va. 2015). Neither Rule 702 nor case law establishes a mechanistic test for determining the reliability of an

expert's proffered testimony. *Id.* In *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378 (4th Cir.1995), the court first reviewed the basic holdings of *Daubert,* and then stressed that *Daubert* has not imposed a "rigid test or checklist" of factors:

> In offering these guidelines, the court emphasized that it was not formulating a rigid test or checklist, relying instead on the ability of federal judges to properly determine admissibility. In conclusion, the Court held that the Federal Rules of Evidence, especially Rule 702, assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.

66 F.3d at 1384 (internal citation and quotation omitted). "All *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable ... and helpful." *Maryland Cas. Co. v. Therm–O–Disc., Inc.,* 137 F.3d 780, 783 (4th Cir.1998). " 'The test of reliability is flexible' and 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.' " *United States v. Wilson,* 484 F.3d 267, 274 (4th Cir.2007) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141-42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). To be relevant, the evidence must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a). Another aspect of relevancy is whether there is a sufficient "fit," or in other words " 'whether expert testimony proffered in the case is *sufficiently tied to the facts of the case* that it will *aid the jury* in resolving a factual dispute.' " *Id.* at 591 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)) (emphasis added). A court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved. *See Kumho Tire Co.,* 119 S.Ct. at 1175–76 (footnote omitted).

It is important to recognize that, notwithstanding a trial court's "gatekeeping" function as to expert opinion, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595. A court should also be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. *See Cavallo v. Star Enter.,* 100 F.3d 1150, 1158–59 (4th Cir.1996). Further, although the trial court is granted broad discretion, the rejection of proposed expert witness testimony is the exception rather than the rule. *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 634–35 (E.D.N.C. 2013) (citing Fed. R. Evid. 702 advisory committee's note (2000)); s*ee also United States v. Crisp*, 324 F.3d 261, 269–70 (4th Cir. 2003) ("The Supreme Court emphasized in *Daubert* that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " (quoting *Daubert*, 509 U.S. at 596)).

A witness qualified as an expert has wide latitude to testify on matters within the scope of his expertise. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993). The primary limitation on the scope of an expert's testimony is helpfulness: testimony that is helpful to the jury may be admissible, while testimony that is not helpful can be excluded. *See Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir.1993) ("The boundary between [admissible and inadmissible expert testimony] is defined by helpfulness.").

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may

disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. The Advisory Committee Notes to Rule 703 provide:

> Facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. The first is the firsthand observation of the witness with opinions based thereon traditionally allowed. A treating physician affords an example. Rheingold, The Basis of Medical Testimony, 15 Vand.L.Rev. 473, 489 (1962). Whether he must first relate his observations is treated in Rule 705. The second source, presentation at the trial, also reflects existing practice. The technique may be the familiar hypothetical question or having the expert attend the trial and hear the testimony establishing the facts… The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes. Rheingold, *supra,* at 531; McCormick § 15. A similar provision is California Evidence Code § 801(b).

Pursuant to Federal Rule of Evidence 704(a),

**(a) In General--Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

According to the Advisory Committee Notes to Rule 704,

The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17. Efforts to meet the felt needs of particular

situations led to odd verbal circumlocutions which were said not to violate the rule. Thus a witness could express his estimate of the criminal responsibility of an accused in terms of sanity or insanity, but not in terms of ability to tell right from wrong or other more modern standard. And in cases of medical causation, witnesses were sometimes required to couch their opinions in cautious phrases of "might or could," rather than "did," though the result was to deprive many opinions of the positiveness to which they were entitled, accompanied by the hazard of a ruling of insufficiency to support a verdict. In other instances the rule was simply disregarded, and, as concessions to need, opinions were allowed upon such matters as intoxication, speed, handwriting, and value, although more precise coincidence with an ultimate issue would scarcely be possible.

