IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

THE KAY COMPANY, LLC,
H. DOTSON CATHER, Trustee
of Diana Goff Cather Trusts,
and JAMES E. HAMRIC III,
and all other persons and
entities similarly situated,

        Plaintiffs,

v.                                                       Case No. 1:13-CV-151
                                                       Honorable John Preston Bailey

EQT PRODUCTION COMPANY,
a Pennsylvania corporation;
EQT CORPORATION,
a Pennsylvania corporation;
EQT ENERGY, LLC, a
Delaware limited liability company;
EQT INVESTMENTS HOLDINGS, LLC, a
Delaware limited liability company;
EQT GATHERING, LLC, a
Delaware limited liability company; and
EQT MIDSTREAM PARTNERS, LP,
a Delaware limited partnership,

        Defendants.

## **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF CERTIFICATION**

## **INTRODUCTION**

      EQT argues that plaintiffs should address the observations and holdings in *Adair v. Equitable Production*, 764 F3d 347 (4th Cir. 2014) and particularly in *Adkins* which EQT is closely aligned. Plaintiffs agree. The Fourth Circuit states:

> We also think it proper for the district court to assess the extent of the defendant's efforts to resolve and pay undisputed claims. A finding that the defendants have not acted in good faith toward that end, may weigh strongly in favor of a finding of superiority of a class action.

Not that this statement is the only issue raised by the *Adair* Court, but it weighs strongly in favor of a finding of superiority of this class action because defendants have not acted in good faith. They arrogantly have disrespected the law in West Virginia. They are intelligent, smart and knowledgeable in this industry. They know what the West Virginia Supreme Court held in *Tawney*. Instead of preparing to comply with the law, they set about and prepared to dodge it and find and invent arguments to disobey the law.[1]

West Virginia wasn't and isn't the only state which long ago held that it was a marketable product jurisdiction. As the Court can see below, EQT trained its employees to follow procedures contrary to West Virginia law and they take deductions when they clearly have no right to them. The Court in *Adair* also stated that on remand, the District Court could conclude that one or more subclasses could be certified, not that the Court could not certify it and the Court limited its holding that certification was premature.

The Court also indicated it was sympathetic with the CBM owners who had gotten less than their due. The Court was also correct that sympathy alone is not enough for the Court or the plaintiffs. That is why plaintiffs here have worked diligently and intend to continue to do so to comply with *Adair* and Rule 23 to provide the Court with a platform that, while not easy to manage, is reasonably manageable.

Defendants again begin their response by claiming the facts in this case are not only "virtually identical to those in *Adkins v. EQT Production Company*," but in addition, they claim that they are "more of everything in the subject case contrary to class certification." If there is more of anything, it is more exaggeration and mischaracterization of the facts in defendants'

---

[1] Defendants claim their EQT Energy arrangement was not a fraudulent attempt to make the claim that they purchase gas at the wellhead by saying they entered into the arrangement in 2005, prior to the *Tawney* decision, but Tawney was filed in 2003 and certified as a class action in February 2004 and it was well known in the industry. *Tawney v. CNR*, Roane County Circuit Court, Civil Action No. 03-C-10E.

efforts to avoid class certification.  However, Rule 23 really is the only way most EQT lessors could ever afford litigating a case against EQT and that is pursuant to F.R.C.P. 23.[2]  Defendants know that most all of their lessors have small claims which make them defenseless to pursue a remedy for the defendants' underpayment of royalty.[3]

There are obvious decisions this Court will have to make in order to evaluate the merits of plaintiffs' and the class claims, but as previously explained and further explained below, this Court will not be required to "examine each and every lease and corresponding royalty statement to determine whether deductions were improperly taken from the leases," as defendants claim. (Doc. Id. 311, Defendants' Brief, p. 20.)  Defendants claim that "[i]t is this individualized analysis and identification of the missing royalty interest owners, that create an insurmountable administration burden… ."  As set forth below, if EQT's royalty owners are missing, it is defendants' own responsibility and it is their lack of effort which caused them to be missing. Defendants claim that the Fourth Circuit has held that gas royalty cases simply cannot be handled by class action under Rule 23.  That's not what the Court held in *Adair v. Equitable Production*, 764 F3d 347 (4th Cir. 2014).

Defendants, hereinafter, "EQT,"[4] have and continue to intentionally flaunt the requirements of the West Virginia Supreme Court's holdings on these issues and the plain language of *W.Va. Code*, Ch. 22, Art. 6, Section 8.  *Adair v. Equitable Production*, 764 F3d 347 (4th Cir. 2014.)  The differences between the facts of *Adair*, *supra*, and the subject case are

---

[2] The reason is that defendants are huge companies with multiple subsidiaries and sister companies who planned ways to avoid paying their lessors less than a 1/8 royalty now for years.  They have the lawyers, the staff, the computers, the data, and more importantly, they do the economics of rates, costs and billings and deductions and royalty payments behind closed doors.

[3] The Fourth Circuit suggested that "the Court should consider how the dominance of state law issues may affect the suitability of this litigation in a federal forum and what state law mechanism may be available to resolve the underpayment claims as an alternative to a class action." *Adair at* . 371.

[4] Defendants include EQT Corporation, EQT Production Company, EQT Energy, LLC, EQT Investments Holdings, LLC, EQT Gathering, LLC and EQT Midstream Partners, LP, all wholly owned subsidiaries.  Plaintiffs allege EQT Corporation is the alter ego of all these sister companies.

3

several, but most importantly, the West Virginia Supreme Court had, prior to defendants'
wrongful conduct, already answered in *Tawney v. Columbia Natural Resources, L.L.C.,* 219
W.Va. 274, 633 S.E.2d 30 (2006) many of the questions asked by the Fourth Circuit in *Adair* and
Virginia had not.  Importantly, the Court, in Adair, pointed out that Virginia had not adopted the
"first marketable product rule" and West Virginia has always been.   And there are more
differences between the subject case and *Adair*. [5]

---

[5] In addition, the following factors which existed in *Adair* and *Adkins* do not exist here:

1.    *Adair* related to coalbed methane ("CBM"). *See Adair*, at 352.
2.    Virginia law applied in *Adair*. *Id.* at 353.
3.    In Virginia, questions regarding CBM ownership have been in conflict for years. *Id.* at 353.
4.    At times, both gas estate owners and coal estate owners have claimed title to CBM. *Id.* at 353.
5.    To identify owners of CBM royalties, CBM producers must extensively research and prepare numerous lease reports and title examinations. *Id.* at 353.
6.    CBM producers, under Virginia law often paid monies into escrow when CBM ownership conflicts were present. *Id.* at 353.
7.    In order to claim money from escrow where CBM ownership was in conflict, ownership would have to be judicially adjudicated, arbitrated or agreed upon by the conflicting estates. *Id.* at 353.
8.    Four of the five classes in *Adair* consisted of persons who had never been paid royalties. *Id.* at 355.
9.    Many of the class members' CBM interests in *Adair* had been subject to pooling and their royalties paid into escrow accounts or internally withheld by the gas producers. *Id.* at 355.
10.    The primary object of the ownership classes was to obtain the release of the escrowed or suspended royalties. *Id.* at 355.
11.    The other class, *Adkins,* consisted of persons whose ownership was not disputed, but were seeking recovery for underpayment of royalties as far back as January 1, 1995. *Id.* at 355.
12.    Resolution of many ownership issues required reference to title records. *Id.* at 359.
13.    Commonality for the ownership classes turned on the proper meaning and interpretation of unsettled Virginia law.  *Id.* at 360-361.
14.    Plaintiffs had to prevail on their interpretation of Virginia common law in order to prevail. *Id.* at 361.
15.    The Fourth Circuit found that Virginia law did not fully resolve the issue of who owned the CBM under the severance deeds and that the issues would likely have to be decided on a deed-by-deed basis. *Id.* at 362.
16.    The district court did not mention the implied duty of marketability in its certification decision, therefore, the Fourth Circuit did not take the duty into consideration in its *Adkins* ruling. *Id.* at 364-365.
17.    The plaintiffs made no attempts to demonstrate commonality with regard to the implied duty to market. *Id.* at 368.
18.    The district court defined the classes to include only those gas owners whose leases are "silent" with respect to deduction of costs without explaining what it meant by "silent," making it inevitable, according to the Fourth Circuit, that disputes would arise with regard to the meaning of silence. *Id.* at 369.
19.    The plaintiffs failed to demonstrate that variations in lease language did not defeat Rule 23 requirements. *Id.* at 369.
20.    The district court entirely failed to discuss course of performance evidence with respect to the breach of contract claims in *Adkins*. *Id.* at 369-370.

