IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

THE KAY COMPANY, LLC, et al.,

                    **Plaintiffs,**

v.                                  **CIVIL ACTION NO.  1:13-CV-151**
                                  **(Hon. John Preston Bailey)**

EQT PRODUCTION COMPANY, et al.,

                    **Defendants.**

### DEFENDANTS' MEMORANDUM IN SUPPORT
### OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The United States Supreme Court has held that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013).  The Supreme Court explained its limitation on merits inquiries at the certification stage as follows:

> Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. See *id.,* at ——, n. 6, 131 S.Ct., at 2552, n. 6 (a district court has no "'authority to conduct a preliminary inquiry into the merits of a suit'" at class certification unless it is necessary "to determine the propriety of certification" (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974))); Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C.App., p. 144 ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.").

Likewise, the Fourth Circuit has held that the "likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citations omitted).

Addressing merit issues as they pertain to the proposed class is premature since Plaintiffs have not demonstrated and cannot demonstrate that a class should be certified. In fact, this memorandum further demonstrates that a class should not be certified because each of the issues which the Court asked be briefed ultimately requires lease by lease and/or well by well analysis.

All discovery to date has been focused on issues relating to whether a class can be certified. Merits discovery necessary to evaluate the merits of Plaintiffs' claims has not yet occurred. Thus, at this time it is impossible to fully and adequately address those claims in a summary judgment motion. However, if the Court does consider the merits of Plaintiffs' claims at this time, it should enter a summary judgment ruling that (1) the Defendants are not alter egos of one another; (2) EQT Production's wellhead sale of gas to EQT Energy cannot be disregarded; and (3) that "actual and reasonable costs" means those costs incurred by a lessee.

## STATEMENT OF FACTS

EQT Production Company ("EQT Production") explores for and produces natural gas in six states, including West Virginia. Affidavit of John Bergonzi, attached as Exhibit 1.   It sells natural gas it produces to EQT Energy, LLC ("EQT Energy"). *Id.*   EQT Energy purchases natural gas from EQT Production and many other producers and then sells that gas at various sales points to numerous purchasers. *Id.*   EQT Gathering, LLC ("EQT Gathering") gathers natural gas for a fee, usually from the point it is produced to a processing facility or interstate pipeline.[1] Its customers include EQT Energy and many other unaffiliated customers. *Id.* EQT Corporation; EQT Investments Holdings, LLC; and EQT Midstream Partners, LP; are not directly involved in the production, gathering, or marketing of any West Virginia natural gas. *Id.*

---

[1] Gas may also be gathered by another affiliated entity.

### A.     Historical Sales and Royalty Calculation

In February 2000, Equitable Production Company ("EPC"), EQT Production's predecessor, acquired all of the West Virginia, Virginia, and Kentucky oil and gas interests of Statoil Energy, Inc., and one of its subsidiaries ("Statoil").  *Id.*  At the time EPC acquired Statoil's interests, EPC did not own or operate any gas wells in West Virginia. *Id.* The vast majority of all West Virginia wells currently operated by EQT Production are the result of the Statoil acquisition or new well drilling after February 2000. *Id.* Following the Statoil transaction, EPC continued making revenue distributions on the accounting system acquired from Statoil. *Id.* In January 2002, that system was replaced by Enertia, an oil and gas accounting system still utilized by EQT Production, with information from the Statoil accounting system downloaded to the new Enertia system. *Id.*[2]

Until 2005, Equitable Energy, LLC (now EQT Energy) purchased EPC's gas at the interstate connection.  *Id.*  On leases where royalty was to be paid "at the well" and did not prohibit the deduction of downstream costs, EPC deducted the royalty owners' share of downstream costs from the sales price received.  This method of calculating the wellhead price by deducting post-production costs from the downstream sales price is generally referred to as the "work back method" and had long been used in West Virginia and other states to set a wellhead price.  *Id.*

### B.     Current Sales and Royalty Calculation

Before 2005, EQT Production's predecessor, EPC, operated two businesses: production and gathering.  Bergonzi Aff., Exh. 1.  On January 1, 2005, EQT Production reorganized to separate out its "midstream" business to, among other things, better track and analyze the cost

---

[2] EPC made no changes to Statoil's royalty payment practices.

structure of its production, gathering, and marketing businesses to ensure that each business was generating a fair rate of return. *Id.* This reorganization resulted in the formation of EQT Gathering, LLC, and EQT Gathering Equity, LLC, the entities responsible for gathering, compressing, and transporting natural gas.  As part of the reorganization, EQT Production entered into gas purchase contracts with EQT Energy (formerly Equitable Energy). The contracts' pricing provisions utilized the "work back method"[3] to calculate the wellhead value of the gas sold. The contracts provided for a sales price based on the following objective formula:

> [The] Applicable First of the Month Index Price applicable to the interstate pipeline(s) into which the Gas is delivered, less prevailing gathering related charges and retainage applicable to such point(s), less any other agreed applicable fees or charges.

