```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF WEST VIRGINIA

 3   The Kay Company, LLC, et al.,

 4         Plaintiffs,

 5               VS.                    CIVIL ACTION NO.

 6                                      1:13-cv-151

 7   EQT Production Company, et al.,

 8         Defendants.

 9                            – – –

10       Proceedings had in the hearing of the above-styled action

11   on January 31, 2018, before Honorable John Preston Bailey,

12   Judge, at Wheeling, West Virginia.

13                            – – –

14       APPEARANCES:

15       On behalf of the Plaintiffs:

16       Marvin W. Masters
         The Masters Law Firm, LC
17       181 Summers Street
         Charleston, WV  25301
18       304.342.3106

19       Michael W. Carey
         Carey, Scott, Douglas & Kessler, PLLC
20       707 Virginia Street, East
         PO Box 913
21       Charleston, WV  25323
         304.345.1234
22

23   APPEARANCES CONTINUED ON NEXT PAGE

24

25
```

```
 1          On behalf of the Defendants:

 2          David K. Hendrickson
            Hendrickson & Long
 3          PO Box 11070
            Charleston, WV  25339
 4          304.346.5508

 5          John K. West
            Steptoe & Johnson
 6          41 South High Street, Suite 2200
            Columbus, OH  43215
 7          614.458.9889

 8          Proceedings recorded utilizing realtime translation.
            Transcript produced by computer-aided transcription.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                     Wednesday Morning Session,

2                                     January 31, 2018, 10:00 a.m.

3                                            - - -

4              THE COURT:  I would ask the clerk to call the case.

5              THE CLERK:  This is the case of The Kay Company, LLC,

6     et al., versus EQT Production Company, et al., Civil Action

7     Number 1:13-CV-151.

8              Will the parties please note their appearance for the

9     record.

10             MR. MASTERS:  Marvin Masters for plaintiff.

11             MR. CAREY:  Mike Carey for the plaintiffs.

12             MR. HENDRICKSON:  David Hendrickson, Your Honor, for

13     the defendants.

14             MR. WEST:  Kevin West for the defendants, Your Honor.

15             THE COURT:  Where do you want to start?  Looks like

16     we've got a motion to approve class notice, we've got

17     objections to my January 5 order, and we have a motion to

18     continue.

19             I guess we ought to start with the objections to the

20     January 5 order.  In that order I asked EQT to let me know if

21     they contend there are any leases that meet the standard.  They

22     sent me a list of 5500-plus leases that they contend satisfy

23     Tawney, which I think is probably less than -- or more than we

24     had at the last hearing.  Either they don't understand my

25     ruling of January 5, or they're messing with me.

 1            Now, Mr. Hendrickson, what's your best lease to try

 2   this -- I'm sorry, Mr. West, what's your best lease to try to

 3   satisfy what I have now determined to be the Tawney standard?

 4            MR. WEST:  If the Court please, there are two

 5   examples, and I can provide the Court with the exemplary

 6   language from the two examples, and I do think that there are

 7   less than originally determined to be Tawney compliant, but

 8   what we did is we took the language, particularly at pages 27

 9   and 28 of your order, and looked at that and went back and

10   looked at lease language.  And I can provide, if the Court

11   please, the two examples that we used.

12            THE COURT:  That would be wonderful.

13            MR. WEST:  May I approach, Your Honor.

14            THE COURT:  Sure.

15            MR. WEST:  And Your Honor, with regard to the leases

16   that are on the list, all of them fall within these two

17   categories.  They contain language that's either on example one

18   and example two, and with regard to example one, we -- just

19   looking down through there, it talks about how you defined

20   amount realized.  It says that it's the amount received by the

21   lessee for the sale of the gas, minus any and all reasonable

22   and actual production costs and expenses, and we realize that

23   your order addressed reasonable and said that that's not

24   sufficient.

25            THE COURT:  Right.

1          MR. WEST:  But we -- it's our position that while

2    that may not be sufficient alone, that if it satisfies it, if

3    it satisfies the test that you've set forth, and then just

4    happens to have that reasonable language, that the reasonable

5    language would not disqualify it from being Tawney compliant.

6          So it does talk about how you go about calculating

7    the royalty.  There are specific deductions that it talks

8    about, gathering and/or affiliates, cost associated with

9    gathering or -- and/or its affiliates between the wellhead and

10   point of sale.

11         Then it gets even more specific.  It says, including,

12   but not limited to, costs associated with the following:

13   Gathering or transporting the gas from the well to the point of

14   sale.  It gets even more specific.  Including line loss and

15   compressing.  More specific.  Including the cost of

16   electricity, gas, or other fuel, and desulfurization and

17   purification, treating, dehydrating, extracting, processing,

18   storage and marketing, cleaning and removal of liquid or

19   gaseous substances or impurities, and then talks about

20   severance and production taxes.

21         So we believe that even when you compare this against

22   the standard that you've set forth on pages 27 and 28 of your

23   order, that this is a lease that would be Tawney compliant.

24         For example two, it's very similar, in that at the

25   very beginning of the lease it talks about how you go about

1   calculating the royalty, 15 percent of the net amount realized

2   by the lessee, and then goes forward and defines how you

3   determine the net amount realized by the lessee; defines

4   postproduction costs very specifically, treating and processing

5   oil and gas, separating liquid, hydrocarbons from the gas,

6   transporting oil and gas, including, but not limited to,

7   transportation between the wellhead and any production or

8   treating facilities and transportation to the point of sale,

9   compressing gas for transportation and delivery purposes,

10  metering oil and/or gas to determine the amount sold and used

11  by the lessee, sales charges, commissions, and fees paid to

12  third parties, whether or not affiliated, any and all costs and

13  expenses of any kind incurred in regard to gas or the handling

14  thereof.

