IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

THE KAY COMPANY, LLC, et al.,

        Plaintiffs,

v.

CIVIL ACTION NO. 1:13-cv-151
(Honorable John Preston Bailey)

EQT PRODUCTION COMPANY, et al.,

        Defendants.

## JOINT PRETRIAL ORDER

Pursuant to Rule 16(d) of the Federal Rules of Civil Procedure and Northern District of West Virginia Local Rule 16.04(b), Plaintiffs and Defendants, by their respective counsel, submit the following Pretrial Order:

**I.     RULE 26(a)(3) DISCLOSURES:**

    **A.     PLAINTIFFS DISCLOSURES:**

    **A.     Class Representatives**

Presently, the class representatives are:

        1.     The Kay Company, LLC

            a.     President:  Christopher Thomas
            b.     Vice President:  Henry Battle

        2.     a.     William Cather, Trustee of Diana Goff Cather Trusts
            b.     Former Trustee:  H. Dotson Cather, Deceased

        3.     James E. Hamric, III

    **B.     Defendants**

        1.     EQT CORPORATION, a Pennsylvania corporation

        2.     EQT PRODUCTION COMPANY, a Pennsylvania corporation

3.      EQT ENERGY, LLC, a Delaware limited liability company

4.      EQT INVESTMENTS HOLDINGS, LLC, a Delaware limited liability company

5.      EQT GATHERING, LLC, a Delaware limited liability company

6.      EQT MIDSTREAM PARTNERS, LP, a Delaware limited partnership

**C.      <u>Class Definition</u>**

Pursuant to West Virginia Rules of Civil Procedure 23, the Court certified the class as follows:

> All EQT natural gas lessors that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their natural gas or mineral estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period.) (See exception below.)
>
> > Subclass A - All EQT natural gas lessors with flat rate leases converted by operation of W. Va. Code, § 22-6-8 and that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period.).
> >
> > Subclass B - All EQT natural gas lessors that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period,) and whose leases do not permit the deduction of post- production expenses under *Tawney,* except for those lessors holding flat rate leases converted according to W. Va. Code, §22-6-8.
> >
> > Subclass C - All EQT natural gas lessors that received or were due to be paid royalties from defendants and EQT's production or sale of natural gas which was produced within the boundaries of the State of West Virginia from their estates during the period beginning after December 8, 2008, and extending to the present (during any time within their leasehold period,) and whose leases do permit the deduction of postproduction expenses under *Tawney,* except for those lessors holding flat rate leases converted according to W. Va. Code, §22-6-8.

There would be excepted from the class the officers and agents of any defendant or subsidiary of any defendant named in this lawsuit or any lawsuit involving the same or similar claims as those alleged in this lawsuit; any attorney for any such defendant; any attorney for any plaintiff in this lawsuit or in any lawsuit involving the same or similar claims as those alleged in this lawsuit against any such defendant; and any judicial officer who presides over this lawsuit or over any other lawsuit involving the same or similar claims as those alleged in this lawsuit against any such defendant.

(Doc. Id. 400.)

## PLAINTIFFS' RULE 26(A)(3) DISCLOSURES

**1.      Rule 26(a)(3)(A)(i) Witnesses**

**Plaintiffs expect to present the following witnesses:**

Plaintiffs may present the following witnesses at trial.   All of the below defendants' witnesses were presented as F.R.C.P. 30(b)(6) witnesses and were deposed or were deposed as a result of filing affidavits in this case, except Mr. Porges and Mr. Schlotterbeck, who were CEO's of EQT and were deposed.   Plaintiffs intend to call all witnesses in person, if they are available. If not, plaintiffs will call them by deposition.   Mr. H. Dotson Cather and Mr. Leggett are now deceased and they were deposed, therefore, plaintiffs may call them by deposition.

> 1.      John Christopher Thomas
> 1 Woodchute Lane
> Charleston, WV 25314

Mr. Thomas is President of Kay Company.   He may testify about the Kay Company royalty, royalty statements and deductions from Kay Company's royalty by EQT and others leases and producers.

> 2.      H. Dotson Cather (Deceased)

H. Dotson Cather was Trustee of Diana Goff Cather Trusts.   He was a mining and mechanical engineer in the oil and gas field focused on the oil and gas industry.   He looked after his own and family property, including the EQT leases of the trusts' property.   Now deceased, he will be offered by portions of his deposition.

3.  Bill Cather
    800 Davisson Run Road
    Clarksburg, WV 26301

Bill Cather, son of H. Dotson Cather, above, also has worked in the oil and gas industry and took over the responsibility of his father with respect to the trusts.  He may testify concerning the leases, royalty and deductions from royalty by EQT and other producers, including reporting of the produced productions, sale and deductions.

4.  Kathy Leggett
    1625 Stonehenge Road
    Charleston, WV  25314

Mrs. Leggett is a lessor of EQT and may testify as to the deductions taken from her and her deceased husband's royalty.

5.  Keith Crihfield
    4290 Deephaven Lane
    Naples, Florida  34119

Mr. Crihfield and his wife, are EQT lessors.  He may testify concerning the lease and leases which he has an interest in and the amount of deductions taken from him and his wife's royalty.

6.  Phoebe Bennett
    Bennett Land Management, LLC
    Post Office Box 166
    Weston, WV  26452

Phoebe Bennett is the Manager of Bennett Land Management, LLC which manages leases in Braxton, Calhoun, Gilmer and Lewis Counties in West Virginia.  Ms. Bennett will testify regarding the language of the original leases, as well as amendments and modifications to those leases.  She will also testify regarding 1099s and remittance statements for the leases, letters she sent and received from EQT, telephone conversations she had with EQT representatives and the settlement of the first *Kay v. EQT* case.

7.  Danita Hiley
    1875 Oxford Road
    West Union, WV 26456

Danita Hiley has leases in Gilmer County, West Virginia.  Ms. Hiley will testify regarding the language of the original leases, as well as amendments and modifications to those leases.  She will also testify regarding 1099s and remittance statements she received from EQT Production Company, telephone conversations with EQT representatives, correspondence she received from EQT, and the settlement of the first *Kay v. EQT* case.

8.      Christopher Reger
        1001 Knob Way
        South Charleston, WV  25309

Christopher Reger is co-owner of mineral interests in wells in Gilmer County, West Virginia. Mr. Reger will testify regarding the language of the original leases, as well as amendments and modifications to those leases.  Mr. Reger will also testify regarding 1099s and remittance statements he received from EQT Production Company, letters he received from Hawkeye Research, telephone conversations he had with the co-owner of the leases and with EQT representatives, and the settlement of the first *Kay v. EQT* case.

9.      Dennis Brady
        345 Kenna Dr.
        South Charleston, WV 25309

Mr. Brady is plaintiffs' expert.  He may testify concerning his review and analysis of data and documents of EQT and the findings from said documents.  He may testify the deductions, costs and expenses, categories, royalties, price and costs as are set forth in EQT's databases.  He also may testify concerning the statistical analysis he performed and all issues as disclosed in his report.

10.     Daniel Reineke
        6900 North Classen
        Oklahoma City, OK 73116

Mr. Reineke is a petroleum engineer and experienced in the production of oil and gas and the business of oil and gas, including the duties and responsibilities of oil and gas producers and businesses to produce and sell the gas and properly pay royalty according to the rules in each state.  Mr. Reineke provided reports and affidavits in this case and has given a deposition.  He may testify to the overall damages in the case and explain the bases.  He also will rebut the testimony of defendants' experts for the reason they are not based upon the West Virginia rules. He will explain the oil and gas business with respect to EQT's operations and may testify as to all issues in his reports, affidavits, his deposition and as raised by defendants or their experts.

11.     Daniel Selby
        23 Chase Dr.
        Hurricane, WV 25526

He may testify to his analysis of records and data in this case and based upon West Virginia rules for lessees that (1) EQT did not follow the West Virginia rules for lessees in paying royalty; (2) EQT did not provide detail and costs as in an accounting case; (3) EQT did not charge reasonable costs nor actual incurred costs; (4) he also may identify the categories of costs that are not reasonable nor actual.  He will explain that the core costs, direct costs of gathering are the costs allowed and why, from an accounting perspective and an equitable perspective, and will address all issues in his reports and deposition.

12.     Karen Balmer
        155 Chestnut Hill Road
        Ridgefield, CT  06877

Ms. Balmer is a CPA with education and training in investigative audits, both for preventive and regulatory purposes, and also to discover whether there is financial wrongdoing.  She has attempted an audit of defendants' records.  She will testify that the records are produced in a fashion that prevents a full audit for West Virginia lessors.  She has provided a report and will testify to all issues in the report concerning JD Edwards and back up detail and the findings of some of the invoices and charges which are not reasonable nor direct.  She will also address the requirements of SOX and other regulatory agencies and statutory requirements for accounting and accuracy of accounting and financial documents for companies like EQT.  She may testify that her review of their records show that each dollar deducted from lessors' royalty goes to a positive dollar in EQT's bottom line and that her review demonstrates evidence which, from an accounting standpoint, has the hallmarks of intentional conduct and fraudulent conduct.

13.     John Bergonzi
        218 East Union Rd.
        Cheswick, PA 15024

Mr. Bergonzi was a defendant 30(b)(6) designated witness to testify concerning many subject matters in this case including decision making of EQT with respect to the organization, duties, procedures, accounting, royalty, leases, prior to and during the class period.  He was an officer of EQT and its subsidiaries and testified in two depositions concerning all aspects of the business, including deductions, the different individuals responsible to run the business, produce the gas, gather it, process it and sell it, including the "at the wellhead" decisions, the Board of Directors, Land Administration, Revenue Accounting, business units, methods of calculating cost of service as per Mr. Piccirilli, leases and categorizations, *Tawney* and *Wellma*n, the sale of gas to Energy, remittance statements, hedging, gas processing, MarkWest, Mobley Sales and Processing, maps of facilities, gathering rates, taxes, various categories of deductions, sales price, true-ups of cost of service rates.  There are numerous other issues that Mr. Bergonzi may testify about related to the case.

14.     Steven Schlotterbeck
        5640 North Montour Rd.
        Gibsonia, PA 15044

Mr. Schlotterbeck was CEO of EQT in 2017, for about a year.  He served also as an officer in EQT Production and other subsidiaries since about 2000.  He can testify about the organization of EQT and subsidiaries and the role of EQT's CEO and Board of Directors with the other subsidiaries and officers of subsidiaries, the history of EQT's oil and gas business and the payment of royalty.  He was also CEO of Midstream Partners and its employees, and EQM's contracts and services with respect to gathering and costs, EQT's bonus plan, the business units and how they worked and the employee contracts with EQT.  He can testify concerning the SEC filings and targets.  He may testify concerning a subsidiary, EQT GP Holdings, LP, and EQT's

procedures to drop funds into a subsidiary, government affairs and funding EQT Corporation's growth.

> 15.    Lloyd Johnson
>        289 Carnell Drive
>        Pittsburg, PA 15202

Mr. Johnson is a financial analyst and is EQT's assistant controller and can testify concerning EQT's revenue and accounting for revenue.   He has some knowledge of the JD Edwards database and accounting procedures related to expenses and costs and with respect to Docusphere and other accounting systems of EQT's SEC filings and the gathering and cost of service costs and rates.   He can discuss related e-mails and other data and correspondence with respect to the above as set out in his deposition.   He also can testify concerning the interrelationship of EQT Corporation and the subsidiaries.

> 16.    Alma Tolman
>        222 Locust Street
>        Pittsburgh, PA 15202

Ms. Tolman was a division order analyst who enters lease information into the EQT computer discs and can explain and describe those procedures, methods and documents and databases. She can describe how deductions are determined and described, including codes.  She can describe how leases in West Virginia, Kentucky, Pennsylvania and Virginia are applied and recorded in their data.  She also can describe the royalty hotline and the documents related to inquiries and results and what information is recorded about deductions.   She is responsible to account in various ways for the royalty.

> 17.    Bruce Graybiec
>        50 Ruby View Drive
>        Lemont Furnace, PA 15456

Mr. Graybiec is Director of Operations for EQT Corporation, northern West Virginia and Ohio. He supervised and was responsible for the gathering in the Weston District and some other areas. He can describe the system, the lines, the costs and some of the items of cost, the gas itself, the Mobley plant and liquid separation, storage and other expenses.

> 18.    Bryant Bowman II
>        58 Casey Place
>        Alum Creek, WV 25003

Mr. Bowman is the Regional Land Manager for EQT Production.  He can describe how EQT provides access to leases, reviews and files them for payment of royalty and categorizes them.

> 19.    David Porges
>        5725 Aylesboro Ave.
>        Pittsburg, PA 15217

Mr. Porges is or was President and CEO of EQT for most all of the class period, except for one year when Mr. Schlotterbeck was the President. He held numerous positions at EQT, including positions at the subsidiaries and they reported to him. He can describe the organizations, business structures and units and the responsibilities of the various officers, directors and employees. He may testify concerning all aspects of the corporation, its reporting requirements, both internal and regulatory, including reporting to royalty owners. He can testify concerning decision making of the companies with respect to oil and gas leases, royalty, deductions, business ethics, finances and all subjects addressed in his deposition concerning the issue in this case including, but not limited to, employment plans, shared services, allocated expenses and budgets, EQM, the authority of EQT officers and employees, SEC and royalty as it affects filings, Tawney and its holdings, remittance statements and the royalty owner, gathering and processing.