Many modern decisions illustrate the trend to abandon the rule completely. People v. Wilson, 25 Cal.2d 341, 153 P.2d 720 (1944), whether abortion necessary to save life of patient; *Clifford-Jacobs Forging Co. v. Industrial Comm.,* 19 Ill.2d 236, 166 N.E.2d 582 (1960), medical causation; *Dowling v. L. H. Shattuck,* Inc., 91 N.H. 234, 17 A.2d 529 (1941), proper method of shoring ditch; *Schweiger v. Solbeck,* 191 Or. 454, 230 P.2d 195 (1951), cause of landslide. In each instance the opinion was allowed.

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact… These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed. McCormick § 12.

## III.   DISCUSSION

Plaintiff has proffered Daniel T. Reineke and Daniel L. Selby as expert witnesses in this action. Defendants object to Mr. Reineke's testimony on the grounds that (1) Mr. Reineke and Mr. Selby are unqualified to render opinions in this matter; (2) Mr. Reineke's and Mr. Selby's opinions relate to issues upon which expert testimony is not permitted or admissible; and (3) Mr. Reineke's and Mr. Selby's opinions are unreliable or irrelevant.   As fully addressed below, Defendants arguments are without merit and Defendants' motion to exclude these witnesses should be denied.

A.      **Daniel T. Reineke**

1.      **Mr. Reineke is Qualified to Render Opinions in this Matter.**

The first issue which must be addressed is whether Mr. Reineke is "qualified as an expert by knowledge, skill, experience, training, or education" to render the opinions which he has proffered. "Under Rule 702, to be 'qualified' as an expert, a witness must have 'knowledge, skill, experience, training, or education' in the subject area in which he intends to testify. Fed.R.Evid. 702.  An expert's qualification depends on 'the nature of the opinion he offers.' *See Gladhill v. Gen. Motors Corp.,* 743 F.2d 1049, 1052 (4th Cir.1984)." *Foster v. Legal Sea Foods, Inc.,* 2008 WL 2945561 (D.Md. July 25, 2008).

Mr. Reineke has over 40 years of experience in the oil and gas industry. (ECF No. 205-9, pp. 11-13).  In 1972 and 1973, he worked as roughneck in Wyoming and Utah during the summers while he was earning his Bachelor of Science Degree in petroleum engineering. (Id.)  In the summer of 1974, he worked as a student engineer in the drilling department of CONOCO in Louisiana. (Id.)  In 1975, he graduated from the Colorado School of Mines with a BS Degree in Petroleum Engineering. (Id.)  In 1975 and 1976, he worked as a drilling engineer for CONOCO in Houston, Texas. (Id.)  While working there, he also attended schools on offshore and onshore drilling practices. (Id.)  From June 1976 to 1978, he worked as a District Engineer for the Kansas-Nebraska Natural Gas Company. (Id.)  While there, he drilled and completed 40 wells, designed and supervised the installation of a gathering system, including compression and treating facilities, and coordinated field operation with gas plant personnel to ensure maximum efficiency in gas production. (Id.)  From February 1978 to September 1979, he worked for SAMEDAN Oil Corporation as a Division Engineer, supervising drilling, completion