Also in *Adair*, the Court will not be faced with the issue raised with respect to "course of performance evidence."[6]  Plaintiffs and class had brought suit previously against EQT for similar misconduct,[7] clearly, plaintiffs did not have a history of agreeing that defendants could take deductions from their royalty or otherwise pay them less royalty than what was required by their contracts under West Virginia law.  The acts which a party relies upon as constituting such construction must be from constraint, with full knowledge of their impact and not of a doubtful character.  *Greathouse v. Sergent*, 90 W. Va. 347, 110 S.E. 717 (W. Va. 1922.)

## A.     EQT Intentionally Ignores West Virginia Law

EQT trains its employees how to set up leases in their various databases within which EQT manages its business, including its methodology in paying royalty.  In summary, EQT, contrary to Mr. Barbour's affidavit (Doc. Id. 311-16,) that in determining whether "(EQT) takes deductions … depends on the language of their individual lease," Mr. Barbour testified in his deposition that he was trained that EQT can take deductions from generally all leases except for proceeds leases, regardless of what else may be in the lease.  (**Exh. 1**, Barbour Dep., p. 58.)  And "that is true even though there was no mention of the word gathering, the word compression, processing, transportation, the phrase postproduction expenses, or taxes."  (*Id*. p. 58-59.)  And defendants do not identify their deductions.  The only deductions that are identified are G & C and Taxes.  (Doc. Id. 299-7.)  Michael Barbour, an accountant was hired by EQT five (5) and

21.     The district court misapplied law on fraudulent concealment with regard to the defendant's statute of limitations defense and failed to give any consideration to what proof the plaintiff-focused elements of the elements of fraudulent concealment might require. *Id.* at 370.

22.     The district court did not, in tis superiority analysis, consider factors affecting superiority such as whether the dominance of state law issues affect suitability of litigation in a federal forum and whether state law mechanisms are available to resolve underpayment claims as an alternative to a class action. *Id.* at 371.

23.     Because the plaintiffs did not demonstrate the "ownership classes" compliance with the ascertainability and commonality requirements, the Fourth Circuit took no position the adequacy of the district court's rulings on the other Rule 23 requirements. *Id.* at 363, n. 15.

[6] *Adair*, 764 F.3d 369-370.

[7] The Kay Company, et al., v. Equitable Production Co., Civil Action No. 2:06-cv-00612 (Judge Joseph R. Goodwin)

one-half years ago as a division order analyst.  He is now a supervisor in Land Administration.  (**Exh. 1**, Dep. of Barbour, pp. 6-8.)   Land Administration manages EQT's company assets, primarily its leases and their obligations including payment of its gas royalty to its lessors.  (*Id*. pp. 10-11.)

Lease analysts are trained by EQT supervisors  (*Id*. pp. 20-21.)  What he does is "look to see whether post production deductions appear to be allowed or disallowed and the same with production or severance taxes.  "It's limited to them."  (*Id*. p. 23.)  Mr. Barbour was asked these questions with the understanding that there was no specific statement in the lease that dealt with "deductions" or "taxes."  What the analysts are taught to do is grossly contrary to West Virginia law in *Tawney*.  Mr. Barbour testified that he was trained by EQT and its legal department to categorize leases for deductions where the leases had absolutely no words or language included which stated that deductions were allowed.  (*Id*. pp. 32-38.)  He was trained to mark for a tax deduction even though there was no mention of taxes.  (*Id*. pp. 28-29.)  He marked for gathering and compression costs for leases where those words, or even the word "deduction" was not mentioned in the lease.  (*Id*. pp. 32-39.)  This was true for "1/8 revenue realized" (*Id*. pp. 32-33) and "1/8 wholesale market value,"  (*Id*. pp. 37-38.) He was trained not to look for liquids.  (*Id*. pp. 34-35.)  He was trained not to look for "method of calculating deductions" as in *Tawney* or *Wellman*.  (*Id*. pp. 41-42.)  He said he was trained "it wouldn't necessarily have to have to include the specific words" (*Id*. pp. 39-40) and the absence of language would not affect his determination as to deductions.  (*Id*. pp. 41-42.)  He had a couple hour seminars.  (*Id*. pp. 47-48.)

He testified:

Q.  Okay. And do you know the reason that, or any background reason, that may have been explained to you as to why that you'd be able to take tax deductions when there is no mention specifically of taxes?

As just general business practices or policies. We have to make a decision one way or the other so.

Barbour Dep., p. 28, ln. 22 – p. 29, ln. 3

He also testified that he was trained to mark for deductions on the following leases:

Q.   Could you agree that with respect to what you do, you do not review the leases to determine whether or not there may or may not be any indication that the lessor would receive any amount for the liquids? There is not a place for you to mark liquids here?

A.   No, we don't -- because our role in division order is really to make a determination on applicable lease royalty and yes or no on postproduction deducts or taxes.

*Id*. p. 34, ln. 17 – p. 35, ln. 1

Q.   Is there -- are there any other categories for deductions that you're aware of in land administrations, as far as you know? When you set up the deck and when you set up deductions yes or no, there's taxes, just for taxes, and then there's GNC, for, I've been told, is deductions?

A.   Yes.

Q.   Is there any other categories other than those two categories that you're aware of that you go through and enter somewhere?

A.   That's all that we -- that's all that we capture. That's all that we put on the worksheet, so those are the only categories that we reflect.

*Id*. p. 35, lns. 6-18

Q.   Were you ever asked to go back and review all the leases that EQT has ownership of in terms of -- as lessee for determining whether deductions were permitted or not, that all the leases old and new up to any specific point?

A.   No. There's occasions where at a particular well level we may review all the leases and the owners associated with those leases, but that's the  limit it would be. For a particular well, we might review the leases.

*Id*. p. 37, lns. 13-22.

Q.   Well, how about one-eighth market value all gas produced and sold from premises payable monthly. What would you do there? One-eighth -- I'll repeat it -- one-eighth market value all gas produced and sold from premises payable monthly.

A.   We would probably take deductions.

Q.   Okay. How about one-eighth of the net value of such gas sold?

A.   We would probably take deductions.

Q.   What about one-eighth amount realized for sale of gas?

A.   We would probably take deductions.

*Id*. p. 38 ln. 23 – p. 39, ln. 9

A.   I would say in general other than the leases that have proceeds, or language somewhere in the proceeds language, that we probably most cases take deductions.

Q.   Okay. When you were being trained, were you trained that the lease language would have to say gathering charges before you could take gathering charges, or were you trained that if it says take deductions that the lessee is allowed to take deductions, just generally, that you still

7

could take deductions, or did it have to say gathering in order for you to take gathering deductions?