*Id.* EQT Energy, in turn, entered into gathering contracts with the newly-created gathering companies, allowing EQT Energy to transport gas purchased from EQT Production to an interstate connection in exchange for the payment of a cost-of-service rate charged by the midstream companies. *Id.* Under this new framework, EQT Energy began buying gas from EQT Production at the wellhead and paying EQT Production based on the price and volumes for which the gas is sold at the interstate pipeline connection(s). *Id.*  The gas purchase contract was renegotiated in 2012, but the pricing formula remains the same. *Id.*

EQT Gathering has gathered EQT Energy's gas through the Weston, Brenton, Madison, Weston (Marcellus), KA-8, Saturn, WG-100, Pandora, and H-156 gathering systems, pursuant to

---

[3] At the time EQT Production incorporated the work back method into its sales contract, the Fourth Circuit had already recognized the method as a valid means of determining the wellhead price.  *See Imperial Colliery Co. v. Oxy USA, Inc.,* 912 F.2d 696, 701 (4th Cir. 1990) (acknowledging "that there was no available wellhead price does not necessarily preclude computation of the gas' wellhead price. For example, ... such a computation might simply be made by taking Equitable's purchase price and deducting compression and gathering expenses.").

separate, negotiated gathering agreements for each system.  *Id.*[4]  Each year, EQT Gathering calculates "plan rates" to be charged for its gathering services on the various systems.  Bergonzi Aff., Exh. 1.  These annual rates are based on EQT Gathering's business plan, which projects what its operational costs will be for the next year. *Id.*  The rate varies by geographic area and type of development, depending on what costs are allocated to each area and the nature of gas being transported. *Id.* This rate charged to EQT Energy is a fully-burdened rate (meaning it includes all of the costs that typically go into gathering the gas), which EQT Energy applies to the pricing formula set forth in the gas purchase contracts with EQT Production. *Id.*  This same rate is charged by EQT Gathering for gathering services provided by EQT Gathering to unaffiliated third party producers. *Id.* EQT Production does not pay but does bear the full burden of this plan rate in its payment from EQT Energy.   EQT Production determines, with assistance from EQT Gathering, how much of that rate reflects charges for EQT Gathering's rate of return, depreciation, and income taxes and then adds that amount back in to the sales price before it pays royalty owners.  *Id.*   EQT Production pays royalties based on the specific language set forth in royalty owners' leases.  *Id.*

Roger Griffith is a West Virginia certified public accountant who has reviewed the calculations used by EQT Gathering to determine the gathering rates at issue. Based upon his review, Mr. Griffith concluded that  EQT Gathering "did not violate any standard cost accounting procedures, and both the procedures used to calculate the gathering rate and the resulting rate itself appear to be actual and reasonable." *See* Report of Roger Griffith, attached as Exhibit 2.

There are certain geographic areas in West Virginia where no natural gas gathering

---

[4] *See* Footnote 1, *supra.*

companies other than EQT Gathering provide natural gas gathering services.  Affidavit of Justin Friend, attached as Exhibit 3. Moreover, there are certain geographic areas in West Virginia where EQT Gathering, LLC, is the only gathering service available to EQT Energy for gas transportation.  *Id.*

## ARGUMENT

### A.    The Various EQT Entities are Not Alter Egos of Each Other.

The Court has inquired whether it should "find the various EQT companies to be alter egos of the other." [5]As demonstrated below, the Defendants are not alter egos of one another and should not be treated as such.

EQT Production Company is the sole lessee to the Leases at issue in this case.  (EQT Production Company's Partial Answer and Affirmative and Other Defenses ¶¶ 13, 34). As the sole lessee to the subject Leases, EQT Production Company has the exclusive right to drill wells and produce gas on the leased premises and is also the only Defendant with any obligation to pay royalties to Plaintiffs.  *See, e.g., United Fuel Gas Co. v. Battle*, 167 S.E.2d 890, 896-97, 153 W. Va. 222, 231 (1969); *Shearer v. United Carbon Co.*, 103 S.E.2d 883, 886, 143 W. Va. 482, 485 (1958).

Notably, no party other than EQT Production is a party to the Leases at issue in this case or any other contract with Plaintiffs.  Plaintiffs nonetheless claim that EQT Corporation is the alter ego of EQT Production Company, as well as Defendants EQT Energy, LLC; EQT Investments Holdings, LLC; EQT Gathering, LLC; and/or EQT Midstream Partners, LP; and responsible for the acts and conduct of all of these Defendants complained of by Plaintiffs in their Complaint.  (Am.Complaint, ¶¶ 14-24).  (Defendants, EQT Energy, LLC; EQT Investments

---

[5] Question 1, ECF #323, p. 20.

Holdings, LLC; EQT Gathering, LLC; and/or EQT Midstream Partners, LP; are hereinafter sometimes referred to collectively with EQT Corporation as the "Non-Lessee Defendants"). The undisputed facts in this case, however, establish that there is no basis upon which to permit a finding of alter ego liability with respect to EQT Corporation or any Defendant.

It is well-settled under West Virginia law that corporations are presumed to be separate entities and that the "corporate entity may be disregarded" only "[u]nder exceptional circumstances." *See Laya v. Erin Homes, Inc.,* 177 W. Va. 343, 347, 352 S.E.2d 93, 97 (1986). *Accord*, syl. pt. 3, *Southern Elec. Supply Co. v. Raleigh County Nat. Bank*, 173 W. Va. 780, 320 S.E.2d 515 (1984) (recognizing that "separately incorporated businesses are separate entities and that corporations are separate from their shareholders"). These exceptional circumstances do not exist here. As the Supreme Court of Appeals of West Virginia stated in *Southern States Co–Operative, Inc. v. Dailey,* 167 W. Va. 920, 280 S.E.2d 821 (1981),

> The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure. (internal citation omitted). Nor is mutuality of interest, without the countermingling of funds or property interests, or prejudice to creditors, sufficient. (internal citation omitted). Rather, it must be shown that the corporation is so organized and controlled to be a mere adjunct or instrumentality of the other.