15          It specifically says that lessee may use its own

16  pipelines and equipment to provide such treating, processing,

17  separating, transportation, compression, and metering services,

18  or may engage others to provide.  And if it uses its own

19  pipelines, the postproduction costs shall include, without

20  limitation, reasonable depreciation and amortization expenses

21  related to such facilities, together with the lessee's cost of

22  capital and reasonable return on its investment in such

23  facilities.  So we believe that in this instance also that this

24  satisfies the standard that's set forth on pages 27 and 28.

25  And we realize there was discussion on reasonable and what

 1  relevance that had.

 2          We do think that in the second phase, once you

 3  determine whether a lease is compliant with Tawney, that

 4  certainly under Wellman and Tawney then it becomes relevant to

 5  look at whether the costs that were charged were actual and

 6  reasonable.  And I think that the Court had noted that in prior

 7  orders, that this is a two-step process.  And where we are

 8  right now is looking at step one, is that does the lease comply

 9  with Tawney.  And we think that under the standard that you've

10  announced in your order, that these two examples do satisfy

11  that.  And we would represent to the Court that all of the

12  leases on the list that we provided you and are filing are

13  leases that have either the first or the second example as a

14  royalty language.

15          THE COURT:  Mr. Masters, Mr. Carey.

16          MR. CAREY:  Your Honor, as the Court has pointed out

17  in its most recent order on this issue, there's three

18  components of Tawney.  Generally, the lease must -- if the

19  lessee intends to allocate any costs, postproduction costs, to

20  the lessor, it must generally set forth in the lease it intends

21  to do so; second, the lease must specify with particularity the

22  postproduction costs that they intend to deduct; and third,

23  must specify the methodology by which those deductions will be

24  calculated.

25          What they've done in these two examples is comply

1    perhaps with the second element, specify with particularity

2    those postproduction costs it intends to deduct.  But nowhere

3    is there any methodology upon which those particularized

4    deductions will be calculated.

5           Initially, the first example has the language

6    reasonable and actual, and in the prior hearing they relied on

7    that language to say based on the McDonald case that that

8    provides the methodology.  Now, in light of the Court's order,

9    they're saying, well, no, it's not the methodology.  It's just

10   a additional statement to comply with what is required by

11   Wellman.  Well, no.  There is no methodology in example number

12   one.  There --

13          THE COURT:  Is there a waiver of the methodology in

14   number one in the last sentence?

15          MR. CAREY:  Reasonable discretion?  No.

16          THE COURT:  I don't know why -- I mean, I don't know

17   why the hell someone would sign this lease, but they've talked

18   about what costs are going to be -- what types of costs are

19   going to be deducted.  And then they say that the lessee shall

20   have the right to allocate postproduction costs and expenses in

21   its reasonable discretion.

22          MR. MASTERS:  May I address that, Your Honor?

23          THE COURT:  You sure can.

24          MR. MASTERS:  We just got this this morning, so --

25   but here's the reasonable discretion.  First of all, it still

1    has "reasonable" in it.  And so it has the same problem as

2    saying "reasonable" in the sense that they had discretion

3    before.  I mean, they do it.  They make the decision.  So I

4    don't see where it gives them anything else, what they already

5    had or have been doing.  I see nothing else there.  Unless it

6    means -- the only thing the Court would have to say is -- which

7    I don't think this would be an accurate interpretation of any

8    lease like this -- is that they could take anything that they

9    want for however much and figure it out, a method by whatever

10   means.  As long as it has "reasonable" in it, then I think they

11   still have to comply with reasonable and actual.

12              THE COURT:  I'm not disputing that.

13              MR. MASTERS:  I know what you're saying.

14              THE COURT:  What I'm saying is we got three kinds of

15   leases.  We got your flat rates, which are over here a little

16   bit.  We've got your non-Tawney compliant.  And on those it's

17   real easy.  They can't take anything.  Then you have your

18   Tawney compliant, to the extent I find there are any.  And they

19   can take deductions.  But they have to be reasonable and

20   actual.

21              MR. MASTERS:  Correct.

22              THE COURT:  And if they're not reasonable and actual,

23   then they give the money back.  So I'm not in any way, when I

24   say they waived -- I'm pretty close here, in example one, they

25   waived the right to have methodology set forth in the lease, by

1    saying that the lessee can charge anything they want in these

2    categories.  Now, we'll find out later whether it's reasonable

3    and actual.  We find that out at trial.

4             MR. MASTERS:  Okay.

5             MR. CAREY:  Your Honor, not to double-team you, but

6    can I respond to that?

7             THE COURT:  Sure.

8             MR. CAREY:  The Court laid out very appropriately, I

9    think, in its order the fact that many courts have held that

10   there is no fiduciary relationship.  And in that regard the

11   defendants control all the information.  And the plaintiffs

12   have no access to that.  And so for them -- this to constitute

13   a waiver, you would have to find that they give up any right to

14   challenge the methodology, that they would simply be limited to

15   actual and reasonable.

16           But the Court posited many questions that methodology

17   would answer that the phrase "reasonable discretion" doesn't

18   even come close to comporting with.  And that is, in this case,

19   you asked what is included within reasonable costs.  Does it

20   include only the direct costs of providing the service, or does

21   it include indirect costs, including meals and entertainment,

22   uniforms, meter operations and repair, personal property taxes,

23   personnel costs, production management costs, depreciation, and

24   return on investment.  Are costs apportioned by the language of

25   the gathering lines, by the decatherm, or some other method.