> 20.     Jimmie Sue Smith
>         429 Pine Valley Drive
>         Bridgeville, PA 15017

Ms. Smith is the Chief Accounting Officer at EQT Corporation and an executive officer of EQT Corporation. She has worked for EQT as Director of Accounting and Controller at different times of both Energy and Midstream's accounting departments, which subsidiaries reported to her and she held offices in the companies. She was designated to testify as a 30(b)(6) witness with respect to multiple issues in this case. She was deposed twice on multiple issues in this case and may testify as to all of these issues including, but not limited to, corporate and subsidiary accounting, regulatory, private, internal and contractual reporting and accounting duties, allegations, rules, regulations and responsibilities and the practices of EQT with respect to complying with the above, related to the various issues in this case. She also may testify as to her experience and positions with EQT and the corporate structure and responsibilities of relevant officers and employees to carry out the above and to account for production of oil and gas and pay the owner of the oil and gas property the correct royalty and the deductions and processes in arriving at deductions and the personnel at EQT involved in the same. She may also testify concerning the JD Edwards database and other accounting programs and systems at EQT, the various deductions and categories of deductions and price and volume of gas and reporting of same to royalty owners, the Piccirilli cost of service and his and other officers and employees of EQT's role in establishing the price, revenue, royalty, costs and deductions, development of budgets and business plans.

> 21.     Joe Piccirilli
>         114 Winfield Manor
>         Mars, PA 16046

Mr. Piccirilli is Director of Planning Analysis for EQT. He was designated twice and deposed twice as a Rule 30(b)(b) witness. He may be called to discuss all issues discussed in his depositions. He will be called to explain EQT's business plan for accounting for Midstream costs, expenses and the process that is utilized to arrive at an approved costs of service (COS) rate to charge Production and royalty owners for Midstream services, and all accounting related

to that process, including all subsidiaries and business units involved, the contracts and subsidiaries. Mr. Piccirilli has provided this service for many years and he can explain the process, how he was trained and what and how he has provided the data which was made available to plaintiffs in this case.

22. Kristy Toia
278 Hillcrest Circle
North Hills
Pittsburgh, PA 15237

Ms. Toia is Director of Revenue Accounting for EQT Production. She may testify concerning all issues discussed in her deposition. She was designated as a Rule 30(b)(6) witness. She may testify to the costs of service charges and the charges which are deducted from plaintiffs' royalty and the accounting for same, codes, volume, audits, data, taxes, liquids, districts, sales and correspondence among EQT employees.

23. Michael Barbour
1919 Green Commons Dr.
Pittsburgh, PA 15243

Mr. Barbour is a Division Order Analyst. He provided an affidavit in this case and was deposed. He may testify as to all issues discussed in his deposition. He may testify as to methods and procedures with respect to the leasing and recording of leases in EQT's accounting systems for payment of royalty and taking of deductions, training of employees, manuals and directions concerning West Virginia and other rules for paying royalty and deductions from royalty and maintaining the files and corresponding to lessors.

24. Nicole King
209 Old Hickory Road
Zelienople, PA 16063

Ms. King is EQT's Corporate Secretary and Staff Attorney and is an officer in the subsidiaries. She may testify concerning the corporate structure, formations and deactivation of corporations of EQT. She also can describe the various subsidiaries and their organizational structure and reporting and supervisory authority and responsibility. She may testify of the ownership and control of the companies including their SEC filings and responsibilities and interrelationships. Ms. King was deposed and may testify to all issues upon which she was deposed.

25. Nichole L. Mazur
625 Liberty Ave., Suite 1700
Pittsburgh, PA 15211

Ms. Mazur is Assistant Director of Operations and Evaluation of EQT. She may testify concerning EQT's gathering and production operations and the deduction/royalty process.

26.     Brett A. Varner
        366 Bradley Street
        Pittsburgh, PA 15211

Mr. Varner is Director of Planning and Continuous Improvement.  Mr. Varner may testify concerning his role at EQT and how deductions of the royalty cost affects EQT and the plans with respect to control or reduce the cost of royalty.

**Plaintiffs reserve the right to call the following witnesses if the need arises:**

1.      Henry Battle
        1417 Oakmont Road
        Charleston, WV  25314

Mr. Battle is the Vice President of The Kay Company and may testify concerning the leases and deductions from royalty by EQT.

2.      Patrick Leggett (Deceased)
        1625 Stonehenge Road
        Charleston, WV  25314

Mr. Leggett (deceased,) by deposition, as to the leases he had, the deductions taken and the circumstances and conversations he had with EQT.

3.      James Hamric III
        201 Woodbridge Dr.
        Mineral Wells, WV 26150

Mr. Hamric is the owner of oil and gas leases and can testify concerning the lease and EQT's payment history.

4.      Julia Bodamer, Expert
        11820 Paddock Dr. 103 1
        Midlothian, VA 23113

Ms. Bodamer is experienced in the oil and gas business, including transportation and sale by all available sales points and options.  She may be offered as a result of defendants' experts' claim that Equitrans' costs are being billed to lessors in this case.  This is a surprise to plaintiffs. (Plaintiffs object to the position and late disclosure.)  If necessary, she may be called on to discuss issues related to Equitrans and also available sales point options.

5.      Emily G. Kime
        1631 Greystone Road
        Charleston, WV 25314

Ms. Kime may testify as to the lease categorization by electronic search and duplication.

6.      L.E. Sawyer
        529 West Pike Street
        Clarksburg, WV  26301

L.E. Sawyer may testify with respect to L.E. Sawyer, LLC and Franklin Maxwell Heirs Limited Partnership No. 1, 2 and 3, LLPs.  Mr. Sawyer may testify regarding the language of the original leases, as well as amendments and modifications to those leases.  He may testify regarding 1099s and remittance statements for the leases.

7.      Stephen Hornor Maxwell
        Post Office Box 2424
        Clarksburg, WV  26302

Mr. Maxwell is in charge of WBM Heirs Properties, LLC, and is the principal of Franklin Maxwell Heirs Limited Partnership No. 1 and No. 2, LLCs.  Mr. Maxwell may testify regarding the language of the original leases, as well as the amendments and modifications to those leases.  He may also testify regarding 1099s and remittance statements for the leases.

8.      Jeffrey W. McCabe, CPA
        McClure & Wolfe, LLP
        578 Morgantown Street
        Uniontown, PA  15401

Mr. McCabe manages EQT leases belonging to Shiven Estates, Inc., primarily in Wetzel County, West Virginia.  Mr. McCabe will testify regarding the language of the original leases as well as amendments and modifications to those leases.  He will also testify regarding 1099s and remittance statements for the leases, and communications with EQT relating to deductions from the royalties on the leases.

9.      Troy Larkin
        4186 Latosh Court
        Allison Park, PA 15101

Mr. Larkin is Senior Vice President of Commercial Operations for EQT.  His job is to make sure the gas of EQT is sold on each day.  He can testify as to the manner and method of gas sales by EQT's metering, processing and prices.  He can testify to correspondence among EQT with respect to sales, TCO, TETCO and Dominion and MarkWest that Production sells all its gas to EQT Energy and how its priced.

10.     Charles Heilmann
        202 Walnut Drive
        Eighty Four, Pennsylvania 15330

Mr. Heilmann is an independent land man who worked for EQT negotiating and getting signatures on leases under a contract.  He can testify to EQT's procedures in obtaining leases in the period 2006-2008.

11.     Justin Friend
        2 Mystic Lanes
        Finleyville, PA 15332

Mr. Friend is Manager of Gas System Planning for EQT and an employee of Midstream Gathering.  He manages the gas systems and the modeling.  He may testify concerning the gas flow and physical gas gathering systems in West Virginia, BTU and analysis and payback of gas for services to third parties.  He was deposed as a 30(b)(6) witness and will testify as to all issues in his deposition.

12.     Michael Lancaster
        5821 Claridge Rd.
        Export, PA 15632

Mr. Lancaster is the IT Manager for EQT Production.  His department supports the business, geology, land, land administration, drilling, completions, revenue, operations, reserves and engineering.  He may testify as to the IT programs and databases maintained by EQT.

13.     Stephen E. Hastings
        1 Hillcrest Drive, East, Suite 201
        Charleston, WV 25311

Mr. Hastings is an in-house attorney for EQT.  Mr. Hastings signed all discovery responses for all EQT defendants.  Plaintiffs may call Mr. Hastings with respect to the discovery responses, if it is needed.

Plaintiffs reserve the right to supplement this list for witnesses who are disclosed in discovery and not expected to be called but which need to be called in rebuttal.

Plaintiffs reserve the right to call any witness that defendants have identified as a witness or called as a witness whether they were called and testified or not.

Plaintiffs reserve the right to call any of defendants' expert witnesses identified by them in person or by deposition.

Plaintiffs reserve the right to supplement their list given defendants late disclosure of documents and information in this case.

## 2.     Rule 26(a)(3)(A)(ii)

Plaintiffs intend to call all witnesses in person, but plaintiffs have taken the depositions of

all of defendants' witnesses, except for Mr. Varner and Ms. Mazur.  Should these witnesses not

be available for any reason, plaintiffs will offer their testimony by deposition.  Mr. H. Dotson and Mr. Patrick Leggett, now deceased, and plaintiffs may call them by deposition.

Plaintiffs reserve the right to supplement this list for witnesses who are disclosed in discovery and not expected to be called but which need to be called in rebuttal.

Plaintiffs reserve the right to call any witness that defendants have identified as a witness or called as a witness whether they were called and testified or not.

Plaintiffs reserve the right to call any of defendants' expert witnesses identified by them in person or by deposition.

Plaintiffs reserve the right to supplement their list given defendants late disclosure of documents and information in this case.

## 2.    Rule 26(a)(3)(A)(iii) Documents

The parties have agreed that all documents produced by either party are authentic and are admissible, subject to relevance.

The documents which include spreadsheets of data relied upon by experts and other documents expected to be presented are attached as **Exhibit A**.

The documents which plaintiffs will use, if needed, are attached as **Exhibit B**.

## OBJECTIONS TO DEFENDANTS' DOCUMENTS:

1.    Plaintiffs object to all "third party charges to plaintiffs as deductions except for those disclosed to plaintiffs specifically by interrogatory responses and by Joe Piccirilli's and Kristy Toia's depositions.

2.    Plaintiffs object to all spreadsheets which defendants intend to offer showing deductions unless they conform to evidence provided to plaintiffs in discovery and to the West Virginia rules as in *Tawney* and *Wellman,* including having provided plaintiffs with evidence in discovery sufficient to audit it.

3.    Plaintiffs object to wire transfers, sales contracts, spreadsheets, bank statements and receipts of funds for gas sales, severance tax returns, index price of defendants, which do not conform to FRCP notice and responses to discovery and explanation provided to plaintiffs as to the relevance of same.

4.    Plaintiffs have motions *in limine* pending concerning defendants' concealment of third-party charges and the failure to disclose to plaintiffs in this lawsuit to plaintiffs' counsel what defendants are now saying they deducted for third party charges, including Equitrans.

Defendants never disclosed these charges, if it was charged, to plaintiffs.  Through numerous discovery requests, detailed – defendants never identified that they were charging for anything except Piccirilli's cost of service, until the very end of this case.  Further, defendants never produced any of EQT's rates and the details of the rates for any other gathering except, in part, for Piccirilli's rate.  Therefore, plaintiffs object to defendants' offer without seeing defendants' proffer of documents and demonstrative aids based upon plaintiffs and plaintiffs' experts' concerns and refusal to accept as true defendants' data.

### B.  DEFENDANTS' RULE 26(A)(3) DISCLOSURES:

**Rule 26(a)(3)(A)(i): "**[T]he the name and, if not previously provided, the address and telephone number of each witness – separately identifying those the party expects to present and those it may call if the need arises:"

EQT expects to present the following witnesses at trial:

1.   Troy Larkin

   Mr. Larkin will be called to testify regarding EE's gas sales.

2.   Bruce Graybiec

   Mr. Graybiec works for EQT Midstream Partners, LP.  He will testify about how expenses are tracked and accounted for within the various the EQT districts in West Virginia. He will also testify regarding the nature of gathering expenses incurred by EQT Gathering.

3.   Jimmi Sue Smith

   Chief Accounting Officer for EQT Corp., and assistant treasurer for both EPC and EE. Ms. Smith can provide an overview of the interaction between the affiliates on an accounting basis as to the sales transactions and post-production expenses ("PPE's"). She will testify regarding all the categories, both direct and indirect, included in the gathering rate, and give an overview of the business plan process. Ms. Smith can also testify to third-party gathering rates EQT charged and which EQT Energy Gathering, LLC paid for EQT Energy, LLC.

   Ms. Smith is expected to testify about EQT Production's interest, as Lessee, in the Leases at issue; well production from the subject wells; the amounts received for the sale of gas from the wells at issue; the manner in which royalties are calculated for the Lease premises; the accounting procedures utilized to calculate Plaintiffs' royalties; the price at which gas is sold by EQT Production Company; the gas purchase agreements for the sale of gas; the costs for providing gathering and compression services and this service generally; the work-back method that is used to determine a wellhead price for

the gas; the location and price of the downstream interstate pipeline connection used to calculate royalties; the amounts incurred and allocated for post-production costs; a comparison of the amounts charged by third parties to provide services in the area where the Lease premises are located.  She may also be offered to provide rebuttal testimony in response to evidence offered by Plaintiffs.