and production for the company. (Id.)  He participated in gas contract negotiations, joint interest billing procedures, and reservoir analysis on wells for yearly budget reviews. (Id.)  From September 1978 to the present, he has worked as an independent consulting engineer. (Id.)  As an independent consultant, he supervised filed operations in drilling and completion, performed reservoir analyses and economic evaluations, designed gathering systems, and assisted client in negotiating gas sales contracts, lease agreements and operating agreements.  He continues to consult for various independent oil companies. (Id.)  He was also the President of C.D. Operating Company from 1987 to 2010. (Id.)  While President of C.D. Operating, he purchased and/or drilled and operated over 100 wells in Oklahoma, Utah, Kansas and Texas. (Exh. 1, pp. 57-58.)  During this time, he dealt with multiple oil and gas leases. (Exh. 1, p. 58.) This business required him to be familiar with and to enter into multiple leases and to calculate and pay royalties pursuant to those leases. (Exh. 1, p. 59-61.)  In addition, he negotiated and entered into gas sales contracts. (Exh. 1, p. 62.)  The business also operated a gathering system in Utah that took gas to be processed and/or treated. (Exh. 1, p. 64.)  Mr. Reineke has also testified to issues relating to the oil and gas industry as a litigation consultant in multiple jurisdictions throughout the United States, including West Virginia, since 1995.  (See Doc. 205-9, pp. 13-20).  He has testified as an expert regarding whether producers have followed accepted business practices and he has reviewed databases and testified about underpayment of royalties in various jurisdictions. (Exh. 2.)  He is a licensed engineer in Oklahoma and Utah. (Exh. 1, p. 41.)

Mr. Reineke has over 40 years of experience, skill and knowledge in nearly every facet of the oil and gas industry.  He has also gained knowledge of Defendants' practices

through discovery and witness testimony.  He is undoubtedly qualified to render opinions to testify regarding Defendants' business structures, i.e., the production, gathering, processing and selling of gas, and the proper method of calculating royalties in the industry.  He is not required to have personal knowledge of the Defendants' business operations in order to offer his opinions.  An expert may base an opinion on facts or data in the case that the expert has been made aware of through testimony, per Federal Rule of Evidence 703.  Mr. Reineke's background qualifies him to testify regarding the propriety of both the Defendant's actions and practices.  During his analysis, Mr. Reineke also reviewed discovery produced by Defendants and testimony of the Defendants' witnesses. Mr. Reineke reviewed a variety of materials in forming his opinions in this case, applying his knowledge and experience to the facts. As the Fourth Circuit has stated, "Rule 702 further provides that a witness may be qualified as an expert on the grounds of 'knowledge, skill, experience, training, *or* education." *Friendship Heights Associates v. Vlastimil Koubek, A.I.A.,* 785 F.2d 1154, 1159–60 (4th Cir.1986) (emphasis in original) (quoting Fed.R.Evid. 702)).   Mr. Reineke has sufficient education, knowledge, experience, and training to make his testimony admissible under Rule 702. *See Friendship Heights Associates v,* 785 F.2d at 1159–60.

An additional consideration under Rule 702 is "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving the factual dispute." *Daubert,* 509 U.S. at 591 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). The consideration is one of "fit." In other words, will the expert testimony be helpful to the jury.  Mr. Reineke's experience, skill and knowledge would assist the Court and the jury to understand complex issues and

information relating to the oil and gas industry in general, and would necessarily assist the Court and jury in understanding the practices in the industry, in relation to and in comparison to, the Defendants' practices in this case.

Furthermore, there is nothing in the Federal Rules, or any case law or other precedent, which requires Mr. Reineke to be a licensed petroleum engineer in West Virginia in order to provide expert testimony pursuant to Rule 702. *See FA Mgmt., Inc. v. Great Am. Ins. Co. of N.Y.*, No. 5:13CV25, 2014 WL 2515040, at *8–9 (N.D.W. Va. June 4, 2014). And, in assessing a proffered expert's qualifications, courts must " 'consider the proposed expert's full range of experience and training,' not just his professional qualifications." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). It is also important to recognize that, notwithstanding a trial court's "gatekeeping" function as to expert opinion, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595. While Plaintiffs do not agree with Defendants' arguments, the more appropriate context for the arguments that Mr. Reineke is not licensed in West Virginia and has never been employed with any of the Defendants is cross-examination is through cross-examination. This is not a case where the exception, excluding Mr. Reineke's testimony, rather than the rule should be applied.