A.  It wouldn't necessarily have to include the specific words.

*Id*. p. 39, ln. 23 – p. 40, ln. 25

Q.  You had not been trained that to look for a method of calculating those deductions, you have not been trained to look for that, correct?

A.  No. I don't think I've ever been asked to look at the method of calculation.

Q.  And you weren't trained that if the methodology is absent from the lease, you weren't trained to say no, deductions are not allowed because there is no method of determining how to calculate those deductions, correct?

A.  Yeah, the absence of that language wouldn't affect a determination on whether they were allowed or not allowed.

*Id*. p. 41, ln. 23 – p. 42, ln. 23

Mr. Barbour's training was from "we had a couple hours [seminar] and just, kind of, review some general situations, including some of the similar situations of what you've shared and how we would approach, review those.

*Id*. p. 47, ln. 1 – p. 48, ln 2

## B.   Defendants' "Random Survey" is Misleading

One of EQT's several examples of misinformation is that defendants claim that EQT has approximately 25,000 lease documents, implying that it has that many leases depending on the definition of a lease document.  (Doc. Id. 311, Defendants' Brief, p. 9.)  That may be true, but it does not have 25,000 leases.  In the next paragraph, EQT states that Mr. Bryant Bowman, its 20 year experienced land man, reviewed a sampling of "more than 500 of EQT Production's West Virginia leases and determined that significant variations exist in their royalty provisions, including at least 61 leases or amendments with royalty clauses unique from the named plaintiffs' leases and the other leases in the sampling."  (Doc. Id. 311, Defendants' Brief, p. 9.)  And defendants attorneys prepared and had Mr. Bowman sign an Affidavit to that effect.  (Doc. Id. 311-5, Bowman Affidavit, Defendants' Brief, Exh. 5.)  This statement is not true.  Under cross examination, Mr. Bowman admitted that he didn't know how many leases he had reviewed, but it would be somewhere between 80 and 130, not 500.  (**Exh. 2**, Bowman Dep., p.

31.)  Even more misleading is the fact that he did not choose the leases he did review, The leases he reviewed were handed to him by EQT's "legal group."  (Doc. Id. 311-5, Bowman Affidavit.) Defendants proclaimed that Mr. Bowman was a 20 year experienced land man.  No criticism of Mr. Bowman, but he had limited experience with leases until in the mid 2000's.  Mostly, he dealt with permitting, not paying royalties.  (**Exh. 2**, Bowman Dep. pp. 5-13.)[8]

Mr. Bowman testified that "I wanted to go through and see if there is a significant variation in royalty clauses across a random sample of some 9000 leases."  (**Exh. 2**, Bowman Dep. p. 20.)  And, more importantly, he could not state how many leases in his search were of the same type, that is, had the same or similar royalty clauses;[9] however, this is particularly true in that Mr. Bowman admitted that in his review "<u>in some of their categories, there would be multiple leases that were reviewed that would fall under a particular category</u>."  (Emphasis added.)  This, of course, confirms plaintiffs' position that the leases can and should be categorized for purposes of deciding rights of groups of lessors and by doing so, the Court can manage the case by a class action.  (*Id*. pp. 21-22.)  This is the case because Mr. Bowman's categories are similar to plaintiffs' categories, as well as defendants' previous categories.  (*See* Doc. Ids. 299-10; 299-11.)

Mr. Bowman eventually admitted that he did not go into the system and pick out the 500. (**Exh. 2**, Bowman Dep. p. 23.)  When he claims he "identified" the 61 leases, it was his attempt to focus on the "royalty clause."  (*Id*. p. 23.)  And Exhibit 1 to his deposition is the "result" of his review.  (**Exh. 3**, Bowman Dep. p. 23, Exhibit 1.)

---

[8] He has never had responsibility with respect to paying royalty.  Mostly, his responsibility dealt with reviewing leases to determine surface rights for permitting.  (**Exh**. *2, Bowman Dep*. pp. 12-14.)  And, even now, no one in his department reviews leases for royalty provisions.  (*Id*. p. 15.)
[9] That was very relevant to the issues in this case. It certainly eliminates EQT's point that the leases are so different that a court cannot reasonably manage this case by using categories pursuant to Rule 23.

In summary, Mr. Bowman was approached by EQT legal to do an affidavit and they prepared it for him.  (**Exh. 2**, Bowman Dep. p. 16.)  Contrary to what his affidavit claims or infers, Mr. Bowman did nothing randomly.  He didn't pick out the 500.  He didn't even read 500.  (*Id*. p. 31.)  If he had 500, he never reviewed them and he cannot state how many he did review: "I read more than 61."  "I don't' have a total number."  I didn't keep a record of how many that were reviewed" "whether that is 80 or 130, I don't know."  But, what was provided to him and however many, came from EQT legal that by definition is not a random selection by Mr. Bowman.  (*Id*. pp. 30-32.)

Defendants' claim that the royalty clauses found by its legal team are "a few of the 61 distinct royalty clauses identified in the sampling."  But contrary to their claim, they are not unique as to the operating royalty clauses and fit into the plaintiffs' categorization table.  (Doc. Id. 299-12.)

### C.     The McDonald Analyses of Leases

Therefore, the *McDonald* Court ruled that defendants' sister subsidiaries' plan nor the works back method are effective in avoiding the holdings in *Tawney*.

The defendants argue that the Court's analyses in *McDonald* of the leases proves that the class cannot be certified.  Plaintiffs contend it proves the opposite.  The Court reviewed all leases, first categorizing them into leases which do not specify deductions.  The Court's method is essentially the same as followed by plaintiffs and defendants for that matter, except that the Court would be deciding in some categories for thousands or hundreds of lessors at a time.

### D.     Ascertainability of the Class

Defendants claim that in the previous class action there are numerous lessors, 3,500, which EQT does not know the whereabouts.  Therefore, EQT claims the Court will be left with

an unmanageable group of lessors where the Court will have to conduct trials to determine the whereabouts, ownership and as many other difficult tasks as EQT can invent to scare the Court to avoid class treatment of this litigation.

First, as explained below, the defendants handling of the previous class action settlement administration was unorthodox, at best.  Alma Tolman, an EQT employee, provided the affidavit upon which EQT relies to explain the lost 3,500.  (Doc. Id. 311-17, Affidavit of Alma Tolman, Defendants' Brief, Exh. 8.)  Ms. Tolman, however, testified that neither of the administrators, both selected by EQT, were requested by EQT to find the 3,500.  EQT was supposed to do that themselves, but obviously didn't know how.  (Doc. Id. 299-5, Tolman Dep. p. 43-47.)   In response to this allegation, plaintiffs contacted Darden Greene who was in the business of class action administration during the relevant time period and had actually worked on the EQT class settlement when he was at Arnett & Foster.  Mr. Greene explained that he found it exceedingly unlikely that EQT had exercised best practices in trying to locate the 3,500 lessors.

Mr. Greene was and is a CPA.  Among other employment in his career, he worked on various class action administrations.  (**Exh. 4**, Greene Dep. pp. 12-15.)  He also owned a company which did class action administrations.  (*Id*. p. 10, 16.)  The last class action administration he was involved in, he located and paid more than 95% of the members of the class.  He explained why it is important to have experience and utilize the correct methodology in finding and providing notice to class members.  Mr. Greene explained:

> …I think it has more to do with methodology than it has to do with size of class.  …if methodology is right, the number of people unidentified can remain very, very small. Just may take a little more personnel.  (*Id*. pp. 36-37.)

Mr. Greene explained that there are services for hire which locate the class members, including Accurint.  (*Id*. p. 46.)  Normally, social security numbers are available for the lessor or

one of his family members.  From that information, by accessing on of the available services, like Accurint and LexisNexis, one can track down heirs and lessors.  (*Id*. pp. 46-47.)  Mr. Greene also explained how disputes are handled in the several cases he has been involved in and managed.  The trial court handling the class action has not determined the issues relating to heirship or ownership.  Mr. Greene explained how the Courts have directed how to deal with the administration.[10]  Given the fact that EQT did not have either of its Administrators "find people," it is understandable that they never found the 3500.