*Id*. at 930, 280 S.E.2d at 827.

When analyzing whether to pierce the corporate form, West Virginia requires courts to engage in a case-by-case analysis, "with particular attention to factual details." *Raleigh County Nat. Bank*, 173 W. Va. at 788, 320 S.E.2d at 523. According to the Supreme Court of Appeals of West Virginia, some of the factors to be considered in deciding whether to pierce the corporate veil are:

> (1) commingling of funds and other assets of the corporation with those of the individual shareholders;

(2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders);

(3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors;

(4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation;

(5) failure to maintain corporate minutes or adequate corporate records;

(6) identical equitable ownership in two entities;

(7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties);

(8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking;

(9) absence of separately held corporate assets;

(10) use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation;

(11) sole ownership of all the stock by one individual or members of a single family;

(12) use of the same office or business location by the corporation and its individual shareholder(s);

(13) employment of the same employees or attorney by the corporation and its shareholder(s);

(14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corporation, which makes loans to them without adequate security);

(15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities;

(16) use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity;

(17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another;

(18) contracting by the corporation with another person with the intent to avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions;

(19) the formation and use of the corporation to assume the existing liabilities of another person or entity.

*Laya v. Erin Homes, Inc*., 352 S.E.2d 93, 98–99, 177 W. Va. 343, 347–48 (1986). *Accord*,

*Raleigh County Nat. Bank*, 173 W. Va. at 788, 320 S.E.2d at 523.[6]

Typically, "alter ego" liability may be a consideration with a closely-held corporation that has one or few shareholders.[7] Public companies, like EQT Corporation, have many shareholders who are separate and distinct from the managers who operate and control the business, making it significantly more difficult for any individual to disregard formalities and exert control over the company to the detriment of creditors.  In addition, because entities like EQT Corporation and EQT Midstream Partners, L.P., are publicly-traded, market influences and shareholder demands prevent the undercapitalization that is more common in close corporations.

Plaintiffs' alter ego allegations are without support here in the context of modern public companies, like EQT Corporation, that are subject to state and federal reporting requirements and routinely required to file documents relating to corporate structure, control, and affiliated

---

[6] In *Raleigh County Bank*, the Court noted that alter ego and "piercing the corporate veil" are essentially different names for the same concept. *Id.* at 522.

[7] Close corporations are distinguishable from public companies with many affiliates and subsidiaries.  Unlike a public company that must comply with formalities in order to satisfy both federal and state reporting requirements, "the very nature of a closely held corporation militates against strict compliance with corporate formalities." *In re Country Green Limited Partnership*, 438 F. Supp. 701, 707 (W.D.Va.1977) (rev'd on other grounds, 604 F.2d 289 (4th Cir.1979). *See also, Laya*, 177 W. Va. 343 at 349, n. 6. "The close corporation with a single dominant shareholder has no 'corporate ends' separate from those of its owner." Stephen M. Bainbridge, *Abolishing Veil Piercing*, 26  J. Corp. L. 479, 507 (2001).

transactions. Indeed, the undisputed facts in this case demonstrate that the factors to be considered in deciding whether to impose alter ego liability under West Virginia law are not satisfied. Notably, there is *no evidence*:

- that funds between EQT Corporation and EQT Production Company (or any other Defendant) were commingled;

- that any Defendant failed to maintain corporate formalities;

- that any Defendant failed to maintain corporate minutes or adequate corporate records;

- that any Defendant's business was undercapitalized;

- that separately held corporate assets are absent;

- that legal formalities or proper arm's length relationships have been disregarded;

- that corporate assets have been diverted from one business to another;

- that the ownership, management or financial interests of any Defendant have been concealed or misrepresented; or,

- that EQT Corporation operates EQT Production Company or any other Non-Lessee Defendant as a mere shell, adjunct, or instrumentality of itself.

In fact, in *Leggett v. EQT Production Company*, Civil Action No. 1:13cv4, pending in the U.S. District Court for the Northern District of West Virginia before Judge Stamp, the Court, after considering the plaintiffs' claims of alter ego liability, recently ruled that the exact same Defendants in this case  are not alter egos of one another and that the non-lessee defendants in that case (the Non-Lessee Defendants here are the same those in *Leggett*) are not bound by the lease agreements that are the subject of that case. *See* Exh. 4, Memorandum Opinion and Order dated Jan. 22, 2016, pp. 15-18.  There, the facts offered in an attempt to support the plaintiffs' claim of alter ego liability were the same as those offered here.  *Id.*

Other courts that have recently considered alter ego claims involving allegations of purported "control" by a parent company like those made by Plaintiffs in this case have also