1  Without the answers to these and other questions, the lease

2  fails to define the methodology for calculating this.

3  　　　　　This doesn't constitute a waiver.  It's just a

4  reaffirmation of what they say before, that they will be,

5  quote, reasonable and actual.  It doesn't provide notice to the

6  lessee -- I'm sorry, to the lessor that he is going to be

7  subject to all these variations of possible different methods

8  of calculation, direct cost, indirect cost, length of

9  transporting, does our gas need to be stripped of liquids or

10  not, does it need to be compressed to reach pipeline pressure

11  or not, those are the kinds of things that simply could not

12  constitute a waiver simply by using the phrase "reasonable

13  discretion," and therefore doesn't meet the requirements.

14  　　　　　MR. HENDRICKSON:  Judge, can I say a couple words?

15  　　　　　THE COURT:  You've been remarkably quiet so far.

16  　　　　　MR. HENDRICKSON:  I think you hit the nail on the

17  head.  I mean, the second part of the trial, if the trial is

18  going to be whether or not they're actual and reasonable,

19  that's for the jury to determine.  We set out in the lease what

20  type of charges we're going to take.  And the problem with

21  doing it in a class action -- and again, we're past that phase,

22  and I understand that -- is that there are a lot of variations

23  between where people's wells are located, what type of gas they

24  have in there, how high the decatherm count is, all those

25  variations have to come into play, and so it's nearly

1   impossible to write a lease that is tailor made for each of

2   those situations.

3              THE COURT:  That's not true.  I just -- I had a class

4   action filed -- I don't know if you were involved in it or

5   not -- where the leases had an amount set forth, like $2 for

6   postproduction costs.

7              MR. HENDRICKSON:  I wasn't in that --

8              THE COURT:  I said that's fine.  That's set forth the

9   methodology and --

10             MR. HENDRICKSON:  Obviously, we don't have that here.

11             THE COURT:  No.

12             MR. HENDRICKSON:  But whatever the charges we have,

13  it's up to us to show what we took and then whether or not --

14  which is the actual part, and then the reasonable part is, is

15  that reasonable under the circumstances.  That's our burden in

16  that situation.

17             THE COURT:  That's your burden in phase two.

18             MR. HENDRICKSON:  Correct.

19             THE COURT:  Your burden in phase one is do you have

20  the right to take any.

21             MR. HENDRICKSON:  And I think that lease gives us a

22  right to take.  We set amount and we tell them what we're going

23  to do.

24             THE COURT:  Is there anywhere in here where you tell

25  them you're going to take meals?

1              MR. HENDRICKSON:  No.

2              THE COURT:  Or uniforms or vacations for the --

3              MR. HENDRICKSON:  But it's just like -- you're going

4    to an extreme there, but it's just like when you hire a moving

5    company and you say, I want to move my household goods from A

6    to B, they give you a charge.  You don't know what that charge

7    incurs.  The charge -- it probably includes uniforms, it

8    probably includes meals, it probably includes gas.

9              THE COURT:  And I know what the charge is up front.

10   These people don't.

11             MR. HENDRICKSON:  But it's up to us to prove,

12   according to law, whether or not they're actual and reasonable.

13             THE COURT:  That's phase two.

14             MR. HENDRICKSON:  Correct.

15             THE COURT:  Phase one is do you have a right to take

16   them under Tawney.

17             MR. HENDRICKSON:  We think we do in this type of

18   lease.

19             THE COURT:  I understand you think you do and on --

20   I'm going to find that example one, if you've got the language,

21   first of all, that allows you -- if you've got example one

22   language, all of it, I find that satisfies Tawney.  I don't

23   know how many that is.

24             MR. HENDRICKSON:  We'll have to get you that count,

25   get you the list.

1          THE COURT:  Let's talk about example two.  I focused

2     on example one.  I'm not so sure.

3          Mr. Carey, you want to --

4          MR. CAREY:  Well, unless I'm overlooking it in my

5     advanced age -- I don't see well.

6          THE COURT:  You're not that advanced.

7          MR. CAREY:  Well, my brain thinks I am.  I don't see

8     anything about the reasonable discretion language that the

9     Court believes constitutes a waiver in one.  And it doesn't

10    even have "reasonable and actual" up in the body of the -- as a

11    preface to the postproduction costs that exist in example one.

12    What it does have is a detailed list to comply with perhaps the

13    second requirement of Tawney.

14          THE COURT:  Tawney part two.

15          MR. CAREY:  Tawney part two.  But nowhere is there

16    any language that either constitutes a waiver or specifies

17    methodology.  And so I don't believe that there's any way that

18    this one --

19          THE COURT:  I agree.

20          Go ahead.  Take your last shot.

21          MR. WEST:  I'm sorry, Your Honor.  I was just going

22    to say -- I'll be brief -- that I do think if you look at your

23    decision in Kinney, one of the things you very aptly did is you

24    went through and said, in this lease it shows you're going to

25    take the volumes, you're going to take the revenue, and then

1    this is what it says you can deduct.  I think this example does

2    that.  It doesn't -- in Kinney they said it's $2 is the actual

3    and reasonable.  But I think that goes to the second phase

4    rather than the first phase.  It's our position if you look at

5    your decision in Kinney and if you look at this, that this

6    would state a methodology.  All right.