4.      Joe Piccirilli

Director of Planning Analysis for EQT Gathering, LLC.  Mr. Piccirilli can testify to the actual process of development of the planned gathering rates annually, and how his group, at EPC's Revenue Accounting direction, figures annually what the royalty interest rate is calculated, and that it has been, and continues to be, the total planned rate minus return, depreciation, and income taxes.  Mr. Piccirilli may be called to respond to or rebut evidence, if permitted, offered by Plaintiffs regarding the costs for providing gathering and compression services.

5.      Justin Friend

Mr. Friend will be called to testify concerning the gathering system EQT utilizes from the transmission and sale of natural gas.

6.      Kristy Toia

EPC Director of Revenue Accounting.  Ms. Toia be called to testify about the amounts received for the sale of gas from the wells at issue; the accounting regarding the sale of gas between EPC and EE; the accounting procedures utilized to calculate royalties manner in which royalties are calculated for lease premises; the post-production costs and work-back method that determine a wellhead price for the gas; the location and price of the downstream interstate pipeline connection into which gas is delivered; the amounts incurred and allocated for post-production costs.

7.      Michael Barbour

Mr. Barbour is a division order supervisor.  He will be called to testify regarding ownership interests in the leases.

8.      Dennis Brady

Expert witness identified by Plaintiffs.

9.      Daniel Reineke

Expert witness identified by Plaintiffs.

10.     Daniel Selby

Expert witness identified by Plaintiffs.

11.    Stephen L. Becker, Ph. D.

Dr. Becker is a Director at Applied Economics Consulting Group, Inc., which was formed in 1999.  Dr. Becker is a founding partner. He will serve as an expert who can testify that PPE's shared proportionately with royalty owners were actual and reasonable from an economics and industry viewpoint.  He can testify to the historical change in sales points and resulting issues as a result of the deregulation of the gas industry in the early 90's. Before deregulation, gas was typically sold at the wellhead. Leases were written and royalties were paid based on selling the gas at the wellhead. When the industry was deregulated, the sales point shifted to the interstate pipelines. The issue then became how to calculate royalties when the sales point was further downstream from the wellhead. He can testify that the work back method is a proper economic tool to derive a wellhead market value or price. Dr. Becker can describe the work back method generally and that the work back method is used appropriately by EQT. He will also testify regarding Plaintiffs' damage calculations, including those it has submitted on its pricing claim and the amount of post-production expenses which are actual and reasonable under recent orders entered by the Court.

12.    Kyle Pierson

Mr. Pierson is a chemical engineer. He co-founded Pearson Adair & Co. in January, 2016, which provides consulting services to the energy industry. Pearson has worked in the natural gas industry since 1985. He often works with Becker and Krause.  He will testify regarding the reasonableness of the ppe's from an engineering standpoint. He will testify that the overall gathering system is efficiently designed and operated, i.e., that there are an appropriate number of compressor stations, that the gathering piping is appropriately sized, that the way in which the piping is used is efficient, etc.  He has in the past addressed processing plant design and operation issues, should NGL's become an issue, and can also address LUF if that becomes an issue. Mr. Pearson also has an MBA in Finance, and can, and has in the past, testified on economic and pricing issues. He will also testify regarding which post-production expenses fit within the definition of direct expenses under recent orders entered by the Court.

13.    Roger Griffith

Mr. Griffith is, among other qualifications, a Certified Public Accountant with over forty (40) years experience in public accounting, including providing accounting and consulting services for individuals, businesses, and attorneys in tax, financial and economic matters.  He is a Director of Gray, Griffith & Mays, a.c. and a former Assistant Professor of Accounting at West Virginia State College.  Mr. Griffith will testify that the gathering rates charged and allocated on a proportionate basis to Plaintiffs are reasonable, actual and consistent with standard cost accounting procedures.

EQT reserves the right to present the following witnesses at trial if the need arises:

1.      Eric M. Wright, CPA

Mr. Wright may be called to rebut calculations regarding the amount of deductions offered by Plaintiffs.

2.      John Bergonzi

Retired EQT Corp. executive, former Controller, among other positions.  Mr. Bergonzi can provide historical context, especially regarding the reason for the January, 2005, reorganization, and that it was NOT done in reaction to *Tawney* (which was issued in 2006).  He may also provide testimony about the gas purchase agreements for the sale of gas from the Lease premises; the process by which natural gas is gathered and compressed; the costs for providing these services; the work-back method that is used to determine a wellhead price for the gas, and the process of producing, gathering, and compressing gas generally.  He may also be offered to provide rebuttal testimony in response to evidence offered by Plaintiffs.

3.      Kristie Rudick

Ms. Rudick may be called to testify about the leases at issue in the case.

4.      Employees of EQT or other witnesses to rebut evidence presented by Plaintiffs.

5.      Employees of EQT to testify about Plaintiffs' mineral interest, royalties, gathering and compressions costs, and costs allocated to Plaintiffs to the extent necessary to rebut evidence presented by Plaintiffs with respect to the same.

6.      EQT reserves the right to call any and all witnesses identified by the Plaintiffs.

**Rule 26(a)(3)(A)(ii):** "[T]he designation of those witnesses whose testimony the parties expects to present by deposition and, if not taken stenographically, a transcript of the pertinent parts of the deposition:"

EQT does not anticipate the need to present deposition testimony in its case in chief.

**Rule 26(a)(3)(A)(iii):** "[A]n identification of each document or other exhibit, including summaries of other evidence – separately identifying those items the party expects to offer and those it may offer if the need arises."

EQT expects to offer the following exhibits at trial:

1.      Copies of Plaintiffs' royalty remittance statements from 2008 to Dec. 31, 2017;

2.      Base Contract for Sale and Purchase of Natural Gas from 2008 to Dec. 31, 2017;

3.      Summary spreadsheets/charts reflecting the royalties paid to Plaintiffs and the post-production costs allocated to Plaintiffs from 2008 to Dec. 31, 2017;

4.      Summary spreadsheets/charts reflecting the rates charged by EQT Gathering, LLC from 2008 to Dec. 31, 2017, which were marked as "Confidential" when provided in discovery and are subject to and provided pursuant to the terms of the Protective Order (including but not limited to EPC 000001- EPC 007057; EPC 007644 – EPC 008490; EPC 008491 – EPC 035951; EPC 158452 – EPC 158458; EPC 158460 – EPC 158734; EPC 158460 – EPC 158734; EPC 158738 – EPC 158750; EPC 158820 – EPC 158825; EPC 158863 – EPC 158886; EPC 159163 – EPC 159164; EPC 159214 – EPC 159215; EPC 159379 – EPC 159430; EPC 159452 – EPC 159455);

5.      Agreements reflecting the rates charged by third parties for gathering and compression services from 2008 to Dec. 31, 2017, which were marked as "Confidential" when provided in discovery and are subject to and provided pursuant to the terms of the Protective Order (including but not limited to EPC 007058 – EPC 007126; EPC 007142 – EPC 007144; EPC 035953 – EPC 035955; EPC 1588451; EPC 158459; EPC 158751- EPC 158819; EPC 158826 – EPC 158827; EPC 158829 – EPC 158862; EPC 158909 – EPC 158921; EPC 158979; EPC 159159 – EPC 159162; EPC 159379 – EPC 159403; EPC 159426 – EPC 159449; EPC 159451);

6.      Demonstrative exhibits reflecting information relating to royalties paid to Plaintiffs; costs allocated to Plaintiffs; rates charged by EQT Gathering, LLC, and, if any, charges for gathering and compression services by third parties from 2008 to Dec. 31, 2017;

7.      J. D. Edwards Compilation of Expenses for West Virginia from 2008 to Dec. 31, 2017;

8.      Wire transfers for the sale of gas between EQT Production and EQT from 2008 to Dec. 31, 2017;

9.      Bank Statement of EQT Production, showing receipt of funds for sales of gas to EQT Energy from 2008 to Dec. 31, 2017;

10.     Severance Tax Returns from 2008 to Dec. 31, 2017;

11.     Index Prices for first liquid sales point from 2008 to Dec. 31, 2017;

12. Curriculum Vitae and Report of Steven L. Becker, Ph. D. dated August 27, 2018, to be supplemented to adopt the Court's most recent rulings on Motions for Summary Judgment;

14. Curriculum Vitae and Report of Kyle Pierson dated August 27, 2018, to be supplemented to adopt the Court's most recent rulings on Motions for Summary Judgment;

15. Demonstrative exhibits for trial to be exchanged between counsel before the witness' testimony;

16. Exhibits to Expert Reports;

17. Business plan documents provided in discovery; and

18. EQT reserves the right to introduce any document or database produced by either party during discovery.

EQT may offer the following exhibits at trial:

1. Plaintiffs' Answers and Responses to EQT's Requests for Admission, Interrogatories and Requests for Production; and

2. To the extent necessary, correspondence produced by the parties in discovery.

EQT reserves the right to supplement this disclosure and the right to identify additional witnesses and documents as necessary for rebuttal at trial.

**<u>Defendants' Objections to Plaintiffs' Rule 26(a)(3) Disclosures</u>:**

- EQT objects to the following witnesses testifying at trial:

  EQT has filed motions in *limine* with regard to the Plaintiffs' expert witnesses and hereby incorporates the objections from those motions herein.

- EQT objects to the following documents:

  Subject to their relevance at the time they are offered into evidence, EQT states that it has no objections to the authenticity of the plaintiffs' proposed documents for use at trial to the extent they have been produced by either party during discovery.

II.   **CONTESTED ISSUES OF LAW REQUIRING RULING BEFORE TRIAL:**

A.   **Plaintiffs' Contested Issues of Law:**

[See below]

B.   **Defendants' Contested Issues of Law:**

1.   Defendant's Motion In Limine With Accompanying Memorandum Of Law To Formalize Agreements Regarding Scope of Issues for Trial (ECF 628 and 629)

2.   Defendant's Motion In Limine With Accompanying Memorandum Of Law To Exclude Testimony or Evidence of "Other Claims" (ECF 632 and 633) (Denied).

3.   Defendant's Motion In Limine With Accompanying Memorandum Of Law To Exclude Testimony or Evidence Regarding Other Operators' Practices (ECF 634 and 635)  (Denied).

4.   Defendant's Motion In Limine With Accompanying Memorandum of Law To Preclude Argument or Evidence of Alleged Damages of Absent Class Members Who Have Opted Out of Class Action, Whose Lease Does Not Meet the Class Definition, Whose Lease Has Been Excluded by a Court Ruling and/or Who Have Filed Separate Lawsuits (ECF 636)  (Granted in part/denied in part)

5.   Defendant's Motion In Limine With Accompanying Memorandum Of Law To Exclude Testimony or Evidence of Prejudgment Interest (ECF 637 and 638) (Granted)

6.   Defendant's Motion In Limine With Accompanying Memorandum Of Law To Partially Exclude Testimony of Daniel Selby and Daniel Reineke and to Exclude Testimony of Karen Balmer and Dennis Brady (ECF 639 and 640)

7.   Defendants' Joint Motion To Reconsider Order Transferring Case With Supporting Memorandum And Memorandum In Opposition To Plaintiffs' Motion To Transfer Case (ECF 704).

8.   Defendant's Motion In Limine With Accompanying Memorandum Of Law to Exclude Evidence of Corporate Wealth and Disparity of Wealth (ECF 626 and 627 ) (If evidence at trial deems renewal of this Motion appropriate).  (Granted in part/denied in part)

9.   Defendant's Motion In Limine With Accompanying Memorandum Of Law To Exclude Golden Rule Argument (ECF 630 and 631 ) (Granted in part/denied in part).

10.     Defendant's Motion In Limine With Accompanying Memorandum Of Law To Transfer Venue (to Clarksburg Division) (ECF 641 and 642) (Denied).


## III.     BRIEF STATEMENT OF ESSENTIAL ELEMENTS WHICH MUST BE PROVED TO ESTABLISH MERITORIOUS CLAIM REMAINING FOR ADJUDICATION AND DAMAGES SOUGHT:

### A.     Plaintiffs' Brief Statement of Essential Elements:

### A.     Breach of Contract

(1)     General Contract Elements

(a)     the existence of a valid enforceable contract
(b)     the plaintiffs have performed his obligations under the contract
(c)     the defendants have breached or violated its duties or obligations under the contract
(d)     plaintiffs have been damaged as a proximate result of the violation of the contract

*Exec. Risk Indem., Inc. v. Charleston Area Med. Center, Inc.*, 681 F.Supp.2d 694, 714 (S.D.W.Va. 2009;) *Wittenberg v. Wells Fargo Bank, N.A.*, 852 F.Supp.2d 731, 749 (N.D.W.Va. 2012;) *Carley Capital Group v. City of Newport News*, 709 F.Supp. 1387 (E.D. Va. 1989); *Blue v. Hazel-Atlas Glass Co.*, 106 W. Va. 642, 147 S.E. 22 (1929); *Jefferson Cooperage Co. v. Getzendanner*, 116 W.Va. 489, 182 S.E. 90 (1935); *Thomas v. Board of Educ. of McDowell County*, 181 W. Va. 514, 383 S.E.2d 318 (1989).