### 2.     Mr. Reineke's Opinions are Permitted and Permissible.

Mr. Reineke's opinions are helpful to the jury and should not be excluded. As explained by the Tenth Circuit in *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988):

13

> We do not exclude all testimony regarding legal issues. We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

An expert does not invade the court's authority by discoursing broadly over the entire range of the applicable law where the opinion is focused on a specific question of fact. *Id.* (citing *Huddleston v. Herman & MacLean,* 640 F.2d 534, 552 (5th Cir.1981), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (attorney expert in securities law allowed to testify that a statement in a prospectus was standard language for the issuance of a new security because this information helped the jury weigh the evidence of defendants' scienter)). *See also, Camacho v. Nationwide Mut. Ins. Co.*, 13 F. Supp. 3d 1343, 1366 (N.D. Ga. 2014); *Travelers Indemnity Co. v. Royal Oak Enter. Inc.,* 2004 WL 3770571, *2 (M.D.Fla. Aug. 20, 2004) (When "the substance of the expert's testimony concerns ordinary practices and customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry, his passing reference to a legal principle or assumption in an effort to place his opinions in some sort of context will not justify the outright exclusion of the expert's [testimony] in its entirety."); *Principal Mut. Life Ins. Co. v. United States,* 26 Cl.Ct. 616, 623 (1992), *aff'd,* 50 F.3d 1021 (Fed.Cir.1995) (quoting *Aetna Life Ins. Co. v. United States,* 16 Cl.Ct. 364, 365 (1989), *aff'd,* 935 F.2d 280, 1991 WL 72724 (Fed.Cir.1991) (expert testimony reaching legal conclusions may be admissible "where the testimony concerns 'state law or a technical provision peculiar to the ... industry."); *Applegate v. United States,* 35 Fed. Cl. 406, 424–25 (1996).

It is the role of the trial judge to distinguish opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion. *See Owen v. Kerr–McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983).  As many courts have recognized, it is often difficult to draw the line "between proper expert evidence as to facts, the inferences to be drawn from those facts, and the opinions of the expert, on the one hand, and the testimony as to the meaning and applicability of the appropriate law, on the other hand." *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 366 (4th Cir.1986), disapproved on other grounds in *Pinter v. Dahl,* 486 U.S. 622 (1988).  However, Federal Rule of Evidence 702 permits an expert to give opinions on scientific matters, technical matters, or matters involving other specialized knowledge so long as the testimony "*will assist the trier of fact* to understand the evidence or to determine a fact in issue" (emphasis added). The touchstone of the rule is whether the testimony will assist the jury. *United States v. Offill*, 666 F.3d 168, 174–76 (4th Cir. 2011).  Determining when legal conclusions would be helpful to the jury must also take into account the role that the judge has in instructing the jury on the law. *Id.*  Further, it has been noted that when the legal regime is complex and the judge determines that the witness' testimony would be helpful in explaining it to the jury, the testimony may be admitted. *See United States v. Barile,* 286 F.3d 749, 760 n. 7 (4th Cir.2002).  Indeed, courts and commentators have consistently concluded that expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly specialized or technical legal issues. *See, e.g., United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts"); *Peckham v.*

*Cont'l Cas. Ins. Co.,* 895 F.2d 830, 837 (1st Cir.1990) (expert testimony on proximate causation in insurance law was properly admitted because experts "could reasonably be expected to shed some light in a shadowy domain"); *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed.2003) ("[Expert] testimony may be helpful if the case involves a specialized industry"). *See also, Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 22 Fed. R. Evid. Serv. (LCP) 1227 (5th Cir. 1987), (a suit involving the net profits on a lease of an oil field, the court held that, because the word "costs" has a technical meaning within the field of oil and gas accounting, the trial court properly permitted accountants—one of whom was also an attorney—to testify to its meaning. The court stated that, although the word had a lay meaning, too, its specialized meaning rendered the expert testimony on that subject admissible); *Nucor Corp. v. Nebraska Public Power Dist.*, 891 F.2d 1343, 29 Fed. R. Evid. Serv. (LCP) 364 (8th Cir. 1989), reh'g denied, (Jan. 19, 1990) and reh'g withdrawn, (Jan. 31, 1990) and reh'g denied, (Mar. 16, 1990) and related reference, 999 F.2d 372, 26 Fed. R. Serv. 3d (LCP) 502 (8th Cir. 1993), reh'g and suggestion for reh'g en banc denied, (Sept. 1, 1993) (experts could testify regarding the meaning of "fair," "reasonable," and "non–discrimination," in the context of an electricity overcharging dispute between a company and a utility, because expert testimony is frequently admitted to explain technical terms and whether the terms have acquired a well–recognized meaning in a business or industry); *O'Neill v. Atlas Auto. Finance Corp.*, 139 Pa. Super. 346, 11 A.2d 782 (1940) (witnesses explaining the significance of the accounting reports in the performance of the contract aided the jury in understanding whether the performance complied with the contract's terms).