In fact, Ms. Tolman and Mr. Barbour, EQT employees, testified that it is part of the industry practice to deal with unknown and/or unlocated lessors during the day to day business practices of the company.  From time to time there are unknown lessors.  The process they use is the same as Mr. Greene testified was used in the gas company class settlements he was involved with. Notices were sent to the lessors and if there was no response or if she was told the lessor was deceased, she said she would, by practice, place the money in suspense.  She then would request state documentation and to transfer the ownership to the legal heirs and then she would transfer the money to the heirs.  She testified that that's just part of the day to day business practices of EQT, as well as other production companies.  (Doc. Id. 299-5, Tolman Dep. p. 45.)

---

[10] We've always treated that as outside the scope of the administration that that's something that has to be settled independent of this administration.  It's not part of the litigation that we're dealing with and they have to – that amount of money is set aside and they have to get that settled through whatever means, court order, to get that taken care of so that we can then distribute the funds because we don't get involved in any heirship disputes like that.

We set the money aside, but one they resolve that and we receive a court order and counsel directs us, we can distribute that.

Q.  And in all the litigation – in all the class actions you've been involved with, have they all been handled in that manner?

A.  Yes.

Q.  Now, when you were working at A&F there, did they utilize the same sources of information, in terms of finding people?

A.  They did not.

A.  No they don't.  The Court does not get involved.  The administration is handled and the only time the Court gets involved, they may get involved if there's a procedural issue, but they don't get involved in any of the administration aspects of the case.

Ms. Tolman testified that neither the second administrator, Rust Consulting, nor Arnett & Foster, looked for people. "They were not looking for people." (*Id.* p. 46.) (*See also* Barbour Dep. pp. 12-14.)

As the Court in *Adair*, *supra*, at 358, stated, the plaintiffs need not be able to identify every class member at the time of certification. But "[i]f class members are impossible to identify without extensive and individualized fact-finding mini-trials, then a class action is inappropriate." That is not the case here. The class in this case are members identified by defendants' own records which defendants have a duty to keep and maintain. It is part of the business practices of the oil and gas industry that oil and gas leases are generally assignable and many are decades old and have been assigned more than once and it is true that the owners may pass away and leave heirs their gas interests.

Defendants claim that it would be impossible or too great a chore for the Court to review all the leases in this case on an individual basis. That is true, but it is an unnecessary consideration because the Court should never be required to undertake any such analysis. That is what discovery, witnesses, both fact and expert, and attorneys are for. Plaintiffs and defendants have reviewed the leases and attached the list of the lease documents. (Doc. Id. 205-1.) Doc. Id. 205-2 is a list of leases and Doc. Id. 205-3 is the cross reference of wells to leases. Plaintiffs have identified the lease language, whether there is language in each lease which allows deductions or provides a method for calculating deductions or states that the lessor will be responsible for any post-production costs. Plaintiffs have determined the number and identity of the flat rate leases.

*Tawney*, *Wellman*, *McDonald* and *W.Va. Code*, § 22-6-8 provide the basis for resolution of most all of the liability issues in this case. *Tawney* and Wellman explained above, resolved

the issue of what deductions or costs a lessor may credit itself from the lessor's stated royalty and it places the burden on lessees to prove that the deductions are actual and reasonable. Defendants ignore the language in *Tawney* and *Wellman* that states that defendants "must prove" they incurred it and it was reasonable.

Defendants claim this case cannot be managed as a class action, but the *Tawney* case was a West Virginia class action tried to a jury and appealed to the West Virginia Supreme Court. The case was duly administered by the Court through an appointed administrator and its Order outlining the administration. There were approximately 8000 lessors and 2258 leases. *Tawney*, 633 S.E.2d at 25. The *Tawney* court also considered whether the added language of "gross proceeds," "market price," "net of all costs" and "less all taxes, assessments and adjustments" would allow lessee to take deductions. The Court held that it did not. "Absent additional language that clarifies what the parties intended by the words "assessments" and "adjustments" we believe these words to be ambiguous as the issue of the allocation of post-production expenses." *Id*. at 273, 29.

Plaintiffs can demonstrate the following:

1.      There are an approximate 4000 leases with essentially the same royalty clause and deduction clause. By deciding one of these leases, the Court can decide issues for all. (See Category 1A, plaintiffs' categorization of leases, Doc. Id. 299-12.)

2.      There are 2001 flat rate leases. The defendants treat all flat rate leases the same and they take the same deductions from them as they do all others where deductions are taken. This Court can decide all flat rate leases by deciding one and the only issue will be amounts owed accessible within the databases. The deductions taken, the prices shorted, the volume and liquids can be determined from the database of defendants.

3.      There are other types of royalty clauses and some leases have deduction clauses or deduction language.  Plaintiffs have, likewise, categorized deductions.  Plaintiffs will present a grid which will include the deduction clauses and language and the leases which the language applies to.  It matters not to defendants whether a lease has language which permits deductions or not, they take them anyway, except for "proceeds" leases which defendants "claim" they do not take post-production deductions.  But in trying the case, since the deduction language, if any, will be categorized, the Court can rule on the effectiveness of the deductions which likely will apply.

4.      All leases which do not provide for the lessor being paid only for gas delivered to the point of sale should be paid for the difference in volume between what is extracted and what is sold.  These leases have been identified.  Also, plaintiffs' expert has determined that EQT is paying on a volume reduced by approximately 11.5% of volume extracted, over double the amount of lost gas which the industry experiences.  Therefore, not only is EQT deducting volumes normally reduced in the process of getting it to market, but also is deducting an increased and unreasonable amount from those it may have a right to deduct.  However, there are some recent leases which also provide that the lessors only receive royalty on gas sold – not on gas not sold.  Therefore, those leases have been identified and plaintiffs can and will address that issue on a class wide basis as well.

5.      There are lease categories that contain no deduction language whatsoever and yet defendants take full deductions of "G&C" and "Taxes."  These leases are identified.

6.      The price defendants claim they receive for the gas is contained in its database.  The amount is approximately 10% less than the index price which is the price defendants claim they pay on.  Defendants' duty is to achieve the highest price available for the gas and, at least,

15

the index price.  Defendants also store the gas and hedge it later and do not pay plaintiffs for the price they receive for the hedge.  The price differential applies to all lessors as that is the price (10% less/that EQT Production claims is their sale price) less again the deductions if deductions are taken.  These values can be calculated for the class and plaintiffs' expert has estimated those amounts.

7.     The liquids damage can be calculated based upon a well to well basis. Defendants' witness, Justin Friend, testified that EQT's database can identify each well which liquids are produced from.  They run gas analyses on each well as a regular business practice and from that, and from their FLOCAL database, defendants and plaintiffs can determine from the monthly industry price indexes the amount of money from liquid hydrocarbons defendants have extracted and sold from plaintiffs' wells and the amount due each plaintiff and the class.

8.     Defendants' databases and defendants' witnesses have testified that defendants take deductions on a percentage basis across districts at the same rate and plaintiffs' experts have confirmed that they do.

The above issues can be proven from the following issues.  The above may be proven through defendants' databases and public and private index rate.  Defendants' data must, by industry practice, be kept and maintained.

1.     The volume extracted from plaintiffs' land is required to be reported to the West Virginia Department of Environmental Protection and a complete public record is kept there and plaintiffs' experts have obtained and reviewed it and compared it to defendants' data loss.