found that those allegations provided an insufficient basis to overcome the presumption of corporate separateness that normally adheres under West Virginia law:  *Billiter v. Kellogg Brown & Root Servs., Inc.*, No. 5:09CV119, 2010 WL 2901618 (N.D.W. Va. Jul. 21, 2010) (applying West Virginia law); *Haley Paint Co. v. E.I. DuPont De Nemour & Co*., 775 F. Supp.2d 790 (D. Md. 2011) (applying similar Maryland law).[8] In *Billiter*, for example, the district court, applying West Virginia law, recognized that efforts to maintain alter ego claims where the plaintiffs attempted to rely on the type of conclusory allegations made by Plaintiffs here cannot be sustained.  The plaintiffs in *Billiter* raised many of the same arguments that Plaintiffs allege to support their alter ego claims here – common ownership, overlapping officers and directors, sales to only related entities, and the work purportedly being directed from the top.  *Id*. at *6-7. After reviewing these allegations, the court found that the plaintiffs' conclusory allegations provided an insufficient factual basis to overcome the presumption of corporate separateness that normally adheres under West Virginia law.  *Id*. at *7.  Further, *Billiter* and *Haley Paint* both recognize that a certain amount of corporate planning or supervision is part of normal corporate governance and cannot be equated with disregard of corporate separateness.  *See, e.g., Haley Paint*, 775 F. Supp.2d at 800 ("the fact that [the parent] will control certain decisions and even must approve changes does not mean the two companies operate as one"). These cases also similarly hold that the mere fact that one corporate affiliate may purchase goods or services from another, that a subsidiary may be wholly-owned, or that corporate affiliates might participate in corporate planning are hardly evidence that their corporate forms should be disregarded.  *Billiter,* 2010 WL 2901618 at *6; *Haley Paint*, 775 F. Supp.2d at 800. Finally, as to allegations of officers holding positions in more than one corporation, or sharing office space, these likewise

---

[8] Copies of these cases are attached as Exhs. 5 and 6.

have been rejected as a sufficient basis to pierce the corporate veil. *See Billiter,* 2010 WL 2901618 at *7.

The record here is devoid of evidence that Defendants failed to observe any corporate formalities. Moreover, all transactions between EQT Production Company and EQT Corporation, as well as between and among all Defendants, are memorialized and recorded by contract, shared services agreements, and loan documents, a fact that Plaintiffs do not deny. The fact that certain individuals have been employed by or have served as officers, directors, or managers for one or more of the Non-Lessee Defendants and/or EQT Production also provides no support for Plaintiffs' alter ego argument. Overlapping directors and officers, employment of some of the same employees and use of the same business location cannot, as a matter of law, support Plaintiffs' contention that EQT Corporation is the alter ego of EQT Production or the other Non-Lessee Defendants. *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 61-62, 69-70 (1998) (a parent corporation is generally not liable for acts of its subsidiaries, despite overlapping of some or all of the executive officers or directors: "it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility.").

Finally, no inequitable result will occur if the purported acts of EQT Production Company are treated as those of it alone. Plaintiffs' claims relate to the alleged underpayment of royalties in connection with Leases to which the Non-Lessee Defendants are not parties. EQT Production Company is the sole lessee and the only entity that owes any duty to Plaintiffs with respect to the leases. EQT Production Company is a party defendant and Plaintiffs' claims against it are pending. Plaintiffs' right to relief, if any, under the Leases is from the lessee, EQT Production Company.

Having failed to present material evidence of a unity of interest and ownership such that the corporate form should be ignored under West Virginia law, Plaintiffs' claim that EQT Corporation is the alter ego of EQT Production Company and/or the other Non-Lessee Defendants must fail as a matter of law.

**B.**    **The Court Should Not Follow *McDonald Land* and The Price For Calculating Royalty Should Not Be Determined By The First Sale To a Non-Affiliated Party**

In its February 2, 2017 Order, the Court directed the parties to brief the issues of whether the Court should follow the holding in *W.W. McDonald Land*, where Judge Goodwin found that the sale of gas to an affiliate did not count as an arms-length transaction, and whether the price of gas should be determined by the first sale to a non-affiliated party.[9]  The answer to both of these questions is "no."  The Defendants will address these interrelated issues together.

First and foremost, the Court should not follow the holding in *W.W. McDonald Land* because the issue of whether a sale between subsidiaries at the wellhead could not be used to calculate royalties had not been fully developed and briefed at the time the Court rendered its decision.[10]  Moreover, as demonstrated below, the Court in rendering its decision did not consider controlling authority that mandates a contrary result.

An affiliate sale is not *per se* improper and cannot be automatically disregarded.  So long as an affiliate sale occurs at the fair market value, then the fact that it was between affiliates is immaterial.  Plaintiffs' own expert witness, Daniel Reineke, acknowledges that affiliate sales are not *per se* improper.  When questioned on this issue, he testified as follows:

Q [Mr. West]:  We've talked about the issue of affiliated sales.  Would you agree that there are circumstances where it would be appropriate with an affiliated sale

---

[9] Questions 2 and 3. ECF #323, p. 21.
[10] Neither party appealed the holdings in the *W.W. McDonald Land* decision because a settlement was reached after the decision.

if certain conditions were met for the gathering cost of an affiliated gathering company to be deducted in calculating royalty?

A [Mr. Reineke]:   Well, if a lease allows for deductions and meets the requirements that are listed by Tawney and Wellman then whether it is an affiliate or not an affiliate to me seems to be immaterial.  It just – it can be deducted.

Q [Mr. West]:  Okay.

A [Mr. Reineke]:  If they are reasonable and et cetera, et cetera, okay?  -- actually incurred, yes.[11]

Reineke Depo, Exhibit 7, pp. 130:2-130:15, 136:16-137:7.  Thus, Plaintiffs' own expert witness does not believe affiliate sales should automatically be disregarded.  Jurisprudence from West Virginia and other mineral bearing jurisdictions dictate the same conclusion—if the price for the sale of gas is fair and if all deductions taken conform with *Wellman* and *Tawney*, then it is immaterial that the sale was between affiliated entities.