7            THE COURT:  Example one satisfies Tawney.  Example

8    two does not.  No methodology in there.  So we've taken care of

9    that.  With that exception, I'm not going to reconsider my

10   January 5 order.

11           Let's talk about your objection to the class notice.

12   Do you have a purpose here?  Did you drive?

13           MR. HENDRICKSON:  Actually, Your Honor, I'm just here

14   to see you.  That's it.

15           THE COURT:  By the way -- I shouldn't put this in the

16   middle of the hearing.  When the hearing's over.

17           MR. HENDRICKSON:  I had nothing to do --

18           MR. WEST:  As set forth in our written pleading that

19   we made, our primary argument with regard to the class notice,

20   we're not objecting to the way it was drafted, their methods of

21   serving it.  We believe it's premature.  We believe that there

22   are issues with regard to who should get notice in this case.

23   We've mentioned several, but I think there are two that are

24   very good examples.

25           For instance, with regard to flat rate leases that

1    have not been converted, and we intend to file a motion with

2    the Court, provide information as part of that motion to

3    opposing counsel that these are the ones that we say have not

4    been converted under the flat rate statute and so they

5    shouldn't be part of the class because with regard to those

6    leases, the rate that they get paid -- what they get paid is

7    set.  So to the extent they have a pricing claim, it doesn't

8    come into effect.

9           To the extent that they're claiming there's an issue

10   on volumes, which we intend to file a motion on that to address

11   how that should be dealt with as far as at trial, whether there

12   is a claim for that or not, but with regard to those flat

13   rates, on ones that have been converted, they don't have any

14   claims that would fall within anything that's been raised in

15   this litigation as a complaint about --

16          THE COURT:  You said the ones that have not been

17   converted?

18          MR. WEST:  Yes, Your Honor.

19          THE COURT:  Okay.  Go ahead.

20          MR. WEST:  So we think we should be -- at the very

21   least, we should be given an opportunity to file a motion,

22   there be a determination which of those are in, which of those

23   are out, before the class notice is sent.

24          Secondly, another very similar example is with regard

25   to those based on an index price where the royalties be

1   calculated on 90 percent of a TECO rate.  There are no

2   deductions taken on those.  And so we would -- we intend to

3   file a motion on that saying -- on those that's not falling

4   within any of the claims that have been raised by the

5   plaintiffs in this case, so they should be knocked out.

6           So we think that the Court should decide those

7   issues -- and we can get them before Court very promptly -- but

8   the Court should decide those issues before any notice should

9   send out, because it would be confusing to someone that had a

10  lease but it fell within one of those categories if they

11  received a notice and think that they may have a claim when, in

12  fact, they have no claim at all, not any.

13          MR. MASTERS:  Yes, Your Honor.  The flat rate

14  nonconverted, we believe we can determine that from the

15  database we have.  And there's no reason that they can't

16  produce a list of those, if they wish.  I'd prefer they did.  I

17  asked them to do that a long, long time ago because we knew

18  this was going to be an issue.  And they just haven't done it.

19          THE COURT:  Why not?

20          MR. WEST:  We didn't know what they were.  We've been

21  working on that and we -- I think that we -- it has to be

22  checked, but I think that we -- we're very close to having a

23  list, so --

24          THE COURT:  I would think you'd have that list as a

25  matter of routine, I mean, so you know how the guy gets paid.

1          MR. WEST:  And I understand that, Your Honor.  But

2    the only way to come up with it, and what we've done is having

3    to do cross-referencing between flat rates and then looking at

4    situations where deductions have been taken, which would

5    indicate that if there were deductions taken on a flat rate,

6    that it has been converted.  And so we're just trying to

7    confirm that that list is actually correct and that all of

8    those fall -- either do or don't fall into that category.

9          MR. MASTERS:  So anyway, I see no reason that we

10   can't discern it the best we can from the database that we've

11   been provided or that they can't get that to us promptly in

12   time to include or take out their names and addresses from the

13   list.  I mean, I have no problem doing that, flat rate,

14   obviously nonconverted, would not be entitled to any money out

15   of this particular class action.

16          I didn't understand what you were talking about

17   volumes, Kevin.

18          MR. WEST:  Well, you've -- if you've raised claim

19   with regard to the calculation whether royalty should be paid

20   on the gas.

21          THE COURT:  Volume at the wellhead or volume at the

22   point of sale.

23          MR. WEST:  We intend to file a motion on that issue,

24   but to the extent on a flat rate that's not an issue.  On an

25   index price that's not an issue.  That's what I was saying

1   about it.

2            MR. MASTERS:  Well, I don't necessarily agree on the

3   index price.  I mean -- anyway.

4            THE COURT:  How do you calculate index price?

5            MR. WEST:  I think that the leases that have index

6   price say that you get 90 percent of the TECO rate for gas

7   which is sold.

8            THE COURT:  Using what volume?

9            MR. WEST:  Gas which is -- for the gas which is sold.

10           THE COURT:  So they would -- it would be not volume

11  at the wellhead.  It would be volume at sale.

12           MR. WEST:  Correct.

13           THE COURT:  So to the extent -- so they would be

14  included to the extent there's a claim for loss in

15  transmission.

16           MR. WEST:  And on that, as I said, we will be filing

17  something on that, but that would be their only possible claim

18  was on the lost and unaccounted for gas.