A.     Fraud: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.

Authorities:   *Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737 (1927); Syl. Pt. 1, *Lengyel v. Lint,* 167 W.Va. 272, 280 S.E.2d 66 (1981); Syl. Pt. 1, *Radec, Inc. v. Mountaineer Coal Development Co.*, 210 W.Va. 1, 552 S.E.2d 377 (2000); Syl. Pt. 5, *Kidd v. Mull,* 215 W.Va. 151, 595 S.E.2d 308 (2004).


B.     Fraudulent Concealment:  (1) the concealment of facts by one with knowledge or the means of knowledge; (2) a duty to disclose, coupled with an intention to mislead or defraud; and (3) resulting damages.

Authorities:  *Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W.Va. 578, 584, 567 S.E.2d 294, 300 (2002); *Kessel v. Leavitt*, 204 W.Va. 95, 127, 511 S.E.2d 720, 752 (1998); *Teter*

*v. Old Colony Co.*, 190 W.Va. 711, 717, 441 S.E.2d 728, 734 (1994); *Thacker v. Tyree*, 171 W.Va. 110, 113, 297 S.E.2d 885, 888 (1982); *Frazier v. Brewer*, 52 W.Va. 306, 310, 43 S.E. 110, 111 (1902).

Plaintiffs note that this Court recently acknowledged and discussed the elements of the claims of fraud and fraudulent concealment in its "Order Denying Motion for Summary Judgment on Plaintiffs' Fraud and Punitive Damages Claims" (ECF Doc. No. 672), at pp. 18-22. The Court also noted in its Order that a breach of contract claim can be joined with an independent tort claim of fraud and/or fraudulent concealment and held that Plaintiffs' claims of fraud and fraudulent concealment constituted independent torts.  ECF Doc. 672, at pp. 9-18.

**Damages Recoverable**

A.      Breach of Contract

Compensatory damages, whether direct, consequential, or incidental.  Direct damages are those directly flowing from the contract breach. As to these damages, there is no requirement that the parties must have actually anticipated them because they are a natural consequence of the breach. The second category is indirect or consequential damages that arise from the special circumstances of the contract. In order to recover these damages, the plaintiff must show that at the time of the contract the parties could reasonably have anticipated that these damages would be a probable result of a breach.

Authorities:  Syl. Pts. 1 & 2, *Desco Corp. v. Harry W. Trushel Const. Co.*, 186 W.Va. 430, 413 S.E.2d 85 (1991); Syl. Pt. 3, *Supervalu Operations, Inc. v. Center Design, Inc.*, 206 W.Va. 311, 524 S.E.2d 666 (1999); Syl. Pt. 2, *Kentucky Fried Chicken of Morgantown, Inc. v. Sellaro,* 158 W.Va. 708, 214 S.E.2d 823 (1975); *Lewis v. Welch Wholesale Flour & Feed Co.,* 96 W.Va. 694, 123 S.E. 801 (1924).

B.      Fraud and Fraudulent Concealment

Full compensation for all injuries directly or indirectly resulting from the fraudulent acts or omissions; punitive damages; and reasonable attorney fees.

Authorities:  *Persinger v. Peabody Coal Co.*, 196 W.Va. 707, 719-20, 474 S.E.2d 887, 899-900 (1996); *Capper v. Gates*, 93 W.Va. 9, 18, 454 S.E.2d 54, 63 (1994); Syl. Pt. 3, *Chesser ex rel. Hadley v. Hathaway,* 190 W.Va. 594, 439 S.E.2d 459 (1993); Syl. Pt. 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941); Syl. Pt. 4, *Harless v. First Nat'l Bank,* 169 W.Va. 673, 289 S.E.2d 692 (1982); Syl. Pt. 4, *Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.,* 188 W.Va. 468, 425 S.E.2d 144 (1992).

Plaintiffs note that this Court also held in its "Order Denying Motion for Summary Judgment on Plaintiffs' Fraud and Punitive Damages Claims" (ECF Doc. No. 672), at pp. 11-18, 25, & 28-30, that Plaintiffs may assert a claim for punitive damages arising from their independent tort claim of fraud and/or fraudulent concealment in the initial phase of the trial with

the amount of any punitive damages award to be determined by the same jury after hearing any other evidence relevant to the issue of the amount of punitive damages.

C.     Punitive Damages

"'[T]he weight of West Virginia precedent is that where there is an intentional wrong, or where there are circumstances which warrant an inference of malice, willfulness, or wanton disregard of the rights of others, punitive damages may be awarded.'"

Authorities:   *Goodwin v. Thomas*, 184 W.Va. 611, 614, 403 S.E.2d 13, 16 (1991) (quoting *Addair v. Huffman*, 156 W.Va. 592, 599, 195 S.E.2d 739, 743 (1973). *Accord Perrine v. E.I. du Pont de Nemours and Co.*, 225 W.Va. 482, 566, 694 S.E.2d 815, 899 (2010) ("Punitive damages are awarded to punish and deter defendants who have acted '"maliciously, wantonly, mischievously or with criminal indifference to civil obligations."'" (citations omitted)); Syl. pt. 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941) ("Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong."); Syl. pt. 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895) ("In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.").  *See also Hensley v. Erie Ins. Co.*, 168 W.Va. 172, 175-84, 283 S.E.2d 227, 229-34 (1981) (acknowledging that punitive damages may arise from gross, reckless or wanton negligence); *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 474, 419 S.E.2d 870, 887 (acknowledging that the punitive damages definition of malice has grown to include extremely negligent conduct that is likely to cause serious harm).

West Virginia Code § 55-7-29(a) (2015) provides: "An award of punitive damages may only occur in a civil action against a defendant if a plaintiff establishes by clear and convincing evidence that the damages suffered were the result of the conduct that was carried out by the defendant with actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others."

**B.     Court Rulings**

1.     The Court granted plaintiffs' motion as to alter ego holding that:

Based upon the foregoing, this Court finds that EQT Corporation is the alter ego of the

subsidiary defendants and of EQT Midstream Partners and that the defendants are alter egos of

each other with respect to this civil action.  (Doc. Id. 400, p. 58)  [I]n light of the restrictions set

forth in *Wellman* and *Tawney*, and the need to carefully scrutinize calculation of post-production

activities, whether it be alter-ego self-dealing, or a "sweetheart" deal with an affiliate, it a lease provides for post-production deductions, actual and reasonable costs must mean the actual and direct costs incurred rather than the costs charged by a company. (Doc. Id. 400, p. 68).

2.      The Court granted plaintiffs' motion as to the effect on lessee's duty to pay royalty to its lessors where there is an intermediate sale of lessors' gas to an affiliated company, holding that "as provided in *McDonald*, the sales price for gas will be determined first sale to a non-affiliated party." (Doc. Id. 400, p. 74)

3.      The Court also held that [w]hether an affiliated party or an alter ego, in circumstances where deductions are permitted under *Tawney* or *Leggett*, actual and reasonable costs means the actual and reasonable **direct cost** of providing the post production services. It does not include indirect costs such as the following examples:  "monetary deductions for personnel costs, indirect costs, production management costs, depreciation and return on capital investment and "meals and entertainment," "uniforms," meter operation and repair, and "personal property taxes." See *McDonald*, 983 F. Supp.2d at 816. (Doc. Id. 400 p. 74)

4.      The Court ruled that use of the word "reasonable" costs does not satisfy Tawney's requirement that the lease must contain the method that Lessee may use to consider and take deductions from their Lessor's natural gas sales.  *Id.*

5.      The Court denied the defendants' motion for summary judgement on plaintiffs' fraud and punitive damages claim on defendants' gist of the action doctrine, lack of evidence of fraud, statute of limitations and that the claim can't be decided on a class wide basis (Doc. Id. 672, p. 1).  The Court found:

(a)      Lessees have the duty to be transparent to inform the lessors of the sales and revenue received and of any deductions taken from their royalty;

(b)      Had the duty to follow the law in West Virginia for paying West Virginia lessors;

(c)     Had the duty to carefully read leases and determine whether they were entitled to take deductions and, if so, exactly what deductions could they take as stated in the lease;

(d)     If they took deductions which were not on the lease, then they had the duty to inform the lessor of that;

(e)     The lessors had a right to rely on the accuracy of the remittance statements which was the only accounting statement that EQT provided to the lessor;

(f)     They provided a royalty statement which was devoid of details;

(g)     There was no detail of the types of deductions taken;

(h)     The only column for deductions was titled "Gross Deducts" and "Gross Taxes";

(i)     A lessor could not determine what was being deducted except for taxes and then it did not specify what taxes;

(j)     The remittance statement was not true-it stated "Gross Volume," when the volume in that column was sales volume;

(k)     Volume extracted from plaintiffs' property was concealed from plaintiffs;

(l)     "Net Price" was not a price the gas was sold from, but it was an index price;

(m)     The Deductions taken by the defendants were estimates, not actual numbers;

(n)     The acts and omissions of the defendants at the root of this class action were accomplished by defendants' scheme of concealment which would constitute the independent tort of fraud;

(o)     Therefore, plaintiffs' claims of fraudulent conduct constitute independent torts which are actionable under the law of West Virginia;

(p)     This concealment has continued up to now in this case.

6.     The Court ruled that with regard to severance tax deductions, that taxes incurred as a result of such severing of the gas from the earth are production costs, and, in the absence of an express lease provision apportioning severance taxes, defendants may not deduct severance tax from the plaintiffs' royalties and the plaintiffs will be entitled for the return of all severance

taxes deducted without the support of an express, specific lease provision allowing for such deductions.  (Doc. Id. 670, p. 7)

7.     The Court denied defendants' motion for partial summary judgement on plaintiffs' claim for underpayment or price holding that "EQT was required to obtain the best price reasonably available" for the sale of marketing and sale of the gas.

### C.     Lessee Liability – Wrongful Taking of Deductions From Lessor

(1)     <u>Lessee Duty</u>

This Court, in its Order Resolving Motion, Doc. Id. 400, filed on September 6, 2017, on pages 67-68, stated that:

When the *Tawney* and *Wellman* requirements are combined, **six conditions** must be met before a lessee may deduct post-production costs from royalties.  These are:

> a.     The lease must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and point of sale;
>
> b.     The lease must identify with particularity the specific deductions that the lessee may take;
>
> c.     The lease must expressly provide for a method of calculating the amount to be deducted from royalty for post-production costs;
>
> d.     The costs, which have been identified with particularity, must be actually incurred;
>
> e.     The amount of the costs must be reasonable; and
>
> f.     The lessee must prove all costs as it would in an action for an accounting.  If all six elements are not established, the lessee is not permitted to deduct post-production expenses.

*See also* ***W.W. McDonald Land Co. v. EQT Production Co.***, 983 F.Supp.2d 790, 797-799 (S.D. W.Va. 2013) (surveying relevant West Virginia gas law to the present).  Accordingly, in light of the restrictions set forth in ***Wellman*** and ***Tawney***, and the need to carefully scrutinize calculation of post-production activities, whether it be alter-ego self-dealing, or a "sweetheart" deal with an affiliate, if a lease provides for post-production deductions, actual and reasonable costs must mean the actual and direct costs incurred rather than the costs charged by a company.

The Tawney and Wellman holdings are as follows:

1. "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syllabus Point 4, *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, 557 S.E.2d 254 (2001).

2. "If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that *they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.*" Syllabus Point 5, *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, 557 S.E.2d 254 (2001).

10. Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

11. Language in an oil and gas lease that provides that the lessor's 1/8 royalty (as in this case) is to be calculated "at the well," "at the wellhead," or similar language, or that the royalty is "an amount equal to 1/8 of the price, net all costs beyond the wellhead," or "less all taxes, assessments, and adjustments" is ambiguous and, accordingly, is not effective to permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale.

Syl. Pts. 1, 2, 10 & 11, *Estate of Tawney v. Columbia Natural Resources, LLC*, 219 W.Va. 266, 633 S.E.2d 22 (2006) (emphases added).  *See also Bryan v. Big Two Mile Gas Co.*, 213 W.Va. 110, 121-22, 577 S.E.2d 258, 269-70 (2001) (holding that the calculation of damages for value of minerals must be based on "evidence of the type normally developed in legal proceedings requiring an accounting").

  (2) <u>Affiliate Sales – Alter Ego</u>

Whether an affiliated party or an alter ego, in circumstances where deductions are permitted under **Tawney** or **Leggett,** actual and reasonable

costs means the actual and reasonable direct cost of providing the post production services. It does not include indirect costs such as "monetary deductions for personnel costs, indirect costs, production management costs, depreciation and return on capital investment and "meals and entertainment," "uniforms," meter operation and repair, and "personal property taxes." *See **McDonald***, 983 F.Supp.2d at 816.

The Court granted summary judgment as to the issue of affiliate sales and alter ego.  Doc. Id. 400, pp. 58, 68, 74, 76.

(3)     Burden of Proof Regarding Accounting

    (a)     Plaintiffs' burden of proof is to demonstrate that he is entitled to an accounting such as the mineral was taken.

    (b)     Once established, the burden shifts to the defendants to prove the amount taken, its proceeds or volumes, are legitimate (reasonable and actually incurred expense) as in an accounting case.