First, it should be noted that the standards set forth in *Wellman v. Energy Resources*, 557 S.E.2d 254 (W.Va. 2001) and *Estate of Tawney v. Columbia Natural Resources,* 633 S.E.2d 22 (W.Va. 2006) set the standards for payments of royalties in the oil and gas industry.  Mr. Reineke merely refers to cases as a guide for the standards in the oil and gas  business or industry.  His testimony concerns ordinary practices and customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry and his reference to standards merely place his opinions in context.   He is not advocating for, or offering, an interpretation of the law.  Further, as set forth above, Mr. Reineke's extensive experience, skill and knowledge in the oil and gas industry qualifies him to testify to these standards and the performance of these standards.  He relies on "standards in the industry as set forth in public, as well as private, transactions and his personal experience." (ECF No. 205-9, p. 2)

Moreover, there are specialized terms within the oil and gas industry that necessitate expert testimony in order for the jury to understand these standards and to allow them to apply these standards, and the law as instructed by the Court, to the facts in the case, i.e., production, gathering, transportation, processing, "post production," mid-stream, mmbtu, hydrocarbon, NGLs, "index price," "point of sale".  It is helpful to a fact-finder to understand these terms to be able to determine what these terms entail and how they apply to the facts at issue.  It is helpful for a jury to understand the manner in which the Defendants compute and determine their royalties and deductions from royalties.  This is a highly technical area that lay jurors could not be expected to understand Defendants' operations without the assistance from an expert familiar with the industry

and its terms and practices.   Mr. Reineke has reviewed thousands of pages of documents relating to Defendants' practices and can testify to the Defendants' databases and lease information and can present this information to the jury.  His testimony in this respect will is invaluable in assisting jurors in understanding and applying this information.

Additionally, his opinions, based upon his review and experience, skill, knowledge and education, include the opinions that "EQT deducts from its royalty owner at the same proportionate rate across all leases," (ECF No. 205-9, p. 7.) and that "out of all EQT accounting data provided to me, 95% of the leases which had deductions taken, were at a uniform proportionate rate for each district geographically."  He also reviewed, analyzed and compared EQT's royalty payment history and compared it to index prices and calculated the estimated damage to royalty owners.  His opinions, set forth in ECF No. 205-9, pp. 7-10 do not state legal conclusions.  They do not seek to instruct the jury on the law or advocate a particular legal interpretation.

Nonetheless, the specialized nature of the legal regimes involved in this case and the complex concepts and information make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury.  To be sure, the ultimate responsibility for instructing the jury on the law belongs to the Court, but, in these circumstances, the expert testimony will assist the Court and the jury. Indeed, it would be difficult to imagine how the Plaintiffs could effectively present their case, or how the jury would understand the case, without the assistance of Mr. Reineke's testimony.