2.     The volume sold is kept by defendants and recorded in its records, which plaintiffs' expert have reviewed them.

3.     The purchase index price is kept and maintained and actually reported by industry services publications on a regular basis.  Plaintiffs' experts have them and have reviewed them.

4.      The price reported to plaintiffs are kept and maintained by defendants in their Enertia database electronic filing system, an industry IT program which accounts for essentially all activity with respect to defendants' production and sale of products and the payment and deductions from plaintiffs' royalty.  Plaintiffs' experts have reviewed and analyzed those databases in regard to all relevant activity with respect to each royalty owners' royalty payments and deductions from volume and price.

5.      The documents defendants keep with respect to deductions are very simple.   The list defendants provided plaintiffs and testified as being correct, simply have a column for G & C (Gathering and Compression) and Taxes.  Therefore, assuming the accuracy of those representations, which truly have been a moving and contradictory target, the categories of deductions are therein found.  Plaintiffs' experts reviewed their data and analyzed it and are familiar with the deductions taken from plaintiffs' royalty.

6.      The liquids are somewhat different because defendants have never paid any lessor, to plaintiffs' knowledge, for any liquids, regardless of lease language.  As set forth, *infra*, defendants admit that from their databases, including FLOCAL, they can determine each well and lease from which liquids are processed and sold and the amount owed to each lessor can be determined based upon the gas analysis which is routinely taken from each well.  (**Exh. 5**, Friend Dep., p. 4, 9-12, 14, 118-120.)

The calculation of the above is mathematics and can be performed for each month by accountants and engineers who are familiar with databases and IT systems, like Mr. Reineke's, which are utilized by EQT and the oil and gas industry for each and every lessor and for the class as to deductions, loss, volume, price and liquids.

**F.      Typicality**

First, Mr. Cather, now deceased, was a retired petroleum engineer who had extensive experience in the oil and gas business himself.  Mr. Hamric is a retired educator and Mr. Thomas is a retired banker.   These gentlemen have expertise in this industry and are typical of most of the class.  Most lessors are like these gentlemen.  They do not have large claims, but claim they have been harmed and seek Court review.  Defendants claim that there is a huge problem with Estates as parties.  There is an estate, as in a trust, as a plaintiff here.  Further, the plaintiff in the

*Tawney* case was the Estate of Mr. Tawney, an educator who died during the pendency of the case.

Defendants actually claim that Mr. Cather had no flat rate converted well.  Michael Barbour was offered by affidavit to testify that none of plaintiffs had a well on a lease converted by operation of *W. Va. Code* § 27-6-8, the West Virginia Flat Rate Statute.  The following was his bases.  He looked at the EQT payment history of the Cather Trust, well 657076, which sets on a flat rate lease no. 715367.  His affidavit states that the Trust "has been <u>mistakenly</u> paid a percentage royalty on one of the wells on the lease although no new wells have been drilled on the lease or the well has not been deepened or converted to allow for production of oil or gas from another formation since the enactment of W. Va. Code § 22-6-8."  He then stated "none of the named Plaintiffs have flat leases that have been converted pursuant to *W. Va. Code* § 22-6-8."  (Doc. Id. 311-16, Barbour Affidavit, ¶¶ 3-4.)   In other words, he swears EQT made a mistake and therefore plaintiffs do not have a class representative for flat rate leases.  Obviously, EQT is trying to cut out plaintiffs' flat rate class.  Here is his basis as testified in his deposition:

A.  I remember looking at the owner account and in terms of this particular lease, it looks liked for some mysterious reasons or in error a flat rate well may have been miskeyed…."
(Barbour Dep. p. 50, lns. 1-3.)

Q.  Is it fair to say that your knowledge was limited to that one time that you looked in the system?
A.  I didn't have -- to my recollection, I didn't have any other owner communications or reason to visit owner communications with the owner mentioned in Bullet No. 3.
Q.  Could the mistake not have been that they -- the mistake was made and not entering the clean-out that was done?
A.  It could have been it was an old well.  Like, Enertia has been a system in use at EQT since  the early 2000s, but we've been in operation for well before that. It could have been when we were converting to a prior system to Enertia with the IT upload, that something didn't come across right. So it may have occurred at that point in time.
 (*Id*. p. 53, lns. 2 –25.)

Q.  Could there have been a conversion occurred before this well -- this lease and this well were transferred over to the ownership of EQT?

18

A.  I don't know.
(*Id*. p. 54, ln. 21 – p. 55, ln. 2.)

Q. Under West Virginia law, what does it take to cause a well to be converted to a one-eighth royalty well?
A.  I'm not sure -- other than it being brand new, a brand new well production on the lease, I'm not sure particular to an existing well what the requirements are.
Q.  So is it fair to say that you don't really know whether there was work done, from a personal knowledge, converted the well, correct? You don't have any personal knowledge of that?
A.  No, I have no personal knowledge.
Q.  You just saw that there was not a new well drilled on this lease, correct?
A.  This was an existing well, yes.
(*Id*. p. 56, lns. 4-19.)

Obviously, Mr. Barbour had no basis to conclude that Mr. Cather's well was not converted

particularly in light of the record in this case.  Further, Mr. Cather, now deceased, testified under

oath as follows:

Q.  So under this particular lease, you're not receiving flat-rate payments?
A.  Yes.  On several wells we get flat-rate payments.  This is the Burton W. Despard estate. So we don't get much, but, yes.  And EQT pays – at least to the trust, pays us flat rates, like $12.50 a year on one of them.
Q.  But are you saying they are also paying for some wells under this lease – on one well –
A.  <u>One well we received a one eighth royalty after they drilled it down in accordance with state law.  I think in my memory that stae law was passed in 1982</u>.  You probably know all about it.
(Doc. Id. 299-18, Cather Dep. p. 29.)

Not only Mr. Cather's testimony but defendants own "Remittance Statement" (*See* **Exh.**

**6.**) shows well 657076 as a 1/8 royalty well as a flat rate lease.  Also, attached is the lease which

shows as a flat rate lease.  (*See* **Exh. 6**, Lease, p. 1.)  And finally, see the settlement document

from the United States District Court, Southern District settlement which clearly shows 657076

as a Type A well (flat rate lease converted) along with sister wells which were flat rates.  (Doc.

Id. 299-1, Class Action Settlement Document.)

Defendants have no credibility here.  They continue to exaggerate, mischaracterize and

misstate facts to support their position, but there is no question that plaintiffs are members of the

19

class and have claims similar to those of other class members. Rubenstein, 3 Newberg on Class Actions § 3:28 (5ᵗʰ ed.).   The requirement rests upon the belief that such a representative, pursuing her own interest, will pursue the class's as well. *Id.*   "Plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466-467 (4ᵗʰ Cir. 2006).   The class representative's "interest in prosecuting [her] own case must simultaneously tend to advance the interests of the absent class members." *Id.*   "That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Deiter,* at 466.[11]

### G.   Defendants' Other Allegations

Defendants set out a number of allegations concerning the problems which may be encountered in managing this case as a class.   Due to the number of them, plaintiffs will address them concisely, in no particular order, as follows:

1.      Plaintiffs did not attempt to identify other lessors of their leases.   (Doc. Id. 311, Defendants' Brief.)   The list of plaintiffs' other lessors is attached.   (See **Exh. 7**.)