In deciding whether EQT Production complied with its duty to market in selling gas to its affiliate, EQT Energy, the fact finder must consider the facts and circumstances surrounding the sale and determine whether EQT Production acted as a reasonably prudent operator under the circumstances.  The fact that EQT Production sells the produced gas to its affiliate does not mean the sale is invalid or that EQT Production breached the implied duty to market.

 "'The standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances.'"  *Parker v. TXO Prod. Co.*, 716 S.W.2d 644, 646 (Tex. App.-- Corpus Christi 1986, no writ) (quoting

---

[11] Mr. Reineke later attempted to partially qualify his testimony, saying that if wellhead gas needs to be processed to separate liquids for sale, the wellhead price would not necessarily reflect fair market value. This qualification is inapplicable in the instant case, because as Defendants have demonstrated and the Court has noted, none of the named Plaintiffs' gas is processed to remove any liquids.  *See* Deposition of Justin Friend, Exhibit 8, pp. 94-99;   ECF No. 323, p. 20, Page ID#10022.

*Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex. 1981)).   As the West Virginia Supreme Court of Appeals has explained, "[t]he owner of a lease for the production of oil and gas, containing the usual terms and conditions, must. . . exercise due and reasonable diligence in prosecuting operations thereunder for the mutual benefit of himself and his lessor. . ."   *Grass v. Big Creek Dev. Co.*, 75 W. Va. 719, 84 S.E. 750 (1915).

The issue of whether revenue received from an affiliate sale can be used to calculate lessors' royalties falls under the "pricing" element of the implied duty to market.   *See* Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 St. Mary's L.J. 1, 24(2005).   As part of the implied duty to market, "the lessee owe[s] a duty to market its production for a reasonable price."   *Id.*   This does not mean the lessee has to obtain the highest price—a lessee may fulfill its duty by selling its production at the prevailing market price.   *Id.,* n. 97;   *see also Parker v. TXO Prod. Co.*, 716 S.W.2d 644, 645-47 (Tex. App.-- Corpus Christi 1986, no writ) (holding that the lessee had acted prudently even though it  accepted a price five percent below market value).

While courts apply stricter scrutiny to affiliate sales, such sales do not automatically implicate a breach of the implied duty to market.   The authors of "Post-Production Charges to Royalty Interests: What Does the Contract Say and When Is It Ignored?"[12] discussed this issue in detail, explaining as follows:

> '[W]hen the sales of production are made to an affiliate or an affiliate is used to provide downstream (transport or processing) services, the question arises whether royalties can be properly paid on the basis of the proceeds received by the lessee' from such sale, rather than the affiliate at the other end of such

---

[12] The West Virginia Supreme Court of Appeals cited this article in *Tawney*, stating that it is instructive on the issue of the implied covenant to market gas.   *See, Estate of Tawney v. Columbia Nat. Res., L.L.C.,* 219 W. Va. 266, 271, 633 S.E.2d 22, 27, n. 4 (2006).

transportation facilities.  Matlock's articles propose that the following guidelines should be observed when entering this arena:

> (1) The mere existence of affiliates in marketing transactions should not constitute a per se breach of the express or implied covenants of the lease. (However, it is inherently suspect and triggers a close scrutiny to the affiliate transaction.)
> . . .
> (3) In all of the cases in which the lessee has survived the inquiry triggered by the existence of an affiliate in the marketing transaction, there was independent evidence of the fairness or competitiveness of the sales price on which the lessee had paid royalties.

Jefferson D. Stewart & David F. Maron, *Post-Production Charges to Royalty Interests: What Does the Contract Say and When Is It Ignored?*, 70 Miss. L.J. 625, 651 (2000) (footnotes omitted) (quoting Judith M. Matlock, *Payment of Gas Royalties in Affiliate Transactions*, 48 Inst. on Oil & Gas L. & Tax'n 9-1 (1997)).

Several other courts have found that an affiliate sale, in and of itself, does not violate the implied duty to market.  *See, e.g., Ramming v. Nat. Gas Pipeline Co. of Am.*, 390 F.3d 366, 374 (5th Cir. 2004)(finding that post-production expenses were not the result of a sham transaction and explaining that "the mere fact a subsidiary is wholly owned by the parent and there is an identity of management does not justify finding that any transaction between the two is a sham") (internal citations omitted); *see also, ConocoPhillips Co. v. Lyons*, 2013–NMSC–009, ¶¶ 66–68, 299 P.3d 844, 860–61 (finding that without any language in the statutory leases expressly governing affiliate transactions, affiliate and nonaffiliate transactions would be treated the same, and permitting lessees to deduct reasonable costs incurred for post-production services). Additionally, in *Abraham v. WPX Prod. Prods.*, 317 F.R.D. 169, 264–66 (D.N.M. 2016), plaintiffs argued in their motion for class certification that a common question existed as to whether the lessee breached the implied duty to market and the duty to deal in good faith by

participating in "keep whole" gathering and processing arrangements with affiliates.   In addressing plaintiffs' arguments, the District Court of New Mexico stated as follows:

> Calculating royalty payments based on the sale of gas at index prices, even to affiliates, does not in itself violate the implied duty to market. *See Garfield v. True Oil Co.*, 667 F.2d 942, 945–46 (10th Cir.1982); *Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F.Supp.2d 979, 1035 (D.N.M.2013)(Browning, J.)(stating that affiliate sales in and of themselves do not violate the duty to market); *ConocoPhillips Co. v. Lyons*, 2013–NMSC–009, ¶¶ 66–68, 299 P.3d 844, 860–61. What violates the duty to market is marketing the products at less-than-reasonable sales prices that do not mutually benefit the royalty owners and the lessee alike, whether sold to an affiliate or an unaffiliated entity.   *See Libby v. De Baca*, 1947–NMSC–007, ¶ 7, 51 N.M. 95, 179 P.2d at 265 (stating that the duty to market requires the lessee to "market the product," "having in mind his own interest as well as that of the lessor").