19           THE COURT:  Okay.

20           MR. MASTERS:  So anyway, now I understand what he's

21  talking about.  I mean, we contend that they would still be in

22  the class.  If they would get with me and Mike and sit down and

23  show us something that we don't understand, right now I have no

24  problem -- I don't want somebody noticed that has no claim.

25           So anyway, what our position is, we need to get

1    notice out.  This case has been pending since '13, and we're

2    supposed to give notice as soon as practicable and we are

3    several months beyond the time and plaintiffs allow them --

4    don't allow them, but we did not file anything till they did

5    their Fourth Circuit appeals and that sort of thing, and

6    objections.  So now it's time to do it.

7            Now, another issue has arisen.  And still don't have

8    an answer on this, Judge, and that's this:  In the first

9    settlement we have a list of all those lessors that were in the

10   settlement that was considered or classified as different types

11   of leases.  And you remember there was a lot of controversy

12   over us getting that classification and so forth.  But

13   anyway, at the end of the day we received it.  I sent them a

14   list of those leases.  And I'm not bringing this up for

15   resolution today, but I'm just telling the Court, I brought up

16   a list, sent them a list of leases in that first group of the

17   settlement, first settlement in '08, that had to be in the

18   system when this -- in the time period that this class action

19   is covering.  And we still don't have that.  We've searched,

20   used everything we can do to find them in the spreadsheet.  And

21   we haven't been able to do it.

22           So we will intend to notice those people if they have

23   a claim under what you certified in this case.  We have their

24   names and addresses, use the same methodology we did before,

25   unless they can identify them in the spreadsheet they provided

1    to the Court and Court's already ruled on.  So I don't think

2    it's going to change anything.  I mean, if there's -- sorting

3    it out and maybe we can get together and these type of leases

4    here are flat rate nonconverted, we can figure that out.  But

5    we assumed all the leases were in the spreadsheet.  But it

6    doesn't appear that way.  And I approached them about that,

7    sent them a list a long time ago and confirm one way or the

8    other.  We don't have that.  And I've been told that they're

9    still working on that.  But we don't have it.  So our intent,

10   absent the Court's ruling, at some point to send these people

11   notices, if they fall -- if, according to their lease, it falls

12   within the class.

13            MR. HENDRICKSON:  There are about 3,000 leases that

14   he's talking about from the earlier class.  I've asked for them

15   in an Excel spreadsheet or Word document.  We'll go back and

16   search it against the leases we produced and try to figure out

17   what's what.  We're in the process of doing that right now.

18   And we will also get with them on the flat rate issue and the

19   index issue and any other ones we have, in order to come up

20   with a list that they can then use for the purposes of

21   notification.

22            THE COURT:  What's the ending date of the class?

23            MR. MASTERS:  I'm sorry?

24            THE COURT:  Ending date of the class.

25            MR. MASTERS:  Oh, I had that.  Let's see.

1          THE COURT:  September 17, 2017.

2          MR. MASTERS:  Yeah, that's it.  December 8, '08, to

3     9-17-17.  Yes, Your Honor.

4          MR. HENDRICKSON:  Still presents an issue.  I didn't

5     think we were including the new acquisitions that occurred in

6     that time period.  I mean, we had several that I don't think

7     we've included those leases in the database we provided to

8     Mr. Masters.  And they certainly didn't predate back to '07.

9     And so that's why we've asked which ones aren't you putting in

10    there, so that we have assurance which ones are.  That's the

11    issue.  We can't -- it's not as clear-cut just to do a date.

12          THE COURT:  Well, did you read his response?

13          MR. HENDRICKSON:  I didn't.

14          THE COURT:  Okay.  Plaintiffs agreed not to include

15    lessors from new businesses in order to facilitate the

16    conclusion of this action.

17          MR. HENDRICKSON:  I knew that, Your Honor, but we

18    don't still have an understanding as to what that means from

19    them.

20          THE COURT:  All right.  What does it mean?

21          MR. MASTERS:  Well, you may recall that in a hearing

22    here they brought up the fact that they purchased from, I

23    believe, TransEnergy and Rice, it was two or three other

24    companies, in the period that we were litigating this case.  It

25    was brought up and I indicated that the plaintiffs would not

1    intend to try to incorporate those new purchases into this

2    action because we wanted the case to move on along with what we

3    had before the Court then.  And that's what you -- what I

4    agreed to and that was it.

5              MR. HENDRICKSON:  And the last hearings we always

6    heard, we want to look at it and get back to you.  This is the

7    first time today we're getting exact dates.  So with that

8    understanding with the Court and understanding that's going to

9    be the Court's order in this situation, we can move forward and

10   we're good with that.

11             The other point I'd like to bring out is that I think

12   we have an agreement that damages for this class will be cut

13   off as of the end of the year '17, so that both sides are

14   talking about the same numbers, as opposed to trying to bring

15   it right up to trial.

16             MR. MASTERS:  That's probably realistic, Your Honor,

17   to be able to calculate damages, because of the volume that

18   we're dealing with.  I think that would probably -- we probably

19   need to do that.

20             THE COURT:  Okay.

21             MR. MASTERS:  I could supplement, but then coming up

22   on trial there would be -- they have objections and so forth,

23   I'm not sure --

24             THE COURT:  12-31-17.

25             MR. MASTERS:  Yes, Your Honor.

1            MR. HENDRICKSON:  Yes, Your Honor.

2            THE COURT:  Mr. Masters, what's your response to the

3      motion to continue?