See Court Order, Doc. Id. 671, p. 3.

(4)     Lease Must Contain The "Method"

    (a)     Reasonableness is not a method of calculation.  A method of calculation is a procedure, technique or process for mathematically determining something.  Reasonable, actual and/or incurred in a lease to describe costs to be deducted from royalty does not give the lessor useful information.

(5)     Flat Rate Converted Leases

    With respect to flat rate leases, the West Virginia Supreme Court held that, regardless, that deductions may be allowed for flat rate leases, the lease must still comply with the above rules.  The *Leggett* Court stated that:

    "the *Wellman* Court recognized and explicitly held that where costs are properly allocated or deducted, "the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable."

A.

Syl. Pt. 5, in part

(6)    <u>Defendants are Liable for Failure to Pay the Proper Price</u>

The defendants had the duty to market plaintiffs' gas to obtain the reasonably best price available at the time of the same.  This Court's ruled:

(7)    <u>Defendants Are Liable for Failure to Pay the Proper Volume</u>

The plaintiffs contended that the defendants paid only for volume extracted – not for volume not sold.  This Court has granted defendants' summary judgement with respect to the plaintiffs' volume claim.

## III.    OTHER AUTHORITIES

### 1.    <u>Actual Fraud</u>

"Generally speaking, `[f]raud has been defined as including all acts, omissions, and concealments which involve a breach of a legal duty, trust or confidence justly reposed, and which are injurious to another, or by which an undue and unconscientious advantage is taken of another.' *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76, 285 S.E.2d 679, 682 (1981) (citations omitted).  *Accord Dickel v. Smith*, 38 W.Va. 635, 641, 18 S.E. 721, 723 (1893)." *Kessel v. Leavitt*, 204 W. Va. 95, 511 S.E.2d 720 (1998).  The essential elements in an action for fraud are that:  (1) the act claimed to be fraudulent was the act of the defendant or induced by him; (2) it was material and false; (3) the plaintiff relied upon it and was justified under the circumstances in relying upon it and (4) he was damaged because he relied upon it.  Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981); Syl. Pt. 2, *Muzelak v. King Chevrolet, Inc.*, 179 W.Va. 340, 368 S.E.2d 710 (1988); Syl. Pt. 2, *Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.*, 188 W.Va. 468, 425 S.E.2d 144 (1992); Syl. Pt. 3, *Cordial v. Ernst & Young*, 199 W.Va. 119, 483 S.E.2d 248 (1996); *Teter v. Old Colony Co.*, 190 W.Va. 711, 717, 441 S.E.2d 728, 734 (1994);

*Powell v. Time Ins. Co.*, 181 W.Va. 289, 296, 382 S.E.2d 342, 349 (1989); *Kessel v. Leavitt*, 511 S.E.2d at 752.

### 2.   **Constructive Fraud**

Fraud may be either actual or constructive.   Constructive fraud is a breach of legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate the public or private confidence or to injure public interests.   Thus, constructive fraud does not require scienter or intent to mislead; it can be established whether the representation is innocently or knowingly made.   *Sewell*, *supra;* see also *Horton v. Tyree*, 104 W.Va. 238, 139 S.E. 737 (1927).

### 3.   **Circumstantial Evidence**

(a)    Because intent to defraud is rarely provable by direct evidence, it may be inferred from the totality of circumstances for purposes of a fraud claim. *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259 (8th Cir. 1994); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503 (E.D.N.Y. 1994); *Crown Ford, Inc., v. Crawford*, 473 S.E.2d 554 (Ga. 1996); *Delzer v. United Bank of Bismarck*, 527 N.W.2d 650 (N.D. 1995); *Davis v. Sun Refining and Marketing Co*., 671 N.E.2d 1049 (Ohio 1996).   Although a party may have no direct evidence of fraudulent intent, such intent may be inferred and established by circumstantial evidence. *BancOklahoma Mort. Corp. v. Capital Title Co., Inc*., 194 F.3d 1089 (10th Cir. 1999); *Cincinnati Ins. Co. v. Guccione*, 719 N.E.2d 787 (2d Dist. 1999); *Constance v. B.B.C. Development Co*., 25 S.W.3d 571 (Mo. 2000).

(b)    For purposes of proving the element of reliance in a fraud claim, such reliance may be demonstrated by either circumstantial or direct evidence. 37 Am.Jur.2d § 477; *Chisolm v. TransSouth Financial Corp*., 194 F.R.D. 538 (E.D.Va. 2000).

(c)    Fraud must, in many cases, be proved by inferences from circumstances. 37 Am. Jur.2d § 471; *Leach v. Central Trust Co.*, 213 N.W. 777 (Iowa 1927); *Burt v. Timmons*, 29 W.Va. 441, 2 S.E. 780 (1887).   Thus, a resort to presumptive evidence often becomes necessary, and the circumstances may be such as to raise a presumption of fraud and thereby cast upon the party charged with fraud the burden of proving its existence. 37 Am. Jur.2d § 471; *Wallick v. Eaton*, 134 P.2d 727 (Colo. 1943); *McCowen, Probst, Menaugh Co. v. Short*, 118 N.E. 538 (Ind. 1818); *Leach v. Central Trust Co.*, 213 N.W. 777 (Iowa 1927).   The raising of a presumption of fraud shifts the burden of going forward with the evidence from the party alleging fraud to the party charged with fraud.   37 Am.Jur.2d § 471; *Steere v. Hoagland*, 50 Ill. 377, 1869 WL 5238 (1869); *Zimmer v. Miller*, 1 A. 858 (Md. 1885); *Burch v. Smith*, 15 Tex. 219, 1855 WL 5003 (1855).

**4.    Presumption/Shifting of Burden of Proof**

(a)    When a party makes a partial disclosure, the party then has a duty to tell the whole truth. 37 Am. Jur.2d § 209; *Trout v. Harrell*, 233 S.W.2d 233 (Ark. 1950); *Sparks v. Guaranty State Bank*, 318 P.2d 102 (Kan. 1957).

(b)    While the general rule is that fraud is not presumed, the existence of fraud may be inferred from circumstantial evidence. 37 Am.Jur.2d §471; *Gregg, by Craig v. Sayer's Lessee*, 33 U.S. 244, 8 L.Ed. 932 (1834); *Tusa v. Omaha Auto. Auction Inc.*, 712 F.2d 1248 (8th Cir. 1983); *Howland v. Smith*, 9 A.D.2d 197, 193 N.Y.S.2d 140 (3d Dep't 1959)(holding that fraud is established when facts are proved from which it results as an unavoidable inference); *Home Mut. Ben. Ass'n v. Rowland*, 244 S.W. 719 (Ark. 1922)(recognizing rule); *Watson v. Gardner*, 236 N.W. 213 (Minn. 1931); *Falkner v. Sacks Bros.*, 30 N.W.2d 572 (Neb. 1948); *Brown v. Laird*, 291 P. 352 (Or. 1930)(holding that fraud may be established by inference like

any other disputed fact); *Halsey v. Minnesota-South Carolina Land & Timber Co.*, 177 S.E. 29 (S.C. 1934).

(c)     Fraud by nondisclosure involves the failure to make a full and fair disclosure of known facts connected with the matter about which a party has assumed to speak, under circumstances in which there is a duty to speak. 37 Am. Jur. 2d § 200; *Pospisil v. Pospisil*, 757 A.2d 655 (Conn. 2000).   Generally speaking, there are four circumstances in which nondisclosure or concealment may constitute actionable fraud:

(i)     when the defendant is in a fiduciary relationship with the plaintiff;

(ii)    when the defendant had exclusive knowledge of material facts not known to the plaintiff;

(iii)   when the defendant actively conceals a material fact from the plaintiff; and

(iv)    when the defendant makes partial representations but also suppresses some material facts.

37 Am. Jur. 2d § 200; *Wilkins v. National Broadcasting Co. Inc.*, 84 Cal. Rptr. 2d 329 (2d Dist. 1999).

(d)     A misrepresentation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation.   Restatement Second, Torts § 529.   "A statement containing a half-truth may be as misleading as a statement wholly false.   Thus, a statement that contains only favorable matters and omits all references to unfavorable matters is as much a false representation as if all the facts stated were untrue." Restatement Second, Torts § 529, comment a.

(e)     An action for fraud and deceit may be maintained not only if affirmative representations are made, but also for negative misrepresentations, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak.  37

Am. Jur. 2d § 200; Restatement of Torts, Second § 550, 551; *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Oh. 1996); *In re Conduct of Brown*, 956 P.2d 188 (1996); *Smith v. Brown & Williamson Tobacco Corp.*, 108 F.Supp.2d 12 (D.D.C. 2000)(plaintiff suing for fraud may satisfy the false representation element of a claim by nondisclosure or silence); *American Baptist Churches of Metropolitan New York v. Galloway*, 710 N.Y.S.2d 12 (1st Dep't 2000)(a cause of action for fraud may be based on a fiduciary's intentional concealment of a material fact); Restatement Second, Contracts § 160 (action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist). Accordingly, the concealment of a fact that one has a duty to disclose may serve as a substitute element for an affirmative false representation in a fraud action. 37 Am. Jur. 2d § 200; *Constance v. B.B.C. Development Co.*, 25 S.W.3d 571 (Mo. 2000).

> [i]n order to constitute fraud, it is not essential that an affirmative representation be made; fraud may consist as well in the suppression of what is true as in the representation of what is false.  If a party conceals a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exits, the concealment is as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated.

8B Michie's Jurisprudence, Fraud and Deceit, § 15 at 365-66.  As recently stated by the West Virginia Supreme Court of Appeals, "'"an action for fraud can arise by the concealment of truth."'"  *Teter*, 190 W.Va. at 717, 441 S.E.2d at 734 (quoting *Thacker v. Tyree*, 171 W.Va. 110, 113, 297 S.E.2d 885, 888 (1982)).  Such a basis for a claim of fraud is possible because `[f]raud is the concealment of the truth, just as much as it is the utterance of a falsehood.'  *Frazier v. Brewer*, 52 W.Va. 306, 310, 43 S.E. 110, 111 (1902)."  *Kessel v. Leavitt*, 204 W. Va. 95, 511 S.E.2d 720 (1998).

5. **Duty to Speak**

(a)     A duty to disclose arises when the parties are in a relationship that gives rise to the duty, such as a seller and buyer, an employer and prospective employee, a doctor and a patient, or parties entering into any kind of contractual agreement. *Shin v. Kong*, 95 Cal.Rptr.2d 304 (1st Dist. 2000).

(b)     The duty to disclose may arise from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose this knowledge or has knowledge or information that the other party does not have and cannot be expected fairly and reasonably to obtain. 37 Am. Jur.2d § 205; *Constance v. B.B.C. Development Co.*, 25 S.W.3d 571 (Mo. 2000); *Wild v. Trans World Airlines, Inc*., 14 S.W.3d 166 (Mo. 2000).

(c)     The factors used to determine whether a party to a contract has a duty to disclose information, including the relative intelligence of the parties, the relation of the parties to each other, the nature of the fact not disclosed, the nature of the contract, whether the buyer or the seller is the concealer, the materiality or importance of the fact not disclosed, and the respective knowledge of the parties and their means of acquiring knowledge, overlap and the relative weight of each factor is determined on a case-by-case basis. 37 Am. Jur.2d § 205; *Constance v. B.B.C. Development Co.*, 25 S.W.3d 571 (Mo. 2000).

(d)     A duty to disclose may arise when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them. 37 Am.Jur.2d §207; *Chiarella v. U.S.*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *TransPetrol, Ltd. v. Radulovic*, 764 So.2d 878 (Fla. 2000); *Sowards v. Rathburn*, 8 P.3d 1245 (Id. 2000); *Rood v. Newberg*, 718 N.E.2d 886 (Mass. 1999).  Once a person undertakes to speak, that person assumes a duty to tell the whole truth, and to make a full and fair disclosure as

to the matter about which the person assumes to speak. 37 Am. Jur.2d § 209; *Sparks v. Guaranty State Bank*, 318 P.2d 1062 (Cal. 1957); *American Petroleum Products, Inc., v. Mom and Pop Stores, Inc.*, 497 S.E.2d 616 (Ga. 1998).   Under the law of fraudulent concealment or suppression, a duty to disclose may exist where one voluntarily undertakes to speak but fails to prevent his or her words from being misleading. 37 Am. Jur.2d § 209; *Eisenschmidt v. Conway*, 155 P.2d 241 (Okla. 1944).

Putting aside a fiduciary relationship, each of the other three circumstances in which nondisclosure may be actionable in fraud presupposes the existence of some other relationship between the plaintiff and the defendant to which a duty to disclose can arise, and such a relationship can only come into being as a result of some sort of transaction between the parties. Id.  However, an express agreement is not required between the parties for a recovery under the theory of fraudulent concealment.  37 Am. Jur. 2d § 200; *Ho v. University of Texas at Arlington*, 984 S.W.2d 672 (Tex. 1998).

(e)     Where a defendant has a legal or equitable obligation to reveal material information, the defendant's failure to do so is equivalent to a misrepresentation and may therefore support a claim of actionable fraud where the remaining elements of that tort are proved. 37 Am. Jur. 2d § 200; *Vela v. Marywood*, 17 S.W.3d 750 (Tex. 2000).