      **3.**        **Mr. Reineke's Opinions are Reliable.**

Mr. Reineke's opinions, as stated in his deposition and as set forth in his disclosure and Affidavit, provide that they are based upon his experience, skill, knowledge, and education.  Mr. Reineke's qualifications have been established above. He has expressly provided that his opinions are based upon his review of discovery documents, Defendants' databases, testimony of Defendants' witnesses, and a review of index prices. (ECF Nos. 309-1, pp. 2-3, 309-3, p. 23.)  Defendants' arguments that there are facts that contradict the 30(b)(6) testimony of their own witnesses does not render Mr. Reineke's opinions unreliable because he relied upon that testimony.  Further, Mr. Reineke's opinion, that Defendants are not paying index prices, is supported by Defendants' databases and records and a review of the TCO and Dominion index prices. (ECF 309-3, p. 23.)  A motion to exclude is not the proper method to address the issues raised by Defendants in this section.  As set forth in the legal standard above, Rule 702 was intended to liberalize the introduction of relevant expert evidence.  *See Cavallo v. Star Enter.,* 100 F.3d 1150, 1158–59 (4th Cir.1996).  Further, although the trial court is granted broad discretion, the rejection of proposed expert witness testimony is the exception rather than the rule. *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 634–35 (E.D.N.C. 2013) (citing Fed. R. Evid. 702 advisory committee's note (2000)).  Moreover, while Plaintiffs disagree with Defendants' arguments, "the Supreme Court emphasized in *Daubert* that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *United States v. Crisp*, 324 F.3d 261, 269–70 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 596)).

The issue of whether EQT Production is required to pay Plaintiffs for liquids and Mr. Reineke's opinions on this issue is premature at this time. At this point, Mr. Reineke has deleted his damage allocation based upon testimony from Defendants that certain gas was not being processed. However, Mr. Reineke made clear that he has never been provided a list of gas wells for which the liquids were or were not processed and Defendants' 30(b)(6) witness on this issue, when asked, could not testify whether or not the Plaintiffs gas was processed. (Exh. 1, pp. 142-143). Mr. Reineke's opinions regarding natural gas liquids (NGLs) should not be excluded at this time. The information regarding the liquids in Plainitffs' gas is not definitive at this time. However, it is Mr. Reinekes' opinion that if the gas was processed and NGL's are recovered, royalty owners are due value. (Exh. 1, pp. 142-43.) Further, even if Plaintiffs' gas is not being processed at this time, they have natural gas with liquid hydrocarbon and they have an interest in how their lease is interpreted by their lessee. (Exh. 1, pp. 142-43.)

Defendants' argument relating to Mr. Reineke's testimony regarding the reasonableness of the gathering rate paid by EQT is also premature. First, he testified that he has not evaluated this at this time. His testimony revolves around the fact that what EQT charges is not the actual rate incurred at the time. His testimony is that the gathering rate is not actual because it is "forecast" and the question of whether it is reasonable is based on accounting standards addressed by Mr. Selby. (Exh. 1, p. 93). Further, Defendants' argument is focusing on royalty calculations and Mr.Reineke is opining, in this instance, on gathering rates, not royalty calculations. Furthermore. Contrary to defendants' claim, Mr. Reneike did not testify or acknowledge that income taxes,

depreciation, and return on investment are added back into the sales price before calculating royalties. (Exh. 1, pp. 78-79).

Moreover, as established above, Mr. Reineke is qualified to render opinions on the estimated damages here.  His extensive experience in and knowledge of the industry, including but not limited to the experience in calculating royalties and the knowledge he has learned from the documents and testimony in this case and as limited by this Court's instruction or decision with respect thereto, qualifies him to render opinions on the calculation of royalties.  His opinions are based upon his experience with and knowledge of the industry and the standards within the industry and the testimony of and documents provided by Defendants.  As set forth above, this is a reliable basis for his opinions under the Federal Rules.