2.      Defendants claim a class should not be certified because defendants are providing help to its lessors, having fielded 130 calls.   Defendants' affidavit in support was signed by Alma Tolman.   (Doc. Id. 311-17.)   She testified that this was the JIRA system where EQT uploads all the phone calls and e-mails from customers and business partners (Doc. Id. 299-5, Tolman Dep., p. 26)   and it is not limited to just phone calls; however, it's all on the print-out that appears on

---

[11] "Factual differences will not render a claim atypical if the claim arises from the same… practice or course of conduct that gives rise to the claims of the class members and is based on the same legal theory." Rubenstein, 3 Newberg on Class Actions § 3:34 (5ᵗʰ ed.).   Courts have conclusively held and routinely found that variations in the amount of relief sought will not render the proposed class representative's claims atypical." Rubenstein, 3 Newberg on Class Actions §§ 3:42 and 3:43 (5ᵗʰ ed.).   *See Deiter,* 436 F.3d at 466 (factual variations defeat typicality only when "the variation strikes at the heart of the respective causes of action.").

the record.  Ms. Tolman admitted she did not print the list or review the list.  (*Id*. 28-29.)
Lessors call and say "where's my check."  She says it's in the mail.  "If you choose direct
deposit, you wouldn't be having this problem."  (*Id*. 30.)  She did not respond to all the calls.
(*Id*. 31.)  Calls there are assigned out to a number of different people, "different groups in our
organization.  (*Id*. 32.)  When it says a claim is resolved on the hotline, Ms. Tolman doesn't
know if that is true of not.  (*Id*. 32.)  If EQT's record says "resolved" it means "To at least make
a contact to the owner."  (*Id*. 34.)  "Unresolved" means "analyst has not contacted the customer."
(*Id*. 33-34.)  She has no memory of any calls she received and could not explain any of the
record.  (*Id*. 36-41.)

She was provided a "guideline" as to what to say to the callers.  (*Id*. 40.)  What is clear is
it is a meaningless "hotline" and document that, at best, the affiant had no substantive knowledge
about.  Plaintiffs called some of the people on the list and none of any serious issue was
addressed.

3.     The gas content varies at each well.  It probably doesn't in any significant way,
but it's irrelevant to this class action except for damage calculations because the BTU and gas
analysis is a known and historically recorded and kept for each well.  It is their FLOCAL
database.[12]  (**Exh. 5**, Friend Dep.)  Mr. Reineke can then calculate the damages for pricing and
liquids with defendants' own database of information.  (See Doc. Id. 299-24, Reineke Affidavit,
p. ___.)

---

[12] The FLOCAL system actually shows the historic volume and tracks the historic pressure for individual meters or wellheads and that information is available.  (**Exh. 5**, Friend Depo, pp. 9-10.  The sales point for a particular well can thereby be identified.  *Id*. 11-12.  EQT can then track the gas from well to processing and sale.  *Id*. 34.  Mr. Friend, by using the system he has, can determine from each lease and well number the liquids that are extracted from each well and the gathering lines by number and location that carry the gas from each lease and well to the processing point where the liquids are extracted and to the point of sale.  *Id*. 119-120.

4. Plaintiffs made no effort to determine if natural gas liquids were produced from plaintiffs' gas. Not true. Plaintiffs took 30(b)(6) depositions from Mr. Bergonzi and Mr. Friend on that very issue. Neither could tell whether plaintiffs' wells were processed. For whatever reason, defendants designated Mr. Friend over Mr. Gilmore as a 30(b) on the liquids issue, but filed an affidavit by Gilmore. Friend said he couldn't say. What plaintiffs did prove, however, was that the Cather and Hamric wells were in Marcellus and equitably are entitled to protect themselves and the class on liquids being removed from their gas. The answer to this question is premature because EQT has not provided a list of wells where gas is being processed.

5. The Court will have to "review all leases," thousands to <u>find</u> the <u>individuals</u> in <u>those leases</u>," find all missing and adjudicate all of them in mini trials. (Doc. Id. 311, Defendants' Brief, p. 19.) Not true. This is an absurd contention which defendants know or should hopefully know is not true. First, many of the lessors on the leases were dead years ago or assigned their rights. Defendants have the list of royalty owners, sends check to them at their last known address, which is the address they would receive class notice. Then the defendants claim the same thing over and over again throughout their brief that the Court will have to examine "each and every lease and royalty statement" and find missing people.

6. Plaintiffs have offered no factual support for their categorization of leases. Not true. Defendants made their own list very similar to plaintiffs and even Mr. Bowman, recognized that in his deposition. Plaintiffs, defendants and Mr. Bowman have copies of the lease. (*Id*. p. 19, fn. 13.)

7. Plaintiffs' requests for admissions identify 96 different categories of leases. Not true. Plaintiffs' requests for admissions identify exact royalty clause language in leases – not categories. Plaintiffs lease categories are called "categories."

22

8.      Common questions do not predominate this litigation.   Not true.   The central common question of liability predominates the West Virginia litigation.   Did the defendants comply with West Virginia's statutory and common law with respect to paying its lessors?   Did they intentionally and maliciously breach their contracts knowing that they did not have the right to take deductions?   Did they fraudulently conceal what they were doing?   Were the lessors damaged?   Did defendants have a legal duty to pay for liquids, for volume for the index price?   Is EQT Corporation liable, etc.?

9.      Plaintiffs have not demonstrated commonality because in looking at the "broader" litigation.   Not true.   But here, all lessors have the pricing claims, the over-charging plaintiffs on deductions claim and reducing plaintiffs' volume claim by more than reasonable.   (See Doc. Id. 299-24, Reineke Affidavit.)

As set forth in #9 above, the predominant issues, the ones which are most costly and difficult to litigate and the ones which will resolve the litigation are common to the class.   For example, plaintiffs will prove that EQT Corporation was acting as a joint venture or is liable as principal and agent, alter ego or by its own conduct in charging lessors deductions for its overhead.

10.     In another two page footnote on pg. 24-25, defendants claim Mr. Selby's opinion that the deductions are not actual or reasonable are not based on fact.   Not true.   Defendants take estimated deductions without true-ups and then include costs from various other corporations, cell phones, overhead, bonuses and much more.   This came from defendants' own records, a fact ___ by the U.S. District Court in the McDonald case.   (Doc. Id. 311, Defendants' Brief, p. 24, fn 13.)

11.     Defendants did not prepare the defendants' list of leases.  Not true and absurd. Multiple defendants' 30(b)(6) witnesses testified they had lists, used lists and defendants were ordered to produce it and months later produced the defendants' list.  (*Id*. p. 25, fn 13.)

12.     The volume for each lease can't be calculated.  Not. True.  The defendants know how much gas they extracted by meters at the wellhead and also how much they sold at the point of sale and its known how much they were paid and not paid.  It's all in their records and with the West Virginia Department of Environmental Protection.  (*Id*. p. 27.)

13.     Geographic location will affect the ability to determine whose gas is wet or dry and wet gas in only in northern West Virginia.  Not true.  Mr. Friend was designated to testify with respect to EQT's FLOCAL electronic database and with respect to determination of and tracking of BTU and liquids which were processed.  Mr. Friend testified that generally, east of I-79 is dry and west of I-79 is wet.  (Exh. 5, Friend Dep. p. 44.)

Mr. Friend testified that he could go into his FLOCAL database on a monthly basis and determine the amount of gas which was sent to processing plants in West Virginia.  (*Id*. p. 13.) He could determine a ratio of a percent which would show the percentage of gas which went to Mobley Processing Plant where the gas was processed to liquids.  (*Id*. pp. 84-85.)

EQT uses a payback system where DTI, Dominion Transmission, processes gas and then pays EQT for the dekatherms which it used in the process (*Id*. pp. 85-86) as compensation for making gas marketable.  EQT measures the BTU content and analyzes the gas from each well and that measurement is recorded and kept and maintained in FLOCAL.   (*Id*. pp. 49-50.) Everything is billed in Dekatherms and the original BTU sample reading is utilized for determining the gas sales price.  (*Id*. pp. 51-52.)  The gas chromatograph rates determines the mix of all the gas at the wellhead.  (*Id*. p. 53.)  The BTU blend typically would not change.  (*Id.*

24

p. 53.)  <u>Importantly, Mr. Friend could not testify as to whether gas in southern West Virginia is processed or not for liquids.</u>  (*Id.* p. 47.)