*Id.* [13]   As explained in *Abraham,* affiliate sales, in and of themselves, do not violate the implied duty to market gas, and should not be automatically disregarded.   Instead, the Court must consider whether the gas was sold at reasonable sales prices, for the mutual benefit of the lessor and the lessee.   The reasonableness of the sales price is then an issue of fact to be decided by the fact finder.   *See Smith v. Amoco Prod. Co.*, 272 Kan. 58, 84-85, 31 P.3d 255, 273-74 (2001) (finding that whether Amoco performed its duty under the implied covenant to market is a question of fact and that the task of the factfinder is to balance any conflict of interest).

In *W.W. McDonald Land*, the Court concluded that a sale between subsidiaries at the wellhead could not be used to calculate royalties, and explained as follows:

---

[13] The *Abraham c*ourt further found that even if a common question existed on the issue of breach of the implied duty to market, it is not the type of question that can result in common answers because the plaintiffs would only suffer injury from the "keep whole" agreement if it deprived them of their royalty interest.   *Id.* (stating that "although WPX Production has a common duty to sell the products for the lessors' mutual benefit, determining whether WPX Production complied with that duty may vary between lease forms.").   The same is true here. Even if the Court determined that EQT Production's sale of gas breached the implied duty to market, it would have to look at each individual lease to determine whether the sale deprived Plaintiffs of their royalty interest.

> The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead. I predict with confidence that, if confronted with this issue, the Supreme Court of Appeals would hold the same.

*W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 804 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014).  However, in one of the cases relied upon by the *W.W. McDonald Land* Court, *Beer v. XTO*, the court did not find that affiliate sales should be automatically disregarded.  Instead, it found that because XTO **failed to present evidence** showing that the **affiliated contracts reflected the prevailing market price or a price under the work-back method**, the lessors were entitled to have their royalties calculated from the contract price with the unaffiliated buyer.  *Beer v. XTO*, No. CIV-07-798, 2010 WL 476715, * 3 (Feb. 5, 2010).   Thus, *Beer* does not stand for the proposition that affiliate sales are per se invalid.

One of the other cases cited in *W.W. McDonald Land* actually sanctions the wellhead sale to an affiliate if the price is fair. In *Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla. 2004), Texaco's production division and its gas plant division entered into an intra-company "contract" for the sale of gas from Plaintiffs' leases at the wellhead.  After the gas was processed, Texaco sold the residue gas and the natural gas liquids to third parties.  The Plaintiffs in *Howell* argued that the market value at the wellhead should be based on the first arm's-length transaction, which occurred after the gas was processed; they contended that the intra-corporate sale at the wellhead should be ignored.  Conversely, although Texaco admitted that the intra-company contract was not an arm's-length transaction and that there was not an arm's-length sale at the wellhead, it contended that the intra-company contract

reflected the prevailing market price of the Plaintiffs' gas, and that that price could serve as the basis for calculating royalties.

The Oklahoma Supreme Court, in *Howell,* did not disregard or ignore the wellhead sale of the gas. Instead, the Court stated that there are three basic methods of establishing the market value at the wellhead.  The first is an actual sale at the wellhead reached through arm's-length negotiations.  In the absence of such an actual arm's-length sale, the Court stated, "the market value may be constructed by evidence of the prevailing market price." Third, and finally, the Court said that "the market value may be established by the work-back method."  "Under the work-back method," the Court explained, "the market value at the wellhead is calculated by subtracting allowable costs and expenses from the first downstream, arm's-length sale."  Thus, the *Howell* Court implicitly rejected the Plaintiffs' argument that royalties should be calculated based on the amount Texaco received from its sale to unaffiliated third parties after the gas was processed.

In sum, the Court must look to the circumstances surrounding EQT Production's sales contracts in order to determine whether royalties can properly be calculated based on the price received from the sale at the wellhead to EQT Energy.  The sale should not be disregarded solely because it was an affiliated sale.  The *W.W. McDonald Land* decision presumes that affiliates will make nominal sales at the wellhead to avoid certain obligations under the lease.  This is not what EQT Production does—EQT Production sells produced gas at a fair market rate.

Since EQT Production's reorganization in January 2005, and before *Tawney*, EQT Production sells gas at the wellhead, and receives a price for the sale of gas equal to the first of the month **__index price__** applicable to the interstate pipeline(s) into which the gas is delivered, less gathering-related charges, retainage, and any other agreed charges.  The price is calculated using

a work-back method for determining the fair market value of the gas at the wellhead. The "work-back method" is one of the two generally accepted methods of determining the fair market value of gas at the well, and by the time EQT Production incorporated the work-back method into its sales contract, the Fourth Circuit had already recognized the method as a valid means of determining the market value at the wellhead. *See Imperial Colliery Co. v. Oxy USA, Inc.,* 912 F.2d 696, 701 (4th Cir. 1990) (acknowledging "that there was no available wellhead price does not necessarily preclude computation of the gas' wellhead price. For example, … such a computation might simply be made by taking Equitable's purchase price and deducting compression and gathering expenses."). Thus, the sales contracts are not a sham; they were in place prior to *Tawney*; implemented for independent and valid business reasons; and are based on objective criteria that are market-based. For example, EQT has absolutely no control over the index price used in the pricing formula. Likewise, with regard to the gathering rate that is used, each year, EQT Gathering calculates "plan rates" to be charged for its gathering services. Bergonzi Aff., Exh. 1. These annual rates are based on EQT Gathering's business plan, which bases the rates on historic and projected operational costs, and are the same rates EQT Gathering charges to **<u>unaffiliated</u>** customers.[14] *Id.*