4            MR. MASTERS:  Your Honor, this case has been pending

5      so long, to be honest with you, we have motions pending now to

6      produce documents that they ultimately -- it was filed in

7      August of last year and we have been trying to work with --

8      because it is very complex and difficult to obtain the records

9      needed to determine whether all these charges are reasonable.

10     And actual.  In order to do that, we have to go back to the

11     source of the charges, and so at this point Kevin and Dave met

12     with us right before the hearing and said after the hearing

13     they're going to get back with us, sit down and go over the

14     things that we need and I've identified for some time.

15            The only thing I worry about is the February 14 or

16     15th date, whichever it was.  I wanted to send out class

17     notice.  I don't think we can get it done and out by February

18     14.  But we got to go forward.  We will do our very best to go

19     forward and keeping in mind this:  The Tawney case says it's

20     their burden and the stuff we've got right now, we can give an

21     opinion, but it is not -- I don't think they proved that any of

22     it's reasonable particularly.  Okay?

23            So with that said, they don't produce the documents

24     that our experts have to look at, then I don't think they've

25     met that burden.  But we object to the continuance at this

1    point.

2              THE COURT:  Mr. Hendrickson, with regard to the

3    leases which this Court has found do not comply with Tawney --

4              MR. HENDRICKSON:  Correct.

5              THE COURT:  -- and for which deductions are being

6    taken, is there any issue?

7              MR. HENDRICKSON:  Yeah, there is.  With your ruling,

8    Your Honor, you've changed the sales point by your ruling from

9    where we have it now between production and energy, because

10   it's an affiliated company, to a downstream pipeline.  Okay?

11   There are charges that are incurred between EE, moving that gas

12   to the pipeline.  We have to now go back and that's part of the

13   complication in this, Judge, your rulings are your rulings,

14   okay?  We have to comply with them.

15             So we have to go back now and look at this and we

16   think there are deductions beyond that point that we can still

17   take to get the gas to the new sales point.  But we have to do

18   all that math and figure all that out.  I mean, this is not --

19   first of all, I understand how long this case has been going,

20   but it's not a red car green/car case.  It's a very complex,

21   complicated case and really a case of first impression in West

22   Virginia.

23             Tawney was tried on a very limited issue.  This is

24   the first time a case like this is being tried on all issues

25   across all kinds of leases.  And so what we're trying to do in

 1   representing our client is put our best case on.  We don't

 2   think we can do that by May.  We think we can do it by

 3   November.  And now that we have all the Court's rulings, I

 4   think we do now, on all the types of leases and stuff, we can

 5   figure out a game plan on how to put it all together.  We have

 6   some idea, but we still have to put the missing pieces

 7   together.

 8          We're going to get Mr. Master's his information.

 9   He's entitled to his information.  The stuff we tried to meet

10   with him before he got here -- and he's not feeling well and

11   didn't get here till later -- is to tell him we're going to

12   update everything he's asked us for through at least November

13   2017, because they're still closing the books out on '17, it's

14   just January of '18, and get him all of the rest of the

15   information he's asked us for, but at the same time we've got

16   to take that information ourselves and get it in a format ready

17   to present to a jury.

18          To answer your question, there are still issues,

19   Judge, even on what you consider to be the non-Tawney

20   compliant.  There's still damage issues and how you're going to

21   calculate those damages.  And that's something the jury is

22   going to have to determine, I assume.

23          THE COURT:  Isn't the damages the return of the

24   money?

25          MR. HENDRICKSON:  No, I don't think so.

1          THE COURT:  You get to keep it?

2          MR. HENDRICKSON:  I think there are some costs that

3   we've taken that we can deduct for.  And again, that's where I

4   think you're looking at this differently.

5          THE COURT:  I mean, Tawney is pretty clear.  If it

6   doesn't comply with Tawney, you don't take postproduction

7   costs.

8          MR. HENDRICKSON:  But these are transportation costs

9   from --

10          THE COURT:  That's postproduction.

11          MR. HENDRICKSON:  -- to another place.  Well, you're

12   the one that picked the sales point.  We didn't.

13          THE COURT:  Doesn't make any difference.

14          MR. HENDRICKSON:  Well, I respectfully disagree.  And

15   I think that we are entitled to put that kind of information on

16   before the jury and let them make a determination as to whether

17   or not when we can take those kind of costs in non-Tawney

18   compliant leases.

19          MR. MASTERS:  Your Honor, I would ask Dave to

20   explain, because I'm not following what he's saying.

21          MR. HENDRICKSON:  The way we do stuff, Judge, even

22   prior to Tawney, the company made a decision to sell the gas at

23   the wellhead with the workback method, okay?  Of cost.  That's

24   what we did with selling the gas.  All right?  So the sales

25   point was when production sold it to EE.

 1                And we've got rulings all over the board.  Some

 2     courts have ruled that those sales are okay.  This court has

 3     ruled that sale is not okay, but it's not to a nonaffiliated

 4     company, okay?  When you did that, you changed what effectively

 5     for us is a sales point, which could be TECO, it could be

 6     Dominion, it could be somewhere else on down the line, and it's

 7     different which lease you're talking about and which pipe

 8     system you're talking about.

 9                There are costs that aren't taken that are put back

10     into the factoring of the royalties that we have to pay beyond

11     what's charged back to the royalty owners that we feel we can

12     present to the jury that are legitimate costs that we're

13     allowed to take.  And right now, when you made your ruling, we

14     had to go back and figure all this out, because that was an

15     area that we weren't even thinking about in preparing our case

16     for trial.