**6.     Fraud to Class**

**(a)     Intent**

Where false representations are made to a particular class of persons, they must, in order to form the basis of liability, have been intended to influence a complaining party as one of such class. 37 Am.Jur. 2d § 111; Restatement Second, Torts § 534; *Gulf Oil Corp. of Pennsylvania v. Newton*, 31 A.2d 462 (Conn. 1943); *Webb v. Rockefeller*, 93 S.W. 772 (Mo.

1906).  In such case, however, intent to deceive the plaintiff in particular is not necessary, but it is sufficient that there was intent to defraud any person falling within the category for whom the representations are made who may act on them. 37 Am.Jur. 2d § 111; Restatment Second, Torts § 531, comment e; *Gulf Oil Corp. of Pennsylvania v. Newton*, 31 A.2d 462 (Conn. 1943); *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504 (Del. 1931).  It is enough that the complaining party was entrapped by the misrepresentations and that they were designed to entrap someone. 37 Am.Jur. 2d § 111; *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504 (Del. 1931); *Campbell v. Gooch*, 292 P. 752 (Kan. 1930).  One who intends to defraud a particular class of persons is deemed to have intended to defraud every individual in that class who is actually misled. 37 Am.Jur. 2d § 111; *Wennerholm v. Stanford University School of Medicine*, 128 P.2d 522 (Cal. 1942).

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation. Restatement Second, Torts § 531.

One who makes a fraudulent misrepresentation intending or with reason to expect that more than one person or class of persons will be induced to rely on it, or that there will be action or inaction in more than one transaction or type or transaction is subject to liability for pecuniary loss to any one of such persons justifiably relying upon the misrepresentation in any one or more of such transactions. Restatement Second, Torts § 534.

### (b)    Presumption of Fraud

Once plaintiffs have proven that defendants have omitted material facts common to the class, plaintiffs are entitled to a presumption that they relied on the omission. In other words, "it is proper to presume reliance." *Id*. at 817.  This inference of reliance extends to the entire class.

7.   __Reliance__

(a)   One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation. Restatement Second, Torts § 525.  Reliance upon misrepresentations may be presumed. *Basic v. Levinson*, 485 U.S. 224, 241, 108 S.Ct. 978, 989, 99 L.Ed.2d 194, on remand 871 F.2d 562 (6th Cir. 1989).

(b)   One party to a transaction who by concealment or other action intentionally prevents them from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering. Restatement Second, Torts § 550.  Liability for fraudulent concealment occurs "[w]hen the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation." Restatement Second, Torts § 550, comment b.

(c)   Restatement Second, Torts § 551, provides:

"(1)   One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2)   One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

Restatement of Torts, Second § 551.

### 8. <u>Unjust Enrichment</u>

The law never permits a wrongdoer to take advantage of his own wrong to the detriment of another. Therefore, if two or more persons conspire to cheat a third and together consummate an act by which they defraud such person of a sum of money, the law will imply a joint promise on their part to restore it. *Culpeper Nat. Bank v. Tidewater Improvement Co.*, 119 Va. 73, 89 S.E. 118 (1916); *Plate v. Durst*, 42 W. Va. 63, 24 S.E. 580 (1896).

### 9. <u>Joint Venture</u>

West Virginia recognizes the doctrine of joint venture and joint enterprise. A joint venture exists when two or more persons or entities carry out a single business enterprise for profit, for which purposes they combine their property, money, effects, skill, and knowledge. *Price v. Halstead*, 177 W. Va. 592, 355 S.E.2d 380 (1987). A joint enterprise is distinguished from a joint venture by the fact that there is no business motive underlying the parties' efforts in a joint enterprise. *Id.* The law applicable to joint ventures and joint enterprises is thus interchangeable, and is used so throughout the cases in this area of law.

The wrongdoing of one participant in a joint enterprise is imputed to all participants. *Alban Tractor Co. v. Sheffield*, 263 S.E.2d 67, 68 (Va. 1980). The liability for one engaged in a joint enterprise, for the acts of his associates, is founded on the principles of agency. 46 <u>Am. Jr.</u>

§ 57, Joint Ventures.  In accordance with the general rule that each member of a joint venture acts as both principal and agent of their co-venturers and for their benefit, it is held that each of several joint venturers has power to bind the others and to subject them to liability to third persons for injuries sustained as a result of the negligence of one of the co-venturers.  *Id.* at § 58.  Moreover, on principles similar to those by which one joint venturer is bound by the acts of another, knowledge of one co-venturer within the scope of the common enterprise is the knowledge of all.  *Id.* at § 57.  Again, unless reasonable minds could not differ, questions of whether a joint venture or enterprise relationship exist is one for the jury.

### 10.   Conspiracy

A "civil conspiracy" has been defined as a combination of two or more persons acting by concerted action to accomplish an unlawful purpose, or a purpose not in itself unlawful, by unlawful means.  *Blackwelder v. Millman*, 522 F.2d 766, 775 (4th Cir. 1975); *Dixon v. American Indus. Leas. Co.*, 162 W. Va. 834, 253 S.E.2d 150 (1979); 16 Am.Jur2d, "Conspiracy," § 49; 4A Michie's Jurisprudence, "Conspiracy," § 12.  Circumstantial evidence may provide adequate proof of conspiracy.  Participants in a civil conspiracy must share generally the conspiratorial objective, but they need not know all details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result.

As stated by the West Virginia Supreme Court of Appeals in *Dixon v. American Indus. Leasing Co.*, 162 W. Va. 832, 253 S.E.2d 150 (1979) (citing 15A C.J.S. Conspiracy § 1(1) and 16 Am. Jur.2d Conspiracy § 44):

> [A] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.  The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

Stated otherwise, "[t]he law of this State recognizes a cause of action sounding in civil conspiracy.  At its most fundamental level, a `civil conspiracy' is `a combination to commit a tort.'  *State ex rel. Myers v. Wood*, 154 W. Va. 431, 175 S.E.2d 637 (1970) (citing 15A C.J.S. Conspiracy § 1 (1967))."  *Kessel v. Leavitt*, 204 W. Va. 95, 511 S.E.2d 720 (1998).

> Given the tort-based liability of participants in a civil conspiracy, a plaintiff can maintain such a claim provided he/she satisfies the enumerated standard:  "In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]"  Syl.  pt. 1, in part, *Dixon v. American Indus. Leasing Co.*, 162 W.Va. 832, 253 S.E.2d 150.  See also Syl. pt. 7, *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986) (same). . . .

*Kessel*, *Id.* at 754.

> The Court in *Kessel* further explained:

> Additionally, individuals who have conspired with one another to orchestrate and/or carry out a *fraudulent* plan or scheme can be held liable for their conduct.  See 37 Am.Jur.2d Fraud and Deceit § 301, at 397 (1968) (stating that "everyone who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity" (citing *Densmore v. County Court*, 106 W.Va. 317, 145 S.E. 641 (1928))); 37 Am.Jur.2d Fraud and Deceit § 305, at 403 & 405 (1968) (noting that relief from fraud may be had only against those who were "parties to the fraud," but explaining that "**in order to establish liability, any person or persons sought to be charged need not have benefited from the transaction, have had any interest therein, or have colluded with the person benefited**"; **recognizing further that "[o]ne who participates in a fraud is of course guilty of fraud, and one who, with knowledge of the facts, assists another in the perpetration of a fraud is equally guilty**" (footnotes omitted) (citing *Lincoln v. Claflin*, 74 U.S. 132, 7 Wall. 132, 19 L.Ed. 106 (1968))).  *See also Frazier v. Brewer*, 52 W.Va. at 310, 43 S.E. at 111 ("**He who adopts the results adopts also the means by which they are brought about.**").

*Kessel, Id.* (emphases added).

**11.  Alter Ego**

Defendants and their various subsidiaries operated as a single entity, thereby justifying the piercing of the corporate veil.  In *Norfolk Southern Ry. Co. v. Maynard*, 190 W. Va. 113, 437 S.E.2d 277 (1993), our Court set forth several factors which are relevant in making this

determination.  This Court has granted summary judgment that EQT Corporation is the alter ego of its subsidiaries.

12.   **Agency**

As to the existence of an agency relationship, the West Virginia Supreme Court of Appeals has held in cases in which a dispute exists as to whether an individual was an agent or employee that "the determining factor to be considered . . . is whether the right of control or supervision over the work done existed in the person for whom the work was done, and not the use of such control and supervision." *Spencer v. Travelers Ins. Co.*, 148 W. Va. 111, 133 S.E.2d 735, 739 (1963).  "[I]t is of no moment that an employer [or principal] does not actually exercise control.  The important consideration is whether he had the right to exercise such control and supervision." *Myers v. Workmen's Compensation Commissioner*, 150 W. Va. 563, 148 S.E.2d 664, 667 (1966).

However, a principal is bound by the acts of the agent, whether general or special, within the authority he has actually given him, which includes not only the precise act which he expressly authorizes him to do, but also whatever usually belongs to the doing of it or is necessary to its performance.  Beyond that the principal is bound by the acts of the agent within the apparent authority which the principal himself knowingly permits the agent to assume or which he holds the agent out to the public as possessing. *Pownall v. Cearfoss*, 129 W. Va. 487, 40 S.E.2d 886 (1946); *General Elec. Credit Corp. v. Fields*, 148 W. Va. 176, 133 S.E.2d 780 (1963).

A principal is bound by the acts of an agent if those acts are either within the authority the principal has actually given his agent or within the apparent or ostensible authority the principal has knowingly permitted the agent to assume. *Thompson v. Stuckey*, 171 W. Va. 483,

300 S.E.2d 295 (1983).  An act is within the apparent scope of an agent's authority when a reasonably prudent person having knowledge of the usage of the business is justified in supposing that the agent is authorized to perform it from the character of the known duties. *Bluefield Supply Co. v. Frankel's Appliances, Inc.*, 149 W. Va. 622, 142 S.E.2d 898 (1965).

(i)      An agent may also be ordered to account for the agent's actions in handling the principal's property.  Restatement Third, Agency, § 8.01, comment d(1).  The burden is on the agent to establish that assets of the principal have been properly applied or disposed of.  Id., see also, § 8.12, comments c and d.

(j)      An agent has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position. Restatement Third, Agency, § 8.02.

(k)      An agent has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party. Restatement Third, Agency, § 8.05.  An agent who has possession of property of the principal has a duty to use it only on the principal's behalf, unless the principal consents to such use.  *Id., see also*, § 8.06.

(l)      An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person. Restatement Third, Agency, § 8.11.

### 13.     Breach of Natural Gas Lease by Lessee (General)

1.      From the very beginning of the oil and gas industry, it has been the practice to compensate the landowner by selling the oil by running it to a common carrier and paying him 1/8 of the sale price received.  *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001).  The 1/8 received by a royalty owner is commonly referred to as the landowner's royalty.  *Id.* at 263.

2.      Historically, the lessee has had to bear the cost of complying with his covenants under the lease.  *Id.* at 265.  Requiring the lessee to pay for all such post-production costs is "consistent with the long-established expectation of lessors" that they would receive 1/8 of the sale price received.  *Id.* at 265.  The lessee must bear all costs incurred in exploring for, producing, marketing and transporting the product to the point of sale.  *Id.* at 265.

3.      The lessee must transport to the "point of sale."  *Id.* at 265.  Only those costs "actually incurred" and "reasonable" are chargeable; if the lease specifically provides for it, it may be charged.  *Id.* at 265.  And, then, only if it can be done by "accounting methods."  *Id.*

4.      "A lessee in the operation of his lease must act in good faith."  *Lamp v. Locke*, 89 W.Va. 138, 108 S.E. 889 (1921).

5.      Where there is an "express covenant [in an oil and gas lease] to perform certain acts, there is an implied covenant to refrain from performance of other acts which operate to defeat performance of the express covenant."  *Millan v. Bartlett*, 69 W.Va. 155, 71 S.E. 13 (1911).

6.      There is an implied covenant to receive the amount stipulated for in the lease. Syl. Pts. 1 & 2, *Kilcoyne v. Southern Oil Co.*, 61 W.Va. 538, 56 S.E. 888 (W.Va. 1907).

7.      "Lessee will do all that is necessary to carry into effect the purposes and object of the lease" and oil and gas leases "are to be construed liberally in favor of the lessor and strictly against the lessee." *Martin v. Consolidated Coal & Oil Corp.*, 101 W.Va. 721, 133 S.E. 626, 628 (1926); *Hall v. South Penn Oil Co.*, 71 W.Va. 82, 76 S.E. 124, 124-126 (1912); *Adkins v. Huntington Dev. & Gas Co.*, 13 W.Va. 490, 168 S.E. 366, 367 (1932).

8.      It is the lessee's obligation to market the product, and it is his task also to prepare it for market, if it is unmerchantable in its natural form.  No part of the cost of marketing or of preparation for sale is chargeable to the lessor.  *Maurice H. Merrill, Covenants Implied In Oil and Gas Leases*, §85 at 214-215 (2d Ed. 1940).

9.      The law implies a covenant of good faith and fair dealing in every contract. *Elmore v. State Farm Ins. Co.*, 202 W.Va. 430, 504 S.E.2d 893 (1998); *Hoffmaster v. Guiffrida*, 630 F.Supp. 1289 (S.D. W. Va. 1986); Restatement Second, Contracts, § 205.