Defendants' argument with regard to the NGL uplift is also premature at this stage.  For purposes of class certification, Mr. Reineke was required to estimate these damages because he has not received all of the information necessary to make these calculations.  However, based upon the cases he has been involved with in calculating and administering these types of damages, this is a reliable method to estimate damages at the class certification stage.  NGL's have value and Mr. Reineke's opinion gives the Court a reasonable estimate of how damages may be calculated on a class wide basis and whether there are any damages, not necessarily the exact amount thereof, at the class certification stage.  The numbers that are now estimates will be actual calculations after merits discovery is complete.

**B.**     **Daniel L. Selby**

   **1.**     **Mr. Selby is Qualified to Render Opinions in this Matter.**

Mr. Selby is qulaified to render opinions in this matter.  He is a licensed certified public accountant, a certified valuation analyst and he is certified in finanacial foresincs. (ECF No. 205-8, pp. 1, 4-23)   He obtained a Bachelor of Arts degree in Business in 1975 and also earned an M.B.A. in 1977. (Id.)   Throughout his career, he has taught accounting, foresnsic accounting and auditing courses as an adjucnt professor, and he has taught at various seminars on subjects including business valuations. (Id.)  He has been qualified as an expert in finance and accounting in courts in West Virginia, Pennsylvania, Ohio, Kentucky, Virginia, Maryland, North Carolina, South Carloina, and Florida. (Id.) He has also provided reports in Texas, Louisiana and Wyoming. (Id.)  He has extensive experience with respect to businesses and accounting.

Mr. Selby has over 40 years of experience, education, skill and knowledge in business, accounting and valuation.  He has also gained knowledge of Defendants' business practices through discovery and witness testimony.  He has reviewed volumes of data, produced by Defendants in discovery, associated with Defendants' planned expenses and tax expenses used as the basis for their deductions.  He has also reviewed the testimony of Defendants' witnesses, Defendants' SEC filings, and Defendants' business organization charts.  He also has other experience and knowledge relating to the relating to the oil and gas industry and accounting principles.  He has audited gas companies; valued gas companies and gas company business segments; he has been involved in natural gas litigation, over the years since 1984; he was involved in regulation of gas companies while employed with the WV Public Service Commission; he assisted in the preparation of natural gas accounting and tax testimony before the Federal Energy Regulatory Commission (FERC), while working for J.W. Wilson &

22

Associates in the 1980's. (Exh. 3.)   He is also familiar with the chart of accounts that guide the accounting process applicable to natural gas companies.  (Id.)  Being a CPA, and CVA, he has experience with operating costs, inclusive of both intra-company and inter-company cost allocations. (Id.)  He is familiar with variable and fix costs, along with other cost accounting designations for expenditures and incurred costs. (Id.) Further, within the scope of teaching accounting courses at WV State College (now University), Marshall University and the University of Charleston, he has have taught theory and application of expense designation and classifications. (Id.)

Based upon the legal standards set forth above, Mr. Selby is undoubtedly qualified to render opinions and testify regarding Defendants' business structures and accounting practices.  Mr. Selby's experience, skill, education, and knowledge will also help the Court and the jury to understand complex issues and information relating to the Defendants' business organization and accounting practices.  Furthermore, in assessing a proffered expert's qualifications, courts must " 'consider the proposed expert's full range of experience and training,' not just his professional qualifications." It is also important to recognize that, notwithstanding a trial court's "gatekeeping" function as to expert opinion, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." This is not a case where the exception, excluding Selby's testimony, rather than the rule should be applied.

Moreover, Mr. Selby is not opining to legal issues.  He merely provides the standards in the industry to put his opinions in context.  He does not and will not instruct the jury on the law.   Furthermore, Mr. Selby's experience, skill, education and

knowledge, and the records and tedstimony he has reviewed are the basis for his opinions that EQT Corporation and its subsidiaries operate as one company in fact and substance. Mr. Selby does not opine on any law in this regard.  Nonetheless, even if Mr. Selby's opinions do touch on legal issues, they are still helpful to the jury and should not be excluded.  Lay jurors cannot be expected to understand the complex accounting issues and business issues involved here.  The same analysis applied to Mr. Reineke's opinions above can be applied here and Mr. Selby's opinions should not be excluded.