14.    The Court will have to determine whether the leases have been converted.  Not true.  The defendants have witnesses and documents and can testify to that issue.  (Doc. Id. 311, p. 25, fn 19.)

15.    Reineke's opinion on price is unsupported.  Not true.  He testified how he determined it based upon the price data in defendants' data and the published industry prices.  It was all there.  (*Id.* p. 26, fn 20; Doc. Id. 299-14, Reineke Dep. p. ___.)

16.    The differences in the distance to the pipelines is an issue.  Not true.  The lessors are charged proportionally and deductions do not affect it.

17.    Plaintiffs' claims are not typical because plaintiffs do not possess the same interest and suffer the same injury as defendants.  Of course, this is not true.  Mr. Reineke described these claims and injuries in his deposition.  This includes the fact that Mr. Hamric and the Cather trust, have Marcellus (heavy wet gas) which is leased by EQT and on which wells are located.  Mr. Friend cannot say whether their gas is processed or not.  However, they have, at a minimum, a real interest in the outcome of the issue.  As Mr. Reineke stated, he has never been provided with a list of wells which gas is processed.  (Doc. Id. 299-14, Reineke Dep. p. 33.)

18.    Defendants allege 7 different bases for their allegation that plaintiffs' claims are not typical.  These 7 issues have been addressed above, are de minimis issues or non-existent claims, none which affect plaintiffs' qualifications to represent the class.  The last bullet point is a false statement.  As set forth above, Mr. Cather has a converted flat rate lease.  The claims of all class representatives do not have to mirror or be the same as all class members or, for that

matter, each others claims in order for the class reps to qualify. The plaintiffs' claims are clearly representative of and are typical of the class claims.

19.     Plaintiffs have demonstrated the adequacy requirement of Rule 23 and they have demonstrated that the common questions predominate. Defendants' arguments have no merit. For example, defendants criticize plaintiffs for claims on volume being dependent upon whether the lease allows for volume deductions. (Doc. Id. 311, p. 39.) There are specific leases which allow for defendants to only pay for volume actually sold, not for volume not sold. Plaintiffs have identified the leases and the ones which don't allow for it.

20.     Defendants' claim in footnote 27 on page 40 that defendant EQT reviews "particular language of every lease prior to taking deductions." However, the review that defendants do is not in compliance with *Tawney*, if they do, in fact, do a review. (See pgs. 8-9, *supra*.) In addition, Mr. Bergonzi testified that they simply dumped the data from Eastern when they bought the wells in West Virginia into their system and simply continued to pay based on the way Eastern had done it before. Mr. Barbour explained what they really do. Plaintiffs have proven predominance.

21.     Superiority is the strongest of plaintiffs 23(b) criteria. This case is very manageable once it is understood that there are thousands of types of leases, all presently being managed in IT systems and databases. Plaintiffs can present those claims on a class-wide basis through classifying leases, claims and damages applicable to each well and lessor.

Further, Rule 23(c)(4) allows for certification of plaintiffs' equitable relief prayed for which includes plaintiffs' claim for declaratory relief as to plaintiffs and the class claim that defendants are required to pay for liquid sales and for defendants to cease violating its duties in failing to pay plaintiffs the royalties owed in violation of West Virginia law.

### H.     The Fraud Claim

Defendants argue that they purchase the gas at the wellhead which gives them a right to deduct the costs.  One of defendants' fraudulent concealment was that in 2005, defendant EQT created a new separate subsidiary, EQT Energy, for the purpose of moving the point of sale of the gas from the interstate pipeline to the wellhead.  (Doc. Id. 299-15, Crites Dep. p. 98.)  The accounting stayed the same.  "From an accounting perspective, we continue to operate the same way."  *Id.*  Mr. Crites explained that the allocation was essentially the same and, as a result, royalties and breakdown of royalty calculations remained the same.  *Id.* 99.  The only logical reason for changing the point of sale was to attempt a fraudulent concealment of the fact that defendants were intending to claim that, as they did in *McDonald*, *supra*, and in this case, that they sell the gas at the wellhead and therefore, they are authorized to take deductions.  Again, Mr. Bergonzi agrees with Mr. Crites.  Defendants do not pay royalty owners differently and even if they do, the database makes the determination of the damages easy to calculate.  (Doc. Id. 299-3, Bergonzi Dep. pp. 194, 211.)

### I.      Deductions are not Actual or Reasonable

Plaintiffs also know that for every lease where deductions are taken, they are not actual nor reasonable.  (*See* Doc. Id. 299-20, Selby Affidavit.)  Plaintiffs know that there is no lease which provides for the methodology for calculating deductions.  The District Court in *McDonald* found that:

> I FIND that meals and entertainment, uniforms, meter operations and repair, and personal property taxes are not costs of compression, desulphurization, or transportation. I further FIND that deductions for "personnel costs, indirect costs, production management costs, depreciation and return on capital investment," are too vague to be specifically related to compression, desulphurization, or transportation. These costs are not identified with what I predict the Supreme Court of Appeals of West Virginia would find to be sufficient "particularity." Accordingly, these costs may not be deducted pursuant to lease (*l*) and (m).

(Doc. Id. 205-4, *McDonald* Order, pp. 22-24.)

The above holding is important to the entire class because plaintiffs' evidence is that these same costs as above, personnel costs, indirect costs, production management costs, depreciation and return on capital investments, are deducted from all leases from which defendants take deductions.  (*See* Doc. Id. 299-20, Selby Affidavit.)

**J.  Class Wide Issues**

The facts plaintiffs will prove in their case for the element of intentional breach of contract, fraud by concealment and punitive damages by alter ego, joint venture and agency are the same as those for the class.  First, the claims run across the entire class due to the failure of the leases to provide for a method to calculate royalty not being in the leases.. Also, should defendants take royalty, the defendants then have the burden to prove the deductions were "reasonable."  Plaintiffs have provided an accountant report and the District Court decision finding the same costs unreasonable in an EQT lease.  Since defendants pay royalty and take deductions on the same proportionate manner in each of its districts, the plaintiffs' proof is the same as is required for the class.  Further, the defendants are paying less than the index price at the interstate pipeline by approximately 10%.  Defendants are claiming on the check stubs that their sale price starts at the index price but they are paying less.  Therefore, the failure to pay royalty claims crosses the class.  Further, the plaintiffs' claims that defendants are taking deductions from converted flat rate wells will address that issue for the subclass of converted flat rate wells.  The remaining leases with no deductions specified will also be resolved because the class representatives have such a lease.  Defendants' "estimate" the deductions taken, therefore, the plaintiffs' claims will be resolved as to whether deductions were actual and reasonable, which is defendants' burden.  Also, reasonableness of volume deductions is class-wide.  This

28

likewise, will resolve this issue for the class.  Therefore, plaintiffs' claims are not so different from the class as a whole that plaintiffs are not permitted to be named class representatives.

### K.   Plaintiffs' Fraud Causes of Action Can Be Certified

Defendants claim plaintiffs' fraud claim cannot be certified, but plaintiffs' fraud claims are for fraudulent concealment of their misconduct and over charges of deductions.  "Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud."  *Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W.Va. at 584, 567 S.E.2d at 300 (citing *Silva v. Stevens*, 156 Vt. 94, 589 A.2d 852, 857 (1991)).