The rate charged to EQT Energy is a fully-burdened rate, which EQT Energy applies to the pricing formula set forth in the gas purchase contracts with EQT Production. *Id.* EQT Production bears the full burden of this plan rate in its payment from EQT Energy. EQT Production, however, adds the amount of EQT Gathering's rate of return, depreciation, and income taxes back in to the sales price before it pays royalty owners. *Id.* Thus, royalty owners

---

[14] The fact that other unaffiliated companies use EQT Gathering's services supports its position that it is providing its services at a fair rate. It is difficult to determine the exact market rate in these circumstances because anti-trust laws prohibit gathering companies from comparing their gathering rates to those charged by other companies and then setting their own rates accordingly.

receive more than 1/8th of the price paid to EQT Production because income taxes, depreciation, and return on investment are added back into the sales price before calculating the royalty. Plaintiffs' royalty is paid based on the sale price for the gas sold at the wellhead, and EQT Production takes no monetary deductions.

Additionally, EQT Production, EQT Energy, and EQT Gathering treat each other as wholly independent companies.  The contract price is negotiated, the gathering rate is negotiated, EQT Energy and EQT Gathering have unaffiliated customers, and no EQT entity has control over another.[15]  Accordingly, there is no basis to disregard the corporate forms of the distinct entities or to disregard the sale of gas from EQT Production to EQT Energy. *See,  Parker v. TXO Production Corp.*, 716 S.W.2d 644 (1986), 647-48 (finding no basis to pierce the corporate veil to determine the sale was a sham where the corporations involved had the same directors, but no evidence demonstrated that the entities treated each other as anything other than independent companies).

Moreover, oil and gas producers have to pay someone to gather and transport gas, and they should not be placed in a worse position for using an affiliated entity.  As long as the gathering rate is reasonable, and not in excess of what a third-party would charge, it is not unjust to use an affiliated entity.  In fact, often times, no other gathering companies provide services in a production area, and producers use affiliate entities out of necessity.  Importantly, even Plaintiffs' own expert acknowledges that a sale between affiliates can be appropriate.  When questioned on this issue, he testified that "if a lease allows for deductions and meets the requirements that are listed by Tawney and Wellman then whether it is an affiliate or not an affiliate to me seems to be immaterial.  It just – it can be deducted."  Reineke Depo, Exh.7, pp.

---

[15] *See* Argument A, *supra*.

130:2-130:15.  Thus, it would be unfair to EQT Production to completely ignore the sale to EQT Energy and to require EQT Production to bear all of the costs.

Finally, Plaintiffs have the burden of proving that EQT Production breached the implied duty to market under their leases.  See, *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269, 1274 (Okla. 1981) ("The burden of proving that a gas purchase contract was unfair or unreasonable at the time it was entered into is on the lessor seeking additional royalty.").  Plaintiffs have not demonstrated that EQT Production's sale of gas to EQT Energy was unfair or unreasonable.

For the above-stated reasons, the Court should not follow *W.W. McDonald Land's* decision finding that the sale of gas to an affiliate did not count as an arms-length sale.  The Court should also find that the price of gas is properly determined from the sale of gas from EQT Production to EQT Energy.  This sale should not be disregarded, because it is based on the market value at the wellhead and is fair to lessors.  No basis exists for disregarding this sale and determining the price of gas based off of the first sale to a non-affiliated party.  In fact, *each* sale should be analyzed to determine whether *each* sale complies with the implied duty to market, which is further reason why this Court should not consider merits issue at this stage and that this matter should not be certified as a class action in any event.  Summary judgment should be granted in Defendants' favor on this issue.  Alternately, and at the very least, genuine issues of material fact exist regarding whether the EQT Production's wellhead sale complies with the implied duty to market, precluding summary judgment on this issue.

    **C.**    <u>**The Meaning of Actual and Reasonable Does Not Change When Dealing With an Affiliate Company or an Alter Ego Company—It Means the Costs Actually and Reasonable Incurred by the Lessee, EQT Production**</u>

The Court asks the parties to address when dealing with "an affiliated company" or "alter ego company" whether "actual and reasonable costs mean the cost charged by the company or

the direct costs incurred by the company."[16] Whether dealing with an affiliated company or an alter ego company, actual and reasonable costs means the same as it would when dealing with an unaffiliated company.

As a preliminary matter, as is explained above, Defendants are not alter ego companies and should not be treated as such. Moreover, no distinction exists between the meaning of "actual and reasonable costs" when dealing with an affiliated company rather than a non-affiliated company.  The West Virginia Supreme Court of Appeals first set forth this standard in *Wellman*:

> [I]f an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.

*Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 211, 557 S.E.2d 254, 265 (2001); *See also Estate of Tawney v. Columbia Nat. Res., L.L.C.*, 219 W. Va. 266, 272, 633 S.E.2d 22, 28 (2006) ("Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.").  Thus, *Wellman* and *Tawney* make clear that **actual costs** are those costs actually incurred by the **lessee**, here EQT Production.