17                MR. MASTERS:  I am totally confused.  I mean, if --

18     what they did was when they sent a check stub that had laid out

19     how much gas, the volumes and how much it sold per decatherm or

20     whatever, there was a place on there for deductions and then a

21     place where they paid them the net.  So I don't see how it

22     changed anything when you explain that, David.  You're showing

23     on the check stub that you're taking deductions and now you're

24     saying you really didn't have to do that.

25                MR. HENDRICKSON:  That's not what I'm saying.  I'm

 1   saying we did a calculation that -- on the sale point being

 2   from production to EE.  And in that we calculated the cost of

 3   getting it to there.  Then when the judge made his ruling, he

 4   changed the sales point.  He changed the sales point to on down

 5   the line.  EE is paying a cost separate and above the charge

 6   that EE is charging production to move that gas on down the

 7   line to a new sales point.  And so to simply say, okay, if we

 8   pay 2.30 to the royalty owners but we got $3 down here, so the

 9   difference is because you wipe all those out, it's really $3,

10   isn't accurate.

11          THE COURT:  If it's not Tawney compliant, there are

12   no postproduction costs allowed.  That's what Tawney says.

13          MR. HENDRICKSON:  Okay.  Let's take the Tawney

14   leases, the ones you say do comply.  We still have to go back

15   and comply with the Court's order, and the Court's order is the

16   sales point is moved from here to here.  That's a whole new set

17   of calculations on thousands of leases.  And we have to put

18   that forward to the jury, because it's a measure of damages.

19          THE COURT:  And you're telling me you make a separate

20   calculation for every lease individually?

21          MR. HENDRICKSON:  Yeah, because every well is

22   different.  Volumes are different.  They go through different

23   systems.

24          THE COURT:  I understand volumes are different.

25          MR. WEST:  But Your Honor, they're also different

1    points of sale, so I think that that is adding a component as

2    far as determining, even if there are no deductions allowed at

3    all, what is the proper point of sale, and then comparing

4    whatever that's determined to be from the sales price used when

5    royalties were calculated for these leases, so that's one

6    issue.

7            One other factor that is going to take more time is

8    in your ruling on January 5th you talked about looking at the

9    gathering expenses on a well-by-well basis.  I think you used

10   the example what if one -- for one well you're transporting it

11   a different length than you are for another well.  And that

12   could go into the analysis.

13           THE COURT:  The analysis is whatever you already did.

14   That's what we're going to look at, not what you could have

15   done or anything.  It's what you have done and how you have

16   made the calculation up through December 31st.  And we're going

17   to look at that calculation to see if it's reasonable and

18   actual on a Tawney lease.

19           MR. WEST:  But Your Honor, I think -- using your

20   analysis, though, what may be reasonable for one well would not

21   be reasonable for another well.  So for that reason you're

22   going to have to look at the gathering expenses and any

23   deductions that were taken and compare it to a particular well

24   rather than -- we had talked about before we were operating

25   under the assumption that we would go district by district and

```
 1    whether a district charge was actual and reasonable or not, and
 2    I think the plaintiffs were proceeding under that --
 3              THE COURT:  Don't you go district by district?
 4              MR. WEST:  We do.
 5              THE COURT:  Then that's all we need to do.
 6              MR. WEST:  Well, I -- if that's all we need to do,
 7    then that's all we need to do, but looking at your opinion,
 8    Your Honor, on page 28, where you talk --
 9              THE COURT:  Those are issues that, when there's no
10    methodology, are out there.
11              Now, I've said most -- some of the these leases don't
12    comply with Tawney.  There's no methodology.  Frankly, you give
13    the money back.  There's ones where there is -- I've ruled that
14    there's a waiver of methodology, so the only question is going
15    to be is the method by which EQT takes postproduction expenses
16    reasonable and actual and does it include things which should
17    be included.
18              MR. CAREY:  I thought we resolved this at the last
19    hearing, because they said that they make these calculations on
20    a district basis.  And we agreed to challenge the
21    reasonableness and the actual -- where they're actually
22    incurred on a district basis as opposed to a well-by-well
23    basis.
24              MR. WEST:  That's correct, and we did do that.  What
25    I was saying, if you look at the Court's order on January 5 at
```

1   page 28 in talking about looking at what's actual and

2   reasonable, we thought that that had been changed.

3            THE COURT:  It has not changed.

4            MR. CAREY:  It doesn't change the approach -- our

5   approach to this case.  We're going to show that taking meals

6   and uniforms in the district is unreasonable.  Not for this guy

7   whether he showed up on this well on this day and went to Sam's

8   hamburger joint instead of Chop House.

9            MR. HENDRICKSON:  Even with that, Your Honor, I just

10  don't think we're going to be ready by May.  And I understand

11  how long this case has been on your docket, but it's a very

12  important case for our client.  We deserve to be able to put

13  our best foot forward.  We're working as hard as we can.  I

14  know you may hear from the plaintiffs that we're not, but we

15  really are.  All these documents aren't stored in the back room

16  of our office.  If they were, I'd need three more offices to do

17  it.

18            We're trying to give them the information we can as

19  quickly as possible.  Although to them it may not seem like

20  we're doing it, we're working as hard as we can to get it to

21  them.  So by the time we get the stuff to them and then we got

22  to get the new information too and do all the calculations we

23  have to do, including putting forth our best effort with

24  experts and stuff, it's just going to take more time.  And

25  that's why I've come to the Court now to tell you that.  I

1    think by November we will be ready.

2              And, oh, by the way, I did comply with the local rule

3    by getting extra dates, although it seems kind of crazy that

4    the other side is going to oppose your motion to continue to

5    have to get extra dates when they don't want you to do it

6    anyway.