10.     A material breach of contract occurs when there is a breach of an essential feature of the contract which induced the party to enter into it.  *Prozinski v. Northeast Real Estate Services, LLC*, 797 N.E.2d 415 (Mass. App. 2003).  The breach is material if it relates to a matter of vital importance and defeats an essential purpose of the contract.  *Horton v. Horton*, 487 S.E.2d 200 (Va. 1997); *Linan-Faye Const. Co., Inc. v. Housing Authority of the City of Camden*, 995 F.Supp. 520 (D.N.J. 1998).

11.     An injured party may treat a material breach of contract to be a breach of the entire contract.  *Southwest Virginia Hospitals v. Lipps*, 68 S.E.2d 82 (Va. 1952).

**B.**     **Defendants' Brief Statement of Essential Elements:**

**Breach of Contract – Plaintiffs' Pricing Claim**

Plaintiffs claim that Defendant is liable for breach of the terms of the Leases by allegedly failing to pay royalties based upon the proper price for gas that is sold from the lease premises. To establish liability for their breach of contract claim with respect to the Leases involved in this case, Plaintiffs must prove, by a preponderance of the evidence, that Defendant failed to perform a requirement of the Leases and that such failure to perform was so important and central to the terms of that Leases that it defeated the very purpose of the parties' contract.  *See e.g.*, *J.W. Ellison, Son & Co. v. Flat Top Grocery Co.*, 69 W.Va. 380, 71 S.E. 391(1911); *Emerson Shoe Co. v. Neely*, 99 W.Va. 657, 129 S.E. 718 (1925); *Milner Hotels, Inc. v. Norfolk & Western Ry. Co.*, 822 F.Supp. 341 (S.D.W.Va. 1993), *aff'd*, 19 F.3d 1429 (4th Cir. 1994); *Wittenberg v. Wells Fargo Bank, N.A.*, 852 F.Supp.2d 731, 749 (N.D.W.Va. 2012); 17A AmJur2d Contracts §699 (2007).

**Post-production costs are actually incurred and reasonable:**

For the leases found by this Court to satisfy the standard announced in *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 274, 633 S.E.2d 22 (2006), upon which a lessee may deduct from the lessor's 1/8 royalty a portion of post-production costs (i.e. "*Tawney* compliant" leases), and for royalties that are paid pursuant to W. Va. Code § 22-6-8, Defendants have the burden to establish that the post-production costs allocated to the royalty owners were actually incurred and reasonable.  *See,* Syl. pt. 5, *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001); Syl. pt. 8, *Leggett v. EQT Production Company*, 239 W.Va. 264, 800 S.E.2d 850 (2017).  Further, Defendants will establish that the severance tax deducted from

the royalties paid to the royalty owners was the royalty owners' proper share of the severance tax.

According to West Virginia law, the reasonableness of post-production costs is to be considered in the context of the overall cost incurred for those post-production services, and the proof necessary to establish that the costs were incurred and are reasonable is "of the type normally developed in legal proceedings requiring an accounting."  *See, Leggett*, 239 W. Va. 264, 800 S.E.2d 850, 868; Syl. pt. 5, *Wellman*, 210 W. Va. 200, 557 S.E.2d 254.

An "accounting" is an equitable remedy which arises from an obligation to account for money or property owed to another.  *See e.g. Belcher v. Big Four Coal & Coke Co*., 68 W.Va. 716, 70 S.E. 712 (1911); *Shearer v. United Carbon Company*, 143 W.Va. 482, 486, 103 S.E.2d 883, 886 (1958); 1A C.J.S. Accounting § 6; 1A C.J.S. Accounting § 33.  An "equitable accounting" generally refers to the report of all expenses, income and/or property prepared by one having a duty to account.  ACCOUNTING, Black's Law Dictionary (10th ed. 2014). Accordingly, in the context of this case, Defendants will offer proof that the post-production costs were incurred and are reasonable according to accounting standards.  *Id*.  *See also*, *Leggett*, 239 W.Va. 264, 800 S.E.2d 850, 868; Syl. pt. 5, *Wellman*, 210 W.Va. 200, 557 S.E.2d 254.

**Plaintiffs' Fraud/Misrepresentation Claim:**

Plaintiffs have asserted a cause of action for fraud or misrepresentation against Defendants in this action.  If Plaintiffs are permitted to proceed with these claims, they must prove each of the following elements by clear and convincing evidence:  (1) the act claimed to be fraudulent was the act of the Defendant or induced by it; (2) the act was material and false; (3) Plaintiffs relied upon it and were justified under the circumstances in relying upon it; and, (4) Plaintiffs were damaged because of this reliance.  "Clear and convincing" is defined as "highly

probable" and this standard of proof requires more than a preponderance of the evidence.  It is the measure or degree of proof that will produce a firm belief or conviction about the truth of the allegation.  Where, as here, fraudulent concealment is alleged, Plaintiffs must prove concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud.  *See e.g. Muzelak v. King Chevrolet, Inc,*, 179 W. Va. 340, 368 S.E.2d 710 (1988); *Lengyel v. Lint*, 167 W. Va. 272, 280 S.E.2d 66 (1981); *Trafalgar House Construction, Inc. v. ZMM, Inc.* 211 W. Va. 578, 567 S.E.2d 294 (2002); *Folio v. City of Clarksburg*, 221 W. Va. 397, 655 S.E.2d 143 (2007); *Bowens v. Allied Warehousing Services, Inc.*, 229 W. Va. 523, 729 S.E.2d 845, 852 (2012); *Pocahontas Mining Company Limited Partnership v. Oxy USA, Inc.,* 202 W.  Va. 169, 503 S.E.2d 258 (1998); Restatement, Second, Torts, §§ 525 and 531; Restatement, Second, Contracts § 162; *O'Dell v. Stegall*, 226 W. Va. 590, 608, 703 S.E.2d 561, 579 (2010).

Further, Plaintiffs have requested an award of punitive damages in connection with their fraud claim.  Punitive damages are not proper absent a finding of clear and convincing evidence that Defendants acted with actual malice toward Plaintiffs or the class members, or that Defendants acted with a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others.  *See e.g.*, *Boyd v. Goffoli*, 216 W. Va. 552, 608 S.E.2d 169 (2004); *TXO Production Corp. v. Alliance Resources Corp.*,187 W. Va. 457, 419 S.E.2d 870 (1991), *aff'd* 509 U.S. 433 (1993); *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 656, 413 S.E.2d 897 (1991); *Seymour v. Pendleton Community Care*, 209 W. Va. 468, 549 S.E.2d 662 (2001); *Yourtee v. Hubbard*, 196 W. Va. 683, 474 S.E.2d 613 (1996); *Beardsley v. Webb*, 30 F.3d 524 (4th Cir. 1994).

## IV.    BRIEF SUMMARY OF MATERIAL FACTS AND THEORIES OF LIABILITY OR DEFENSE:

### A.    Plaintiffs' Brief Summary of Facts and Theories:

1.    Defendants were under a contractual duty to perform certain functions under the leases in exchange for defendants receiving most of all proceeds from the sale of plaintiffs' gas.

2.    One of the contractual responsibilities of defendants was to market the gas to receive reasonably the best price available for the gas.

3.    Defendants had the responsibility to properly account for the sale price and advise plaintiffs of any significant fact related to the plaintiffs' royalty and to pay the accurate and honest price to plaintiffs for all gas.

4.    Defendants were acting as plaintiffs' agents in selling the gas is that they had the duty to market and account for the gas and the Plaintiffs' money and paying plaintiffs their percent royalty.

5.    Defendants were acting in a fiduciary capacity or other capacity in handling plaintiffs' money and accounting for it such that they had the express duty to pay correctly and report correctly.

6.    Defendants intentionally and knowingly took deductions from plaintiffs' royalty checks when they knew they had no right to do so and/or took unlawful unreasonable deductions, and defendants knew plaintiffs had no reasonable way to determine that the deductions were being taken.

7.    Defendants, therefore, intentionally and knowingly concealed the fact that they were selling plaintiffs' gas and taking deductions from plaintiffs' money, thereby taking advantage of plaintiffs and the class.

8.     The rules of the State of West Virginia required defendants to first prove by evidence as in a cause of action for an accounting that the deductions were actually incurred and reasonable before taking any deductions, and further, they were prevented from taking deductions unless they were specifically identified in the lease as being costs which were agreed by the parties to be deducted from royalty.  In order to take deductions, the lease had to state that the specific costs must be deducted and further that the lease must explain that the method that the deductions were going to be deducted and calculated so that the lessors would know and be able to determine their accuracy.  Defendants set about through a sham scheme to set up a number of subsidiaries with different oil and gas business, departments, in order to claim that there was a market at the wellhead to sell the gas and that they sold it there, therefore, they were going to falsely claim that there were no deductions and also that they could take deductions, therefore, defendants wrongfully took deductions from plaintiffs.

9.     Plaintiffs had the right to rely upon EQT to properly account for their money and to only take deductions where the defendants had fully complied with the leases and the West Virginia statutory and common law including all covenants of duties and responsibilities of lessees, both express and implied.  Defendants intentionally, not only did not comply, but intentionally and maliciously concealed the facts of their conduct from plaintiffs.

10.     Defendants breached their contracts with plaintiffs and the class and underpaid plaintiffs their royalty.

11.     Defendants concealed significant facts from plaintiffs and misled and took advantage of plaintiffs by underpaying royalty over the period December 2008 to December 31, 2017, and are liable to Plaintiffs' based upon and through the fraudulent and intentional acts and omissions.

12.     Defendants converted plaintiffs' money and right to receive money to their own benefit and purpose.

13.     Plaintiffs are entitled to the presumption that without being advised of the underpayment of royalty that they had the right to rely and did rely on the honesty of defendants that defendants would pay them correctly and advise them of any significant facts to the contrary.

14.     Failure to inform the lessors that Defendants were taking of unreasonable and unlawful deductions from the lessors' royalty or failing to sell the gas at the reasonably best price available is a significant and material fact.

15.     Failing to pay plaintiffs the proper royalty under the above circumstances and/or concealing same was and is unreasonable, intentional, malicious and unlawful misconduct.

16.     Defendants' intentionally and knowingly breached the implied covenant of good faith and fair dealing incorporated in the lease agreement with the lessors.

17.     Defendants willful, wanton and reckless disregard of plaintiffs' and the class' rights, under West Virginia statutory law, including W. Va. Code § 22-6-8 and the common law of West Virginia, including *Wellman*, *Tawney*, *Leggett* and *McDonald*, and under the express and implied contractual rights of plaintiffs, amount to fraudulent, malicious, unconscionable misconduct and Plaintiffs are entitled to compensatory and punitive damages.

18.     Plaintiffs are entitled to the presumption of reliance and presumption of causation of damages.

**B.      Defendants' Brief Summary of Facts and Theories:**

The claims in this case relate to the alleged underpayment of royalties by EQT Production Company, as lessee, to the subject leases.  For the leases found by this Court to be

"*Tawney* compliant" and for royalties that are paid pursuant to W. Va. Code § 22-6-8, Defendants have the burden to establish that the post-production costs allocated to the royalty owners were actually incurred and reasonable. *See,* Syl. pt. 5, *Wellman, Inc*., 210 W. Va. 200, 557 S.E.2d 254; Syl. pt. 8, *Leggett*, 239 W.Va. 264, 800 S.E.2d 850.  To meet this burden, Defendants will offer evidence at trial to establish that the post-production costs proportionally allocated to Plaintiffs and the class members for moving gas from the wellhead to the first liquid trading point were expenses that were actually incurred and reasonable.  Additionally, Defendants will establish that the severance taxes allocated to the royalty owners were actually assessed by the State of West Virginia and deducted based upon the royalty owner's actual share of the tax assessment.

Defendants will offer evidence of the actual rates charged to gather and compress natural gas from the wellhead to the first liquid trading point.  To establish that the post-production costs allocated to the royalty owners were reasonable, Defendants will offer expert witnesses to address the issue of whether the cost accounting procedures and methods used to calculate royalties, establish rates and determine service costs, and allocate post-production costs are reasonable.  Defendants will also provide evidence of the rates/amounts charged by other businesses to provide gathering and compression services for other wells located in West Virginia.  Charges by third-party businesses providing these post-production services evidence that the amounts allocated to the royalty owners for these services are reasonable.

The evidence at trial will prove that Defendants' conduct and the method used to calculate royalties meet the requirements of West Virginia law.  While the Court may disagree with some of the categories of deductions, other jurists in West Virginia have recognized EQT's method of calculating royalties inclusive of all of the deductions the Court has disallowed.  No

other court has ever discussed or ruled upon these issues and neither *Tawney* nor *Wellman* are instructive or controlling.

## V.   LISTING OF CONTESTED ISSUES OF FACT AND CONTESTED ISSUES OF LAW:

**Plaintiffs' contested issues of facts:**

      A.    **Contested Issues Of Fact**

          1.    **Breach of Contract**

      (a)    Did defendants breach the leases of plaintiffs?

      (b)    What are plaintiffs' compensatory damages?

      (c)    Were the breaches of contract intentional?

      (d)    If intentional, are plaintiffs entitled to punitive damages for breaches of contract?

      (e)    Are defendants liable for punitive damages as a result of their tortious interference with plaintiffs' contracts and their intentional acts?