### 2.    Mr. Selby's Tesimony on Punitive Damages Should Not be Excluded.

At the outset, Plaintiffs note that this issue is premature since merits discovery has not taken place and puntive damages is not an issue for class certification.[1]  Nonetheless, as sert forth above, Mr. Selby is qualified to render opinions in this regard.  Further, Mr. Selby has not and will not take any position that the jury should award a certain amount of money.  *See* Exh. 3.  He will simply help provide the jury a better understanding of Defendants' financial position which is relevant to an award of punitive damages.  As set forth by Mr. Selby in his Affidavit, Exh. 3:

(1) I have made no legal declarations in any regard. I have merely set forth for jury use as to the assets, liabilities, and equities that the company holds on a consolidated basis. In addition, I have shown a regression analysis that produced a statistically valid correlation between EQT's stock price and the movement of its net earnings and the Dow Jones Index. This provides the jury with an understanding as to how much net income the Company would have to lose before its stock price would be affected. The calculated regression carried an 82.65% R squared. The Company's stock price movement can be captured by the movement of the DOW Jones Index and net income. This model provides the jury with a frame of reference as to the size of EQT consolidated and to what extent independent variables would need to move before the company's stock price is affected. It by no means indicates what an award should be. It is a reflection of relative size of the entity. Further I have shown what cash they have generated and what cash the Company expended and for from what sources produced the

---

[1] Plaintiff reserves the right to further address this issue should the Court deem it necessary to consider at this stage in the proceedings.

cash and for what uses the cash was spent for various years, on a consolidated basis.

(2) At no time have I opined as to how much it would take to punish the Defendants, I have left that up to the trier of fact.

(3) All of the information placed in the record relative to the capacity to pay a punitive award was information for jury use during their determination as to what award should be assessed, in compliance with generally accepted information submitted during a punitive award process.

(4) All of the information provided in this record as Company data came from company's consolidated SEC Form 10K that is in the public domain.

The amount of punitive damages will be left to the discretion of the jury.  Furthermore, it should be kept in mind that the Court will instruct the jury on punitive damages to ensure that the jury uses and weighs the appropriate factors in awarding punitive damages which should alleviate Defendants' concerns regarding any possible prejudice or an arbitrary jury award.

## IV. CONCLUSION

It is for these reasons that Plaintiffs respectfully request this Court to deny Defendants' Motion.

THE   KAY   COMPANY,   LLC,   WILLIAM CATHER, Trustee of Diana Goff Cather Trusts, and JAMES E. HAMRIC III, and all other persons and entities similarly situated,
By Counsel

/s/ Marvin W.  Masters
Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301

Michael W. Carey
West Virginia State Bar No. 635
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301

Thomas W. Pettit
West Virginia State Bar No. 2886
Thomas W. Pettit, L.C.
Post Office Box 189
Barboursville, West Virginia  25504

## <u>CERTIFICATE OF SERVICE</u>

I, Marvin W. Masters, hereby certify that on November 14, 2016, I electronically filed "Plaintiffs' Response in Opposition to Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Proffered Expert Witnesses, Daniel Reineke and Daniel Selby" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

David K. Hendrickson
Carl L. Fletcher, Jr.
Hendrickson & Long PLLC
214 Capitol Street
Post Office Box 11070
Charleston, West Virginia  25339
daveh@handl.com
cfletcher@handl.com
Counsel for Defendants


Michael W. Carey
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301
mwcarey@csdlawfirm.com
Counsel for James E. Hamrick, III


Thomas W. Pettit
Thomas W. Pettit, L.C.
945 Main Street
Post Office Box 189
Barboursville, West Virginia  25504
twpettit@comcast.net
Co-Counsel for H. Dotson Cather


/s/ Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
304-342-3106
mwm@themasterslawfirm.com

26