> In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

Syl. Pt. 4, *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895).  *Accord* Syl. Pt. 5, *Manor Care, Inc. v. Douglas*, 234 W.Va. 57, 763 S.E.2d 73 (2014).  *See also TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 474, 419 S.E.2d 870, 887 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (noting that "the punitive damages definition of malice has grown to include not only mean-spirited conduct, but also extremely negligent conduct that is likely to cause serious harm").

While discussing the elements of a common law claim for fraudulent concealment under West Virginia law, and the pleading requirements in connection therewith,[13] Justice Workman of

---

[13] *See also In Town Hotels Ltd. Partnership v. Marriott Intern., Inc.*, 246 F. Supp.2d 469, 487 (S.D.W.Va. 2003) ("[a]s for the allegations of material omissions, the plaintiffs correctly point out that when the allegation of fraud relates to an omission rather than an affirmative misrepresentation, less particularity is required."); *Bonfield v. AAMCO Transmissions, Inc.,* 708 F. Supp. 867, 875 (N.D.Ill. 1989) (explaining that an allegation of fraudulent omission "is really not subject to Rule 9(b) analysis. Like Sherlock Holmes' dog that did not bark in the night, an actionable omission obviously cannot be particularized as to the time, place, and contents of the false representation'

the West Virginia Supreme Court of Appeals has explained:

> The law relating to fraud makes clear that the concept of detrimental reliance includes not only an action, but also an inaction.  Where a claim is based upon fraudulent concealment or fraudulent nondisclosure, it is the concealment of material facts inducing nonaction that constitutes fraud. . . .  As expressed in the Restatement of the Law, Torts 2d 118, Section 550, a party to a transaction is liable to the other for fraudulent concealment if he "by concealment or other action intentionally prevents the other from acquiring material information." **Obviously, one who is defrauded in this manner cannot possibly take any affirmative action to indicate reliance, since he knows nothing of the deception.   Yet, it would be ludicrous to reward a fraudulent actor for his skill in perpetrating such a deception.   That is not what the law on fraud, and specifically on the element of detrimental reliance, envisions.**

*Pocahontas Mining Co. Ltd. Partnership v. Oxy USA, Inc.*, 202 W.Va. 169, 175, 503 S.E.2d 258, 264 (1998) (Workman, J., concurring) (emphasis added; citations omitted) (also noting, at 174, at 263, "reliance to the plaintiff's detriment is indicated by the plaintiff's failure to act upon its right of collection for the ten-year period in which the concealment continued").  *Accord Edens v. Goodyear Tire & Rubber Co.,* 858 F.2d 198, 206-07 (4th Cir. 1988) ("direct proof of reliance on the concealment was not required for it was practically impossible to prove, by direct evidence, reliance on that which had been intentionally concealed"; applying South Carolina law permitting the recovery of punitive damages when a breach of contract is accompanied by a fraudulent intent and a fraudulent act); *Basic Inc. v. Levinson,* 485 U.S. 224, 245, 108 S.Ct. 978, 990, 99 L.Ed.2d 194, 217 (1988) ( "Requiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted if omitted material information had been disclosed ...  or if the misrepresentation had not been made . . . would place an unnecessarily unrealistic evidentiary burden on the ... plaintiff..." (citations omitted)).  *See also State ex rel. Metro. Life Ins. Co. v. Starcher*, 196 W.Va. 519, 523-26, 474 S.E.2d 186, 190-93 (1996) (as to the issue of identifying class members, the Court rejected MetLife's argument that "individual inquiry is necessary to

---

or 'the identity of the person making the misrepresentation.'"); *Shaw v. Brown & Williamson Tobacco Corp.,* 973 F. Supp. 539, 552 (D.Md. 1997).

ascertain the respective intentions of each prospective class member concerning the funding of the additional policy of insurance that they purchased"; also affirming circuit court's holding that plaintiffs' "breach of contract claim and other asserted West Virginia common law claims are not based upon oral testimony but are instead based upon proof of the standard form documents utilized by the defendant [MetLife] in its processing of insurance applications and the issuance of life insurance policies and the standardized rules, procedures and conduct of the defendant in handling these matters").

Numerous courts in other jurisdictions have recognized the wisdom of permitting the element of reliance to be presumed or inferred for members of a plaintiff class action. *See, e.g. Varacallo v. Massachusetts Mut. Life Ins. Co.*, 332 N.J.Super. 31, 752 A.2d 807 (2000,) *BP America Production Co. v. Patterson*, 263 P.3d 103, 110-14 (Col. En Banc. 2011,) *Seeco, Inc. v. Hales*, 330 Ark. 402, 413-14, 954 S.W.2d 234, 240-41 (1997,) *Cope v. Metro. Life Ins. Co.*, 82 Ohio St.3d 426, 696 N.E.2d 1001, 1004-05 & 1008 (1998,)

Further, the statute of limitations would not begin to run on any such misconduct that occurred subsequently until the plaintiffs knew or reasonably should have known of the facts giving rise to their claims under the discovery rule as recognized in West Virginia. *See Dunn v. Rockwell*, 225 W.Va. 43, 50-53, 689 S.E.2d 255, 262-65 (2009,)  Of course, how far back plaintiffs may assert their claims and requests for damages will also depend upon whether this Court finds the defendants' misconduct to constitute a continuing tort or separate and discrete acts and transactions. *See Dunn, id.*; *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F. Supp.2d 790, 811 (S.D.W.Va. 2014)

**L.    Predominance**

The plaintiffs' issues identified above and in plaintiffs' motion and memoranda clearly

will resolve the class issues.  The plaintiffs have pointed out that these issues are identical to the converted flat rate wells, the no deduct wells, the royalty claim, the unreasonable deduction issues, the no mention of method of calculating deductions and all other issues in this case. While there are some claims which individual royalty owners may not have, they all will have many of the claims.  And these issues will resolve the cases.  And compensatory damages can be determined for the entire class along with punitives if a multiplier is allowed.

## **CONCLUSION**

Plaintiffs have demonstrated that they have carried their burden of proof that this case complies with F.R.C.P. 23.  Rule 23 should receive "a liberal, rather than a restrictive, construction ... [with] a standard of flexibility that will best serve the ends of justice for the affected parties and ... promote judicial efficiency." *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 424 (4th Cir.2003). *See also, Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 285 (S.D.W. Va. 2015).  Without its application here, most lessors will have no recourse.

THE KAY COMPANY, LLC,
H. DOTSON CATHER, Trustee
of Diana Goff Cather Trusts,
and JAMES E. HAMRIC III,
and all other persons and
entities similarly situated,

By Counsel

/s/ Marvin W.  Masters_____
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301

Michael W. Carey
West Virginia State Bar No. 635
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301

Thomas W. Pettit
Thomas W. Pettit, L.C.
945 Main Street
Post Office Box 189
Barboursville, West Virginia  25504

Counsel for Plaintiffs
F:\5\903\b022.docx

## CERTIFICATE OF SERVICE

I, Marvin W. Masters, hereby certify that on November 15, 2016, I electronically filed "Plaintiffs' Reply Memorandum in Support of Certification" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

David K. Hendrickson
Carl L. Fletcher, Jr.
Hendrickson & Long PLLC
214 Capitol Street
Post Office Box 11070
Charleston, West Virginia  25339
daveh@handl.com
cfletcher@handl.com
Counsel for Defendants

Michael W. Carey
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301
mwcarey@csdlawfirm.com
Counsel for James E. Hamrick, III

Thomas W. Pettit
Thomas W. Pettit, L.C.
945 Main Street
Post Office Box 189
Barboursville, West Virginia  25504
twpettit@comcast.net
Co-Counsel for H. Dotson Cather

/s/ Marvin W. Masters
West Virginia State Bar No. 2359
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
304-342-3106
mwm@themasterslawfirm.com