These cases do not suggest that a different standard applies when dealing with an affiliated company.  As a result, affiliated transactions must be treated the same as non-affiliated transactions, and the analysis regarding whether costs are actual and reasonable should not vary when affiliated entities are involved.  *See, e.g., ConocoPhillips Co. v. Lyons*, 2013–NMSC–009,

---

[16] Questions 4 and 5. ECF #323, p.21.

¶¶ 66–68, 299 P.3d 844, 860–61(finding that "because there is nothing in the 1931 or 1947 statutory lease forms to indicate that Legislature intended to treat affiliated and non-affiliated transactions differently when deducting post-production costs, we affirm the district court's finding that deductions used in calculating Lessees' royalty obligations must be reasonable" and need not be actually incurred).

Throughout this litigation, Plaintiffs have misstated the applicability of *Tawney* and *Wellman* in analyzing whether post-production costs are "actual and reasonable." Plaintiffs' proffered expert, Daniel Selby, opines that the costs incurred by EQT Production were not "actual" because they were based on "forecasts." Selby Aff. ECF No. 299-20, p. 8. This opinion has no basis in fact or law. As explained, *Wellman* specifically provides that the relevant inquiry is not whether EQT Gathering's **gathering rate** is "actual and reasonable," but whether any deductions taken from royalties were **based on costs actually and reasonably incurred by the lessee, EQT Production**. The testimony of Plaintiffs' expert, Daniel Reineke, supports this conclusion. When asked what "actual" means, he testified as follows:

> Q:   Okay. You were asked a question about what actual and reasonable meant. Would you agree that . . . the word "actual" reflects that it is an expense actually that is being paid by the producer to the company that's doing the transportation on the gathering system?
> A.   Actually incurred, I believe, is the language, and that would be money changing hands?
> Q.   Yes.
> A.   Right. Somebody writing somebody a check.

Reineke Depo., Exh. 7, pp. 170-71.

In sum, the proper analysis requires a determination of (1) whether the **lessee** actually incurred the costs, and (2) whether they were reasonable. According to expert testimony submitted by the Defendants, EQT Gathering "did not violate any standard cost accounting procedures, and both the procedures used to calculate the gathering rate and the resulting rate

itself appear to be actual and reasonable." *See* Report of Roger Griffith, attached as Exhibit 2. Regardless of whether an affiliate entity or an unaffiliated entity gathers and transports the produced gas, costs will be incurred.  As long as those costs are actually incurred, are reasonable, and otherwise comply with *Tawney*, lessors are required to bear part of those costs. Furthermore, as noted above, oil and gas producers have to pay someone to gather and transport gas, and they should not be placed in a worse position for using an affiliated entity.  As long as the gathering rate is reasonable, it is not unjust to use an affiliated entity, especially where no unaffiliated gathering companies provide services in a production area, and producers are required out of necessity to use an affiliated company to transport gas.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment and hold (1) that the Defendants are not alter egos of one another; (2) EQT Production's wellhead sale of gas to EQT Energy cannot be disregarded; and (3) that "actual and reasonable costs" means those costs incurred by a lessee.

**EQT PRODUCTION COMPANY; EQT**
**CORPORATION; EQT ENERGY, LLC;**
**EQT INVESTMENTS HOLDINGS, LLC;**
**EQT GATHERING, LLC; and**
**EQT MIDSTREAM PARTNERS, LP,**
**By Counsel.**

*/s/  David K. Hendrickson     03/01/2017*
David K. Hendrickson, Esquire (#1678)
Carl L. Fletcher, Esquire (#1225)
**HENDRICKSON & LONG, PLLC**
P. O. Box 11070
Charleston, WV  25339
(304) 346-5500; (304) 346-5515 (fax)
daveh@handl.com
cfletcher@handl.com

John Kevin West (pro hac vice)
**STEPTOE & JOHNSON PLLC**
Huntington Center - Suite 2200
41 South High Street
Columbus, OH  43215
(614) 458-9889; (614) 221-0952 (facsimile)
kevin.west@steptoe-johnson.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG**

**THE KAY COMPANY, LLC, et al.,**

        **Plaintiffs,**

**v.**                                 **CIVIL ACTION NO. 1:13-cv-151
(Hon. John Preston Bailey, Judge)**

**EQT PRODUCTION COMPANY, et al.,**

        **Defendants.**

**<u>CERTIFICATE OF SERVICE</u>**

    I, David K. Hendrickson, counsel for Defendants, do hereby certify that on the **1st day of March, 2017**, a true and exact copy of "**MEMORANUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**" was served upon counsel of record using the Court's CM/ECF system, which will deliver an electronic copy to counsel of record as listed below:

Marvin W. Masters, Esquire (#2359)
**THE MASTERS LAW FIRM, LC**
181 Summers Street
Charleston, West Virginia   25301
***Counsel for Plaintiffs***

Michael W. Carey, Esquire (#635)
**CAREY, SCOTT, DOUGLAS & KESSLER, PLLC**
Suite 901
707 Virginia Street East
Charleston, West Virginia  25301
***Counsel for Plaintiffs***

***/s/  David K. Hendrickson     3/01/2017***
David K. Hendrickson, Esquire (#1678)
Carl L. Fletcher, Esquire (#1225)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
P. O. Box 11070
Charleston, WV  25339
(304) 346-5500
(304) 346-5515 (fax)
daveh@handl.com
cfletcher@handl.com