7              MR. MASTERS:  Your Honor, I'm not -- I don't know

8    exactly what David and Kevin do.  I don't know.  It's not their

9    job to go into the bowels of EQT and pull out data and

10   information.  And they've had our request -- their client has

11   had our request for months now.  I've tried to work with them

12   and make it as easy as I could, and they still said, well, you

13   don't need this and you don't need that and it's over here and

14   it's not over there, it's not there, it's somewhere else I

15   don't have, and continuing to put this off.

16             If I thought in November things would be different

17   between now and then, I probably wouldn't care.  But in terms

18   of the -- getting this stuff in one place so my experts could

19   actually look at it and have time to look at it, I just don't

20   see them doing it.  I honestly don't.  The things they're

21   talking about today, I'm not sure what they're going to tell me

22   after this hearing.  But to put the trial date off from May

23   seems to me to be just prolonging the fight over what's

24   relevant or discoverable and what we are able to get to our

25   experts on what they admit is complex.

1          And that's -- they have the decision in terms of

2     Leggett that we're left with reasonable and actual.  And in

3     that situation then we're entitled, the same as if it was a big

4     accounting case, to get in there and try to figure it out.  And

5     you got to have the documents.  We don't have their general

6     ledger, which is done by JD Edwards.  We do have their

7     allocution database which shows where they're allocating stuff

8     from.

9          I took the deposition of Mr. Piccirilli, the second

10    deposition, here in the last part of the year after we had some

11    data, and he had -- the things he identified in there that

12    were, I thought, relevant and discoverable to this point I

13    specifically asked for.  We still don't have that.  So putting

14    it off I'm not sure is ever going to make any difference.

15    First of all, I don't think they can prove what they're trying

16    to say anyway, that it's reasonable.  I don't think they can

17    prove that.

18         MR. HENDRICKSON:  They do have the information from

19    Mr. Piccirilli.  We've just heard for the first time this week

20    or last week that they can't access some of the links.  I'm not

21    a technocrat.  We're going to try to work that out tomorrow and

22    figure out what that means.  They'll have 90 percent of

23    everything they asked us for through November of last year

24    before the end of the week.

25         And so all I'm saying is, look, I understand that his

1   clients deserve their day in court.  Ours do too.  We have to

2   be able to put our best foot forward.  Whether or not you

3   believe what we're doing or you don't believe what we're doing,

4   it doesn't matter.  We have to have the time to prepare, to

5   make sure we put the best case forward for our clients.  We

6   can't do that by May, whether Mr. Marvin wishes we can do it or

7   not.  I can do it by November.

8            THE COURT:  Frankly, when the defendant states he

9   can't be ready by May, frankly, this Court doesn't believe it.

10  The motion to continue is denied.  But am I correct we need to

11  move the notice date?

12           MR. MASTERS:  I don't think we can -- I think it has

13  to be March, probably the first of March, another two weeks,

14  probably March 1 or something.

15           THE COURT:  If we do that, does it affect --

16           MR. MASTERS:  That's the other issue.

17           THE COURT:  -- does it affect the trial date?

18           MR. MASTERS:  Let me -- I'm not too with it today,

19  Your Honor.

20           April 14th is the opt-out date.  Sixty days, I had it

21  scheduled for 60 days after the notice was sent for them to opt

22  out.  Of course, we have to have a -- they'd have three weeks,

23  I guess.  What is the date in May?

24           MR. HENDRICKSON:  May 21st, isn't it?  I believe it

25  is.  I'm not sure.

1          MR. MASTERS:  That would leave -- it depends how much

2     time you want to give them for opt-out.  I mean, normally I

3     think 60 days is probably a fair time.

4          So if you move both of them two weeks, your opt-out

5     date would be May 1, trial starts three weeks later.  I don't

6     know.  That is pushing it, Your Honor, honestly.

7          THE COURT:  Well, it's pushing it, although your

8     case, the plaintiffs' case, and the defendants' case, is not

9     going to be based on an individual or an individual lease.

10    We're going to be looking at the districts, whatever they are,

11    and whether the costs are reasonable, actual, and appropriately

12    allocated to the districts.  I don't think that the identity of

13    somebody -- all that is is you are going to be bound or not

14    bound, so I don't think it makes that big a difference.

15         We will make notices mailed by March 1.  Let me see

16    if that's a -- I do things like that.  March 1 is during the

17    week.  We'll have them due by April 30.  A little less than 60

18    days.

19         Anything else?

20         MR. MASTERS:  The plaintiff has nothing, Your Honor.

21         MR. HENDRICKSON:  Nothing.

22         THE COURT:  All right.  Thank you.

23         (Proceedings concluded at 11:02 a.m.)

24

25

1                            CERTIFICATE

2          I, Cindy L. Knecht, Registered Professional Reporter and

3     Official Reporter of the United States District Court for the

4     Northern District of West Virginia, do hereby certify that the

5     foregoing is a true and correct transcript of the proceedings

6     had in the above-styled action on January  31, 2018, as

7     reported by me in stenotypy.

8          I certify that the transcript fees and format comply with

9     those prescribed by the Court and the Judicial Conference of

10    the United States.

11         Given under my hand this 5th day of February 2018.

12                    /s/Cindy L. Knecht
                      _____
13                    Cindy L. Knecht, RMR/CRR
                      Official reporter, United States
14                    District Court for the Northern
                      District of West Virginia
15

16

17

18

19

20

21

22

23

24

25