Plaintiffs will prove that defendants breached the leases/contracts with plaintiffs by demonstrating through documents and witnesses identified that defendants did the following:

      1.    Deducted moneys for gathering charges and processing fees from plaintiffs' royalty checks.

      2.    Sold to subsidiaries and paid on the subsidiary price, not the ultimate sale price, reducing plaintiffs' royalty payment by taking unreasonable deductions.

      3.    Since the West Virginia Supreme Court has decided that defendants cannot take deductions except under limited circumstances, disputes for those leases is that the plaintiffs are entitled to royalty without deductions, in the absence of the compliance with Tawney.  The only dispute is over what was actually deducted.  Tawney, et al. v. Columbia Natural Resources, L.L.C., et al., 219 W.Va. 266, 633 S.E.2d 22 (2006).

4.      Defendants took unreasonable deductions and deductions not actually incurred by an analysis of the defendants' categories of deductions.

5.      Defendants cannot prove their deductions were reasonable by evidence as in an accounting.   Therefore, plaintiffs are entitled to recover all deductions taken from their royalty.

6.      Defendants' price was not based upon the best price reasonable available.

## 2.      <u>Fraud</u>

(a)    Did defendants take advantage of their superior knowledge to take deductions of various types from plaintiffs' royalty and then conceal it from plaintiffs?

(b)    Were defendants' acts and conduct intentional?

(c)    Were defendants agents of plaintiffs in marketing and paying plaintiffs' part of the sales price?

(d)    Did defendants intentionally violate their obligations to plaintiffs?

(e)    Did defendants have a duty to disclose all the deductions?

(f)    Did defendants' concealment prevent plaintiffs from knowing that defendants were, in fact, deducting money from plaintiffs' royalty?

(g)    What are plaintiffs' damages for loss of income and interest?

(h)    What are plaintiffs' punitive damages against defendants?

(i)    All factual issues raised in plaintiffs' recitation of the "Elements of Causes of Action and Authorities," <u>supra</u>.

Plaintiffs will prove defendants committed fraud by identified witnesses and documents, as follows:

1.      See "Elements of Causes of Action and Authorities," above.

2.      Defendants concealed that they were not following West Virginia law and set about to pay royalty when they knew it violated *Tawney*.

3.      Plaintiffs had a right to rely on defendants for truthful, honest and complete information because defendants had all the information concerning royalty information.  Plaintiffs did not.

4.      Plaintiffs are entitled to the presumption of reliance, materiality, and that the transaction was fraudulent.

5.      The burden of proof then shifts to the defendants to prove that the transactions were not fraudulent.  Defendants' burden of proof is clear and convincing evidence.

**B.**      **Contested Issues Of Law**

1.      Did defendants' conduct amount to common law fraud?

2.      Did defendants' amount to breach of contract?

3.      Are plaintiffs entitled to summary judgment on liability for breach of contract?

4.      Plaintiffs are entitled to presumption of materiality and reliance based on defendants' conduct and concealment, and the burden of proof shifts to defendants.

5.      All issues raised by "Elements of Causes of Action and Authorities," above.

**C.**      **Proposed Stipulations – Facts, Documents And Tangible Evidence**

The parties have stipulated as to the authenticity of defendants' documents produced in response to Interrogatories and Request for Production of Documents or by Rule 30(b)(7) depositions, and to the admissibility of defendants' documents so produced, including the electronic data.

**D.**      **Pending Motions**

The following motions are pending:

**(1)**      **Plaintiffs' Motions**

Plaintiffs' Motion to Transfer Case (Doc. Id. 684)

Plaintiffs' Motion in Limine Re:  Prohibiting Argument and Evidence of Undisclosed Rates (Doc. Id. 650)

Plaintiffs' Supplemental Motion in LimineRe: No Leases-Wells-Owners and Late Produced Docs and Data (Doc. Id. 645)

Plaintiffs' Motion in Limine to Prohibit Defendants from Relying on Leggett 2 (Doc. Id. 643)

Plaintiffs' Motion to Exclude Expert Testimony (Doc. Id. 625)

Plaintiffs' Motion in Limine Re:  Prohibiting Deductions Where Defendants Have Not Provided Cross Reference Tables (Doc. Id. 609)

**(2)** **Defendants' Motions**

Defendants' Motion in Limine to Partially Exclude Selby and Exclude Reineke, Selby Brady (Doc. Id. 639)

Defendants' Motion to Formalize Agreements Re:  Scope of Issues for Trial (Doc. Id. 628)

**E.** **Motions Ruled Upon**

The following motions have been ruled upon:

**(1)** **Plaintiffs' Motions**

Plaintiffs' Amended Motion to Transfer (Doc. Id. 657)(Granted)

Plaintiffs' Motion to Transfer MO to Transfer (Doc. Id. 655)(Granted)

Plaintiffs' Cross Motion for Summary Judgement (PL Fraud/Punitive Damage Claim) (Doc. Id. 603)(Denied)

Plaintiffs' Cross Motion for Summary Judgement (underpayment of royalty based on price) (Doc. Id. 601)(Denied)

Plaintiffs' Cross Motion for Summary Judgment (Re: Leases that do not provide for deducts for volume loss) (Doc. Id. 600)(Denied)

Plaintiffs' Cross Motion for Summary Judgment (Re: Plaintiffs' Claim Costs not Actually Incurred) (Doc. Id. 599)(Denied)

Plaintiffs' Cross Motion for Summary Judgment (Re:  Severance Tax) (Doc. Id. 598)(Denied)

Plaintiffs' Motion for Summary Judgment Re:  Deductions and Royalty (Doc. Id. 590)(Denied)

Plaintiffs' Motion to Supplement Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Fraud and Punitive Damage Claim and in Supplement of Plaintiffs' Cross Motion for Summary Judgment (Doc. Id. 649)(Denied as moot)

Plaintiffs' Motion in Limine Requesting Court to Enter Order Holding Defendants Are Not Permitted To Deduct Expenses Not Reasonable or Actual (Doc. Id. 644)(Denied)

### (2)    Defendants' Motions

Defendants' Objection to Magistrate Judge Ruling/Order Dated 8/27/18 (Doc. Id. 593)(Overruled)

Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Addional Royalty for Unsold Gas (Doc. Id. 580)(Granted)

Defendants' Motion for Summary Judgment Re:   Severance Tax (Doc. Id. 588)(Denied)

Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claim for Underpayment Based on Price (Doc. Id. 586)(Denied)

Defendants' Motion for Summary Judgment on Plaintiffs' Fraud and Punitive Damage Claims (Doc. Id. 584)(Denied)

Defendants' Motion for Summary Judgment on Plaintiffs' Claim that Costs Associated with Deductions are Not Actually Incurred (Doc. Id. 582)(Denied)

Defendants' Motion to Transfer Venue (Doc. Id. 641)(Denied)

Defendants' Motion in Limine to Exclude Golden Rule Argument (Doc. Id. 630)(Granted in part/Denied in part)

Defendants' Motion in Limine to Exclude Evidence of Corporate Wealth (Doc. Id. 626)(Granted in part/Denied in part)

Defendants' Motion in Limine to Preclude Argument or Evidence of Alleged Damages Of Absent Class Members (Doc. Id. 636)(Granted in part/Denied in part)

Defendants' Motion in Limine to Exclude Testimony of Prejudgment Interest (Doc. Id. 637)(Granted)

Defendants' Motion in Limine to Exclude Testimony of Other Operator's Practices (Doc. Id. 634)(Denied)

Defendants' Motion in Limine to Exclude Testimony of Other Claims (Doc. Id. 632)(Denied)

F.   **Other Issues of Law to Be Ruled Upon Before Trial**

None other than the above.   Plaintiffs' motion to add an expert to rebut defendants' experts regarding Equitrans' costs.

G.   **Avoidance of Unnecessary Proof – Cumulative Evidence**

1.   Parties have stipulated authenticity of produced documents and admissibility subject to relevance.

H.   **Special Provisions**

1.   Jury Selection

Plaintiffs request and propose the following:

a.   To use a Jury Questionnaire submitted by the Court to the panel to save time in jury selection.

b.   Plaintiffs' counsel be permitted to *voir dire* the panel.

c.   After an opportunity to review the completed questionnaire that counsel will be allowed to conduct individual *voir dire*.

2.   Demonstrative Aides

a.   That the parties view demonstrative aides on November 26, 2018 at an agreed upon location for each party.

b.   Charts and summaries

Plaintiffs propose to offer summary documents, charts, data, animations and video demonstrating liability and damages in order to save time in Court:

3.   Requested Court Ruling and Initial Jury Instructions

a. That the Court rule that plaintiffs are entitled to summary judgment on the breach of contract claim and instruct the jury accordingly;

b. That the Court instruct the jury before opening statements that the oil and gas leases in question did not allow defendants to take deductions from the plaintiffs' percentage of royalty and other pertinent court rulings;

c. That the Court order defendants not to argue to the jury that they "believed" they had a right to take deductions and not tell plaintiffs;

d. That the Court advise the jury that it is exclusively the Court's responsibility to interpret the leases (contracts), and the jury should not speculate as to what the leases may or may not say, regardless;

e. That the Court instruct the jury before openings that the defendants had the duty as a reasonable and prudent operator to obtain the reasonably best price available for the gas and to look out for the mineral owners' best interest in common with its own; and

f. For other pertinent pretrial rulings.

## I.   <u>Damages</u>

Plaintiffs will offer evidence of the moneys wrongfully withheld from plaintiffs by:

a. Wrongful deductions;

b. Unreasonable deductions and deductions not actually incurred;

c. Underpaid royalty (price);

d. Interest on money unpaid; and

d. Punitive damages.

## J.   **Trial Days**

a. Jury trial:  Yes

b. Estimated trial time:  15 days

**Defendants' Contested Issues of Fact:**

EQT disputes that it wrongfully deducted sums from the royalty owners' payments that exceeded the actual expenses incurred from moving gas from the wellhead to the first liquid trading point, or that these expenses were not reasonable.  Additionally, EQT contests that the amount of severance tax deducted from the royalty owners' payments was more than the royalty owners' share of the tax and that it was part of the calculation of fair market price at the wellhead.  Defendants also contest that they engaged in any conduct that would support Plaintiffs' claim for punitive damages.

**VI.     STIPULATIONS:**

The parties have stipulated as to the authenticity of defendants' documents produced in response to Interrogatories and Request for Production of Documents or by Rule 30(b)(7) depositions, and to the admissibility of defendants' documents so produced, including the electronic data.

Stipulation of Facts to be filed by the parties.

All documents produced to date are stipulated to be authentic and admissible, subject to relevance.

**VII.    SUGGESTIONS CONCERNING ANY NEED FOR ADOPTING SPECIAL PROCEDURES FOR MANAGING POTENTIALLY DIFFICULT OR PROTRACTED ASPECTS OF THE TRIAL THAT MAY INVOLVE COMPLEX ISSUES, MULTIPLE PARTIES, DIFFICULT LEGAL QUESTIONS OR UNUSUAL PROOF PROBLEMS:**

None.

**VIII.   STATEMENT OF ALL DAMAGES CLAIMED:**

Defendants do not claim any damages in this case.

**IX.     NUMBER OF DAYS REQUIRED FOR TRIAL:**

Defendants expect that the trial of this action should take 10-15 days.

## X.   OTHER MATTERS:

None at this time.

The Court DIRECTS the Clerk to send copies of this Order to counsel of record.

It is so **ORDERED** this _____ day of _____, 2018.

_____

**HON. JOHN PRESTON BAILEY, JUDGE**

*Respectfully Submitted:*

| | |
|---|---|
| **EQT PRODUCTION COMPANY; EQT CORPORATION; EQT ENERGY, LLC; EQT INVESTMENTS HOLDINGS, LLC; EQT GATHERING, LLC; and EQT MIDSTREAM PARTNERS, LP,** | **THE KAY COMPANY, LLC; H. DOTSON CATHER, TRUSTEE OF DIANA GOFF CATHER TRUSTS, and JAMES E. HAMRIC III, and all other persons and entitles similarly situated,** |

**By Counsel.**

**By Counsel.**

*/s/ David K. Hendrickson     11/13/2018*
David K. Hendrickson (#1678)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
Post Office Box 11070
Charleston, West Virginia   25339
(304) 346-5500
(304) 346-5515 (facsimile)
daveh@handl.com

*and*

John Kevin West, Esquire (pro hac vice)
**STEPTOE & JOHNSON PLLC**
Huntington Center
Suite 2200
41 South High Street
Columbus, Ohio  43215
(614) 458-9889
(614) 221-0952 (facsimile)
kevin.west@steptoe-johnson.com

*/s/ Marvin W. Masters     11/13/2018*
Marvin W. Masters, Esquire (#2359)
**THE MASTERS LAW FIRM, LC**
181 Summers Street
Charleston, West Virginia   25301
(304) 342-3106
(304) 342-3189 (facsimile)
mwm@themasterslawfirm.com

*and*

Michael W. Carey, Esquire (#635)
**CAREY, SCOTT, DOUGLAS & KESSLER, PLLC**
Suite 901
707 Virginia Street East
Charleston, West Virginia 25301
(304) 345-1234
(304) 342-1105 (facsimile)
mwcarey@csdlawfirm.com